# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAGGIE SMITH**<br>1400 Michigan Ave NE<br>Washington, DC 20017<br><br>and<br><br>**GERARD "ROB" CASSAGNOL**<br> 5002 70th Ave.<br>Hyattsville, MD 20784<br><br>and<br><br>**FREDERICK "CORNELIUS" ROUSE**<br>1112 Thompson Ave<br>Severn, MD 21144<br><br>and<br><br>**DELONTAY DAVIS**<br>16404 Steerage Circle<br>Woodbridge VA 22192<br><br>On behalf of themselves and all others<br>similarly situated,<br><br>Plaintiffs,<br><br>  v.<br><br>**GOVERNMENT OF THE DISTRICT OF COLUMBIA,**<br><br>Defendant. | Civil Action No.: 15-737 (RCL) |

# CLASS ACTION

## SECOND AMENDED COMPLAINT AND JURY DEMAND

## (§ 1983 Civil Rights Claims)

## Introduction

1.      Maggie Smith, Gerard Cassagnol, Frederick Rouse, and Delontay Davis (sometimes the "Named Plaintiffs"), on behalf of themselves and the classes defined below, bring this action against the Government of the District of Columbia (the "District" or the "District of Columbia") under 42 U.S.C.A. § 1983 for injuries they suffered during the Class Period because the District, by enforcing its unconstitutional gun control regime, caused them and the other members of the Classes to be arrested, detained, and prosecuted in the District of Columbia Superior Court for violations of those unconstitutional gun laws in violation of their Second, Fourth and Fifth Amendment rights.

2.      Maggie Smith, Gerard Cassagnol, Frederick Rouse, and Delontay Davis and the other members of the classes defined below also bring this action against the District under 42 U.S.C.A. § 1983 for injuries they suffered during the Class Period because the District, by enforcing its unconstitutional gun control regime, seized their handguns and ammunition and either refused to give them back or destroyed them or detained for a period of time in violation of their 2d Amendment, 4th Amendment, and 5th Amendment rights.

3.      Delontay Davis and the other members of certain of the classes defined below also bring this action against the District under 42 U.S.C.A. § 1983 for injuries they suffered during the Class Period because the District, by enforcing its unconstitutional civil forfeiture statute, seized their vehicles and either refused to give them back or disposed of them or detained them for a period of time in violation of their 2d Amendment and 4th Amendment rights.

4.      The Class Period for all classes runs from three years before the date of filing of the original complaint [1] up to the date of termination of the case.

5.      In the alternative, the Class Period for the Non-Resident Right to Travel Class runs from three years before the date of filing of the original complaint (original complaint [1] filed 5/15/15) up until October 10, 2014.

### Jurisdiction and Venue

6.      This Court has jurisdiction over the Named Plaintiffs' § 1983 claims under 28 U.S.C.A. §1331 and 28 U.S.C.A. §1343(3)-(4).

7.      Venue is proper in this jurisdiction pursuant to 28 U.S.C.A. §1391(b) because the events or omissions underlying the claims occurred in this judicial district.

### Parties

8.      Named Plaintiffs and the members of the proposed classes are persons who were arrested, charged or arrested and charged, and detained, and prosecuted, or who lost their property or the use of their property under the District's unconstitutional gun control regime (including its laws, customs, practices and policies banning the carrying and transporting of handguns in public) as they relate to pistols (also known as hand guns) in violation of their Second, Fourth, and Fifth Amendment rights.

9.      The Nonresident Class includes only non-residents of the District of Columbia. The other classes include both residents and non-residents of the District of Columbia.

10.    Defendant District of Columbia is a municipal corporation capable of being sued under D.C. Code § 1-102.

### Factual Allegations

**The District's gun control regime and how it affected ordinary people like Named Plaintiffs and the other class members**

11.     For years the District has maintained the most restrictive gun laws in the nation in violation of the Second Amendment.

12.     The District banned all handgun possession in 1976. D.C. Code §§ 7-2502.01(a), 7-2502.02(a)(4) (2001).

13.     When that ban was struck down in Heller I, the Council followed it with legislation which allowed possession in the home but banned carrying in public. *Id.* § 22-4504 (2009). District of Columbia v. Heller, 554 U.S. 570, 630 (2008) (Heller I).

14.     In 2012 the D.C. Council amended D.C. Code § 22-4504(a) ("CPWL"), carrying a pistol without a license, which the District refused to issue to anyone but a tiny sliver of the population at that time, so that it became a flat prohibition on the carrying of pistols within the District of Columbia{"CP"}. D.C. Code § 22-4504(a) *amended by* Firearms Amendment Act of 2012, D.C. Law 19-170, § 3(d) (effective Sept. 26, 2012).

15.     And when *that* legislation was struck down in Palmer v. District of Columbia, 59 F. Supp. 3d 173 (D.D.C. 2014), the Council responded with the law challenged in Wrenn, a may-issue "good-reason" law which confined carrying a handgun in public to carrying concealed handguns by those with a special need for self-defense. D.C. Code § 22-4506; D.C. Code § 7-2509.11; D.C. Code § 7-2509.02(registration of pistols limited to (1) for use in self-defense within that person's home or place of business, and (2) As part of the application process for a license to carry a concealed pistol pursuant to § 7-2509.02).[1]

---

[1] *See* Bill 20-926, the License to Carry a Pistol Emergency Amendment Act of 2014 (Emergency Act). See 61 D.C. REG. 10765 (Oct. 17, 2014). The permanent legislation, the License to Carry a Pistol Amendment Act of 2014, Law No. 20-279 (Concealed Carry Law or CCL), became effective -- after passing the period of congressional review -- on June 16, 2015.

16.     Then, on July 25, 2017, the District of Columbia Circuit struck down the District's "good-reason" law because, the court held, under Heller I the "good-reason" law amounted to "a total ban" on most D.C. residents' right to carry firearms for personal self-defense beyond the home. Wrenn v. District of Columbia, 2017 U.S. App. LEXIS 13348, at *34-35 (D.C. Cir. July 25, 2017)(clerk's order filed withholding issuance of the mandate, 7/25/2017)(petition for rehearing *en banc* filed by District, 8/24/2017). The Wrenn Court also instructed the district court(s) to issue a permanent injunction against the District's enforcement of the "good-reason" law. [2] *Id.* at *36.

17.     During this time the District's gun control regime simultaneously precluded citizens from registering their pistols for use outside the home or place of business or obtaining a license for use outside the home or place of business while imposing a criminal penalty for possessing or carrying an unlicensed or unregistered firearm or unregistered ammunition in the District of Columbia outside the home or place of business.

18.     The registration scheme until October 2014 also specifically excluded individuals who did not reside in the District of Columbia because the gun control regime required gun registration applicants to submit proof of residency in the District of Columbia. 'Firearms Registration Emergency Amendment Act of 2008,' which states that pistols may only be registered by D.C. residents for protection within the home. D.C. Code § 7-2502.02(a)(4).

19.     Enforcement of the registration scheme fell particularly hard on non-residents because since most states allow their citizens to carry pistols outside the home many otherwise law abiding citizens unwittingly risked becoming felons when they lawfully carried their pistols and ammunition in the District as they would have at home and were arrested for felony "CPWL" (carrying a pistol

---

[2] The Wrenn decision involved consolidated appeals of two district court decisions, Wrenn v. District of Columbia, 167 F. Supp. 3d 86, 2016 U.S. Dist. LEXIS 28362 (D.D.C., Mar. 7, 2016) and Grace v. District of Columbia, 187 F. Supp. 3d 124, 2016 U.S. Dist. LEXIS 64681 (D.D.C., May 17, 2016).

without a license) or "CP" (after Sept. 26. 2012) or UF (unregistered firearm) or UA (unregistered ammunition).

20.      Moreover, many citizens visit the District every year because it is our nation's capital and they wish to see their government in action and visit their representatives and enjoy the national monuments. Many states which allow their citizens to carry pistols actually have places at their legislative assemblies and high courts where citizens can check their guns. In fact, some nonresidents have been arrested at the Capitol when they produced their pistols and asked where they should check their pistols.

21.      Moreover, the District placed no warnings or notifications of its draconian gun laws to persons entering the District.

### Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis' cases typify the type of law abiding citizen who ran afoul of the District's unconstitutional gun laws

22.      Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis typify the type of law abiding citizen who ran afoul of the District's unconstitutional gun laws.

23.      Ms. Smith is a registered nurse. At the time of her arrest she was licensed to carry a pistol in her then home state of North Carolina. She had no prior arrests.

24.      She brought along her pistol with her when she traveled to the District for self-defense.

25.      On June 29, 2014 she was stopped by the MPD while driving in the District and as she had been taught in her gun ownership class at home she immediately informed the officer that she was carrying a pistol licensed in her home state.

26.      The arresting officer charged her with CP under D.C. Code § 22-4504(a)(at that time, a flat prohibition on the carrying of pistols within the District of Columbia), a felony. D.C. Code § 22-

4504(a) *amended by* Firearms Amendment Act of 2012, D.C. Law 19-170, § 3(d) (effective Sept. 26. 2012).

27.    Ms. Smith was subjected to prosecution for various felony[3] and misdemeanor gun related offenses, first by the United States Attorney's Office for the District of Columbia ("USAO" or "US Attorney's Office" or "US Attorney"), and then, after the US Attorney dismissed all charges, by the Attorney General's Office for the District of Columbia ("OAG"), for almost a year (even after the Palmer decision, discussed below) before the District finally dismissed her charges..

28.    The government of the District of Columbia has virtually never offered any type of diversion program to otherwise law-abiding residents or nonresidents who happen to get arrested for possessing an unregistered firearm or ammunition in the District. The District virtually always referred gun cases to the appropriate prosecuting agency for prosecution.

29.    As a result of the District's strict enforcement of the felony statute many otherwise law abiding citizens became, or like Ms. Smith and the other named plaintiffs, almost became felons and so lost or almost lost valuable civic privileges such as the right to vote, the right to serve on juries, and their civil licenses to practice their professions, or saw those rights placed in jeopardy.

30.    For example, had Ms. Smith been convicted of a felony in the District her nursing license would have been automatically revoked. Thus, she would have been deprived not only of her right to vote but of her right to practice her profession.

31.    The District also enforced its unconstitutional gun control regime in misdemeanor cases by arresting people for UF and UA and by (1) consenting to prosecutions by the US Attorney

---

[3] There are two prosecuting agencies who prosecute gun cases in the District. Generally the United States Attorney's Office prosecutes violations of D.C. Code § 22-4504(a). The District of Columbia OAG prosecutes violations of D. C. Code § 7-2507.01 *et seq.* But, the US Attorney's Office prosecutes only those gun cases in Superior Court referred to it for prosecution by the District, and the US Attorney only prosecutes misdemeanor gun cases with the consent of the District. D.C. Code § 23-101(d) and (e).

pursuant to D.C. Code § 23-101(d) and (e), or (2) prosecuting misdemeanor UF and UA cases directly through the OAG.

32.     Had Ms. Smith been convicted of a misdemeanor offense under D. C. Code § 7-2507.01 she would have had to go before the licensing board and defend her license. She still had to explain her arrest and prosecution when her license came up for renewal even though her case was dismissed because she was arrested and prosecuted under unconstitutional laws.

33.     Similarly, Mr. Rouse is a Senior Systems Engineer at the Defense Information Systems Agency. At the time of his arrest, he held a Top Secret Security Clearance. As a result of his arrest in the District his security clearance is currently "under review."

34.     Mr. Cassagnol was fired from his job with Comcast in Maryland as a result of his arrest here.

35.     Mr. Davis was a student and because the District seized his car for civil forfeiture under an unconstitutional statutory scheme he had to drop out of school because he had no car to drive to and from school and to and from work and he cannot return to school until he pays off the tuition for the period of time when he had no car to drive to and from school and to and from work.

36.     Many residents of the District were also arrested and prosecuted under the District's unconstitutional gun control regime and the District seized and kept their guns, ammunition, and vehicles.

### The mechanics of the District's pre-Heller, pre-Palmer gun control regime

37.     The District's has implemented its gun control regime through both a registration and a licensing system.

38.     Licensing provisions regulate the owner of the firearm whereas registration provisions apply to registering the weapon itself. Heller v. District of Columbia, 670 F.3d 1244, 1248-49 (2011)("Heller II").

39.     The District required registration of hand guns and licenses to carry them and then refused to issue registration certificates to all but a sliver of District of Columbia residents, and denied licenses to all but a sliver of District residents.

40.     In a classic Catch 22 scheme the D.C. Council then criminalized possession of unregistered firearms and criminalized the carrying of a pistol without a license.

41.     Specifically, the D.C. Code made it a misdemeanor to "receive, possess, control, transfer, offer for sale, sell, give, or deliver" an unregistered handgun. **D.C. Code § 7-2502.01 ("UF").**

42.     Another provision made it a misdemeanor to own, possess, or control **unregistered** ammunition in the District outside the home. **D.C. Code § 7-2506.01 ("UA").**

43.     One provision declared unlawfully owned, possessed, or carried pistols (including unlicensed or unregistered pistols carried outside the home) contraband subject to seizure and destruction. D.C. Code § 22-4517.

44.     Finally, another provision made vehicles used to transport a hand gun subject to civil forfeiture. *See* D.C. Code § 7-2507.06a ("Any conveyance in which a person or persons transport, possess, or conceal any firearm, as that term is defined in § 7-2501.01, or in any manner use to facilitate a violation of § 7-2502.02 or § 22-4503 or § 22-4504, is subject to forfeiture pursuant to the standards and procedures set forth in D.C. Law 20-278.").

45.     So during this period driving around town with a hand gun, or to work or church or a friend's house, put both the vehicle and the gun in jeopardy of seizure.

## <u>Heller I</u> and the District's response

46.     In 2008 the United States Supreme Court issued its opinion in <u>Heller I</u> which declared the District's gun control regime unconstitutional with respect to the registration of guns by law abiding citizens for use in the home for personal protection.

47.    Although the holding in <u>Heller I</u> was confined to registration of guns for use in the home for personal protection, the rationale of <u>Heller I</u> clearly put the District on notice that its gun control regime prohibiting carrying hand guns outside the home was also unconstitutional.

48.    Nevertheless, the District continued to arrest and prosecute citizens for carrying unregistered and unlicensed pistols and unregistered ammunition outside the home for lawful purposes, and to seize and detain their guns, ammunition, and vehicles.

49.    In 2008, as part of its response to the Supreme Court's decision in <u>Heller I</u>, the D.C. Council enacted legislation which allowed possession in the home but banned carrying in public. *Id.* § 22-4504 (2009). On December 16, 2008, the District of Columbia 10. Inoperable Pistol Amendment repealed the Police Chief's authority to issue Act of 2008, B17-593 handgun carry licenses. Inoperable Pistol Amendment Act of 2008, D.C. Law 17-388 (codified at D.C. Code § 22-4504.01 (1) (Supp. 2010)). So, the felony offence of carrying a pistol without a license remained on the books even though there was no longer was any regulatory scheme in the District for people to obtain licenses to carry pistols.

50.    Moreover, D.C. Code § 7-2502.02(a)(4)(C) limited registration of pistols to pistols for use in self-defense in the home. <u>See</u> "Firearms Control Emergency Amendment Act of 2008."

51.    D.C. Code § 7-2502.01 ("UF"), D.C. Code § 7-2506.01 ("UA"), D.C. Code § 22-4517, and D.C. Code § 7-2507.06a all remained on the books even though the 2d Amendment guarantees the right to carry pistols outside the home.

52.    Then, in September 2012, the City Council again amended D.C. Code § 22-4504(a). The Council removed the "without a license" language from D.C. Code § 22-4504(a), so that the statute was simply a flat prohibition on the carrying of pistols within the District of Columbia, thereby converting the "CPWL" statute into the "CP" statute. Firearms Amendment Act of 2012, D.C. Law 19-170 (effective September 26, 2012).

53.     Moreover, the District continued to seize and destroy handguns and ammunition belonging to people arrested for violations of its unconstitutional gun control regime and to retain or to destroy the property as contraband.

54.     The District also continued to seize and to detain and to forfeit cars on the basis of its unconstitutional gun control regime pursuant to its civil forfeiture scheme. D.C. Code § 7-2507.06a; D.C. Code § 48-905.02(d)(3)(A). *See e.g.*, Simms v. District of Columbia, 872 F. Supp. 2d 90, 92 (D.D.C. 2012)(District seized for civil forfeiture car of person arrested, prosecuted, and acquitted of CPWL).

### Palmer v. District of Columbia and the District's response

55.     On July 24, 2014, the Honorable Frederick James Scullin, Jr., senior United States District Court Judge for the United States District Court for the Northern District of New York, sitting by designation in this Court, issued a decision in Palmer v. District of Columbia, No. 1:09-CV-1482 (D.D.C. 2014) [Document # 51] expressly declaring both D.C. Code § 22-4504(a) ("CPWL" or "CP") and D.C. Code § 7-2502.02(a)(4)(limiting registration of pistols to use in the home) facially unconstitutional because statues constituted a total ban on the public carrying of ready-to-use handguns outside the home and they were thus unconstitutional under any level of scrutiny.

56.     The Palmer decision also implicitly invalidated the related laws of UF, UA, and the "nuisance" and civil forfeiture statutes.

57.     Ultimately, after filing an appeal, the District dismissed its appeal of the Palmer decision. Palmer v. District of Columbia, No. 14-7180, 2015 U.S. App. LEXIS 6414 (D.C. Cir. Apr. 2, 2015) (mem., appeal dismissed)

58.     The US Attorney's Office, apparently recognizing that the Palmer decision had invalidated the District's gun control regime with respect to carrying hand guns outside the home or place of

business, dismissed hundreds of cases against people charged with felony carrying a pistol (CPWL/CP) then pending in DC Superior Court and stopped prosecuting persons under the District's gun control regime.

59.     In contrast, the OAG chose to double down and re-filed misdemeanor UF and UA charges against virtually every person whose felony CPWL charges had been dismissed by the US Attorney's Office.

60.     The OAG has jurisdiction over two misdemeanor gun charges — possessing unregistered firearms, D.C. Code § 7-2502.01 ("UF"), and possessing unregistered ammunition, D.C. Code § 7-2506.01 ("UA"). D.C. Code § 23-101(a).

61.     So, while many people were fortunate to have their felony charges dropped, like Ms. Smith and Gerard Cassagnol, they still faced prosecution for two serious misdemeanors.

62.     The arrests and prosecutions injured Named Plaintiffs and the other members of the classes because they had to defend themselves, they suffered limits on their freedom pending disposition of their cases, and they suffered other injuries, and loss of their property.

63.     Moreover, the District continued to seize and retain or destroy handguns and ammunition and to seize and detain vehicles.

## The District's "good-reason" law

64.     Finally, in response to Palmer, the D.C. Council enacted the District's "good-reason" law. See Bill 20-926, the License to Carry a Pistol Emergency Amendment Act of 2014 (Emergency Act). See 61 D.C. REG. 10765 (Oct. 17, 2014). The permanent legislation, the License to Carry a Pistol Amendment Act of 2014, Law No. 20-279 (Concealed Carry Law or CCL), became effective -- after passing the period of congressional review -- on June 16, 2015.

65.     The D.C. Code provisions in the "good-reason" law directed the District's police chief to promulgate regulations limiting licenses for the concealed carry of handguns (the only sort of carrying the Code allows) to those showing a "good reason to fear injury to [their] person or property" or "any other proper reason for carrying a pistol." *Id.* § 22-4506(a)-(b). The Code also limited what the police chief might count as satisfying these two criteria, in the course of promulgating regulations and issuing licenses. Wrenn, 2017 U.S. App. LEXIS 13348, at *7-8.

66.     The District's regulations did not allow "open carry" for private citizens under any circumstances. D.C. Code § 7-2509.07(e).

67.     The Council also amended D.C. Code § 7-2502.02(a)(4)(C).

68.     The post-Palmer "fix" in the District's "good-reason" law for D.C. Code § 7-2502.02(a)(4)(C) amended D.C. Code § 7-2502.02(a)(4)(C) so that it did authorize registration of pistols intended for use outside of the home but only for (1) concealed carry (§ 7-2509.07(e) prohibits open carry), and (2) only to the extent allowed by the § 7-2509.02 application process, people showing a "good reason to fear injury to [their] person or property" or "any other proper reason for carrying a pistol." *Id.* § 22-4506(a)-(b).

69.     On July 25, 2017 the District of Columbia Circuit Court of Appeals decided Wrenn v. District of Columbia which struck down the District's "good-reason" law -- an ensemble of Code provisions enacted by the D.C. Council in response to Palmer which confined carrying a handgun in public to those with a special need for self-defense -- because, the court held, under Heller I the "good-reason" law amounted to "a total ban" on most D.C. residents' right to carry firearms for personal self-defense beyond the home. Wrenn, 2017 U.S. App. LEXIS 13348, at *34-35.

70.     The <u>Wrenn</u> Court also instructed the district court(s) to issue a permanent injunction against the District's enforcement of the "good-reason" law. [4] *Id.* at *36.

71.     The District enforced the unconstitutional **the District's "good-reason" law** and continues to do so.

72.     Currently in the District of Columbia Superior Court the US Attorney has put prosecutions of the District's gun control regime on hold by asking for continuances in all of its prosecutions.

73.     However, people remain subject to prosecutions and onerous conditions of release while the US Attorney sorts the impact of <u>Wrenn</u> on the District's unconstitutional gun control regime.

74.     For example, on about 8/17/2017 the MPD arrested Maukila Hill on a charge of CPWL. She was presented in Superior Court on 8/18/2017 in case number 2017 CF2 014188 United States v. Hill, Maukila.

75.     The government asked for, and obtained over the objection of defense counsel who argued that under <u>Wrenn</u> the CPWL was unconstitutional, a five day "a1A" hold. That is, the Superior Court judicial officer ordered Ms. Hill detained without bond or other conditions of release until 8/25/2017 for a preliminary hearing on preventive detention. D.C. Code § 23-1322(a)(1)(A).

76.     On 8/25/2017 the Superior Court judicial officer granted the US Attorney's motion for a 30-day continuance of the preliminary hearing, as the docket reads, "due to the US Court of Appeals recent decision on DC's Gun Laws." Ms. Hill was ordered released but she remains subject to the conditions of the High Intensity Supervision Program.

---

[4] The <u>Wrenn</u> decision involved consolidated appeals of two district court decisions, <u>Wrenn v. District of Columbia</u>, 167 F. Supp. 3d 86, 2016 U.S. Dist. LEXIS 28362 (D.D.C., Mar. 7, 2016) and <u>Grace v. District of Columbia</u>, 187 F. Supp. 3d 124, 2016 U.S. Dist. LEXIS 64681 (D.D.C., May 17, 2016).

77.    Moreover, the District has continued since the enactment of the District's "good-reason" law and it continues to seize and retain pistols, ammunition, and vehicles in connection with alleged violations of the District's unconstitutional gun control regime.

78.    For example in one CPWL case in April 25, 2017 the MPD arrested the person for CPWL and they seized the defendant's rental car and held it for several days or weeks during which time the person had to pay the rental fees.

79.    Recently the Superior Court judicial officers have begun denying the US Attorney's open ended requests for continuances in CPWL cases.

80.    However, certain defendants charged with CPWL continue to plead guilty to misdemeanor UF or UA or CDW charges presumably because the District of Columbia Court of Appeals has not yet recognized a right under the 2d Amendment to carry a hand gun outside the home or place of business.

## Handguns, Ammunition, and Vehicles seized in connection with violations of the District's unconstitutional gun control regime

81.    Property - including guns, ammunition, and vehicles - comes into the custody of the District in connection with alleged violations of the District's gun control regime.

### MPD classifies certain vehicles as "evidence" and detains them until the case is over

82.    The MPD had and continues to have a custom and practice in which the MPD classifies certain vehicles seized in connection with alleged violations of the District's criminal code as "E" for "evidence" on the PD 81s according to criteria in the MPD general orders.[5]

---

[5] *See* Recording, Handling and Disposition of Property Coming into the Custody of the Department, GO-601.01, p.3 (property classifications); p. 26 ("When Items of property are classified as Evidence or Suspected Proceeds of Crime:

83.   The MPD applied this practice to vehicles seized in connection with alleged violations of the District's unconstitutional gun control regime.

84.   These designations were and are made by the MPD and not at the direction of the AUSA.

85.   When the MPD classifies a vehicle used to transport a firearm or otherwise used in connection with a violation of the District's gun control regime it does not mean that the vehicle is potential evidence in a criminal prosecution.

86.   Neither of the District prosecutors (the OAG or the US Attorney) makes the classification as "evidence" or directs the MPD to make the classification.

87.   So, the mere fact that a vehicle was classified as "E" for "evidence" by the MPD does not mean the vehicle was held as evidence at the direction of the US Attorney or the OAG.

88.   In the case of vehicles the classification as "evidence" is in fact an investigative classification so the MPD can search the vehicle and process it for evidence by using such techniques such as photographing, fingerprinting, or processing the vehicle for fingerprints, DNA, or other such trace evidence.

89.   When the District seizes vehicles and classifies them as "evidence" the vehicles themselves are never offered as evidence in criminal proceedings.

90.   Affidavits from attorneys who have practiced criminal defense law in the Superior Court on practically a daily basis for over twenty years each, one of whom was an Assistant Attorney General for the District of Columbia in the criminal division for three years and who served as Chief of the Criminal Section in the OAG's criminal division for 11 months from 2008-2009, show that none of them ever saw actual vehicles offered as evidence in a proceeding in District of Columbia Superior Court.

---

Members shall mark Part I.E of the PD Form 81 with the code "E/C.").
https://go.mpdconline.com/GO/GO_601_01.pdf.

91.     In fact, according to recent deposition testimony by the person who managed the District's Blue Plains vehicle impound lot from 2000 to 2016, in the last ten to fifteen years a vehicle was taken to Superior Court for possible use in a Superior Court criminal proceeding only once.

92.     The whole notion of an "evidentiary" hold imposed by a prosecutor blocking release of the vehicle until the end of the criminal case is a pretext.

93.     Except in the most extraordinary cases it takes only a day or two to process a vehicle for evidence using the techniques described above.

94.     In 2014 then-Attorney General for the District of Columbia, Irving Nathan, testified during the hearings on the revisions to the District's forfeiture statute that the government needs at most only about two weeks to analyze and process property as evidence, and to analyze it and extract the evidentiary value from it by photographing it or performing tests on it[6].

95.     In other words, the vehicles in this case were not seized for use as evidence by a prosecutor.

96.     They were seized by the MPD so the MPD can search them and process them for evidence.

97.     After processing the vehicles were no different from any other personal property seized from a person suspected of criminal activity such as keys, wallet, and belt.

**98.**     Although the District cannot release vehicles in the custody of the Property Clerk without obtaining a "release" (an MPD generated form called a PD 81-c) from the appropriate prosecutor, the District is the custodian of the vehicles and the District controls the timing of when to submit the release to the appropriate prosecutor.

---

[6] Video of Mr. Nathan's testimony is available online at
http://dc.granicus.com/MediaPlayer.php?view_id=28&clip_id=1872 (last checked 7/7/2016).

99.     The U.S. Attorney's Office confirms that the procedure for release of seized property is as follows: the MPD officer "makes the decision to release the seized property," and then presents a Form 81C to a supervisor at the USAO to sign "indicating that the USAO-DC has no objection to that release and that said property is not needed to be retained as evidence." <u>Avila v. Dailey</u>, 2017 U.S. Dist. LEXIS 47596, *8 (D.D.C. Mar. 30, 2017). The USAO's determination is "handled on a case by case basis." (Giovannelli Decl. ¶¶ 3-7).

100.    So, the mere fact that (1) an MPD seizing officer classifies a vehicle on the PD 81 as "evidence" (an MPD term in the General Orders, not a designation applied by the prosecutor) and (2) the MPD ultimately seeks a "release" for the vehicle from the appropriate prosecutor, does not mean the vehicle is "potential evidence in criminal prosecutions" as determined by the US Attorney.

101.    Even if seizing and retaining vehicles to search them and to process them for evidence after they were classified as "evidence" by the MPD were constitutional, the seizures became unreasonable under the 4th Amendment after the vehicles were searched and were processed for any evidentiary value they might have because there was no probable cause to continue to hold them after all items of evidentiary value had been removed or processed.

102.    Nonetheless, the District's official policy is to hold vehicles which come into the custody of the District in connection with alleged violations of the District's gun control regime until the related criminal case (including appeals) is over, or "[i]f no criminal judicial proceeding has been initiated, the material shall be preserved for a period of three years from the date such material was first obtained." **DCMR § 804.3; MPD General Order 601.2** "Preservation of Potentially Discoverable Material" (Feb. 3, 2004).

### Taking and detaining a vehicle for a forfeiture determination

103.    Taking and detaining a vehicle for a forfeiture determination means the vehicle is seized so that the Property Clerk (using authority delegated by the Mayor) can make a determination about whether to institute civil forfeiture proceedings against the vehicle even if the Property Clerk ultimately decides that the vehicle is not subject to civil forfeiture[7].

104.    The MPD classified each such vehicle on the PD 81 as "H," "hold for civil forfeiture," according to criteria in the MPD general orders

105.    The District's civil forfeiture statute makes vehicles used to transport firearms subject to forfeiture. D.C. Code § 7-2507.06a(b) (making vehicle used to carry any firearm subject to forfeiture); D.C. Code § 48-905.02(d)(3)(C), amended 2015.

106.    Property seized for forfeiture determinations remains in the custody of the Mayor until it is deemed not subject to forfeiture and returned to the owner or it is forfeited or auctioned off or sent to the federal government for adoption.

### The importance of vehicles in daily life

107.    The importance of a vehicle to an individual's ability to work and to conduct the affairs of life, and the serious harm thus resulting from the undue retention of a vehicle by the government, cannot be overstated. Our society is, for good or ill, highly dependent on the automobile. It is often an individual's most valuable possession, as well as their primary mode of transportation, and for many, the means to earn a livelihood. The seizure of a person's automobile is threat to the person's livelihood when they can no longer drive to and from work every day.

---

[7] The term "forfeiture determinations" is used instead "for forfeiture" because sometimes the MPD determine that property seized for forfeiture is in fact not subject to forfeiture. Property that is not subject to forfeiture must be returned to the owner, according to D.C. Code § 48-905.02(d)(3)(C).

108.    An additional problem caused by the seizure and retention of vehicles is that cars and trucks are depreciating assets that diminish in value each day they sit idle on the MPD impound lot.

109.    The MPD aggravate the loss in value caused by depreciation by leaving vehicles to waste away on an unprotected lot in the sun, rain, sleet, and snow.

110.    Leaving a car or truck out on an unprotected lot exposed to the elements also destroys much of the vehicle's potential evidentiary value.

## MPD classify and retain guns and ammunition

111.    The MPD classify guns and ammunition as "evidence" according to criteria in MPD general orders and regulations.

112.    The District does not have any statutes that make guns or ammunitions subject to civil forfeiture.

113.    Even if the District needs classify guns and ammunition for use in prosecutions it no longer needs them when the cases are over.

## An unregistered firearm is contraband and an individual has no right to its return under DC law

114.    Under D.C. Code § 22-4517(b), an unregistered firearm is contraband and an individual has no right to its return. Leyland v. Edwards, 797 F. Supp. 2d 7, 11 (D.D.C. 2011).

## Named Plaintiffs' Arrests and Prosecutions

## Maggie Smith

## Ms. Smith's arrest by the MPD

115.     On June 29, 2014, Ms. Maggie Smith, a 34 year-old registered nurse with no criminal record and then a resident of North Carolina, was pulled over by MPD while she was driving her car in the District of Columbia.

116.     Ms. Smith promptly informed the police that she was carrying a pistol for self-defense and that she had a lawful permit from her home state of North Carolina to carry a pistol.

117.     MPD arrested Ms. Smith for Carrying a Pistol, in violation of then-D.C. Code § 22-4504(a).

118.     Ms. Smith was held in Central Cellblock overnight and presented in Superior Court the next day.

### Ms. Smith's prosecution and the dismissal of her case

119.     Ms. Smith was found CJA eligible.

120.     The District through MPD referred the case to the US Attorney's Office for prosecution.

121.     At presentment on June 30, 2014, the US Attorney's Office, by complaint, charged Ms. Smith with Carrying a Pistol, in violation of then-D.C. Code § 22-4504(a).

122.     On July 17, 2014, the USAO obtained an indictment of Ms. Smith for Carrying a Pistol, Possession of An Unregistered Firearm ("UF"), in violation of D.C. Code § 7-2502.01, and Unlawful Possession of Ammunition ("UA"), in violation of D.C. Code § 7-2506.01, and Ms. Smith was arraigned on those charges in Superior Court.

123.     In light of the Palmer decision, issued on July 24, 2014, the US Attorney's Office dismissed the indictment on September 29, 2014.

124.     But, despite the Palmer decision and the injunction Judge Scullin issued in support of his decision, by September 12, 2014, the OAG had already filed a criminal information charging Ms.

Smith with violations of D.C. Code § 7-2502.01 (possession of an unregistered firearm) and D.C. Code § 7-2506.01 (unlawful possession of unregistered ammunition).

125.    On October 8, 2014, Ms. Smith was arraigned in Superior Court on those UF/UA charges.

126.    On February 2, 2015, Ms. Smith, through counsel, filed a motion to dismiss the information and a motions hearing was set for March 20, 2015 and rescheduled for May 29, 2015.

127.    On April 20, 2015, the OAG filed a Notice of Intent to Dismiss and on April 21, 2015, the OAG dismissed the Criminal Information against Ms. Smith.

### MPD's seizure and retention of Ms. Smith's pistol after her cases were dismissed

128.    The MPD officers seized Ms. Smith's Bersa 380 worth approximately $400.00 when they arrested her on June 29, 2014.

129.    The pistol has remained in the custody of the Property Clerk since the date of her arrest.

130.    The handgun and ammunition were not subject to forfeiture under the District's civil forfeiture scheme because the District's civil forfeiture statute does not apply to guns or ammunition. Under D.C. Code § 22–4517(b), an unregistered firearm is contraband and an individual has no right to its return.

131.    Despite the fact that all charges against Ms. Smith were dismissed on April 21, 2015, the District government has not returned Ms. Smith's property or given her notice and a hearing at which she could challenge the District's retention of her pistol or the District could justify its continued retention of the pistol.

### Gerard "Rob" Cassagnol

132.    Gerard Cassagnol is a resident of the State of Maryland.

133.    He had no criminal convictions prior to his arrest and his only minimal contact with the police involved traffic offenses.

134.    He has two children, including a son with Downs syndrome that he cares for.

135.    At the time of his arrest here in the District on October 9, 2013 Mr. Cassagnol was a full-time employee of Cox Communications. He worked shifts varying in length from 8 to 15 hours per day.

136.    At the time of his arrest in the District Mr. Cassagnol owned a 9 millimeter pistol which he had licensed and registered in Maryland.

### Mr. Cassagnol's arrest by the MPD

137.    On October 9, 2013, Mr. Cassagnol drove from his home in Maryland into Southeast, Washington, D.C. District in his employer's Cox Communications truck to Southeast, Washington, D.C. on his way home from work.

138.    While there several MPD cars with sirens blaring converged on Mr. Cassagnol acting in response to a report to a 911operator by an anonymous caller who reported that Mr. Cassagnol had a gun.

139.     Several MPD officers exited the police cars with weapons drawn and pointed at Mr. Cassagnol and the officers ordered Mr. Cassagnol out of his truck.

140.    After Mr. Cassagnol got out of his truck an officer physically threw Mr. Cassagnol to the ground face down and handcuffed him.  When Mr. Cassagnol asked the officers what was going on and why he was being detained, an officer yelled at him to "Shut up!"

141.    The officers began to search the truck.  The officers asked Mr. Cassagnol whether he had a gun in the truck and Mr. Cassagnol told the officers he had his gun in the truck just as he had been

taught. He explained that he had lawfully purchased and registered the pistol in the State of Maryland, his state of residence.

142.    Mr. Cassagnol cooperated fully with the officers answering their questions.  He told the officers he had a 9 millimeter pistol in a combination-lock gun safe in the bottom of a grey bin in the backseat of the truck.  He further told the officers that the clip was not inside the pistol.

143.    Mr. Cassagnol gave the officers the combination to the gun safe when they requested it.

144.    The officers recovered the pistol and stood Mr. Cassagnol up from where they had thrown him to the ground.

145.    Another officer took a photograph of Mr. Cassagnol's work identification card and told Mr. Cassagnol that he intended to report the incident to Mr. Cassagnol's employer to ensure that Mr. Cassagnol got fired.

146.    The police arrested Mr. Cassagnol on one count of Carrying a Pistol in violation of then-D.C. Code § 22-4504 (a) (1).

147.    The officers took him to the Sixth District station where he was booked and fingerprinted and placed in a cell with others. He spent the night in jail and was presented in Superior Court the next morning.

## Prosecution by the US Attorney

148.    The District through MPD referred the case to the US Attorney's Office for prosecution.

149.    On October 10, 2013, Mr. Cassagnol was presented in the District of Columbia Superior Court on a charge of Carrying a Pistol in violation of then-D.C. Code § 22-4504 (a) (1) brought by the US Attorney's office.

150.    Mr. Cassagnol was held without bond upon the AUSA's motion until October 11, 2013 in the case. 2013 CF2 017982, docket 10/10/2013.

151.    On October 11, 2013, Mr. Cassagnol was released under the supervision of the Pretrial Supervision Agency.

152.    On October 22, 2013, Mr. Cassagnol was fired from his job at Cox Communications because of his arrest in the District of Columbia for the constitutionally protected conduct of carrying a pistol outside the home.

153.    On October 23, 2013, the US Attorney's Office obtained an indictment of Mr. Cassagnol on three counts: (1) Carrying a Pistol in violation of then-D.C. Code § 22-4504 (a) (1); (2) Possession of An Unregistered Firearm in violation of D.C. Code § 7-2502.01; and (3) Unlawful Possession of Ammunition in violation of D.C. Code § 7-2506.01.

154.    On November 7, 2013, Mr. Cassagnol was arraigned on those charges.

155.    Several status hearings occurred between November 8, 2013 and March 4, 2014.  On March 4, 2014, a trial date was set before the Honorable John McCabe.

156.    On July 29, 2014, apparently in light of the Palmer decision, the US Attorney's Office dismissed the indictment against Mr. Cassagnol without prejudice.

## Prosecution by the OAG

157.    That same day, the Office of the Attorney General for the District of Columbia filed a criminal information charging Mr. Cassagnol with Possession of An Unregistered Firearm in violation; of D.C. Code § 7-2502.01 and Unlawful Possession of Ammunition in violation of D.C. Code § 7-2506.01 and the Superior Court Clerk opened a new case with a new docket number, 2014 CTF 13231.

158.    Mr. Cassagnol was arraigned on those charges before Magistrate Judge Elizabeth Wingo.

159.    On August 22, 2014, Mr. Cassagnol's defense attorneys filed a Motion to Dismiss based on the Palmer decision.  The government opposed the motion.

160.    On October 14, 2014, Magistrate Judge Elizabeth Wingo denied the motion and a trial date was set.

161.    On April 20, 2015, approximately nine months after the <u>Palmer</u> decision, the Office of the OAG *nolle'd* the case against Mr. Cassagnol without prejudice.

### Seizure and unlawful retention of Mr. Cassagnol's property by the MPD

162.    When the MPD arrested Mr. Cassagnol on October 9, 2013 they also seized from him a 9 mm pistol, make KIMBER, model DP51, worth approximately $500.00, and some ammunition.

163.    The MPD turned the items over to the Property Clerk and the Property Clerk booked the items into evidence.

164.    The Property Clerk still has custody of the gun.

165.    On July 22, 2015, Mr. Cassagnol called the Evidence Control Branch of the Metropolitan Police Department and he spoke to Technician Ferguson of the Evidence Control Branch, and requested the return of his property.

166.    Technician Ferguson informed Mr. Cassagnol that he would have to contact his lawyer if he wanted his property back.

167.    Technician Ferguson further stated that Mr. Cassagnol's lawyer would have to contact the prosecutor and request that the prosecutor to fill out a PD 81C form to get his property returned.

168.    Notwithstanding Mr. Cassagnol's July 22, 2015 request and the fact that the US Attorney's Office dismissed the case they had brought against Mr. Cassagnol and the Office of the Attorney General has dismissed the subsequent case against Mr. Cassagnol, the Property Clerk continues to hold his property.

169.    The handgun and ammunition were not subject to forfeiture under the District's civil forfeiture scheme because the District's civil forfeiture statute does not apply to guns or

ammunition. Under D.C. Code § 22–4517(b), an unregistered firearm is contraband and an individual has no right to its return.

170.     Despite the fact that all charges against Mr. Cassagnol were dismissed on or about April 20, 2015, the District has not returned Mr. Cassagnol's pistol or given him notice and a hearing at which he could challenge the District's retention of his pistol or the District could justify its continued retention of his pistol.

## Frederick "Cornelius" Rouse

171.     Frederick "Cornelius" Rouse is a 32 year old man who is a resident of the State of Maryland.

172.     He served his country in the United States Army for more than four years.  He received an Honorable Discharge in 2007 with the rank of E-4 Corporal.

173.     He is currently a Senior Systems Engineer at the Defense Information Systems Agency.  At the time of his arrest, he held a Top Secret Security Clearance. As a result of his arrest in the District his security clearance is currently "under review."

**174.**     Prior to his arrest in the District on August 30, 2014 he had no adult criminal convictions.

## Mr. Rouse's arrest by the MPD

175.     On August 30, 2014, Mr. Rouse was staying in the District of Columbia at the Renaissance Washington, DC Downtown Hotel ("Renaissance Hotel") at 999 9th Street, Northwest, for a social event.

176.     Reportedly a maid for the Renaissance Hotel noticed two handguns in Mr. Rouse's room while Mr. Rouse was out of the room, and hotel staff notified the MPD that Mr. Rouse had two pistols in his room.

177.    The two handguns belonged to Mr. Rouse and he had lawfully purchased and registered them in the State of Maryland, his place of residence.

178.    The pistols were a Glock 33 Pistol worth approximately $550.00 and a FN Five-Seven Pistol worth approximately $1,200.00. Mr. Rouse also had a TLR2 Scope worth approximately $300.00.

179.    Mr. Rouse had brought the handguns into the hotel room in the same "lockup" carrying case which he used to transport the pistols when he traveled by plane. The case had a "Firearm(s) Declaration" sticker from United Airlines consistent with 49 CFR 1540.111 (c) from a trip in which he lawfully transported his weapons on a plane.

180.    When Mr. Rouse returned to the hotel MPD officers approached and detained him and questioned him about his guns.

181.    Mr. Rouse freely admitted to the officers that the guns in the hotel room belonged to him and were lawfully registered in the State of Maryland.

**182.**    Mr. Rouse was arrested on a Saturday and, as a result spent two nights in jail before being presented in Superior Court on the following Monday.

### Prosecution by the OAG

183.    On September 1, 2014, the OAG filed a Criminal Information charging Mr. Rouse with Possession of an Unregistered Firearm in violation of D.C. Code § 7-2502.01 and Unlawful Possession of Ammunition in violation of D.C. Code § 7-2506.01.

184.    Mr. Rouse was arraigned on those charges that same day in the District of Columbia Superior Court.

185.     On November 26, 2014, in light of the Palmer decision, Mr. Rouse's defense attorney filed a Motion to Dismiss.  On December 15, 2014, the Office of the Attorney General for the District of Columbia filed an Opposition to the Defendant's Motion to Dismiss.

186.     Three days later, on December 18, without a hearing, the Honorable William Jackson summarily denied the Defendant's Motion to Dismiss in a one paragraph order.

187.     A jury trial was set for March 16, 2015.

188.     On March 16, the trial was continued for a status hearing on April 22, 2015.

189.     On April 22, 2014, approximately nine months after the Palmer decision, the OAG dismissed the charges against Mr. Rouse without prejudice.

## MPD seized Mr. Rouse's pistols and the Property Clerk retains them

190.     The MPD seized Mr. Rouse's pistols and the scope for evidence when they arrested him on August 30, 2014.

191.     The MPD Property Clerk still has the pistols and the scope.

192.     The handgun and ammunition were not subject to forfeiture under the District's civil forfeiture scheme because the District's civil forfeiture statute does not apply to guns or ammunition. Under D.C. Code § 22–4517(b), an unregistered firearm is contraband and an individual has no right to its return.

193.     Mr. Rouse sent a letter by certified mail to the Property Clerk on August 4, 2015 asking for his pistol back but the Property Clerk did not returned his pistols and scope to him in response to the letter.

194.     Despite the fact that all charges against Mr. Rouse were dismissed on or about April 20, 2015, the District did not give him notice and a hearing at which he could challenge the District's

retention of his pistols and scope or the District could justify its continued retention of his pistols and scope.

195.    The District finally released Mr. Rouse's pistol on July 28, 2017.

## Delontay Davis

### Mr. Davis's arrest by the MPD

196.    On about March 23, 2014, Mr. Delontay Davis, a student with no criminal record and then a resident of Virginia, was driving a car stopped by the MPD in the District of Columbia on the basis of a false citizen report.

197.    The police observed a pistol on the console of the vehicle.

198.    MPD arrested Mr. Davis for Carrying a Pistol, in violation of then-D.C. Code § 22-4504(a).

199.    Mr. Davis was held in Central Cellblock overnight and presented in Superior Court the next day.

### Mr. Davis's detention, prosecution and the dismissal of his case

200.    Mr. Davis was found CJA eligible.

201.    The District through the MPD referred the case to the US Attorney's Office for prosecution.

202.    At presentment on 3/24/2014, the US Attorney's Office, by complaint, charged Mr. Davis with Carrying a Pistol, in violation of then-D.C. Code § 22-4504(a).

203.    Mr. Davis was determined to be indigent under the District of Columbia CJA Act and the Superior Court judicial officer appointed a lawyer for him at his initial appearance.

204.    Mr. Davis was preventively detained pursuant to D.C. Code § 23-1322(b) in the DC Jail for four nights.

205.    As part of the detention Mr. Davis was subjected to a humiliating strip-search during the intake process at the DC Jail.

206.    On 3/27/2014 Mr. Davis was brought from the DC Jail to the Superior Court for a detention hearing. The Superior Court judicial officer ordered Mr. Davis released but the officer ordered Mr. Davis to stay away from the area where he was arrested and further ordered him not to possess weapons.

207.    On 5/13/2014, the USAO filed an indictment of Mr. Davis for Carrying a Pistol, Possession of An Unregistered Firearm ("UF"), in violation of D.C. Code § 7-2502.01, and Unlawful Possession of Ammunition ("UA"), in violation of D.C. Code § 7-2506.01, and Mr. Davis was arraigned on those charges in Superior Court.

208.    In light of the Palmer decision, issued on July 24, 2014, on 7/28/2014 Mr. Davis' counsel filed an Emergency Motion to Dismiss Indictment.

209.    The US Attorney's Office dismissed the indictment on 1/16/2015.

210.    On 1/16/2015 the OAG dismissed the Criminal Information against Mr. Davis.

**MPD's seizure and retention of Mr. Davis's pistol after his case was dismissed**

211.    The MPD officers seized Mr. Davis's Bersa 380 pistol worth approximately $400.00 when they arrested him on 3/23/2014.

212.    The pistol has remained in the custody of the Property Clerk since the date of his arrest.

213.    Despite the fact that all charges against Mr. Davis were dismissed on 1/16/2015, the District government has not returned Mr. Davis's pistol or given him notice and a hearing at which he

could challenge the District's retention of his pistol or the District could justify its continued retention of the pistol.

214.    The handgun and ammunition were not subject to forfeiture under the District's civil forfeiture scheme because the District's civil forfeiture statute does not apply to guns or ammunition. Under D.C. Code § 22–4517(b), an unregistered firearm is contraband and an individual has no right to its return.

### MPD's seizure and retention and ultimate release of Mr. Davis's car

215.    The MPD seized Mr. Davis' car when he was arrested on 3/23/2014.

216.    The MPD seizing officer filled out a PD 81 (an MPD form known as a "Property Record") which "classified" Mr. Davis' car as "hold for civil forfeiture" both by entering the code for civil forfeiture on page 1 of the PD 81 and in the narrative section on page 2 pf the PD 81. *See* D.C. Code § 7-2507.06a ("Any conveyance in which a person or persons transport, possess, or conceal any firearm, as that term is defined in § 7-2501.01, or in any manner use to facilitate a violation of § 7-2502.02 or § 22-4503 or § 22-4504, is subject to forfeiture pursuant to the standards and procedures set forth in D.C. Law 20-278.").

217.    The MPD seizing officer did not classify the car as "evidence."

218.    The MPD summoned an MPD Crime Scene Evidence Technician to the scene of Mr. Davis' arrest and she searched and processed the car for evidence before it was towed from the scene.

219.    She removed the pistol, a magazine, and some cartridges from the car and she processed them and stored them as evidence in the case.

220.    Her report indicates that she photographed the scene and the firearms but not the car.

221.    The Mayor through the Property Clerk instituted civil forfeiture proceedings against Mr. Davis' car in March by making a finding of probable cause and mailing Mr. Davis a "Notice of

Intent to Administratively Forfeit the Following Property." On April 21, 2014, in response to a "Notice to Receive Vehicle" he received by mail from the MPD, Mr. Davis went to retrieve his car from the District of Columbia impound lot ("Blue Plains").

222.    The notice stated that his car had been seized by the MPD for civil forfeiture. It did not state that his car had been seized as evidence or that it had been classified as evidence.

223.    Mr. Davis reported to his criminal defense lawyer facts which his criminal defense lawyer construed to mean that the MPD employee told Mr. Davis that his car was classified as hold for civil forfeiture and classified as evidence. This is the first and only time anyone had possibly mentioned to Mr. Davis or his criminal defense lawyer that the MPD had classified his car as evidence so Mr. Davis may have been mistaken.

224.    But, vehicles seized for civil forfeiture are in the custody of the Mayor and not the Property Clerk so the Property Clerk statute does not apply to such vehicles.

225.     None of the documents the US Attorney produced to Mr. Davis' criminal defense lawyer in discovery in connection with his CPWL case suggested that the MPD had ever classified the vehicle as evidence.

226.    At Blue Plains Mr. Davis executed a number of forms relating to the civil forfeiture of his car including challenges to the forfeiture and an application for preliminary release of the vehicle and a document in which he promised not to encumber, dispose of or damage the vehicle during pendency of forfeiture proceedings if the District returned possession of the car to him during pendency of forfeiture proceedings.

227.    The next day Mr. Rose, the MPD employee in charge of processing the papers, told Mr. Davis criminal defense lawyer that the District would release possession of the vehicle to Mr. Davis with respect to the civil forfeiture while he processed Mr. Davis' challenge to the forfeiture.

228.    Mr. Rose did not tell Mr. Davis criminal defense lawyer that the District had classified Mr. Davis' car as evidence or that the US Attorney had an evidentiary hold on the car.

229.    Assuming that Mr. Rose meant the US Attorney needed the vehicle as evidence, Mr. Davis' criminal defense attorney tried to obtain a PD 81-C for Mr. Davis' car from the AUSA assigned to the case but he was never able to obtain a PD 81-C after trying for a week. However, the AUSA indicated to Mr. Davis' criminal defense attorney that neither he nor his supervisor objected to the release of Mr. Davis' car.

230.    The AUSA never told Mr. Davis criminal defense lawyer that the US Attorney wanted the vehicle held as evidence.

231.    Mr. Davis' counsel tried to obtain a PD 81-C from the US Attorney but he was unable to do so.

232.    Finally Mr. Davis filed a Rule 41(g) motion for return of the vehicle.

233.    The Superior Court judicial ordered the District to release the car on the premise that the District had not initiated forfeiture proceedings when in fact the District had initiated administrative forfeiture proceedings by mailing a notice of intent to administratively forfeit property to Mr. Davis.

234.    The MPD returned Mr. Davis' car to him in late May 2014.

235.    But, until late July 2014, after this Court had declared in the Palmer decision that the District's gun registration scheme unconstitutional, an AAG from the OAG-Civil Enforcement Division (the division which handles civil forfeitures) continued to demand thousands of dollars from Mr. Davis through his lawyer to prevent institution of judicial civil forfeiture proceedings in Superior Court against the car.

236.    Property - including guns, ammunition, and vehicles - comes into the custody of the District in connection with alleged violations of the District's gun control regime.

## Substantive Allegations for Claims

## Claim 1

### Second Amendment Arrest Claim

237.    The preceding paragraphs are incorporated as though fully stated herein.

238.    The District's gun control regime during the Class Period (including its laws, customs, practices and policies banning the carrying and transporting of handguns in public) violated the 2d Amendment because it effected a total ban on carrying hand guns outside the home.

239.    Criminalizing conduct protected by the 2d Amendment violates the Amendment.

240.    The District enforced its unconstitutional gun control regime against Named Plaintiffs' and the other Second Amendment Arrest Class members in violation of their 2d Amendment rights by arresting and detaining them.

241.    The District enforced its unconstitutional gun control regime against Named Plaintiffs' and the other Second Amendment Arrest Class members directly through its MPD which arrested and detained people pursuant to its unconstitutional gun control regime.

242.    The District also enforced its unconstitutional gun control regime against other Second Amendment Arrest Class members indirectly through other police forces by enabling other police forces in the District to arrest and detain them pursuant to its unconstitutional gun control regime. The District received into custody, processed, and detained persons arrested by other police forces in the District.

243.    The moving force of the constitutional violations was the District's enactment and enforcement of its unconstitutional gun control regime.

244.    Named Plaintiffs and the other Second Amendment Arrest Class members suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal

expenses that resulted from being arrested and detained because of the District's enactment and enforcement of its unconstitutional gun control regime.

245.    Named Plaintiffs and the other class members are therefore entitled to monetary compensation and the other relief described herein.

Claim 2

Second Amendment Prosecution Claim

246.    The preceding paragraphs are incorporated as though fully stated herein.

247.    The District's gun control regime during the Class Period (including its laws, customs, practices and policies banning the carrying of handguns in public) violated the 2d Amendment because it effected a total ban on carrying pistols outside the home.

248.    Criminalizing conduct protected by the 2d Amendment violates the Amendment.

249.    The District enforced its unconstitutional gun control regime against Named Plaintiffs' and the other Second Amendment Prosecution Class members' in violation of their 2d Amendment rights by prosecuting them directly through its OAG, or by consenting through its OAG to prosecutions conducted by the US Attorney pursuant to D.C. Code § 23-101(d) and (e).

250.    Even if the District is not liable for prosecutions of felonies conducted by the US Attorney the District remains liable for prosecuting Second Amendment Prosecution Class members directly through its OAG, or by consenting through its OAG to prosecutions pursuant to D.C. Code § 23-101(d) and (e) conducted by the US Attorney.

251.    In each case the moving force behind the violations was the District's enactment and enforcement of its unconstitutional gun control regime and by assisting in the prosecutions through the MPD and other agencies.

252.    Named Plaintiffs and the other Second Amendment Prosecution Class members suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal

expenses that resulted from being subject to conditions of release and having to defend against prosecution under an unconstitutional gun control regime.

253. Named Plaintiffs and the other Second Amendment Prosecution Class members are therefore entitled to monetary compensation and the other relief described herein.

## Claim 3

### Fourth Amendment Arrest Claim

254. The preceding paragraphs are incorporated as though fully stated herein.

255. The District's gun control regime during the Class Period (including its laws, customs, practices and policies banning the carrying and transporting of handguns in public) violated the 2d Amendment because it effected a total ban on carrying pistols outside the home.

256. Plaintiffs were arrested and detained without probable cause because the District's gun control regime was unconstitutional during the Class Period.

257. The District enforced its unconstitutional gun control regime against Named Plaintiffs' and the other Fourth Amendment Arrest Class members directly through its MPD which arrested and detained people pursuant to its unconstitutional gun control regime.

258. The District also enforced its unconstitutional gun control regime against other Fourth Amendment Arrest Class members indirectly through other police forces by enabling other police forces in the District to arrest and detain them pursuant to its unconstitutional gun control regime.

259. The District received, processed, and detained persons arrested by other police forces in the District.

260. Arresting and detaining Named Plaintiffs' and the other Fourth Amendment Arrest Class members pursuant to its unconstitutional gun control regime violated their 4th Amendment rights because the arrests and detentions were without probable cause.

261.    The moving force of the constitutional violations was the District's enactment and enforcement of its unconstitutional gun control regime.

262.    Named Plaintiffs and the other Fourth Amendment Arrest Class members suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses that resulted from being arrested and detained under an unconstitutional gun control regime.

263.    Named Plaintiffs and the other class members are therefore entitled to the relief described herein.

## Claim 4

### Fourth Amendment Prosecution Claim

264.    The preceding paragraphs are incorporated as though fully stated herein.

265.    The District's gun control regime during the Class Period (including its laws, customs, practices and policies banning the carrying of handguns in public) violated the 2d Amendment because it effected a total ban on carrying pistols outside the home.

266.    Plaintiffs were prosecuted without probable cause because the District's gun control regime was unconstitutional during the Class Period.

267.    The District enforced its unconstitutional gun control regime against Named Plaintiffs' and the other Fourth Amendment Prosecution Class members' in violation of their 2d and 4th Amendment rights by prosecuting them directly through its OAG, or by consenting through its OAG to prosecutions conducted by the US Attorney pursuant to D.C. Code § 23-101(d) and (e).

268.    Even if the District is not liable for prosecutions of felonies conducted by the US Attorney the District remains liable for prosecuting Fourth Amendment Prosecution Class members directly through its OAG, or by consenting through its OAG to prosecutions pursuant to D.C. Code § 23-101(d) and (e) conducted by the US Attorney.

269.     Prosecuting Named Plaintiffs' and the other Fourth Amendment Prosecution Class members and the limitations on their liberty based on an unconstitutional gun control regime means the prosecutions and limitations were without probable cause.

270.     The limitations on liberty and the prosecutions without probable cause violated Named Plaintiffs' and the other class members' 4th Amendment rights in violation of 42 U.S.C. § 1983

271.     In each case the moving force behind the violations was the District's enactment and enforcement of its unconstitutional gun control regime.

272.     Named Plaintiffs and the other Fourth Amendment Prosecution Class members suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses that resulted from limitations on liberty and defending against prosecution under an unconstitutional gun control regime.

273.     Named Plaintiffs and the other class members are therefore entitled to the relief described herein.

## Claim 5

### Fifth Amendment Right to Travel Nonresident Class Arrest Claim

274.     The preceding paragraphs are incorporated as though fully stated herein.

275.     The District's gun control regime during the Class Period (including its laws, customs, practices and policies banning the carrying of handguns in public) violated the 5th Amendment rights to travel and equal protection with respect to non-residents because it effected a total ban on carrying pistols in the District for non-residents because the gun control regime prevented registering their hand guns and licensing them and the MPD police Chief refused to register their hand guns or issue them licenses until at least October 2014.

276.     The District enforced its unconstitutional gun control regime against Named Plaintiffs' and the other Nonresident Class members in violation of their 5th Amendment rights by arresting and detaining them.

277.     The District enforced its unconstitutional gun control regime against Named Plaintiffs' and the other Nonresident Class Arrest Class members directly through its MPD which arrested and detained people pursuant to its unconstitutional gun control regime.

278.     The District also enforced its unconstitutional gun control regime against other Nonresident Class Arrest Class members indirectly through other police forces by enabling other police forces in the District to arrest and detain them pursuant to its unconstitutional gun control regime. The District received into custody, processed, and detained persons arrested by other police forces in the District.

279.     The moving force of the constitutional violations was the District's enactment and enforcement of its unconstitutional gun control regime.

280.     Named Plaintiffs and the other Nonresident Class Arrest Class members suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses that resulted from being arrested and detained because of the District's enactment and enforcement of its unconstitutional gun control regime.

281.     Named Plaintiffs and the other Nonresident Class Arrest Class members are therefore entitled to monetary compensation and the other relief described herein.

## Claim 6

### 5th Amendment Right to Travel Nonresident Class Prosecution Claim

282.     The preceding paragraphs are incorporated as though fully stated herein.

283.     The District's gun control regime during the Class Period (including its laws, customs, practices and policies banning the carrying of handguns in public) violated the 5th Amendment

rights to travel and equal protection with respect to non-residents because it effected a total ban on carrying pistols in the District for non-residents because the gun control regime prevented registering their hand guns and licensing them and the MPD police Chief refused to register their hand guns or issue them licenses until at least October 2014.

284.    The District enforced its unconstitutional gun control regime against Named Plaintiffs' and the other Nonresident Prosecution Class members' in violation of their 5th Amendment rights by prosecuting them directly through its OAG, or by consenting through its OAG to prosecutions conducted by the US Attorney pursuant to D.C. Code § 23-101(d) and (e).

285.    Even if the District is not liable for prosecutions of felonies conducted by the US Attorney the District remains liable for prosecuting Nonresident Prosecution Class members directly through its OAG, or by consenting through its OAG to prosecutions pursuant to D.C. Code § 23-101(d) and (e) conducted by the US Attorney.

286.    In each case the moving force behind the violations was the District's enactment and enforcement of its unconstitutional gun control regime and by assisting in the prosecutions through the MPD and other agencies.

287.    Named Plaintiffs and the other Nonresident Prosecution Class members suffered humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses that resulted from being subject to conditions of release and having to defend against prosecution under an unconstitutional gun control regime.

288.    Named Plaintiffs and the other Nonresident Prosecution Class members are therefore entitled to monetary compensation and the other relief described herein.

<h2 style="text-align:center">Claim 7</h2>

Seizure and Detention of Handguns and Ammunition and Vehicles on the basis of an

unconstitutional gun control regime for any purpose for any length of time violated the 2d

Amendment

289.   The preceding paragraphs are incorporated as though fully stated herein.

290.   The District through its MPD seized hand guns and ammunition and vehicles belonging to

the Named Plaintiffs and the other members of the Second Amendment Seizure Class from

persons arrested for violations of the District's unconstitutional gun control regime and destroyed

them, never gave them back, or kept them for periods of time before giving them back.

291.   The seizure and retention of handguns and ammunition and vehicles on the basis of the

unconstitutional gun control regime for any purpose for any length of time (including the

destruction of any of the property) violated their 2d Amendment rights.

292.   In each case the moving force behind the violations was the District's enactment and

enforcement of its unconstitutional gun control regime and the policies and practices of the MPD

regarding property coming into the custody of the District.

293.   The Named Plaintiffs and the other Second Amendment Seizure Class members were

injured thereby and suffered damages.

Claim 8

Seizure and Retention of Handguns and Ammunition and Vehicles on the basis of

unconstitutional gun control regime for any purpose for any length of time violated the 4th

Amendment

294.   The preceding paragraphs are incorporated as though fully stated herein.

295.   The District seized hand guns and ammunition and vehicles belonging to the Named

Plaintiffs and the other members of the Fourth Amendment Seizure Class on the basis of its

unconstitutional gun control regime and destroyed them, never gave them back, or kept them for amounts of time before giving them back.

296.    The seizure and retention of handguns and ammunition (including the destruction of any of the handguns and ammunition) and the seizure and retention of vehicles on the basis of unconstitutional statutes for any purpose for any length of time violated their 4th Amendment rights because there was no probable cause to support either the seizure or continued retention of the property because the District's gun control regime was unconstitutional.

297.    In each case the moving force behind the violations was the District's enactment and enforcement of its unconstitutional gun control regime and the policies and practices of the MPD regarding property coming into the custody of the District.

298.    The Named Plaintiffs and the other Fourth Amendment Seizure Class members were injured thereby and suffered damages.

## Claim 9

### Retention of Handguns and Ammunition after the case was over violated the 4th Amendment

299.    The preceding paragraphs are incorporated as though fully stated herein.

300.    The District through its MPD seized hand guns and ammunition and vehicles belonging to the Named Plaintiffs and the other members of the Fourth Amendment Handguns and Ammunition Retention Class from persons arrested for violations of the District's unconstitutional gun control regime and destroyed them, never gave them back, or kept them for amounts of time.

301.    Even if seizing and retaining handguns and ammunition for use in prosecutions or investigations were constitutional, retaining handguns and ammunition after the case was over and they were no longer needed in the case violated the 4th Amendment because there was no

probable cause to support the continued detention of the handguns and ammunition after the case was over.

302.    In each case the moving force behind the violations was the District's enactment and enforcement of its unconstitutional gun control regime and the policies and practices of the MPD regarding property coming into the custody of the District.

303.    The Class Named Plaintiffs and the other Fourth Amendment Handguns and Ammunition Retention Class members were injured thereby and suffered damages.

## Claim 10

### Right to Return of Handguns and Ammunition

304.    The preceding paragraphs are incorporated as though fully stated herein.

305.    The District seized hand guns and ammunition belonging to the Named Plaintiffs and the other members of the Right to Return Class on the basis of its unconstitutional gun control regime.

306.    Pursuant to D.C. Code § 22-4517(b)(making a pistol carried outside the home or business a nuisance subject to destruction) the District declared unregistered hand guns and ammunition to be "nuisances" and either destroyed the hand guns and ammunition as contraband or the District still retains the hand guns and ammunition or the District held them for a period after they were needed for a case before giving them back.

307.    The District never gave the Named Plaintiffs and the other members of the Right to Return Class notice when the District no longer needed the hand guns and ammunition even though the District's gun control regime was unconstitutional and remains unconstitutional.

308.    The District never gave the owners hearings at which the owners could challenge the District's right to retain their hand guns and ammunition or the District could establish its right to treat the hand guns and ammunition as contraband.

309.    The District has, and during the Class Period had, a policy and practice of seizing hand guns and ammunition and then destroying them or otherwise not giving them back, or holding them for a period of time without giving the owners a retention seizure hearing before destroying or holding the property.

310.    The District's policy and practice is to not send notice to owners of such property informing them that their property is no longer needed by the District and informing owners how to retrieve their property when the District no longer needs the property or plans to destroy or otherwise dispose of it.

311.    The policy and practice and the failure to provide hearings when the District no longer needs the hand guns and ammunition or before destroying hand guns and ammunition, and destroying or retaining the hand guns and ammunition after they are beaded violates the due process of the Fifth Amendment.

312.    In each case the moving force behind the violations was the District's enactment and enforcement of its unconstitutional gun control regime and the policies and practices of the MPD regarding property coming into the custody of the District.

313.    The Named Plaintiffs and Right to Return Class members were injured thereby and suffered damages.


## Claim 11


## Retention of Vehicles after they were searched and processed for evidence violated the 4th Amendment

314.    The preceding paragraphs are incorporated as though fully stated herein.

315.    The District seized vehicles in connection with alleged violations of its unconstitutional gun control regime from Mr. Davis (the Fourth Amendment Vehicle Retention Class Named Plaintiff) and other members of the Fourth Amendment Vehicle Retention Class.

316.    The District retained the vehicles after the MPD had searched them and extracted all the evidentiary value from them by photographing them or performing tests on them.

317.    The maximum amout of time needed to search and process the vehicles for any evidence was two weeks.

318.    Even if seizing and retaining vehicles to search them and process them for evidence were constitutional, retaining them after they had been searched and processed for evidence violated the 4th Amendment because there was no probable cause to support the continued detention of the vehicles after they had been searched and processed for evidence.

319.    In each case the moving force behind the violations was the District's enactment and enforcement of its unconstitutional gun control regime and the policies and practices of the MPD regarding vehicles coming into the custody of the District.

320.    Mr. Davis as the Fourth Amendment Vehicle Retention Class Named Plaintiff and the other Fourth Amendment Vehicle Retention Class members were injured thereby and suffered damages.


## Claim 12


### Illegal civil forfeiture of vehicles used to transport firearms violates the 2d Amendment


321.    The preceding paragraphs are incorporated as though fully stated herein.

322.    The District City Council enacted and the District through its MPD enforced and continues to enforce a civil forfeiture statute which makes any vehicle used to transport a firearm subject to forfeiture. D.C. Code § 7-2507.06a.

323.    The District seizes directly and indirectly through other agencies seizes vehicles pursuant to the statute and detains them for a period of time or never gives them back.

324.    The District seized and retained for a period of time or never gave back vehicles for forfeiture determinations from Mr. Davis (the Forfeiture Class Named Plaintiff) and the other members of the Forfeiture Class.

325.    The statute violated the 2d Amendment rights of Mr. Davis and the other Forfeiture Class members because in this day and age subjecting to civil forfeiture all vehicles used to transport firearms effectively converts the core right to carry pistols outside the home into the right to carry pistols within walking distance of the home; effecting a total ban on carrying pistols outside the home or office in a vehicle amounts to a total ban on carrying outside the home.

326.    The District enforced its unconstitutional forfeiture statute against Mr. Davis and the other Forfeiture Class members in violation of their 2d Amendment rights by seizing their vehicles (directly or through other agencies) for forfeiture and either never giving them back or detaining them for a period of time.

327.    In each case the moving force behind the violations was the District's enactment and enforcement of its unconstitutional gun control regime including its unconstitutional civil forfeiture statute.

328.    Mr. Davis as the Forfeiture Class Named Plaintiff and the other members of the Forfeiture Class were injured thereby and suffered damages.

### Claim 13

**Illegal civil forfeiture of vehicles used to transport firearms violates the 4th Amendment**

329.     The preceding paragraphs are incorporated as though fully stated herein.

330.     The District City Council enacted and the District through its MPD enforced and continues to enforce a civil forfeiture statute which makes any vehicle used to transport a firearm subject to forfeiture. D.C. Code § 7-2507.06a. The District seizes directly and indirectly through other agencies seizes vehicles pursuant to the statute and detains them for a period of time or never gives them back.

331.     The statute violated the 2d Amendment rights of Mr. Davis and the other Forfeiture Class members because it acts as a virtual total ban on carrying firearms outside the home in an automobile or other vehicle.

332.     The District enforced its unconstitutional forfeiture statute against Mr. Davis and the other Forfeiture Class members in violation of their 2d Amendment rights by seizing their vehicles (directly or through other agencies) for forfeiture and either never giving them back or detaining them for a period of time.

333.     Seizing and detaining vehicles on the basis of a statute and gun control regime that violates the 2d Amendment also violates the 4th Amendment rights of Mr. Davis and the other members of the Forfeiture Class because there is no probable cause to support the seizures and detentions.

334.     In each case the moving force behind the violations was the District's enactment and enforcement of its unconstitutional gun control regime including its unconstitutional civil forfeiture statute and the policies and practices of the MPD regarding property coming into the custody of the District.

335.     Mr. Davis and the other members of the Forfeiture Class were injured thereby and suffered damages.

## RULE 23 ALLEGATIONS

336.     Named Plaintiffs  on behalf of themselves and the classes defined below bring this action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following three classes consisting of each person who:

337.     **Second Amendment Arrest Class and the Fourth Amendment Arrest Class:** (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward until the date this case is terminated; (ii) was arrested and/or arrested and detained (including subjected to conditions of release) in the District of Columbia for violation of any of the District's gun control regime; (iii) for conduct involving any of, or any combination of, carrying or possessing a pistol or unlicensed firearm or ammunition outside their home or place of business.

338.     **Second Amendment Prosecution Class and the Fourth Amendment Prosecution Class:** (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward until the date this case is terminated; (ii) was prosecuted in the District of Columbia for violation of any of the District's gun control regime either directly through by the OAG, or on charges in a prosecution pursuant to D.C. Code § 23-101(d) and (e) conducted by the US Attorney with the consent of the OAG; (iii) for conduct involving any of, or any combination of, carrying or possessing a pistol or unlicensed firearm or ammunition outside their home or place of business.

339.     **Nonresident Class Arrest Class:** (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward and going forward until October 10, 2014, or alternatively, until the date this case is terminated; (ii) was arrested and/or arrested and detained (including subjected to conditions of release) in the District of Columbia for violation of any of the District's gun control regime; (iii) for conduct involving any of, or any combination of,

carrying or possessing a pistol or unlicensed firearm or ammunition outside their home or place of business; and (iv) while a nonresident of the District of Columbia at the time of the arrest.

340.     **Nonresident Prosecution Class:** (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward and going forward and going forward until October 10, 2014, or alternatively, until the date this case is terminated; (ii) was prosecuted in the District of Columbia for violation of any of the District's gun control regime either directly through by the OAG, or on charges in a prosecution pursuant to D.C. Code § 23-101(d) and (e) conducted by the US Attorney with the consent of the OAG; (iv) for conduct involving any of, or any combination of, carrying or possessing a pistol or unlicensed firearm or ammunition outside their home or place of business; and (v) while a nonresident of the District of Columbia at the time of the arrest.

341.     **Right to Return Class:** (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward until the date this case is terminated; (ii) was the owner of handguns or ammunition that were seized by the District or its agents on the basis of its unconstitutional gun control regime; (iii) which the District still retains or has destroyed or otherwise disposed of or held for any period and then returned without giving the owner notice and a hearing within five days of the seizure at which the owner could challenge the retention or destruction or unlawful retention or the District could establish its right to destroy or retain the property or to hold the property for any period of time.

342.     **Second Amendment Seizure Class and Fourth Amendment Seizure Class:** (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward until the date this case is terminated; (ii) was the owner of a vehicle or a handgun or ammunition that was seized by the District or otherwise came into the custody of the District; (iii)

in connection with a violation of the District's gun control regime; (iv) which the District still retains or has destroyed or otherwise disposed of or held for any period.

343.   **Fourth Amendment Handguns and Ammunition Retention Class:** (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward until the date this case is terminated; (ii) was the owner of a handgun or ammunition that was seized by the District or otherwise came into the custody of the District; (iii) in connection with a violation of the District's gun control regime; (iv) which the District disposed of, or still retains after the related criminal case was over, or retained after the related criminal case was over.

344.   **Fourth Amendment Vehicle Retention Class:** (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward until the date this case is terminated; (ii) was the owner of a vehicle that was seized by the District or otherwise came into the custody of the District; (iii) in connection with a violation of the District's gun control regime; (iv) which the District disposed of, or still retains for more than two weeks after the seizure, or retained for more than two weeks after the seizure before releasing.

345.   **Forfeiture Class:** (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward until the date this case is terminated; (ii) was the owner or renter of a vehicle that was seized by the District or otherwise came into the custody of the District for a forfeiture determination or the against which the District instituted civil forfeiture proceedings or forfeited; (iii) pursuant to D.C. Code § 7-2507.06a; (iv) which the District disposed of, or still retains, or retained for any period of time.

346.   Certification of these classes under Federal Rule of Civil Procedure 23(b)(2) is appropriate, because the District of Columbia has a policy, pattern, and practice for each claim that has uniformly affected all members the class, and injunctive relief and declaratory judgment and a judgment against the District will benefit each and every plaintiff and class member.

347.     The classes are entitled to injunctive relief including sealing of their arrest and prosecution records and declaring their arrests as legal nullities and the return of their property.

348.     Certification of the classes under Federal Rule of Civil Procedure 23(b)(3) is also appropriate, in that common questions of law and fact predominate over any individual questions, and class action treatment is superior for the fair and efficient adjudication of these class claims as detailed below.

349.     The classes are entitled to monetary relief.

350.     Regarding Named Plaintiffs and the other members of the classes defined above, there are no individual questions on the issue of liability, because all members of each of the classes were injured by the same policy and practices.

351.     Among the questions of law and fact common to the classes are:

1)   whether the District's gun control regime during the Class Period violated the Second Amendment;

2)   whether during the Class Period D.C. Code § 7-2502.01 ("UF"), D.C. Code § 7-2506.01 ("UA"), D.C. Code § 22-4517, and D.C. Code § 7-2507.06a as applied to persons arrested, charged, or prosecuted for carrying a handgun or ammunition outside the home or place of business violated the Second Amendment;

3)   whether during the Class Period D.C. Code § 7-2507.06a violated the Second Amendment;

4)   whether during the Class Period D.C. Code § 22–4517(b), under which an unregistered firearm is contraband and an individual has no right to its return

5)   whether the District's seizing and retaining or destroying handguns and ammunition on the basis of its gun control regime without notice and a hearing violated the Fifth Amendment;

6) whether the District has or had a policy, custom, or practice prior to amendment by the First Emergency Legislation of never allowing nonresidents to register pistols for carrying outside the home during the class period;

7) whether Named Plaintiffs and the members of the classes are entitled to equitable relief, and, if so, what is the nature of that relief; and

8) whether a jury can determine the general damages for an entire class using a damages matrix on the basis of a trial using a sample of the class members.

352.  Each of the classes is both so numerous that joinder of all members is impracticable. The exact number of the classes members is unknown to plaintiffs at this time, but the District of Columbia Superior Court's online docketing system, CourtView, shows that each year over the last 3 years hundreds of people were arrested and prosecuted for violations of the District's unconstitutional gun control regime.

353.  Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis's claims are typical of the claims of the other members of the classes of which they are members and all other members of the classes were injured by exactly the same means, that is, by District's enforcement of its unconstitutional gun control regime.

354.  Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis on behalf of themselves and each of the classes of which they are members will fairly and adequately protect the interests of the members of the classes and have retained counsel who are competent and experienced in complex federal civil rights class action litigation and criminal defense law including the District's unconstitutional gun control regime.

355.  Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis on behalf of themselves and each of the classes of which they are members have no interests that are contrary to or in conflict with those of the members of each of the classes of which they are members.

## CLASS RELIEF DEMANDS

Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis as Named Plaintiffs on behalf of themselves and all other members of the classes of which they are members respectfully request that this Court grant the following relief:

**A.**             Enter judgment in their favor on all of their claims;

**B.**             Declare the District's gun control regime was and is unconstitutional during the Class Period;

**C.**             Award Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis and the other members of the proposed classes nominal damages in connection with any declaration that the District's gun control regime during the Class Period was unconstitutional.

**D.**             Grant a jury trial on all claims so triable.

**E.**             Declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) and certifying the classes defined above, and designating Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis as the proper representative of each of the classes of which they are a member and appointing William Claiborne and Joseph Scrofano as class counsel.

**F.**             Declare that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b) (2) and 23(b)(3).

**G.**             Award Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis and all other members of the classes defined above injunctive relief in the form of sealing their arrest records and prosecution records and declaring their arrests for violations of any of the District's gun control regime legal nullities, and ordering the return of their property;

**H.**          Award all Named Plaintiffs and class members compensatory and consequential damages in an amount to be determined at trial;

**I.**          Award plaintiffs attorneys' fees and costs incurred in bringing this action under 42 U.S.C. § 1988 or as determined under the "common fund" rule; and

**J.**          Grant such other relief as this Court deems just and proper.

| | |
|---|---|
| Respectfully submitted,<br><br>/s/ William Claiborne<br>**WILLIAM CLAIBORNE**<br>D.C. Bar # 446579<br><br>Counsel for Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis on behalf of themselves and the putative class members<br><br>717 D Street, N.W<br>Suite 300<br>Washington, DC 20004<br>Phone 202/824-0700<br>Email claibornelaw@gmail.com | Respectfully submitted,<br><br>/s/ Joseph A. Scrofano<br>**JOSEPH A. SCROFANO**<br>D.C. Bar # 994083<br><br>Counsel for Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis on behalf of themselves and the putative class members<br><br>406 5th Street NW<br>Suite 100<br>Washington, DC 20001<br>Phone (202) 870-0889<br>Email jas@scrofanolaw.com |

## JURY DEMAND

Plaintiffs demand a jury of six as to all claims so triable.

/s/William Claiborne
**WILLIAM CLAIBORNE**
D.C. Bar # 446579
Counsel for Plaintiff and the classes