# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MAGGIE SMITH et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Case No. 15-737 |
| | ) |
| DISTRICT OF COLUMBIA, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

To stem the tide of violent crime, the District of Columbia has spent decades enacting some of the strictest gun control measures in the country. But despite these laudable ends, the District's means have precipitated repeated tugs-of-war against law-abiding citizens, with the federal courts as the referee and the Second Amendment as the touchstone.

The District has not been on a winning streak. In 2008, the Supreme Court struck down a D.C. law banning all handgun possession. *See District of Columbia v. Heller*, 554 U.S. 570 [hereinafter *Heller I*]. Subsequent litigation upheld some gun control measures (like a ban on assault weapons and large-capacity magazines, *see Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) [hereinafter *Heller II*]), but struck down others (like a triannual reregistration requirement and a ban on registering more than one handgun a month, *see Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015)). In 2014, the district court struck down D.C.'s carrying ban, D.C. Code § 22-4504. *See Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014) (invalidating § 22-4504 (2013) (repealed 2015)), *appeal withdrawn*, No. 14-7180, 2015 WL 1607711 (D.C. Cir. Apr. 2, 2015). But even without the carrying ban, misdemeanor statues still criminalized possession of non–D.C.-registered firearms and related ammunition. *See*

D.C. Code §§ 7-2502.01 (2012) (repealed 2015) (firearms), 7-2506.01 (2013) (ammunition). And since another provision effectively limited handgun registration to D.C. residents, *see* D.C. Code § 7-2502.02 (2012) (repealed 2015), non-D.C. residents remained barred from carrying a gun for self-defense, even if it was registered in their home state. Other statutes subjected non–D.C.-registered firearms and ammunition to seizure and destruction, D.C. Code §§ 22-4517, and exposed cars used to transport handguns to civil forfeiture, 7-2507.06a (1997) (repealed 2015). Almost a year after *Palmer*, the District updated those laws with new measures confining public carry to people with a special need for self-defense. *See* D.C. Code § 22-4506. But the D.C. Circuit eventually struck that down too. *See Wrenn v. District of Columbia*, 864 F.3d 650 (2017).

Here, the District manages a draw—for now. Four non-D.C. residents arrested and charged under §§ 22-4504 (before *Palmer* struck it down), as well as 7-2502.01 and 7-2506.01 (before the District revamped its gun laws), who also had their firearms and ammunition seized under 22-4517, and (for one plaintiff) had a car subjected to civil forfeiture under 7-2507.06a bring a putative class action under 42 U.S.C. § 1983 asserting claims under the Second, Fourth, and Fifth Amendments. The District asks the Court to dismiss the case, taking aim at this Court's jurisdiction under Rule 12(b)(1) and at plaintiffs' claims under Rule 12(b)(6). Its 12(b)(1) motion misses the mark, because plaintiffs have standing and because their claims are neither moot nor precluded. But some of its scattershot 12(b)(6) motion hits the target: although a few of plaintiffs' claims are legally sufficient, most fail as a matter of law or are time-barred. So the Court will deny the District's 12(b)(1) motion, but will grant-in-part and deny-in-part its 12(b)(6) motion.

## I. Background[1]

This matter began when D.C. police pulled-over Maggie Smith, a 34-year-old nurse from North Carolina without a criminal record who visited D.C. in June 2014. During the traffic stop, she told the officer—"as she had been taught [to do] in her gun ownership class"—that she was carrying a handgun licensed in her home state. 2d Am. Comp. ¶ 31, ECF No. 50. So police arrested her, seized her firearm under § 22-4517,[2] and took her to the D.C. jail, where they strip-searched and held her overnight until the U.S. Attorney charged her under §§ 22-4504,[3] and then under 7-2502.01[4] and 7-2506.01.[5] A month later, when *Palmer* struck down § 22-4504, the U.S. Attorney dismissed the case. But pursuant to the division of prosecuting authority outlined in D.C. Code §§ 23-101, the D.C. Attorney General recharged Smith under 7-2502.01 and 7-2506.01. Though the District dismissed those charges seven months later, Smith's gun remains in police custody.

Soon after the District dropped her charges, Smith filed this suit seeking damages related to her arrest and prosecutions, an injunction expunging and sealing her criminal record, a

---

[1] Because the District moves to dismiss under Rule 12(b)(1) and (6), the Court treats the factual allegations in the plaintiffs' second amended complaint as true and gives plaintiffs "the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks omitted) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)).

[2] The relevant portion of § 22-4517 defines "dangerous article" as "any weapon such as a pistol," *id.* at (a); declares "[a] dangerous article unlawfully owned, possessed, or carried . . . a nuisance," *id.* at (b); and requires police officers to "take into [their] possession and surrender . . . to the Property Clerk of the Metropolitan Police Department" any nuisance discovered "in the course of a lawful arrest or lawful search," *id.* at (c).

[3] The relevant portion of § 22-4504 provided that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, or any deadly or dangerous weapon capable of being so concealed." *Id.* at (a).

[4] The relevant portion of § 7-2502.01 provided that "no person . . . in the District [of Columbia] shall possess or control any firearm, unless the person . . . holds a valid registration certificate for the firearm." *Id.* at (a). Relatedly, § 7-2502.02(a)(4)(C) made it impossible to register a pistol unless the registrant sought to "use [it for] self-defense within that person's home," effectively requiring a person to live in D.C. to register a handgun.

[5] The relevant portion of § 7-2506.01 decrees "no person shall possess ammunition in the District of Columbia unless . . . [h]e is the holder of the valid registration certificate for a firearm." *Id.* at (a).

declaration that her arrest and prosecutions violated her Second and Fifth Amendment rights, and attorneys' fees. And through successive amendments, her complaint grew to include more plaintiffs and claims.

Police arrested one new plaintiff, Cpl. Frederick Rouse, after housekeeping found two handguns and a scope in his D.C. hotel room. Both handguns were licensed in Maryland, where Rouse—a senior engineer at the Defense Information Systems Agency—resides. After Rouse spent two nights in jail, the D.C. Attorney General charged him with violating §§ 7-2502.01 and 7-2506.01. The District eventually dismissed the charges without prejudice at a pretrial status conference, though it had earlier successfully opposed Rouse's motion to dismiss. Despite dismissing the charges, the District held his guns and scope—together worth $2050—for another two years before returning them. Thanks to his arrest, Rouse's top-secret security clearance was placed "under review." 2d Am. Compl. ¶ 183.

Police pulled-over another new plaintiff, Gerard Cassagnol, after receiving a tip he had a gun in the car. He volunteered the gun's location to the officers, which was unloaded and properly contained in a locked gun-safe. But he spent two nights in jail before the U.S. Attorney charged him with violating §§ 7-2502.01, 7-2506.01, and 22-4504. When the United States dropped the charges post-*Palmer*, the D.C. Attorney General reinstated the charges for §§ 7-2502.01 and 7-2506.01, and successfully opposed Cassagnol's motion to dismiss before *nolle pross*-ing the charges without prejudice. Before this incident, Cassagnol had no criminal record and worked fulltime for a telecommunications company. After his arrest, he lost his job, and D.C. continues to hold his ammunition and firearm, licensed in Maryland and worth approximately $500, despite Cassagnol's requests for its return.

Police arrested another new plaintiff, Virginia student Delontay Davis, after spotting his firearm during a traffic stop. The District confiscated his car and firearm, strip-searched him, and jailed him for four nights while the U.S. Attorney charged him with violating §§ 7-2502.01, 7-2506.01, and 22-4504. When the U.S. Attorney dismissed those charges ten months later, the D.C. Attorney General recharged him under §§ 7-2502.01 and 7-2506.01, but dropped the case two months later. Even still, the year-long case against him wrought significant harm. First, police seized Davis's vehicle for civil forfeiture under § 7-2507.06a.[6] Although they returned it two months later in response to Davis's motion under D.C. Superior Court Rule of Criminal Procedure 41(g),[7] Davis had already been forced to drop out of school because he lacked transportation. Second, his $400 firearm remains in police custody, four years (and counting) after the District dismissed his charges.

*　　*　　*

Based on these facts, plaintiffs bring ten claims:

1. That §§ 7-2502.01, 7-2506.01, and 22-4504—which together prohibited non-D.C. residents from having handguns and ammunition for self-defense while in the District— violated the Second Amendment;

2. That arresting and detaining people under those laws violated the Fourth Amendment;

---

[6] The relevant portion of § 7-2507.06a provided that "[a]ny conveyance, including vehicles and vessels in which any person or persons transport, possess, or conceal any firearm . . . or in any manner use to facilitate a violation of . . . § 22-4504, shall be seized and forfeited to the District of Columbia." *Id.* at (b). The statute notes that "all seizures and forfeitures of conveyances under this section shall follow the procedures set forth in § 48-905.02," the statute subjecting cars used to transport illegal drugs to civil forfeiture. *Id.* at (d).

[7] Rule 41(g) allows

[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property [to] move for the property's return. The court must receive evidence or any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

3. That those laws violated the Fifth Amendment's right-to-travel and equal protection guarantees;

4. That seizing handguns (under § 22-4517) and the vehicles used to convey them (under § 7-2507.06a) violated the Second Amendment;

5. That the same handgun and vehicle seizure violated the Fourth Amendment;

6. That continuing to seize plaintiffs' handguns and ammunition after dismissing their charges violates the Fourth Amendment;

7. That seizing handguns and ammunition without notice and a hearing violated the Fifth Amendment's procedural due process protection;

8. That seizing cars after searching and processing them for evidence violated the Fourth Amendment;

9. That forfeiting cars used to transport guns violates the Second Amendment; and

10. That forfeiting cars used to transport guns violates the Fourth Amendment.

Plaintiffs seek damages (compensatory, consequential, and nominal), declaratory relief, and injunctive relief sealing their arrest and prosecution records, ordering their property's return, and declaring their arrests legal nullities. Plaintiffs further seek attorney's fees and costs under 42 U.S.C. § 1988.

\*     \*     \*

This is not the only case challenging a D.C. civil asset forfeiture law. In *Hoyte v. District of Columbia*, a putative class brought Fourth and Fifth Amendment challenges to D.C. Code § 48-905.02 (2012) (repealed 2015), a provision subjecting cars used to transport illegal drugs to civil forfeiture. In July 2015, Judge Cooper dismissed the Fourth Amendment claims and some Fifth Amendment claims. More recently, he allowed plaintiffs' procedural due process claims to

proceed as a class action under Rule 23(b)(3), but declined to certify their challenges to the District's retention of forfeited property and to § 48-905.02's bond requirement.

*   *   *

Now, the District moves to dismiss under Rule 12(b)(1). First, the District claims plaintiffs lack standing to challenge vehicle seizures under § 7-2507.06a. In the alternative, the District argues this Court should not consider that challenge because of *Hoyte*. Next, the District claims two other cases involving a different statute and different plaintiffs preclude these plaintiffs' procedural due process challenge to § 22-4517. Finally, the District argues the Court lacks jurisdiction to consider plaintiffs' Second and Fifth Amendment challenges to §§ 7-2502.01, 7-2506.01, and 22-4504.

The District further moves to dismiss under Rule 12(b)(6). It argues plaintiffs' Fourth Amendment challenges fail as a matter of law. It also contends plaintiffs' challenges to §§ 7-2502.01, 7-2506.01, and 22-4504 are not cognizable under § 1983, and fail to state a claim under the Fifth Amendment. Next, the District argues plaintiffs' vehicle-related claims are timebarred. Then it argues Rule 41(g) overcomes plaintiffs' procedural due process challenge to the District's seizure of guns and ammunition. Finally, the District argues plaintiffs cannot pursue declaratory or injunctive relief nullifying their arrests and sealing any related arrest and prosecution records.

## II. Discussion

Given its "'obligation to satisfy itself' of its own jurisdiction before addressing the merits of any dispute," *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)), the Court starts with the District's motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1).

Ultimately, that motion fails: plaintiffs have standing to challenge the laws that enabled the District to seize their cars, take their guns, and subject them to criminal prosecution.

Next, the Court surveys the District's motion to dismiss for failure to state a claim under Rule 12(b)(6), which a layman might deem an attempt to kill plaintiffs' complaint by a thousand cuts. Although the District successfully minces seven claims, three survive: plaintiffs' Fourth Amendment challenge to the District's continued seizure of their guns and ammunition; plaintiffs' Second Amendment challenge to §§ 7-2502.01, 7-2506.01, and 22-4504; and plaintiffs' equal protection and right-to-travel challenge to §§ 7-2502.01, 7-2506.01, and 22-4504. Plaintiffs may also continue pursuing declaratory and injunctive relief nullifying their arrests and sealing related records.

### A. Because Plaintiffs have standing to challenge the laws that enabled the District to seize their cars, take their guns, and subject them to criminal prosecution, the Court will deny the District's 12(b)(1) motion.

A motion to dismiss under Rule 12(b)(1) "presents a threshold challenge to the court's jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). The Constitution cabins federal court jurisdiction to "Cases" and "Controversies." Art. III, § 2. To heed that limitation, courts rely on justiciability doctrines like standing and mootness. And to avoid rehashing cases and controversies other courts already resolved, courts rely on preclusion doctrines like collateral estoppel and claim-splitting.[8]

Standing ensures the plaintiffs are the proper party to sue: it requires they "ha[ve] a personal stake in the alleged dispute, and that the alleged injury suffered is particularized as to"

---

[8] To be sure, preclusion doctrines are not per se jurisdictional. *See Smalls v. United States*, 471 F.36 186, 189 (D.C. Cir. 2006). But since the District raised them alongside its 12(b)(1) motion, and since they do "have a somewhat jurisdictional character" causing "historic confusion about how the[y] . . . are applied," *SBC Comm'ns Inc. v. F.C.C.*, 407 F.3d 1223, 1229-30 (D.C. Cir. 2005), the Court considers the District's preclusion arguments alongside the District's 12(b)(1) motion instead of its 12(b)(6) motion. The reasoning and conclusion are identical regardless.

them. *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (internal quotation marks omitted). More specifically, to have standing a plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (citations and internal quotation marks omitted). The injury must be "fairly . . . trace[able]" to the defendant's conduct. *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). And it must be likely to be "redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted) (quoting *Simon*, 426 U.S. at 38).

Mootness guarantees this "requisite personal interest" not only "exist[s] at the commencement of the litigation" but also "continue[s] throughout its existence." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (internal quotation marks omitted) (quoting Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973)). "Simply stated, a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969) (internal quotation marks omitted).

Preclusion doctrines "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Under the doctrine of collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Id.* And the related rule against claim-splitting threatens dismissal for litigants who "spread[] claims around in multiple lawsuits in other courts or before other judges."

*Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011); *see also The Haytian Republic*, 154 U.S. 118, 124-25 (1894).

The District's 12(b)(1) motion invokes standing, mootness, and preclusion. First, the District claims plaintiffs lack the required injury-in-fact to confer standing to challenge vehicle seizures under § 7-2507.06a because the District did not actually forfeit any plaintiff's car. Alternatively, the District argues claim-splitting precludes this Court from considering that challenge given *Hoyte*'s pending challenge to another D.C. civil forfeiture law. Next, the District claims two other cases rejecting challenges to the District's seizure of property incident to arrest preclude plaintiffs' present challenge to the District's seizure of guns and ammunition under § 22-4517. Finally, the District argues the Court lacks jurisdiction to consider plaintiffs' Second or Fifth Amendment challenges to §§ 7-2502.01, 7-2506.01, and 22-4504, either because plaintiffs lack standing or because their claims are moot.

But the District errs at each step. Plaintiffs have standing to challenge vehicle seizures under § 7-2507.06a: by temporarily seizing Davis's car under color of § 7-2507.06a, the District caused him to suffer a redressable injury. And claim-splitting does not block those challenges, since *Hoyte* concerns a different civil forfeiture law. Relatedly, because plaintiffs did not participate in other cases challenging the District's seizure of property incident to arrest, those cases do not preclude their challenge to § 22-4517. Additionally, plaintiffs have standing to challenge §§ 7-2502.01, 7-2506.01, and 22-4504 because their prosecutions under those statutes caused them to suffer redressable injuries. And finally, repealing §§ 7-2502.01, 7-2506.01, and 22-4504 did not moot plaintiffs' claims for declaratory relief since the superseded laws still harm one named plaintiff and since plaintiffs seek more than a declaration concerning the repealed laws' constitutionality.

## 1. Because the District intended to forfeit Davis's car under § 7-2507.06a, plaintiffs can challenge that statute.

The District argues plaintiffs lack standing to pursue Second and Fourth Amendment

challenges to the District's seizure of cars used to transport guns under its civil forfeiture

scheme. As the District points out, although Davis alleges the District seized his car to forfeit it,

the District ultimately changed its mind, returning it sixty days later following Davis's Rule

41(g) motion. So the District narrowly argues that plaintiffs lack the requisite injury-in-fact to

establish standing.

Not so. After all, plaintiffs allege the District seized Davis's car to forfeit it. *See* 2d Am.

Compl. ¶¶ 306-07, 313, 315. In the best case, that seizure might be temporary (if the District gets

cold feet); in the worst case, it's permanent (if the District effectuates forfeiture). *See id.* Here,

Davis got lucky—the District's seizure was temporary. But he suffered an injury all the same:

the temporary dispossession forced him to drop out of school since he couldn't get to class for

half the semester. And that injury gives him standing to challenge § 7-2507.06a.

In other words, because the District's seizure of Davis's car under § 7-2507.06a caused

him to drop out of school, he has an injury-in-fact sufficient to confer standing to contest § 7-

2507.06a.

## 2. Claim-splitting does not bar plaintiffs' challenges to § 7-2507.06a because *Hoyte* concerns a different D.C. civil forfeiture statute.

Because a potentially overlapping class action is already challenging D.C.'s civil

forfeiture scheme, the District argues the rule against claim-splitting divests this Court's

jurisdiction to consider plaintiffs' § 7-2507.06a challenges.

Our court of appeals has never acknowledged the rule against claim-splitting, a silence

reflecting that "dismissal on this ground" is not a jurisdictional matter but rather a prudential

"matter of docket management" allowing districts courts to "dispense with duplicative litigation." 18 Charles Alan Wright et al., Federal Practice & Procedure § 4406 (3d ed. 2019). Other judges in this courthouse have invoked this discretionary doctrine to dismiss "two actions" by the same plaintiff "on the same subject in the same court, against the same defendant[s] at the same time," *Clayton v. District of Columbia*, 36 F. Supp. 3d 91, 94 (D.D.C. 2014) (internal quotation marks omitted) (quoting *Katz*, 655 F.3d at 1217), and to dismiss claims that "would be precluded under res judicata analysis" if "the first suit was already final." *Hudson v. Am. Fed'n of Gov't Emps.*, 308 F. Supp. 3d 388, 394 (D.D.C. 2018) (internal quotation marks omitted) (quoting *Clayton*, 36 F. Supp. 3d at 94). But still other courts in this district have declined to dismiss a second action under claim-splitting where the court previously precluded the plaintiff from adding the claims and defendants to their prior suit, *Coulibaly v. Pompeo*, 318 F. Supp. 3d 176, 181-82 (D.D.C. 2018),[9] or perhaps where the parties affirmatively agreed to allow multiple suits, *see Alaska Forest Ass'n v. Vilsack*, 883 F. Supp. 2d 136, 145 (D.D.C. 2012). Yet regardless of whether they applied the rule in a given case, all seem to agree that courts can discretionally dismiss claims from subsequent actions for claim-splitting if the claims "may still be advanced in the first action." Wright et al., § 4406 n.20.

This rule does not easily scale to the class action setting. How should it work here, where plaintiffs raise claims similar-but-not-identical to claims raised in *Hoyte*, a pending, potentially overlapping class action? Plaintiffs argue Davis's ability to opt-out of any proposed settlement in *Hoyte* "cuts through the [claim-splitting] tangle . . . like Alexander's sword slicing through the Gordian knot." Pls.' Opp'n 2, ECF No. 56. But what if the District does not offer to settle *Hoyte*?

---

[9] Courts have admittedly gone both ways on this question. *See Dorsey v. Jacobson Holman PLLC*, 764 F. Supp. 2d 209, 213 (D.D.C. 2011).

Alternatively, the District argues "[w]hether the plaintiff's claim was actually raised in the [previous] action is immaterial; what matters is that the Plaintiff could have raised the claim [there]." Def.'s Mot. 9 n.6 (alterations in original) (emphases and internal quotation marks omitted) (quoting *Koker v. Aurora Loan Servicing, LLC*, 915 F. Supp. 2d 51, 62 (D.D.C. 2013)), ECF No. 53. And true enough, Davis did briefly seek to intervene as a named plaintiff in *Hoyte*. Should he have stayed the course and attempted to advance his § 7-2507.06a claim there?

The Court need not split that atom. Rather, the obvious differences between this case and *Hoyte* sufficiently discourage discretionarily dismissing plaintiffs' claims. First, the law at issue here (§ 7-2507.06a) only subjects conveyances to forfeiture; the law at issue in *Hoyte* (§ 48-905.06) prescribes forfeiture of conveyances; real estate; manufacturing equipment; "all property which is used, or intended for use, as a container" for controlled substances; "books, records, and research products and materials"; "cash or currency"; and anything else "of value furnished or intended to be furnished in exchange for a controlled substance . . . , all proceeds traceable to such an exchange, and all moneys, negotiable instruments, or securities used or intended to be used to facilitate any violation" of the District's controlled substances laws. § 48-905.02(a). So even though § 7-2507.06a expressly grafts itself onto § 48-905.02's procedural requirements, *see* § 7-2507.06a(d) ("Except as otherwise expressly provided by this section, all seizures and forfeitures of conveyances under this section shall follow the procedures set forth in § 48-905.02."), the latter's vastly expanded substantive scope poses constitutional questions of a different kind.[10]

---

[10] Indeed, elsewhere in its briefing the District tries to distinguish *Hoyte* on the merits by pointing out "the obvious differences between vehicles and other forms of property." Def.'s Reply 18-20, ECF No. 58.

Second, who knows whether plaintiffs could have advanced their § 7-2507.06a challenge in *Hoyte*? To be sure, Davis—along with several other individuals—briefly sought to intervene as named plaintiffs in that case. *See* Mot. Intervene, *Hoyte v. Gov't of the District of Columbia*, No. 13-569 (D.D.C. Feb. 9, 2017), ECF No. 109. But a month later, he—but not his other co-movants—withdrew his intervention motion before the court had a chance to rule. *See* Notice, *Hoyte*, No. 13-569 (D.D.C. March 5, 2017), ECF No. 119. Perhaps he respected the practical concerns the District identified in opposition to his proposed intervention, not least the delay caused by further stretching a case with more than a dozen named plaintiffs already. *See* Def.'s Opp'n 5-8, *Hoyte*, No. 13-569 (D.D.C. Feb. 23, 2017), ECF No. 115. Perhaps he thought distinctions between §§ 7-2507.06a and 48-905.02 left him not sufficiently similarly situated to *Hoyte*'s proposed class. Whatever the reason, this Court will not penalize him for abandoning his uncertain attempt to shoehorn his §§ 7-2507.06a challenge into a case about 48-905.02. Claim-splitting does not bar plaintiffs' § 7-2507.06a challenges.

### 3. Because plaintiffs did not participate in *Jenkins* and *Melton*, those cases do not preclude their procedural due process challenge to § 44-2517.

The District further argues two prior cases with different plaintiffs preclude these plaintiffs' procedural due process challenge to the District's seizure of their handguns and ammunition without notice and a hearing. In the first, *Jenkins v. District of Columbia*, No. 16-118, Judge Cooper held "due process does not require a prompt hearing . . . for individuals to challenge the seizure and retention of their vehicles for evidentiary purposes." 2017 WL 6211103, at *5 (D.D.C. Mar. 28, 2017). In the second, *Melton v. District of Columbia*, No. 16-237, Judge Cooper reached a similar conclusion about cash seized for civil forfeiture. *See* 2017 WL 6211031, at *3 (D.D.C. Mar. 28, 2017). Coincidentally, plaintiffs' counsel here also

represented plaintiffs in *Jenkins* and *Melton*. But critically, the District concedes these plaintiffs did not participate in *Jenkins* or *Melton*. *See* Def.'s Reply 4.

In other words, the District tries to wield offensive, nonmutual collateral estoppel against a plaintiff not part of the prior case. Yet even if this Court could ignore distinctions between this case and *Jenkins* or *Melton* (neither involved guns), the District's claim would still fail, since that's not how collateral estoppel works. *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329 (1979) ("[T]he party against whom estoppel is [offensively] asserted [must] ha[ve] litigated and lost in an earlier action."). Though *Jenkins* and *Melton* remain persuasive authority, they do not control plaintiffs' procedural due process challenge to § 44-2517.

### 4. Plaintiffs have standing to challenge the constitutionality of the laws they were prosecuted for violating because those prosecutions caused them to suffer injuries-in-fact redressable through damages and injunctive relief.

The District next floats a two-pronged attack on plaintiffs' standing to challenge §§ 7-2502.01, 7-2506.01, and 22-4504. First, the District claims those laws didn't cause "plaintiffs' exposure to the District's criminal justice system." Def.'s Mot. 14. Instead, the District blames "plaintiffs['] . . . conscious choice to violate District law." Def.'s Reply 8.

But that argument confuses causation with the merits and turns centuries of civil rights jurisprudence on its head. By the District's logic, Mildred and Richard Loving could not have challenged Virginia's antimiscegenation law, *see Loving v. Virginia*, 388 U.S. 1 (1967); Greg Johnson could not have challenged Texas's flag-burning prohibition, *see Texas v. Johnson*, 491 U.S. 397 (1989); and John Lawrence could not have challenged Texas's sodomy ban, *see Lawrence v. Texas*, 539 U.S. 558 (2003). Simply put, someone prosecuted under a criminal law can challenge its constitutionality regardless of whether they consciously committed the offense, and regardless of whether their prosecution proceeded to conviction. *See, e.g.*, *Younger v. Harris*,

401 U.S. 37, 41-42 (1971). Like the plaintiffs in *Loving*, *Johnson*, and *Lawrence*, the criminal laws challenged here caused plaintiffs to suffer "humiliation, emotional distress, physical harm, loss of earnings, general damages, and legal expenses that resulted from being arrested and/or detained." 2d Am. Compl. ¶ 252. The District cannot shield those laws from constitutional challenge by blaming plaintiffs for violating them.[11]

Second, the District argues declaring §§ 7-2502.01, 7-2506.01, and 22-4504 unconstitutional will not redress plaintiffs' injuries. As they put it, "even if the Court were to declare that the pre-*Palmer* gun laws violated plaintiffs' [constitutional] rights . . . that decision would have no effect on the outcome of plaintiffs' criminal proceedings, all of which have ended." Def.'s Mot. 16-17.

That logic conflates redressability with damages (or maybe with mootness). Either way, the Court does not adopt the District's cribbed conception of plaintiffs' requested relief. If plaintiffs' constitutional challenge to §§ 7-2502.01, 7-2506.01, and 22-4504 prevails—and for present purposes, the Court must assume it will—plaintiffs will be entitled to compensatory damages for physical suffering, for mental anguish, and for reasonable and necessary expenses like loss of earnings or attorney's fees. *See Carey v. Piphus*, 435 U.S. 247, 254-56 (1978). They will also be entitled to nominal damages. *Id.* at 266. They may even be entitled to declaratory and injunctive relief nullifying their arrests and sealing any relevant records. *See, e.g., Carter v.*

---

[11] The District's related argument—that the District did not cause plaintiffs' injuries because "the actions of the U.S. Attorney and the D.C. Attorney General "are each discrete, intervening events that independently 'caused' the injuries for which plaintiffs seek redress," *see* Def.'s Mot. 15—is similarly dead on arrival. The U.S. Attorney and the D.C. Attorney General are obviously state actors, each tasked with authority to prosecute the District's criminal laws. *See generally In re Crawley*, 978 A.2d 608, 610 (D.C. 2009) (describing the "bifurcat[ion]" of "prosecuting authority for crimes committed in the District"). So the District cannot accuse the U.S. Attorney and the D.C. Attorney General of independently injuring plaintiffs by choosing to prosecute them, since they acted on the District's behalf. *See also Oates v. District of Columbia*, 824 F.2d 87, 90 (D.C. 1987) (noting when "District [of Columbia] officials . . . act[] in their official capacities," it "is equivalent to the 'state action' requirement" for § 1983 litigation).

*District of Columbia*, 795 F.2d 116, 136 (D.C. Cir. 1986). But in all events, a favorable decision will likely redress injuries §§ 7-2502.01, 7-2506.01, and 22-4504 caused. So plaintiffs can challenge those laws on Second and Fifth Amendment grounds.

### 5. Repealing §§ 7-2502.01, 7-2506.01, and 22-4504 did not moot Plaintiffs' declaratory relief claims, because the laws continue to harm one plaintiff and because plaintiffs seek more than a declaration concerning the repealed laws' constitutionality.

The District is right that "[i]n the context of challenges to legislation, a claim for declaratory relief ordinarily becomes moot once the challenged law is 'no longer in force.'" Def.'s Mot. 17 (quoting *Daskalea v. Wash. Humane Soc'y*, 710 F. Supp. 2d 32, 40 (D.D.C. 2010)). But the District is wrong that repealing §§ 7-2502.01, 7-2506.01, and 22-4504 mooted plaintiffs' claims for declaratory relief, for two reasons.

First, even though the statutes lack present legal thrust, their wake continues to harm one plaintiff: Cpl. Rouse. A case the District cites—*National Black Police Association v. District of Columbia*—explains why this keeps his claims alive. In *National Black Police Association*, the D.C. Circuit found the case moot since "[p]laintiffs sought only to have [the challenged law] declared unconstitutional and enjoined." 108 F.3d 346, 350 (1997), *cited with approval in* Def.'s Mot. 18 n.10. Yet the panel suggested it would have reached a different result had those plaintiffs "contend[ed] that [the law] continue[d] to have any residual effect." *Id.* Here, these plaintiffs identify a residual effect for Cpl. Rouse: "As a result of his arrest" and prosecution for violating §§ 7-2502.01, 7-2506.01, and 22-4504, his top-secret security clearance was placed "under review." 2d Am. Compl. ¶ 183. And since he can "show that [he] personally ha[s] been injured," he has standing to pursue declaratory relief for himself and for a class of similarly situated individuals. *Warth v. Sedlin*, 422 U.S. 490, 502 (1975). So although the other named

plaintiffs may be unable to obtain a declaration that the superseded laws were unconstitutional, Rouse still can—at least for himself, and maybe for a class.

Second, and more to the point, plaintiffs' requested relief extends beyond just declaring the defunct laws unconstitutional. Plaintiffs ask the Court to declare their arrests and prosecutions "legal nullities," *id.* ¶ 328, relief helpful to avoid "having to respond affirmatively to the familiar question, 'Ever been arrested?' on application, employment, and security forms." *Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 (D.C. Cir. 2004) (Roberts, J.). Indeed, that's why courts often grant this relief following a successful post-enforcement constitutional attack on a criminal law. *E.g.*, Order at 2, *Chang v. United States*, No. 2-2010 (D.D.C. Jan. 10, 2008) ("The arrests of [plaintiffs] are hereby declared null and void. Each of the [plaintiffs] are authorized to deny the occurrence of his or her arrest that day, without being subject to any penalty of perjury, fraud, or other offense premised upon misrepresentation or deception in response to any query, whether posed orally or in writing."), ECF No. 381; *Sullivan v. Murphy*, 380 F. Supp. 867, 869 (D.D.C. 1974); *see Hedgepeth*, 386 F.3d at 1152, *Carter*, 795 F.2d at 136; *Tatum v. Morton*, 562 F.2d 1279, 1285 n.17 (D.C. Cir. 1977) (collecting cases); *see also Humbles v. District of Columbia*, No. 91-1924, 2000 WL 246578, at *4 (D.D.C. Feb. 18, 2000) ("[I]t does not appear that any court has ever actually denied expungement in a case involving an illegal arrest.").

In sum, since §§ 7-2502.01, 7-2506.01, and 22-4504 continue to harm one plaintiff, and since all plaintiffs seek a declaration regarding their arrest and prosecution's constitutionality, repealing those laws did not moot their claims for declaratory relief.

**B. Because plaintiffs state some valid claims and some invalid claims, the Court will grant-in-part and deny-in-part the District's 12(b)(6) motion.**

In its Rule 12(b)(6) motion, the District takes several swings at the legal sufficiency of plaintiffs' claims. Some land. For instance, plaintiffs' Fourth Amendment challenges to their arrest, detention, vehicle seizure, and initial firearm seizure fail as a matter of law. Additionally, plaintiffs' vehicle-related Second Amendment challenges are timebarred. And because Rule 41(g) provides adequate post-deprivation safeguards, plaintiffs' procedural due process challenge to the District's seizure of guns and ammunition stumbles from the start.

But none are knockouts. Plaintiffs' Fourth Amendment challenge to the District's continued seizure of their guns and ammunition after dismissing their criminal charges may proceed. So too can plaintiffs' Second and Fifth Amendment challenges to §§ 7-2502.01, 7-2506.01, and 22-4504: both are cognizable under § 1983, and their Fifth Amendment allegations bear out equal protection and right-to-travel deprivations. And plaintiffs may continue pursuing injunctive and declaratory relief nullifying their arrests and sealing related records.

**1. Most of plaintiffs' Fourth Amendment challenges fail as a matter of law, but their challenge to the District's ongoing seizure of their guns and ammunition may proceed.**

The District argues plaintiffs' Fourth Amendment challenges—to their arrest, detention, and seizure of property (claims two, five, six, eight, and ten)—all fail as a matter of law given *Michigan v. DeFillippo*'s teaching that "an arrest made in good-faith reliance on an ordinance, which at the time had not been declared unconstitutional, is valid regardless of a subsequent judicial determination of its unconstitutionality." 443 U.S. 31, 33 (1979).

To be sure, *DeFillippo* forecloses plaintiffs challenging their arrests under the Fourth Amendment (part of claim two). At the time, §§ 7-2502.01, 7-2506.01, and 22-4504 were on the books, and police had abundant probable cause to believe plaintiffs had violated them—Smith

and Cassagnol each admitted they had a gun; police saw Cpl. Rouse and Davis's guns in plain sight. After all, "[p]olice are charged to enforce laws until and unless they are declared unconstitutional," and "[s]ociety would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." *DeFillippo*, 443 U.S. at 38. So to the extent plaintiffs ask whether their arrests under §§ 7-2502.01, 7-2506.01, and 22-4504 violated the Fourth Amendment, the Court answers "no" as a matter of law.

But plaintiffs challenge more than just their arrests. They also challenge their overnight detentions (the other part of claim two); the ongoing seizure of their guns and ammunition (claims five and six); and the two-month seizure of Davis's car (claims eight and ten). The Fourth Amendment protects against unreasonable seizures. *See* U.S. Const. amend. IV. So was it unreasonable for the District to seize Smith for one night, Cpl. Rouse and Cassagnol for two nights, and Davis for four nights? Was it unreasonable to seize Davis's car for purposes of civil forfeiture? Or to continue holding it after searching and processing it for evidence? Was it unreasonable to seize their guns and ammunition under § 22-4517? What about after dismissing the charges against them?

For the first four questions, the Court still answers "no." First, given the ample probable cause that plaintiffs had violated §§ 7-2502.01, 7-2506.01, and 22-4504, the District reasonably detained them after their arrests. To be sure, the Fourth Amendment requires a prompt "judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). And this determination must generally occur "within 48 hours of arrest." *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). But here, Davis—the only plaintiff detained for more than forty-eight hours—had his initial appearance in

Superior Court the day after his arrest. *See* 2d Am. Compl. ¶ 210. The Superior Court judge

further detained him for three more nights after determining pursuant to D.C. Code § 23-

1322(b)(2) that "no condition or combination of conditions w[ould] reasonably assure the

appearance of [Davis] as required, and the safety of any other person and the community." *See*

2d Am. Comp. ¶ 214. Of course, plaintiffs do not challenge that ruling here. They only ask

whether Davis and the other plaintiffs received a constitutionally adequate judicial determination

of probable cause prior to their extended detention. And since they did, their challenge to their

overnight detention fails as a matter of law.

Second, the District reasonably retained Davis's car for purposes of civil forfeiture.

Though civil forfeiture statutes raise a hornets' nest of constitutional questions, the Fourth

Amendment inquiry is simple: are forfeiture proceedings supported by probable cause? *See One*

*1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 696 (1965). Here, § 7-2507.06a(b)

provided for forfeiture of "vehicles . . . in which any person or persons transport, possess, or

conceal any firearm . . . or in any manner use to facilitate a violation of . . . § 22-4504." As

explained, police had probable cause to believe Davis violated § 22-4504 by transporting a

handgun in his vehicle. And the District reasonably held the vehicle for two months while

contemplating civil forfeiture: otherwise Davis could have frustrated the proceedings by selling,

destroying, concealing, or removing the vehicle from the jurisdiction. *See also United States v.*

*Von Neumann*, 474 U.S. 242, 249-51 (1986); *United States v. $8,850 in U.S. Currency*, 461 U.S.

555, 562-65 (1983). Thus seizing Davis's car in contemplation of civil forfeiture complied with

the Fourth Amendment.

Third—and for essentially the same reason—the District reasonably retained Davis's car

after processing it for evidence. Because § 7-2507.06a gave the District authority to hold the car

while contemplating civil forfeiture, and because probable cause would have supported those forfeiture proceedings, the Fourth Amendment did not prohibit the District from holding the car in advance of civil forfeiture proceedings, even after processing it for evidence.

Fourth, the District could seize plaintiffs' guns and ammunition while their prosecutions were pending. After all, police can seize weapons found in plain view or following a lawful search incident to arrest to ensure officer safety and to preserve incriminating evidence. *See United States v. Castellanos*, 731 F.2d 979, 984 (D.C. Cir. 1984); *see also Chimel v. California*, 395 U.S. 752, 762-63 (1969). Here, plaintiffs do not dispute the weapons were either in plain view or found during a lawful search. And at least until the District dismissed their criminal charges, the District could justify retaining the guns in order to preserve evidence important to the ongoing prosecution. So plaintiffs' challenge to the District's seizure of their guns and ammunition while their criminal charges were pending fails as a matter of law.

But the Court cannot say whether the District's ongoing seizure of plaintiffs' guns and ammunition after dismissing the charges against them complies with the Fourth Amendment. To answer this question, the Court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). After all, "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringe[d] possessory interests." *United States v. Jacobsen*, 466 U.S. 109, 124 (1984). Put another way, the Fourth Amendment permits seizures only for as long as necessary. Once a justification loses force, the government must cease the seizure or come up with a new justification.

What justification could the District possibly have for still holding plaintiffs' guns and ammunition, years after dismissing the charges against them? The District doesn't say. Clearly any need to preserve evidence for the ongoing prosecutions ended when those prosecutions were dismissed. Is it that § 22-4517—still on the books—declares them contraband? If so, the Court cannot confidently say at the motion-to-dismiss stage that whatever governmental interest § 22-4517 serves (the District never explains) outweighs such a long and significant intrusion on plaintiffs' possessory rights. This is all the more true since § 22-4517 implicates plaintiffs' fundamental right to have a handgun for individual self-defense, *see McDonald v. City of Chicago*, 561 U.S. 742, 767-69 (2010), and thus enjoys no presumption of validity. *See Heller v. Doe*, 509 U.S. 312, 319 (1993). So the District must answer this claim.

In sum, although the Court will dismiss most of plaintiffs' Fourth Amendment challenges (claims two, five, eight, and ten), their Fourth Amendment challenge to the District's continuing seizure of their guns and ammunition (claim six) persists.

### 2. Plaintiffs' Second and Fifth Amendment Challenges to §§ 7-2502.01, 7-2506.01, and 22-4504 survive.

Claims one and three of plaintiffs' second amended complaint challenge §§ 7-2502.01, 7-2506.01, and 22-4504 on Second and Fifth Amendment grounds. Specifically, plaintiffs argue the scheme infringes on their rights to possess a handgun for individual self-defense, to equal protection, and to travel interstate. The District counters that these claims aren't cognizable under § 1983 since plaintiffs' arrest and prosecutions passed independent constitutional muster. The District further argues plaintiffs fail to state an equal protection or right-to-travel claim.

But the District is wrong. Plaintiffs' Second and Fifth Amendment claims are cognizable under § 1983 since plaintiffs allege §§ 7-2502.01, 7-2506.01, and 22-4504 afflict substantive rights beyond their arrests and prosecutions. And plaintiffs adequately state equal protection and

right-to-travel claims since §§ 7-2502.01, 7-2506.01, and 22-4504 distinguish between D.C. and non-D.C. residents in a way that jeopardizes the latter's fundamental rights. So claims one and three can proceed.

### i. Because plaintiffs allege §§ 7-2502.01, 7-2506.01, and 22-4504 violated the Bill of Rights' substantive guarantees, their Second and Fifth Amendment claims are cognizable under § 1983.

Because D.C. law made it impossible for non-D.C. residents to lawfully carry a handgun for individual self-defense in the District, plaintiffs claim §§ 7-2502.01, 7-2506.01, and 22-4504 violate the Second and Fifth Amendments. But the District claims that argument fails as a matter of law, gesturing to two out-of-circuit cases holding that individuals prosecuted under an ordinance later found to be unconstitutional do not suffer a constitutional injury. *See* Def.'s Mot. 27-30 (citing *Reyes v. City of Lynchburg*, 300 F.3d 449 (4th Cir. 2002), *Richardson v. City of South Euclid*, 904 F.2d 1050 (6th Cir. 1990)).

Those cases are inapposite.[12] In *Reyes* and *Richardson*, the plaintiffs' only plausibly alleged constitutional injury was a per se procedural due process violation caused by enforcing a

---

[12] So too are *Corrigan v. Glover*, 254 F. Supp. 3d 184 (D.D.C. 2017) and other Fourth Amendment cases holding that § 1983 plaintiffs subjected to unconstitutional searches cannot recover damages for a subsequent arrest and prosecution based on evidence obtained through the unconstitutional search. In that context, the constitutional deprivation arises from the unconstitutional search—not the penal law justifying a plaintiff's arrest and prosecution. So heeding the Supreme Court's instruction that "the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question," *Carey v. Piphus*, 435 U.S. 247, 259 (1978), the *Corrigan* court correctly concluded "[v]ictims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution." *Corrigan*, 254 F. Supp. 3d at 207 (alteration in original) (internal quotation marks omitted) (quoting *Hector v. Watt*, 235 F. 3d 154, 157 (3d Cir. 2000)). In other words, *Corrigan* holds a person arrested and prosecuted for violating a constitutionally valid criminal law cannot recover injuries stemming from their arrest and prosecution, even if evidence obtained through an unconstitutional search incriminated them.

But this case is obviously different, since these plaintiffs allege the criminal laws undergirding their arrests and prosecutions are themselves constitutionally invalid. Unlike in *Corrigan*, these plaintiffs do not claim some other constitutional infirmity infected their arrests and prosecutions; they claim their arrests and prosecutions were Patient Zero. Put differently, these plaintiffs draw a straight line from an unconstitutional criminal law to their injuries, while the *Corrigan* plaintiffs meander first from an unconstitutional search to a constitutional law, and then

vague municipal ordinance. In other words, those cases test only whether a person prosecuted under an unconstitutional criminal law deserves more process than a person prosecuted under a constitutional criminal law. And both reach (to this Court) the obvious answer: No. "The prosecution itself is the observance of process due the accused." *Richardson*, 904 F.2d at 1053 (rejecting plaintiffs' procedural due process claim since they "were not convicted without notice and trial," but rather "were charged in writing" and "permitted an opportunity to respond in open court"); *see also Baker v. McCollan*, 443 U.S. 137, 145 (1979) ("The Constitution does not guarantee that only the guilty would be arrested."). A contrary result would place cities "in the precarious position of having to determine whether a new law is valid and worthy of their enforcement before risking, through enforcement, suffering damages should the law later be deemed invalid," *Richardson*, 904 F.2d at 1055, and would give every defendant acquitted or suspect released an automatic § 1983 claim if the relevant criminal law turns out to be unconstitutional.

These plaintiffs make a different claim. Unlike their *Reyes* and *Richardson* doppelgängers, these plaintiffs plausibly allege the allegedly unconstitutional criminal laws besiege free-standing substantive rights: the rights to have a handgun for individual self-defense, to equal protection, and to travel interstate. *Cf. id.* (noting the *Richardson* plaintiffs "were not deprived of any 'liberty' interest as that term has been defined in fourteenth amendment jurisprudence"). A law banning law-abiding citizens from having a handgun for individual self-defense constitutes a classic Second Amendment injury. A state law treating non-state residents differently on the basis of a fundamental right presents a paradigmatic equal protection problem.

_____

from the constitutional law to their injuries. Because these plaintiffs take one step where the *Corrigan* plaintiffs took two, they may recover what the *Corrigan* plaintiffs couldn't.

And a law forcing plaintiffs to surrender a fundamental right before traveling interstate impacts the right to travel. So at bottom, plaintiffs claim more than that they had to defend themselves against unconstitutional laws. They claim the unconstitutional laws infringed their substantive rights. Thus they allege constitutional injuries cognizable under § 1983.

### ii. Plaintiffs' equal protection claim survives because §§ 7-2502.01, 7-2506.01, and 22-4504 distinguish between D.C. residents and non-D.C. residents at the expense of the latter's fundamental rights.

The Fifth Amendment's due process clause forbids the District from denying equal protection of its laws to anyone in the District. *See Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954). Essentially, this protects against discrimination: the District cannot treat people differently without a satisfactory justification. By extension, it means the District cannot "den[y] [some people] a benefit available to others on account of their exercise of a fundamental right." *Autor v. Pritzker*, 740 F.3d 176, 184 (D.C. Cir. 2014). Yet because §§ 7-2502.01, 7-2506.01, and 22-4504 make it impossible for law-abiding non-D.C. residents to have a handgun for individual self-defense in D.C., plaintiffs claim the laws violate this guarantee. For its part, the District argues §§ 7-2502.01, 7-2506.01, and 22-4504 pass constitutional muster for two reasons: First, the laws "treat[] District residents and non-residents identically." Def.'s Mot. 23 (emphasis removed). And second, "to the extent there is any difference in treatment," it doesn't matter since the distinction "need only bear a 'rational relation to some legitimate end.'" *Id.* (quoting *Romer v. United States*, 517 U.S. 620, 631 (1996)). Yet the District whiffs on both.

First, §§ 7-2502.01, 7-2506.01, and 22-4504 treated D.C. residents different from non-D.C. residents. True enough, the laws seem generally applicable at first glance. Section 7-2502.01(a) made it unlawful to "possess or control any firearm, unless the person . . . h[e]ld[] a valid registration certificate for the firearm." Section 7-2506.01(a)(3) similarly criminalizes

"possess[ion of] ammunition in the District of Columbia unless . . . [you are] the holder of the valid registration certificate for a firearm." And § 22-4504(a) barred everyone from "carry[ing] within the District of Columbia either openly or concealed on or about their person, a pistol, or any deadly or dangerous weapon capable of being so concealed."

But § 7-2502.02 is the rub. That statute's subsection (a)(4)(C) decreed that a D.C. "registration certificate shall not be issued for" a pistol unless the registrant "seeks to register [the] pistol for use in self-defense within that person's home." In other words, § 7-2502.02 did not provide an avenue for people without a home in D.C. to register guns in D.C. Indeed, plaintiffs allege the District required registrants to prove their D.C. residency before they could obtain a certificate. *See* 2d Am. Compl. ¶ 19. So because §§ 7-2502.01, 7-2506.01, and 22-4504 criminalized unregistered guns and related ammunition, and another provision allowed D.C. residents to register their guns but made it impossible for non-D.C. residents to register their guns, §§ 7-2502.01, 7-2506.01, and 22-4504 treated D.C. residents and non-D.C. residents differently.

And second, this differential treatment causes more problems than the District admits. "The first issue in equal protection analysis is whether the distinction . . . demands heightened scrutiny." *Banner v. United States*, 428 F.3d 303, 307 (D.C. Cir. 2005). "Strict scrutiny—the most demanding variety—is warranted if the restriction 'jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic.'" *Id.* (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). To be sure, "[a] bona fide residence requirement implicates no 'suspect' classification, and therefore is not subject to strict scrutiny." *Martinez v. Bynum*, 461 U.S. 321, 328 n.7 (1983). But—drawing all inferences in the plaintiffs' favor—this de facto residency requirement did restrict plaintiffs' fundamental right to have a handgun for individual

self-defense. *See McDonald*, 561 U.S. at 767-69. So assuming plaintiffs' evidence matches their pleadings, strict scrutiny applies. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988) (requiring strict scrutiny for "classifications affecting fundamental rights").

Outside the equal protection context, courts cleave over what tier of heightened scrutiny applies to laws burdening the Second Amendment, and the D.C. Circuit has yet to take sides. *See Wrenn*, 864 F.3d at 657. *Compare, e.g.*, *Mance v. Sessions*, 896 F.3d 699, 704 (5th Cir. 2018) (applying strict scrutiny), *with, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) (applying intermediate scrutiny).[13] But the D.C. Circuit has said "the proper level to apply . . . turn[s] on whether a gun law imposes 'substantial[ly]' on the Second Amendment's 'core.'" *See Wrenn*, 864 F.3d at 657 (second alteration in original) (quoting *Heller II*, 670 F.3d at 1257). And this approach provides further support for applying strict scrutiny here. After all, §§ 7-2502.01, 7-2506.01, and 22-4504 substantially impose on individual self-defense—the "*central component*" of the fundamental right to keep and bear arms. *Heller I*, 554 U.S. at 599; *see also McDonald*, 561 U.S. at 767-69, 772; *Heller I*, 554 U.S. at 624-25, 628-29. So in addition to the Supreme Court's command to subject fundamental-right–impacting distinctions to strict scrutiny under equal protection analysis, this Circuit's Second Amendment jurisprudence urges the same result.

In sum, strict scrutiny applies to plaintiffs' equal protection claim. And to satisfy strict scrutiny, the District must show §§ 7-2502.01, 7-2506.01, and 22-4504 are narrowly tailored to effectively advance a compelling interest. *See Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 11 (D.C. Cir. 2009). But since the District bears this burden, it is a question for a later day. For now,

---

[13] The Supreme Court has an opportunity to resolve the split next term. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 139 S. Ct. 939 (2019) (granting certiorari).

the Court merely concludes that because §§ 7-2502.01, 7-2506.01, and 22-4504 drew a distinction between D.C. residents and non-D.C. residents jeopardizing the latter's exercise of their fundamental right to possess a handgun for individual self-defense, plaintiffs adequately state an equal protection claim.

### iii. Plaintiffs' right-to-travel claim adequately states a claim for relief because §§ 7-2502.01, 7-2506.01, and 22-4504 penalize plaintiffs for traveling interstate by treating D.C.-resident gunowners differently from non–D.C.-resident gunowners.

In addition to challenging plaintiffs' Fifth Amendment claim on equal protection grounds, the District separately argues plaintiffs' right-to-travel argument fails. Yet "[i]n reality, right to travel analysis refers to little more than a particular application of equal protection analysis." *Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982). Of course, the scrutinized distinction changes: newcomers versus established residents. *See id.* And instead of guaranteeing equal treatment, the right to travel

> protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the Second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

*Saenz v. Roe*, 526 U.S. 489, 500 (1999). But—like in the equal protection context—"any government impingement" on the fundamental right to move between states "would be measured under a strict scrutiny standard and would be justified only if the infringement is narrowly tailored to serve a compelling state interest." *Hutchins v. District of Columbia*, 188 F.3d 531, 537 (D.C. Cir. 1999) (en banc) (describing the right to interstate travel as "well-established" and noting it "reflect[s] a concern over state discrimination against outsiders").

Here, the Court concludes plaintiffs plausibly allege §§ 7-2502.01, 7-2506.01, and 22-4504 impinge on their fundamental right to travel interstate, and thus merit strict scrutiny. A

"law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses 'any classification which serves to penalize the exercise of that right.'" *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (citations omitted) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 340 (1972)). Plaintiffs do not argue the laws actually deter or try to impede interstate travel. But plaintiffs do adequately contend the laws use a classification—gun ownership—to penalize exercising the right. *See* 2d Am. Compl. ¶ 265.

One of the District's cases, *Pollack v. Duff*, explains why. Citing the Supreme Court's jurisprudence on durational residency requirements, the D.C. Circuit concluded state laws "penalize the exercise of" the right to travel interstate when they "prohibit[] a person who has recently traveled to the state from" enjoying a right "available to a longer-term resident of that state." *Pollack*, 793 F.3d 34, 47 (2015) (citing, inter alia, *Dunn*, 405 U.S. at 334-43). And as *Dunn* explained, laws stymieing recent travelers' fundamental rights always merit strict scrutiny. *See* 405 U.S. at 336-37. So if §§ 7-2502.01, 7-2506.01, and 22-4504 take away the fundamental right to have a handgun for individua. self-defense from non-D.C. residents who enter the District, this Court must apply strict scrutiny.

As a result, plaintiff's right-to-travel claim goes the distance. Just as the Court explained for plaintiffs' equal protection claim, because the District bears the burden under strict scrutiny to prove the infringement is narrowly tailored to serve a compelling state interest, the claim cannot be resolved on the District's own motion to dismiss. Because plaintiffs adequately claim §§ 7-2502.01, 7-2506.01, and 22-4504 impinge on their fundamental right to travel interstate, their right-to-travel claim can go forward.

### 3. Plaintiffs' vehicle-related Second Amendment challenges are timebarred.

The District next claims plaintiffs' vehicle-related claims all fall outside D.C. Code § 12-301's default three-year statute of limitations.[14] Of course, as explained in subsection II.B.1 of this Memorandum Opinion, most of those claims will be dismissed for failure to state a Fourth Amendment claim. Only claims two and four remain: plaintiffs' Second Amendment challenges to the District's seizure and forfeiture of vehicles used to convey firearms. And unfortunately for plaintiffs, both come too late.

Section 12-301(8) imposes a "three-year residual statute of limitations" on "section 1983 claims." *Earle v. District of Columbia*, 707 F.3d 299, 305 (D.C. Cir. 2012). That poses a problem for plaintiffs. After all, Davis is the only plaintiff to have his car taken. Police initially seized his car in March 2014; they returned it in "late May 2014." *See* 2d Am. Compl. ¶¶ 225, 243. But plaintiffs did not attempt to add Davis and his vehicle-related claims to the suit until November 2017, well after three years passed. *See* Mot. Amend, ECF No. 43.

Plaintiffs try to skirt this time-limit by claiming the vehicle-related claims relate back to Smith's original complaint filed in May 2015. True enough, a new plaintiff or claim can relate back "to the date of the original pleading if the 'amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.'" *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009) (omission in original) (quoting Fed. R. Civ. P. 15(c)(1)(B)). But new plaintiffs and claims do not relate back if they "assert[] a new ground for relief supported by facts that differ in . . . type from those the original

---

[14] The District actually raised this argument in its 12(b)(1) motion. But since "[s]tatutes of limitations and other filing deadlines 'ordinarily are not jurisdictional,'" *Mussachio v. United States*, 136 S. Ct. 709, 716-17 (2016) (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 155 (2013)), the Court analyzes it within the context of the District's 12(b)(6) motion. *See also Jones v. Rogers Mem'l Hosp.*, 442 F.2d 773, 775 (D.C. Cir. 1971) ("The [statute-of-limitation] defense may be raised by a motion to dismiss under Rule 12(b)(6)."). The reasoning and conclusion are identical regardless.

pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650 (2005). To determine where plaintiffs' claims fall, the Court considers "whether the original complaint adequately notified the defendant[] of the basis for liability the plaintiffs would later advance." *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 866 (D.C. Cir. 2008). Even new claims and plaintiffs sharing "some elements and some facts in common" with the original complaint do not relate back if it operates "to fault [the defendant] for conduct different from that identified in the original complaint." *Id.*

So too for Davis and his vehicle-related claims. Taking as true plaintiffs' contention that "[t]he relevant transaction in the original Complaint is properly understood as Ms. Smith's arrest" in June 2014, Pls.' Opp'n 11, the Court cannot see how claims stemming from Davis's March 2014 arrest arise out of that "conduct, transaction, or occurrence." Fed. R. Civ. P. 15(c)(1)(B). Moreover, plaintiffs admit

> [t]he core allegation pled in the original Complaint remains that the District's gun control regime was a total ban on gun ownership (including gun possession) in violation of the 2d Amendment, and that by enforcing its unconstitutional gun control regime against Ms. Smith and the other class members, the District injured them in their persons and in their valuable property rights.

Pls.' Opp'n 10 (citation omitted). Yet plaintiffs' original property rights argument said nothing about cars—it was limited to professional licenses, the right to vote, and the right to serve on juries. *See* Compl. ¶¶ 22-24, ECF No. 1. Put another way, it was impossible for the District to anticipate based on the original complaint that this lawsuit would swell to include constitutional challenges by a plaintiff whose car was seized and subjected to civil forfeiture.

Accordingly, because plaintiffs' vehicle-related Second Amendment claims assert an unanticipatable ground for relief different in kind from those in the original complaint, they do not relate back to Smith's original complaint. And because they do not relate back, they land outside § 12-301(8)'s three-year timebar. So claims four and nine will be dismissed.

### 4. Because Rule 41(g) provides adequate post-deprivation process, plaintiffs' procedural due process claim fails as a matter of law.

In claim seven, plaintiffs argue the District's failure to provide notice and a hearing regarding their seized handguns and ammunition violated the Fifth Amendment's procedural due process guarantee. But the District argues the claim fails as a matter of law, since Rule 41(g) offers a constitutionally adequate post-seizure mechanism to challenge the guns' seizure.

The District is right—the process Rule 41(g) affords clears any constitutional bar. To be sure, a post-deprivation hearing is not the preferred way to satisfy due process. But in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the" deprivation, a post-deprivation opportunity to be heard suffices. *Boddie v. Connecticut*, 401 U.S. 371, 378-79 (1971). This is such a case.

Determining whether a post-deprivation hearing satisfies the Fifth Amendment's procedural protections requires "examin[ing ] the competing interests at stake, along with the promptness and adequacy of later proceedings." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 53 (1993). As often happens in the procedural due process context, the *Mathews v. Eldridge* factors guide this analysis, weighing the private interest affected, the risk of erroneously depriving that interest, and additional safeguards' likely value against the government's interest. *See id.* (citing 424 U.S. 319, 335 (1976)).

Those factors counsel in favor of post-deprivation proceedings here. To be sure, plaintiffs' right to have a handgun for individual self-defense is a private interest of historic and continuing importance. *See McDonald*, 561 U.S. at 767-69. But where police seize those guns incident to arrest, the risk of erroneous deprivation is negligible. And the search-incident-to-arrest context further makes pre-deprivation process impractical, given the ease with which guns can be quickly and quietly sold, destroyed, concealed, or otherwise removed from the

jurisdiction. *Cf. Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (noting a post-deprivation hearing may pass constitutional muster where the government must necessarily act quickly, or where pre-deprivation process is impractical). Moreover, given Rule 41(g)'s mandatory hearing, additional safeguards seem unlikely to add value.[15] Finally, the District's interest is sizeable: law enforcement's authority to seize unregistered firearms during a search incident to arrest is critical to promote officer safety, prevent crime, and protect the public. So given this balance, the Court concludes that for unregistered guns and ammunition seized incident to arrest, the post-deprivation hearing Rule 41(g) makes available satisfies the Fifth Amendment's procedural due process guarantee.

Accordingly, because seizing plaintiffs' guns and ammunition without pre-deprivation notice and hearing passed constitutional muster, plaintiffs' procedural due process challenge fails as a matter of law. Claim seven will be dismissed.

### 5. Plaintiffs may continue pursuing injunctive and declaratory relief nullifying their arrests and expunging records relating to their arrests and prosecutions.

The District's final contention can be swiftly felled. The District claims plaintiffs cannot obtain declaratory and injunctive relief sealing their arrest and prosecution records and declaring their arrests legal nullities because that relief is limited to individuals who can "show by 'clear and convincing evidence' either that the crime for which she was arrested did not occur, or that she did not commit it." Def.'s Mot. 32 (quoting *Sepulveda-Hambor v. District of Columbia*, 885 A.2d 303, 307 (D.C. 2005)). But this Circuit follows a different standard. *See Hedgepeth*, 386 F.3d at 1152-53 (Roberts, J.); *see also Doe v. Webster*, 606 F.2d 1226, 1230-31 (D.C. Cir. 1979)

---

[15] Other courts agree. *See, e.g., Baird v. Holton*, 806 F. Supp. 2d 53, 58 n.5 (2011) ("Rule 41(g) provides the plaintiff with a constitutionally adequate mechanism for obtaining return of his seized property."); *Leyland v. Edwards*, 797 F. Supp. 2d 7, 10 (D.D.C. 2011) ("Although concise, Rule 41(g) is a comprehensive scheme that provides a straightforward and adequate remedy—and one which avoids any constitutional deprivation.").

(collecting cases); discussion *supra* p. 18. If plaintiffs win their constitutional challenge to the laws justifying their arrest and prosecution, "[i]t is . . . within the equitable powers of the [C]ourt to order expungement of [their] record[s]." *Beran v. United States*, 759 F. Supp. 886, 890 n.7 (D.D.C. 1991).

## III. Conclusion

To review: plaintiffs have standing to challenge the laws that allowed the District to seize their cars, take their guns, and subject them to arrest and prosecution, and their claims are neither precluded nor moot. So the Court will deny the District's motion to dismiss for lack of subject matter jurisdiction.

Additionally, plaintiffs state some legally sufficient claims under the Second, Fourth, and Fifth Amendments. Plaintiffs' Fourth Amendment challenge to the ongoing seizure of their guns and ammunition; their Second and Fifth Amendment challenges to §§ 7-2502.01, 7-2506.01, and 22-4504; and their pursuit of injunctive and declaratory relief nullifying their arrests and sealing related arrest and prosecution records may advance. But their other Fourth Amendment challenges fail, as do their Second Amendment challenges to vehicle seizure and forfeiture, and their procedural due process challenge to the District's seizure of their guns and ammunition. So the Court will grant-in-part and deny-in-part the District's motion to dismiss for failure to state a claim.

Simply put, claims two, four, five, seven, eight, nine, and ten will be dismissed with prejudice. But all other claims remain. A separate order follows.

May 16, 2019

Royce C. Lamberth
United States District Judge

35