# Defendant's Exhibit No. 5



Deposition of:

# Commander John Haines

*January 13, 2021*

In the Matter of:

# Smith, Maggie et al. v. District of Columbia

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

Page 10

1   So my understanding is --
2   MR. CLAIBORNE: Is this correct,
3   Andy, Commander Haines is not doing Topics 1 and 2?
4   MR. SAINDON: That is correct.
5   And, Commander, I just sent you
6   another copy.
7   THE WITNESS: Thanks.
8   BY MR. CLAIBORNE:
9   Q  Yeah, you don't need it, but just in
10  case you want to, you know, have it there.
11  A  I have it.
12  Q  Okay. So the first topic is what
13  policies and practices did the MPD follow for
14  making arrests on weapons charges during the class
15  period. And just for our purposes of today,
16  roughly speaking, the class period we'll say is --
17  starts sometime in 2011 and goes up until October
18  of 2014, when the mayor signed the emergency
19  legislation introducing the Good Cause Program for
20  licensing firearms in the District.
21  So you understand that period?
22  A  Yes, sir.

Page 11

1   Q  Commander, are you familiar -- what's
2   the difference between a weapon and a firearm in
3   MPD terminology?
4   A  The legal definition of a firearm is
5   a device that it -- that it -- I'm trying to think
6   of the actual word. I'm sorry. It emits a
7   projectile by means of an explosive. That is the
8   definition of a firearm. A weapon can literally be
9   anything.
10  Q  And so let's -- No. 4 is, "What
11  policies and practices did the MPD follow" -- well,
12  No. 3, let me -- let me just restrict it then to
13  what you just called firearms -- really pistols is
14  what I really want to talk about, is pistols and
15  handguns.
16  So are you familiar with the statutes
17  that were -- or let's say the primary statutes that
18  were endorsed in the District during the class
19  period that I've defined for you?
20  A  Yes, sir.
21  Q  And so one of them was D.C. Code
22  22-4503. Is that right?

Page 12

1   A  I believe so. Yes, sir.
2   Q  When you say you believe so, what
3   does that mean?
4   A  I don't have the code in front of me,
5   but that sounds correct.
6   Q  Well, then, let me pull up that code
7   for you because I want you to take a look at it and
8   make sure that we're on the same page because I'm
9   going to ask you some questions about that.
10  Now, this is the first time I've used
11  this software, so I'm going to try to pull this --
12  pull this up on the screen.
13  Can you see it on your screen,
14  Exhibit No. 20?
15  A  No, sir.
16  (Discussion had off the record.)
17  (Haines Deposition Exhibit Number 20
18  marked for identification.)
19  BY MR. CLAIBORNE:
20  Q  Okay. Commander, are you able to see
21  that?
22  A  Yes, sir.

Page 13

1   Q  And do you recognize this?
2   A  Yes, sir.
3   MR. SAINDON: Chaz, what version of
4   the code is this?
5   MR. CLAIBORNE: It's the current
6   version.
7   MR. SAINDON: Okay.
8   BY MR. CLAIBORNE:
9   Q  So do you see --
10  MR. CLAIBORNE: Chris, can you scroll
11  it back up so the unlawful possession of firearm is
12  at the top of the screen? There we go.
13  BY MR. CLAIBORNE:
14  Q  So, Commander, you see we have these
15  categories here. There's five that you can see
16  here, "Convicted in any court of a crime punishable
17  by imprisonment for a term exceeding one year"?
18  A  Yes, sir.
19  Q  And then there's -- do you see No. 2
20  there?
21  A  Yes, sir.
22  Q  And No. 3?

Page 42

1  to be presented. It has to go before a grand jury.
2  So any additional charges would be -- could be
3  picked up later within the court proceedings. So
4  that they could just charge the CPWL knowing that
5  additional charges will be picked up later down the
6  line through the judicial system.
7      Q    I see.
8           So at any point up the point in the
9  arrest process that we've talked about, would the
10 arresting officer have made any sort of background
11 check or criminal records check to see if the --
12     A    It's --
13     Q    Excuse me, I've got to finish the
14 question.
15          -- to see if the arrestee had any
16 criminal arrest history?
17     A    It is not a requirement of the
18 arresting officer.
19     Q    Well, sticking with our fact pattern
20 where the person is arrested for CPWL during the
21 class period, was it typically done by the
22 arresting officer?

Page 43

1           We're focusing on the arresting
2  officer right now.
3      A    For a criminal history?
4      Q    Yes. In WALES, NCIC, this type of
5  thing, would the arresting officer have done that
6  kind of check?
7      A    So criminal histories are not
8  provided through WALES and NCIC. Those checks are
9  completed when -- typically they're completed
10 officially by the cellblock technicians. That's
11 part of their responsibility, not the arresting
12 officer.
13     Q    Okay. And just a second -- we're
14 kind of like at a fork in the road, we're got the
15 arresting officer and the cellblock technician. So
16 let's just stick with the arresting officer.
17          So typically would the arresting
18 officer have done any kind of background check of
19 any sort, going onto Justice, looking in Court
20 View, anything like this, to see if the person, for
21 example, had a prior gun offense?
22     A    No, there was no policy that -- that

Page 44

1  required an officer to do that.
2      Q    So do you know the difference between
3  a practice and a policy?
4      A    Yes, sir.
5      Q    So how would you articulate the
6  difference between a practice and a policy?
7      A    So a practice is -- is something
8  that -- is normally done in the course of business
9  and a policy is something that's required in the
10 course of business.
11     Q    All right. So what was the practice
12 in this situation, would the officers do a
13 background to see if the person had a prior felony
14 or something like that or leave it to the booking
15 team?
16     A    For a background check, neither is --
17 was a practice by either, by either the booking
18 team or the arresting officer.
19     Q    All right. Well, let's focus on the
20 arresting officer at the moment. Okay. We'll get
21 to the booking team.
22          When I say -- we've been using this

Page 45

1  term "background check." What does that mean to
2  you?
3      A    So a background check, in the law
4  enforcement world for a criminal history,
5  essentially I assume we're talking about prior
6  convictions, would require III check. And that is
7  not done as a matter of routine or policy for
8  arrestees.
9      Q    What's a III check?
10     A    Interstate -- it's basically -- I
11 forget exactly what it stands for, but it's a --
12 it's a background criminal history check through
13 the FBI nationwide. So it'll give you --
14 essentially should give you a criminal background
15 check of an individual for the entire country.
16     Q    And what do you get when you look in
17 WALES?
18          Doesn't WALES bring back some version
19 of that?
20     A    No, it does not. It's simply --
21 WALES simply does a wanted check to see if there
22 are any active warrants or protective orders,

12 (Pages 42 - 45)

Page 46

1  things of that nature, that are active as -- at the
2  time you run a person or you can run their driver's
3  license information to see if they have a valid
4  driver's license.
5      Q   Well, when the officers -- we looked
6  at 4503, right, Section 22-4503.  That was the
7  first statute that I showed to you.
8      A   Yes, sir.
9      Q   So 4503(a)(1) is an offense for a
10 person that has been convicted of an offense
11 punishable by more than a year in jail, right?
12     A   Yes, sir.
13     Q   So would an officer do any kind of
14 check to see whether that offense should be
15 charged?
16     A   So it would be up to -- and nothing
17 prevents an officer from doing a criminal history
18 check.  Now, they can check through III, however
19 not all officers on the department have access to
20 III, or they could do a local check through the
21 Justice system, through the D.C. Superior Court
22 records, which gives them access to those records

Page 47

1  to determine if anyone potentially has been
2  convicted of a felony in the past.
3      Q   Well, how would -- if the officer
4  didn't do a background check, how would the officer
5  know whether a person was subject to being charged
6  under 4503(a)(1)?
7      A   It could be prior knowledge, a
8  personal knowledge that they know or somebody that
9  they work with.
10     Q   Well, how about apart from that?
11     A   They would have to do a check.
12     Q   And we're dealing once again with
13 these arrests for CPWL and possibly UA/UF.  So in
14 these circumstances, was it the practice for the
15 officer to do whatever check was required to
16 determine if the arrestee was subject to being
17 charged, met the probable cause standard for
18 4503(a)(1)?
19     A   The only way that they could charge
20 them is if they've somehow verified that they had
21 a -- that the individual that they were charging,
22 again the probable cause, would be that they --

Page 48

1  they would have to have knowledge that they had a
2  felony conviction essentially.  So they would
3  have -- they would have to do some kind of check.
4      Q   Right.
5          So, I mean, was it the practice to do
6  the check?
7      A   No, sir, it was not.
8      Q   Then how did -- I see.
9          How about the other -- we looked at
10 4503, and you can take a look, I think you've got
11 it before you, there were five other categories.
12 So for any of these other categories, did the
13 arresting officer make any inquiry as a matter of
14 practice to see whether the person or subject being
15 charged in any of the other five categories of
16 4503?
17     A   So for -- as part of the normal
18 routine of arrests, the WALES/NCIC checks are done.
19 If a -- the -- and there, again, they're done by
20 the cellblock technicians, would come back and say,
21 "This person, for example, had an warrant in
22 another jurisdiction," and that would mean that

Page 49

1  they were a fugitive from justice.  If the
2  cellblock technicians said, "Hey, this person has a
3  felony warrant that's" --
4      Q   Can I stop you, please?
5      A   Uh-huh.
6      Q   Lawyers are very plotting people when
7  we do these depositions, so what I -- my map is
8  when I ask you questions about what the arresting
9  officer did up to the time the arresting officer
10 sought review of their charging decisions, then
11 we'll go through that process, then we'll get over
12 to what the cellblock technicians did.
13     A   But this is specific to the arresting
14 officer.  So if the arresting officer was made
15 aware that that person was a fugitive from justice,
16 then this statute would apply and they would add
17 that charge or could add that charge.
18     Q   So you're saying it was discretionary
19 within the officer?
20     A   Yes.
21     Q   And this is a -- I don't need the
22 complete answer at this time about how it was done,

13 (Pages 46 - 49)

Page 50

1  but just generally, which -- which person or which
2  unit, the arresting officer or the booking team,
3  had responsibility for determining whether a person
4  were subject to being charged under one of these
5  restricted categories in 4503(a)(1) to (a)(6)?
6      A    I'm sorry.  Can you repeat that?
7      Q    Yeah.
8           We've got this statute, 4503, and
9  it's got some -- it's got six restricted
10 categories, people who are restricted from owning
11 or possessing a weapon -- possessing a pistol,
12 actually it's a firearm, I think.  So there's these
13 six categories that I'm interested in, 4503(a)(1)
14 to 4503(a)(6).
15          So as between the arresting officer
16 and the booking team, which of those two sides was
17 responsible for seeing whether the arrestee should
18 have been charged under any of these six restricted
19 categories?
20     A    Neither.
21     Q    Who had that responsibility?
22     A    Nobody.  It was not a requirement.

Page 51

1      Q    Why is that?
2      A    It's not.
3      Q    I know, but I'm asking you, during
4  the class period why was that not a requirement?
5  Why?
6      A    I can't answer that.
7      Q    Okay.  I don't want to start us down
8  a bad path again, but I'm just trying to understand
9  the situation, that's why I'm asking you the
10 follow-up question.
11          When you say -- I think you said you
12 don't know.  Is that right?
13     A    No, there was no policy or procedure
14 requiring the officer -- the arresting officer or
15 the cellblock technicians to complete a history
16 check and add additional charge.
17     Q    Okay.  Then when I asked you why
18 there was no policy, I think you said you don't
19 know or you said you can't answer.
20     A    That would be purely speculative.
21 There's no policy or procedure that requires it.
22     Q    Okay.  I understand that.  But for

Page 52

1  me, for my case, I'd like to know why that was.
2  The why I'm looking at it you've got these statutes
3  on the book, I understand that from reading
4  counsel -- from reading testimony, that a joint
5  statement that then Attorney General Nichols and
6  Chief Lanier gave to the Council in 2009, that
7  there was a big focus on making sure that people
8  with prior felony convictions didn't have illegal
9  guns.  So I want to know if there was a big concern
10 and the statute were on the books, why weren't
11 steps made to see whether the person -- to see
12 whether an arrested person was liable for arrest
13 and prosecution under that statute?
14     A    That part of -- part of what you're
15 looking at, as far as having those people charged
16 with that, would be picked up later in the process,
17 not necessarily at the time of arrest and booking.
18          So the arresting officer would not be
19 responsible for doing that.  That would be a
20 decision made by the United States Attorney's
21 Office once they reviewed the facts and
22 circumstances of the case.  And they did -- they're

Page 53

1  the ones in the process to do a complete criminal
2  background check and make sure that they're
3  qualifying the -- the qualifiers are there to
4  charge this particular charge.
5      Q    I see.
6           In this case the District has
7  produced data from the MPD booking database and
8  they've also produced data from the court view, the
9  prosecution database.  They gave us a list of
10 everybody that was charged with actually a weapons
11 offense during the class period.
12          And so I've looked at the charges
13 that were brought against persons arrested under
14 the CPWL statute and a lot of them in addition
15 to -- well, actually 4504 has got a provision for a
16 charge in a prior felony.  The MPD charged a lot of
17 people with some version of FIP, felon in
18 possession, it was either 4504 or it was
19 4503(a)(1).  So how do we account for those
20 charges, where the MPD did charge a person with a
21 version of a felon in possession charge?
22     A    Nothing prevents an officer from

Page 54

1  charging that. If they choose to do the background
2  and gather that information to add additional
3  charges, but it was not a requirement or a
4  practice.
5      Q    So is it -- and just tell me what --
6  I'm going to sum up what I think you said. If it's
7  not accurate, then tell me and we'll work to get an
8  accurate statement.
9           But what I think I'm hearing is that
10 during the class period, the MPD, neither the
11 arresting officer, nor the booking team had
12 responsibility for seeing whether persons arrested
13 on CPWL were also liable to charge under the -- one
14 of the felon in possession statutes. Is that
15 correct?
16     A    Yes, sir.
17     Q    MPD relied on the arresting
18 officers -- I mean, they relied on the U.S.
19 Attorney's Office to do a complete background check
20 and decide whether an arrestee was liable for
21 prosecution or being charged under one of the felon
22 in possession statutes?

Page 55

1      A    So any time a CPWL charge or a felony
2  charge, someone's charged with a felony, they must
3  appear in court. So there is a review process
4  through the U.S. Attorney's Office where they make
5  the final determination for all appropriate charges
6  based on the totality of circumstances, to include
7  full criminal background checks. So that's the
8  part of the process where that -- that review was
9  done. But that was outside -- in consulting with
10 MPD, but it was not MPD necessarily, it is not
11 ultimately up to us.
12          And those are things that -- it also
13 would have been picked up later through the grand
14 jury process, because all of those charges,
15 assuming they were going to go forward with court
16 proceedings, would have to go through a grand jury
17 process.
18     Q    You said everybody arrested on CPWL
19 must appear in court. Is that correct?
20     A    Yes, sir.
21     Q    Is that what you said?
22     A    Yes, sir. It's -- under the felony

Page 56

1  part of the statute, yes, sir.
2      Q    When you say "under the felony part,"
3  you mean CPWL or some other --
4      A    Yes.
5      Q    -- felony part?
6      A    So if you possessed it in your home
7  or business, you would not be charged with a
8  felony.
9      Q    Okay. Well, for all of these
10 discussions, right -- you know, let's focus solely
11 on CPWL. So carrying the pistol without a license
12 in public, not home, not a place of business, so
13 are you saying that everybody that was -- during
14 the class period that was arrested on CPWL had to
15 appear in court?
16     A    Yes, sir, they did.
17     Q    Okay. Well, let me stop you here
18 then, because the data that we have indicates a lot
19 of people were released without being -- well,
20 that -- a lot of the people that were arrested were
21 never charged, were never prosecuted.
22          So let me ask you this question: Did

Page 57

1  the -- so when the -- during the class period when
2  the MPD arrested somebody for CPWL, did they refer
3  every single person arrested to the U.S. Attorney's
4  Office for prosecution?
5      A    Yes, sir.
6      Q    And so it was -- so did they -- so
7  the MPD never released persons arrested under CPWL
8  without referring them to the prosecutor's office?
9      A    The only circumstances where that
10 would happen would be under a detention journal
11 case. And that would -- and that essentially would
12 mean that through the course of the arrest, they
13 determined there was no probable cause for arrest
14 and that person was released without referring them
15 to the U.S. Attorney's Office.
16     Q    So under what circumstances would a
17 person be released on the detention journal?
18     A    For instance, someone had a license
19 to carry a gun and it was found out later during
20 the arrest process they're already at the
21 cellblock, they're being processed, if someone
22 comes up and says, "Here's their license," or,

15 (Pages 54 - 57)

Page 106

1  Q   And, for example, Metropolitan
2  Transit Police could be one?
3  A   Yes.  Metro Transit, yes, sir.
4  Q   Any other agencies?
5  A   The District of Columbia has over 30
6  sworn police agencies, so any of those agencies
7  could make an arrest for that.
8  Q   Well, when those agencies made an
9  arrest under the D.C. statute, did they bring their
10 arrestee to one of the MPD District or Central
11 Cellblock for processing?
12 A   The only exceptions, to my knowledge,
13 would be U.S. Park Police and U.S. Capitol Police
14 have their own facilities.  There might be others,
15 but they're the only two that I could think of.
16 Q   So when the U.S. Park Police or the
17 U.S. Capitol Police made an arrest and charged
18 somebody with the D.C. version of CPWL, would they
19 have booked the person in the D.C. booking
20 database?
21 A   During that time, I actually don't
22 know the answer to that.  We currently all capture

Page 107

1  it in the same.  Though at that time, I honestly
2  don't know.  I believe they had separate systems.
3  Q   Would they share that information
4  with the MPD?
5  A   It all -- it all eventually gets put
6  into CJIS and also into Justice.  So it's something
7  that we can gain -- we would gain access to see
8  that there was arrest information, but maybe not
9  the specifics to the arrest.  We might have to
10 reach out to that individual agency to get it.
11 Q   But that's just for the Park Police
12 and the Capitol Police, right?
13 A   Again, there might be others, but
14 those are the two big ones that I know right
15 offhand that most likely make those arrests.
16 Q   Now, what about, say, MTP, Metro
17 Transit Police, or University Police, something
18 like that, would they bring their arrestees to the
19 MPD for booking?
20 A   Yes, Metro Transit would take their
21 arrestees to our facility to book and to do the
22 arrest paperwork.

Page 108

1  Q   And they would be booked into the MPD
2  Cobalt, or whatever the booking database was?
3  A   Yes.  It wasn't in Cobalt, but
4  whatever the RMS system was at the time.
5  Q   So what do you know about how the
6  prosecuting authorities do in terms of making III
7  searches?
8      MR. SAINDON:  Objection.  Vague.
9  Beyond the scope.
10     You can answer.
11     THE WITNESS:  So as part of the
12 papering decision by the U.S. Attorney's Office,
13 they do a complete criminal history check --
14 background check, and based on that, and sometimes
15 that information, you know, it's often used for
16 prosecutorial purposes, but they do the complete
17 criminal history background checks on their end.
18 BY MR. CLAIBORNE:
19 Q   So let's suppose a member -- a MPD
20 member took a case over for a papering conference,
21 would the -- to your knowledge, would the U.S.
22 Attorney make the III check before deciding whether

Page 109

1  to paper the case?
2  A   Yes.  All of that stuff, they have
3  people within their office to prepare those
4  packages.  So when the officer sit -- at that time
5  when the officer would sit down with the attorney
6  for the -- there's a screening process to determine
7  if a case is going to be papered and then it moves
8  on.  If the case is papered, they send the officer
9  to another attorney who actually does the complete
10 workup case jacket.  So during the screening
11 process, before it's screened, the U.S. Attorney
12 gets that full complete background packet and then
13 with the arrest paperwork to make the -- to help
14 make their determinations.
15 Q   So the screening process, that's
16 before the papering decision is made?
17 A   No, that's where the papering
18 decision is made.  This is -- the screening
19 attorney determines whether or not a case is going
20 to be papered.  If the case is -- if they make a
21 determination to paper the case, it then gets
22 assigned to an attorney who does the jacket, the