UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAGGIE SMITH, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**GOVERNMENT OF THE DISTRICT OF**<br>**COLUMBIA,**<br><br>Defendant. | <br><br><br><br><br><br>Civil Action No.:  15-737 (RCL) |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT INCORPORATING MEMORANDUM OF LAW

Plaintiffs Maggie Smith, Gerard Cassagnol, Frederick Rouse, Delontay Davis, Kimberly Buffaloe and Carl Atkinson (sometimes the "Named Plaintiffs" or "Plaintiffs" or "Second Amendment Named Plaintiffs") hereby move this Court to enter summary judgment in favor of all Plaintiffs on all claims as to liability and their claim to expunge their arrest records.

### I.   Background and Plaintiffs' Claims.

During the Class Period the District enforced its Unconstitutional gun laws against Named Plaintiffs and grievously injured them. The class period runs from roughly May 15, 2012, three years before the filing of the original Complaint [1] on May 15, 2015, going forward until persons whose cases filed on or before October 10, 2014 were disposed of. Third Amended Complaint ("3d Am. Compl.") [114], ¶¶ 307-308. Plaintiffs discuss the summary judgment standard as it relates to each claim below.

### A.   *Named Plaintiffs and the District's Enforcement of Its Unconstitutional Gun Laws against Them.*

Each of Ms. Smith, Mr. Cassagnol, Mr. Rouse, Mr. Davis, Ms. Buffaloe and Mr. Atkinson were arrested in the District and each spent at least one or two nights in an MPD lockup or Central

Cell Block awaiting presentment at First Appearance in Superior Court simply for engaging in the constitutionally protected conduct of carrying a pistol outside the home, and each was prosecuted for a period of time. SMF # 1 (Named Plaintiffs' Table).[1] Since all arrestees prosecuted in Superior Court on their arrest charges were detained from time of arrest until at least First Appearance in Superior Court the chart also shows their pre-presentment detentions. Pls.'s Ex. # 33, Haines depo, p. 57.

In the cases of Ms. Smith and Mr. Cassagnol, after Judge Scullin declared the District's gun laws unconstitutional in *Palmer*, and the U.S. Attorney dropped their cases, the District's OAG re-prosecuted them on District of Columbia charges and pressed the prosecutions for months.[2] SMF # 1; *see Palmer, 59 F. Supp. 3d at 183* ("home limitations" of § 7-2502.02(a)(4) and D.C. Code § 22-4504(a) violated the Second Amendment because they effected a "complete ban on the carrying of handguns in public").

Mr. Rouse was arrested by the MPD on August 30, 2014, more than a month after *Palmer* was decided. SMF # 1. The OAG initiated its prosecution of Mr. Rouse on September 1, 2014. *Id.* In fact, the District did not dismiss the prosecution against Mr. Rouse until about three weeks after dismissing its appeal in *Palmer. Palmer v. District of Columbia*, No. 14-7180, 2015 U.S. App. LEXIS 6414 (D.C. Cir. Apr. 2, 2015) (mem., appeal dismissed); Pls.'s Ex. # 61, Rouse 2014 CDC 015375 docket 4/22/2025, p. 3.

---

[1] Paragraph 2 of the Grabowsky Declaration, Pls.'s Ex. # 30, is a table showing a list of the Named Plaintiffs, a the list of MPD charged offenses of each Named Plaintiff shown in the data export from Cobalt, the date of their arrests and the dates they were presented in Superior Court

[2] Pursuant to the division of prosecuting authority outlined in D.C. Code § 23-101, the D.C. Attorney General only had authority to prosecute under D.C. Code § § 7-2502.01 and 7-2506.01. *Smith v. District of Columbia*, 387 F. Supp. 3d 8, 14 (D.D.C. 2019).

The District also seized Ms. Smith, Mr. Cassagnol, Mr. Rouse, and Mr. Davis' guns and ammunition and related gun property such as holsters and scopes. SMF # 132 (gun seizure Table); Grabowsky, Decl., ¶ 9.[3] With the exception of Mr. Rouse, the District still has their guns and ammunition. *Id.* The District seized Mr. Rouse's guns and ammunition and kept them both for more than two years after the OAG dismissed the prosecution before releasing them. *Id.*

The Named Plaintiffs suffered grievously from the District's unconstitutional enforcement of its gun laws against them. Ms. Smith is a nurse and her arrest put her nursing license in jeopardy. Plaintiffs' SMF # 8. Mr. Cassagnol lost his job because of his arrest because an MPD officer took it upon himself to photograph his ID and send it to his employer and tell his employer about the arrest. *Id.* at 29. Mr. Rouse, a veteran and a defense agency professional, suffered damage to his security clearance and his earning potential because of his arrest. *Id.* at 53-54. Mr. Davis, a college student, lost his car due to the arrest because of the District's civil forfeiture statute and he had to drop out of school. Pls.'s Ex. # 77, Davis interrogatory responses, p. 11.

After her arrest Ms. Buffaloe had to wear an ankle monitor and stay home unless she received permission to go out. Ms. Buffaloe's daughter died during this period and Ms. Buffaloe had to wear the ankle monitor at the wake and the funeral which caused her embarrassment and emotional distress. Pls.'s Ex. # 80, Buffaloe Decl., ¶ 8.

Mr. Atkinson, a student, also lost his car due to the arrest because of the District's civil forfeiture statute. Pls.'s Ex. # 90A, original Atkinson declaration, ¶¶ 21-34. To add insult to injury, the MPD searched Mr. Atkinson's parents' home where he was living based on his arrest on a gun charge - without finding anything. SMF ## 106-107.

---

[3] SMF # 134 (gun seizure Table) is a table showing information about the District's seizure and retention of their guns, ammunition and gun-related property. Grabowsky, Decl., ¶ 1.

Each of the Named Plaintiffs probably would have lost the right to vote had they been convicted of CPWL or CP (carrying a pistol without a license), a felony. The commission of a felony often results in the lifelong forfeiture of a number of rights, including the right to serve on a jury and the fundamental right to vote. *Medina v. Whitaker*, 913 F.3d 152, 160 (2019)(quoting 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal jury); *Richardson v. Ramirez*, 418 U.S. 24, 56, 94 S. Ct. 2655, 41 L. Ed. 2d 551 (1974) (upholding state felon disenfranchisement)).

### B. Plaintiffs' Claims.

Plaintiffs brought all their claims against the District under § 1983. Plaintiffs did not bring any claims against any individual arresting officers. Plaintiffs sought damages and Plaintiffs also sought other relief such as declaratory relief and expungement of their arrest records.[4]

Plaintiffs remaining claims fall into two categories: (1) "people" claims – claims for injuries to people seeking basically personal damages; and (2) "property" claim – claim for injury to property rights seeking damages for loss of property. Claims 1 and 3 are "people" claims brought by persons who were subjected to one or more of the following when the District enforced its unconstitutional gun laws against them: (1) arrested; (2) detained; (3) prosecuted; (usually by U.S. Attorney but sometimes by OAG); and sometimes (4) re-prosecuted by the OAG when the original prosecutions by the U.S. Attorney were dismissed after *Palmer* and the OAG re-brought the charges.[5] *Smith v. District of Columbia*, 387 F. Supp. 3d 8, 23, 25-30 (D.D.C. 2019). The

---

[4] Plaintiffs seek damages (compensatory, consequential, and nominal), declaratory relief, and injunctive relief sealing their arrest and prosecution records, ordering their property's return, and declaring their arrests legal nullities. Plaintiffs further seek attorney's fees and costs under 42 U.S.C. § 1988. *Smith v. District of Columbia, 387 F. Supp. 3d 8, 16 (D.D.C. 2019).*

[5] This Court dismissed Claim 2 from the Second Amended Complaint but the Third Amended Complaint [ECF 114], the operative complaint, retains the numbering from the previous complaint.

people claims include claims for damages for intangible property interests such as professional licenses and security clearances.

Claims 1 and 3 are based on the same conduct – the District arrested, detained and prosecuted them for the same Constitutionally protected conduct, carrying handguns and ammunition in public - but each is based on a different Constitutional "command." *Soldal*, 506 U.S. at 70. Claim 1 is based on the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008)("*Heller I*"). Claim 3 is brought by a subset of the Second Amendment class who were non-residents of the District at the time of their arrest: Plaintiffs Maggie Smith, Gerard Cassagnol, Frederick Rouse and Delontay Davis. Whereas Claim 1 is based on the Second Amendment Claim 3 is based on two aspects of the Fifth Amendment, the equal protection component of the Fifth Amendment and the "right to travel." The Fifth Amendment's due process clause forbids the District from denying equal protection of its laws to anyone in the District. *Smith v. District of Columbia*, 387 F. Supp. 3d 8, 27 (D.D.C. 2019) (*citing Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954).

Claim 6 is brought under the Fourth Amendment by persons whose guns, ammunition and related property such as holsters and scopes were seized by the District as evidence and retained by the District's Property Clerk long after any related case was dismissed, or simply destroyed. *Smith*, 387 F. Supp. 3d at 25.

## II.  The District's Enactment and Enforcement of its Unconstitutional Gun Laws.

During the Class Period the District had a gun control regime that totally banned carrying handguns in public.

The District's laws allowed residents to own and keep handguns in their residences but it completely banned non-residents from even owning guns in the District.

This Court in *Palmer* declared the total ban on carrying guns in public outside the home unconstitutional under the Second Amendment. The District originally filed an appeal and then dismissed it. *Palmer v. District of Columbia*, No. 14-7180, 2015 U.S. App. LEXIS 6414 (D.C. Cir. Apr. 2, 2015) (mem., appeal dismissed).

Plaintiffs outline below how the District's gun laws got to the point where this Court invalidated them in *Palmer*.

## A. Pre-Heller I.

### 1. Total ban on gun ownership in the home and in public.

The twin pillars of District gun laws pre-*Heller* were (1) 1932 Act requiring licenses to carry a handgun in public; and (2) the 1975 Council Act establishing registration requirements for firearms and ammunition. There is a distinction between licensing the owner of the firearm and registering the weapon itself. *Heller v. District of Columbia*, 670 F.3d 1244, 1248 (2011) *(Heller II)*.

### a) License.

In 1932 Congress enacted the 1932 Act which prohibited any person from carrying a concealed firearm or from carrying it openly with the intent to use it unlawfully in Washington, D.C. Act To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22- 4501 et seq.).

While citizens of Washington had already been prohibited from carrying concealed weapons since 1892, the new law imposed additional penalties for crimes committed with a firearm. *See ARTICLE: Palmer v. District of Columbia*, 60 N.Y.L. Sch. L. Rev. 675, 678(2015 – 2016). The 1932 Act also prohibited ownership or possession of "pistols" by persons who had been convicted of a "crime of violence." Section 3; Section 1 (definitions). A "crime of violence"

was a defined term consisting in violent felonies such as "[m]urder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, [and] kidnaping." Section 1.

Congress enacted the 1932 Act twenty days before District police started eviction of the "Bonus Expeditionary Force," a group of ten thousand veterans who "had 'occupied' the capital since early June" to pressure Congress to grant early payment of a bonus due to them for their World War I service.[6]

In 1943 Congress amended the statute to prohibit the carrying of an unlicensed pistol openly as well as concealed. 57 Stat. 586. Congress repealed this statute and enacted what is substantially the present D.C. Code § [4504(a)(2)]. 47 Stat. 651.

In 1958 Congress provided that any person who violates 22-3204 and has been previously convicted of a felony may be imprisoned up to ten years. 67 Stat. 94. *See Cooke v. United States*, 275 F.2d 887, 889 n.3 (1960).

### b)  *Registration.*

In 1975, the D.C. Council enacted the Firearms Control Regulations Act. 23 D.C. Reg. 2464 (July 23, 1976) (codified as amended in scattered sections of 7 D.C. Code).

This Act introduced a registration regime which effectively made it impossible to register a handgun after a sixty day period during which owners with previously registered enactment of D.C. Code section 7-2502. ARTICLE: Palmer v. District of Columbia, 60 N.Y.L. Sch. L. Rev. 675, 67.

---

[6] At least one commentator questions whether this measure passed entirely or even primarily for the purpose of crime control. Its date of passage, July 8, 1932, is twenty days before District police started eviction of the "Bonus Expeditionary Force," a group of ten thousand veterans who "had 'occupied' the capital since early June" to pressure Congress to grant early payment of a bonus due to them for their World War I service. HERBERT HOOVER AND WORLD PEACE 126 (Lee Nash ed., 2010). Significantly, another law passed the same day as, and immediately following, the Dangerous Weapons Act, which provided for lending money to "any honorably discharged veteran of the World War, temporarily quartered in the District of Columbia" to return home, as long as they did so "prior to July 15, 1932." H.R.J. Res. 462, 72nd Cong., 47 Stat. 654 (1932). ARTICLE: Mental Illness and the Second Amendment, 46 Conn. L. Rev. 1301, 1316

### B.   Heller v. District of Columbia (Heller I).

The District of Columbia gun regulations at issue in *Heller I* effectively banned the use or possession of operable handguns within the homes of D.C. resident. *Heller I*, 554 U.S.at 595.

The statutes at issue in *Heller I* were: D.C. Code section 7-2502.01 required that residents obtain a registration certificate to possess a firearm, and D.C. Code section 7-2502.02 banned the registration of handguns. Furthermore, D.C. Code section 7-2507.02 required that all firearms within the home be "unloaded and disassembled or bound by a trigger lock or similar device." ARTICLE: Palmer v. District of Columbia, 60 N.Y.L. Sch. L. Rev. 675, 681

In 2008 the Supreme Court in *Heller I* struck down the registration regime in violation of the Second Amendment. *Id.* at 628-29.

The core holding of *Heller I* is that the Second Amendment guarantees the right to possess firearms within the home, and that laws that prohibit the total possession of historically allowed guns are unconstitutional. *See also, Wrenn v. District of Columbia*, 864 F.3d 650, 657, 664-65 (D.C. Cir. 2017)(under *Heller I*, complete bans of 2d Amendment rights are always invalid without applying tiers of scrutiny).

*Heller I* did not directly address the right to keep and bear arms in public.

### C.   District's response to Heller I.

#### 1.   Registration: § 7-2502.02(a)(4).

The District responded to *Heller I* by amending § 7-2502.02(a)(4) to allow residents to register handguns for use in the home. The Firearms Control Emergency Amendment Act of 2008. [7]

---

[7] Prior to that amendment, D.C. Code § 7-2502.02(a)(4) barred registration of handguns by anyone. D.C. Code § 7-2502.02(a)(4) ("A registration certificate shall not be issued for a . . . (4)

But, the "home limitations" of § 7-2502.02(a)(4) limited registration of pistols by "[a]ny person" for use for use in self-defense in the registrant's home.  D.C. Code § 7-2502.02(a)(4). Thus, only D.C. residents could even register, and thus own pistols. But, because of the home limitation, not even D.C. residents could carry a pistol in public. Thus, no person was allowed to register a gun for use outside the home. *See Smith*, 387 F. Supp. 3d at 28.

### 2.   License: D.C. Code § 4504(a)(2) .

The Court in *Heller I* did not address D.C. Code § 4504(a)(2) and the total ban on carrying handguns outside the home. The court limited its review to the District's gun registration requirements which effected a total ban on ownership of handguns in the home and the District's other regulation of home ownership of handguns.

Even though the principles of *Heller I* clearly applied to carrying in public as well as the home, less than six months after the Supreme Court decided *Heller I* (June 26, 2008), the District of Columbia's City Council and Mayor amended D.C. Code § 4504(a)(2) (Carrying a Pistol without a License, or "CPWL") by repealing the Police Chief's authority under D.C. Code § 22-4504(a) to issue handgun carry licenses thus establishing beyond any doubt that the D.C. Council intended its ban on carrying handguns in public to be a total ban. D.C. Code § 22-4506, repealed by Inoperable Pistol Amendment Act of 2008, § 2(f), 56 D.C. Reg. 1162 (May 20, 2009), revived and amended by License to Carry a Pistol Amendment Act § 3(b); *Palmer*, 59 F. Supp. 3d at 176.[8]

---

Pistol not validly registered to the current registrant in the District prior to September 24, 1976."). *See Parker v. District of Columbia*, 311 F. Supp. 2d 103, 103 n.1 (D.D.C. 2004)(appellate history).

[8] The Committee Report provided: "The committee print repeals Section 6 of the 1932 act (§ 22-4506) at the request of the Chief of Police and the Executive. Without repeal, the provision gives the impression that ordinary people (as opposed to law enforcement personnel, the military, certain investigators, etc.) may obtain a license to carry a concealed weapon. Given the unique character of the District, such activity would be unwise."

As a result, the District of Columbia lacked any mechanism to issue handgun carry licenses to individuals as of that date.[9]

In 2012 The D.C. Council again amended D.C. Code § 4504(a)(2) (Carrying a Pistol without a License, or "CPWL") to eliminate any reference to "license" so that CPWL became simply "CP," or Carrying a Pistol. D.C. Code § 22- 4504(a) amended by Firearms Amendment Act of 2012, D.C. Law 19-170, § 3(d) (effective Sept. 26. 2012). *Id.*

---

[9] Former D.C. Code § 22-4506 empowered the District of Columbia's police chief to issue licenses to carry handguns to individuals, including to individuals not residing in the District of Columbia. However, it was Defendant District of Columbia's policy for many years not to issue such licenses. *Palmer v. District of Columbia*, 59 F. Supp. 3d 173, 176 (D.D.C. 2014).

D.C. Code § 22-4504(a) provides that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed." The first violation of this section by a non-felon is punishable by a fine up to $5,000 and imprisonment of up to five years.

### 3. In 2009 the District Enacted a Set of Enhancements which Added Enhanced Penalties for Person Who Fell into Certain "Restricted Categories."

In 2009 the District enacted a set of enhancements which added enhanced penalties for persons who fell into certain "restricted categories." *See e.g.* D.C. Code § 4503(a)(1) to (a)(6); D.C. Code § 4504(a)(2) ("restricted category offenses").[10] D.C. Code § 22-4503(a)(1) bans owning or keeping or possessing firearm by anyone convicted of "a crime punishable by imprisonment for a term exceeding one year." D.C. Code § 22-4504(a) partly fits under the first predicate of D.C. Code § 22-4503(a)(1)("convicted in any court of a crime punishable by imprisonment for a term exceeding one year") but it also makes a misdemeanor CPWL in home or business a predicate.

This predicate bans not only felons but also a large number of misdemeanors without distinguishing between violent or non-violent offenses. The District's original licensing statute, enacted by Congress in 1932, prohibited ownership or possession of "pistols" only by persons who had been convicted of a "crime of violence." Section 3; Section 1 (definitions). The 1932 Act.

The burden of proof is on the District to establish that a person has a prior felony conviction. *Heller I*, 554 U.S. at 635 (ordering the District of Columbia to issue a license to Heller, as long as he is "not disqualified from the exercise of Second Amendment rights").

The federal analogue to Section 922(g)(1), Section 4503(a)(1), bans possession (but not ownership) by felons and common law misdemeanants. Section 4503(a)(1) sweeps more broadly than Section 922(g)(1) because Section 922(g)(1): (1) applies only to State misdemeanors punishable by a term of imprisonment of two years or more; and (2) expressly provides for restoration of rights. 18 U.S.C.A. § 921(a)(20)(B); *Medina*, 913 F.3d at 160 (felons); *Schrader*, 704 F.3d at 991 (common law misdemeanants).

---

[10] Analytically D.C. Code § 22-4504(a) partially fits under the first predicate of D.C. Code § 22-4503(a)(1)("convicted in any court of a crime punishable by imprisonment for a term exceeding one year").

### D. *Palmer v. District of Columbia, et al.*

By the time the Class Period rolled around, the collection of the District's gun control laws ("th[e]ensemble of Code provisions and police regulations"[11]) worked a total ban on the carrying of pistols in public by any person, residents or non-residents. *Palmer*, 59 F. Supp. 3d at 183; *Smith*, *387 F. Supp. 3d at* 26; Order [76] denying Plaintiffs' motion to reconsider, p. 3 (denying motion to reconsider because the Court ruled in Plaintiffs' favor as to Claims 1 and 3). As the District phrased it, "[a]t the time of plaintiffs' arrests and seizures, no person—resident or non-resident—could carry a handgun or ammunition outside the home." "Defendant's Statement of the Bases for its Defenses," Meet and Confer Statement [73], p. 5.

It also limited owning or possessing firearms to District residents in their residences.

The District's gun control laws in force during the Class Period – the CPWL/ CP licensing requirement D.C. Code § 22-4504(a) and the "home limitations" of § 7-2502.02(a)(4) -- violated the Second Amendment because they worked "total ban on the public carrying of ready-to-use handguns outside the home" by any person, residents or non-residents. *Palmer*, 59 F. Supp. 3d at 183.

### III. Claim 1: The District's Total Ban on Carrying Handguns in Public Violated the Second Amendment.

The District's gun control laws in force during the Class Period – the CPWL/ CP licensing requirement D.C. Code § 22-4504(a) and the "home limitations" of § 7-2502.02(a)(4) -- violated the Second Amendment because they effected a "complete ban on the carrying of handguns in public" by any person, residents or non-residents. *Palmer*, 59 F. Supp. 3d at 183; *Smith*, *387 F. Supp. 3d at* 26; Order [76] denying Plaintiffs' motion to reconsider, p. 3 (denying motion to

---

[11] *Wrenn v. District of Columbia*, 864 F.3d 650, 656 (2017)(referring to successor "good-reason" law or regulation).

reconsider because the Court ruled in Plaintiffs' favor as to Claims 1 and 3); *Smith v. District of Columbia*, 15-737 (RCL).

Regarding the application of these statutes to non-residents, Judge Scullin held:

Furthermore, as things now stand, Plaintiff Raymond [the only individual non-resident of the District], and all others who are not residents of the District, are treated exactly the same as residents of the District insofar as the District has a complete ban on the carrying of handguns in public for self-defense.

*Palmer*, 59 F. Supp. 3d at 184.

This Court's holding in *Palmer* that the "home limitations" of § 7-2502.02(a)(4) and D.C. Code § 22-4504(a) in effect during the Class Period violated the Second Amendment because they effected a "complete ban on the carrying of handguns in public" has issue preclusion effect against the District. *Palmer*, 59 F. Supp. 3d at 183. The District was a party in *Palmer*, and Judge Scullin entered a judgment in *Palmer* which became final because the District dismissed its appeal of the judgment. *Palmer v. District of Columbia*, No. 14-7180, 2015 U.S. App. LEXIS 6414 (D.C. Cir. Apr. 2, 2015) (mem., appeal dismissed); *Hurd v. District of Columbia*, 864 F.3d 671, 679 (2017)("[i]ssue preclusion makes 'the determination of a question directly involved in one action . . . . conclusive as to that question in a second suit.'"); *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (1992).

In fact, the District concedes the basic factual and legal premise of Plaintiffs' Second Amended claim that the District's totally banned carrying a pistol in public during the Class Period. As the District phrased it in the Meet and Confer Statement, "[a]t the time of plaintiffs' arrests and seizures, no person—resident or non-resident — could carry a handgun or ammunition outside the home." Meet and Confer Statement [73], p. 5.

The D.C. Circuit in *Wrenn* later confirmed the rationale of Judge Scullin's holding in *Palmer* that, under Supreme Court precedent, complete bans of Second Amendment rights are

always invalid without applying tiers of scrutiny.  *Wrenn v. District of Columbia*, 864 F.3d 650, 657, 664-65 (D.C. Cir. 2017)(under *Heller I,* complete bans of 2d Amendment rights are always invalid without applying tiers of scrutiny).

### A. *Plaintiffs are Entitled to Summary Judgment on Their Second Amendment Claim against the District.*

Plaintiffs are entitled to summary judgment on their Second Amendment claim against the District because each Plaintiff established a predicate constitutional violation, and the District's policies were the moving force behind the predicate constitutional violations. Each Plaintiff is entitled to summary judgment on this claim because there are no genuine disputes as to any material fact and the each Plaintiff is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *See Thompson v. District of Columbia*, 573 F. Supp. 2d 64, 67 (D.D.C. 2008) ("Although there are no genuine issues of material fact in dispute, the Court must nonetheless evaluate defendant's motion for summary judgment to determine whether the District is entitled to judgment as a matter of law.") *affirmed by Thompson v. District of Columbia*, No. 09-7054, 2009 U.S. App. LEXIS 25618 (D.C. Cir. Nov. 18, 2009).

To prevail on summary judgment against the District on liability Plaintiffs must establish both (1) a predicate constitutional violation; and (2) a *Monell* claim. *See Harris*, 2019 U.S. Dist. LEXIS 131297 at *7 (*citing Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003)) (to establish a *Monell* claim plaintiff must establish both (1) a predicate constitutional violation and (2) the municipality's policy/custom was the moving force behind the predicate constitutional violation).

### 1. *Each Second Amendment Named Plaintiff Establishes a Predicate Constitutional Violation under the Second Amendment.*

Each Second Amendment Named Plaintiff establishes a predicate constitutional violation under the Second Amendment as established above. SMF # 1; *see Palmer, 59 F. Supp. 3d at 183; Smith, 387 F. Supp. 3d at 25-26.*

Each Named Plaintiff was arrested, detained at least overnight in a police lockup, prosecuted (usually by U.S. Attorney but sometimes by OAG), and in the cases of Ms. Smith and

Mr. Cassagnol, re-prosecuted by the OAG after the U.S. Attorney dismissed the original prosecution in the wake of *Palmer v. District of Columbia.* SMF # 1. Mr. Rouse was prosecuted solely by the OAG after the U.S. Attorney stopped enforcing D.C. Code § 4504(a). SMF ## 61-62.

Each Named Plaintiff was arrested and booked and detained by either the MPD or the Department of Corrections ("DOC") both agencies of the District of Columbia.[12] Each was prosecuted by either or both of the U.S. Attorney or the OAG. Both the U.S. Attorney and the OAG are state actors, each tasked with authority to prosecute the District's criminal laws, and each acted on the District's behalf. *Smith, 387 F. Supp. 3d at* 21 n.11.

These acts by the District violated each of the Second Amendment Named Plaintiffs' Second Amendment rights.

### 2. *Each of these statutes – by itself and read together - is an "official policy" of the government of the District of Columbia.*

Each of the District's gun control statutes – by itself and read together - is an "official policy" of the government of the District of Columbia under *Monell* because each was enacted by the D.C. Council. *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 282 (D.D.C. 2011)(*citing Monell*, 436 U.S. at 690)(overdetentions caused by the District's ordinance are clearly constitutional violations executed in accordance with District policy officially adopted and promulgated by the Council).

### 3. *The District's policy/custom was the moving force behind the predicate constitutional violations .*

Moreover, D.C. Code §§ 7-2502.01, 7-2506.01, and 22-4504 are the moving force of practically every arrest for carrying a handgun during the Class Period and most prosecutions pursuant to the District's gun laws during the Class Period. Grabowsky, Decl., ¶ 3. The District's

---

[12] As of midnight, October 1, 2013, primary responsibility for the operation of CCB at 300 Indiana Avenue, NW, transferred MPD to DOC. D.C. Code § 24–211.02(a-1).

gun laws are policies and the District enforced its policies against the Named plaintiffs by arresting, detaining and prosecuting them. Haines depo, p., 32-33. The policy is closely related to the ultimate injury, and the injury would not have occurred in its absence. *Barnes*, 793 F. Supp. 2d at 285.

Although the District had other gun control laws on the books, an analysis of the data exports from Cobalt shows that these other laws were infrequently used by the MPD in making or booking arrests on gun charges during the Class Period. Grabowsky, Decl., ¶¶ 4-7.

None of the other District of Columbia gun control statutes – such as the "felon-in-possession" or other restricted category offenses of D.C. Code § 4503(a)(1) to (a)(6) or D.C. Code § 4504(a)(2) – undercut the fact that the CPWL/ UF/ UA regulations were the moving force behind peoples' being arrested or booked or detained pending First Appearance during the Class Period.[13]

Analyzing how these statutes applied at each stage of the enforcement process illustrates this point.

### a) *Most arrestees arrested or booked or detained pending First Appearance were charged by the MPD with CPWL/ UF/ UA.*

Most arrestees arrested or booked or detained pending First Appearance were charged by the MPD with CPWL/ UF/ UA. Grabowsky, Decl., ¶ 3.

---

[13] Felon-in-possession is the only statute or restricted category offense that arguably causes a person to lose their Second Amendment rights; if felons, or violent felons, fall outside the Second Amendment, they have no standing to bring a Second Amendment claim, so causation is not an issue for them. The burden is on the District to identify any class members who were convicted of felonies, or violent felonies, before their arrests in this case. *See Heller I*, 554 U.S. at 635 (ordering the District of Columbia to issue a license to Heller, as long as he is "not disqualified from the exercise of Second Amendment rights"). So the burden should fall on the District to identify class members who fell into the other restricted categories as well.

The District's policy was to arrest gun law violators on D.C. Code § 4504. Haines depo, p. 32-33.

The number of persons charged by the MPD with felon-in-possession or any of the other restricted category offenses is so relatively small that it does not undercut the fact that the moving force of the arrests MPD charged during the Class Period was one or more of CPWL/ UF/ UA.[14]

The District had a statute imposing enhanced penalties for persons falling into certain 'restricted categories" such as "felon-in-possession" and "previous conviction of an intrafmily offense. D.C. Code § 4503(a). The relevant restricted category offenses were: (1) felon-in-possession; (2) fugitive from justice; (3) subject to a court order issued in DC such as a CPO with a gun relinquishment clause; and (4) convicted within the past 5 years of an intrafamily offense. D.C. Code § 4503(a)(1) to (a)(6). But, the MPD did not charge many felon-in-possession offenses (172 out of a total of about 4,500 arrests on weapons offenses, a fraction of the total). And it enforced the other restricted category offenses even less frequently.

Out of 4,500 arrests on weapons charges, the MPD charged some version of "felon-in-possession" only 172 times based on Plaintiffs' count to date. Grabowsky, Decl., ¶. 4. Of the arrests charged by the MPD with felon-in-possession, 86 of those arrests overlapped with arrests charged with CPWL/UA/UF. *Id.* at 7.

Of the 172 arrests charged with a felon-in-possession by the MPD in Cobalt that have arrest numbers[15], at least 61 of those arrests were prosecuted by the U.S. Attorney. However, of those 61 prosecutions, only 48 of those prosecutions had a felon-in-possession charge. *Id.* at 12.

---

[14] Plaintiffs are still analyzing the data from the most recent productions and these numbers may change. MPD did not use unique identifiers to identify the offense a person was charged with. Moreover, certain other offenses such as "unlawful discharge of a firearm" may increase numbers in certain categories. But, Plaintiffs do not expect them to change significantly. And, at the end of the day, the overwhelming number of arrests for gun offenses during the Class Period were made pursuant to the District's Unconstitutional CPWL/ UF/ UA.

The MPD charged person with prior intrafamily convictions in only 25 arrests. Grabowsky, Decl., ¶ 11. Commander Haines explained that arrestees subject to foreign warrants were or could be charged with 23DC701/ Fugitive from Justice, and there are 34 arrests charged with Fugitive from Justice in Cobalt. Haines depo, p. 49. The exact number of arrest charged with the restricted category offenses of CPOs with gun relinquishment orders is not yet known.

As stated, these numbers may go up as Plaintiffs continue counting the offenses charged in arrests but relative to the total number of arrests on gun charges the number will remain relatively small. And, at the end of the day, the overwhelming number of arrests for gun offenses during the Class Period were made pursuant to the District's Unconstitutional CPWL/ UF/ UA.

In fact, the MPD and the DOC (the two District agencies booking arrestees during the Class Period) did not even have a policy of running criminal history checks on arrestees to determine whether they fell into one of the restricted categories or other gun regulation statutes. Haines depo, p. 50.

Commander Haines, the District's 30(b)(6) deponent was examined extensively on the District's policy and practice of conducting criminal history back ground checks on persons arrested on the trilogy of CPWL/ UA/ UF offenses and he was adamant that no District policy required either the arresting officer or cellblock technician to do background checks to see if an arrestee fell into one of the categories of D.C. Code § 4503(a)(1) to (a)(6); he was equally adamant that there was no such routine among either arresting officers or cellblock technicians. Haines depo, p. 50. Even if somehow an arresting officer were made aware by a cellblock technician that an arrestee arrested on CPWL/ UF/ UA fell into one of the restricted categories of  D.C. Code §

---

[15] Some arrests in Cobalt do not have arrest numbers, so Plaintiffs are not able to match them with prosecutions in CourtView, so the number may be higher.

4503(a)(1) to (a)(6) it was entirely discretionary within the arresting officer to add, or not add, the charge. Haines depo, p. 50.[16]

Rather, MPD relied on the U.S. Attorney's Office to do a complete background check and decide whether an arrestee should be released or prosecuted or even charged under one of the felon in possession statutes or one of the other restricted category offenses under D.C. Code § 4503(a)(1) to (a)(6) or D.C. Code § 4504(a)(2). Haines depo, p. 54-55. Therefore, although these restricted category offenses may have been the moving force of some prosecutions they were not the moving force behind arrests.

The other statutes that the District charged or booked arrestees with are partially or totally unconstitutional, and resulted in few arrests, and thus the moving force of some prosecutions they were not the moving force behind arrests.

For example, during the Class Period the MPD arrested and charged 172 persons with some version of "felon-in-possession." At least one of these was in error. The MPD charged Mr. Davis with a felon-in-possession offense, SMF # 1, but his bail report shows that he had no prior felonies. Pls.'s Ex. # 76. But, D.C. Code § 4503(a)(1) is unconstitutional as applied to felons convicted of non-violent felonies. *See Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019)(felons protected by Second Amendment and the felon-in-possession ban applies only to violent felonies)(Barrett J., dissenting); *but see Medina*, 913 F.3d at 160 (felon-in-possession ban triggered by all felonies not just violent felons; felons fall outside the scope of the Second Amendment).

---

[16] Q But what I think I'm hearing is that during the class period, the MPD, neither the arresting officer, nor the booking team had responsibility for seeing whether persons arrested on CPWL were also liable to charge under ... one of the felon in possession statutes. Is that correct? A Yes, sir.

Haines depo, p. 54:9-16.

During the Class Period the MPD arrested and charged 33 persons with Presence in a motor vehicle containing a firearm. But, Presence in a motor vehicle containing a firearm, D.C. Code § 22–2511, was held unconstitutional by the District of Columbia Court of Appeals in *Conley v. United States*, 79 A.3d 270 (D.C. 2013) in an opinion decided September 26, 2013.

The MPD charged eight arrestees with "unlawful transportation of a firearm" under D.C. Code 22-4504.02 during the Class Period. But this statute does not establish a separate criminal offense. Rather, Section 22–4504.02, is actually a safe harbor or defense to liability under other gun-possession regulations modeled after the federal Firearm Owners' Protection Act (FOPA), not a separate penal statute. The U.S. Attorney stopped charging the statute as an offense in Superior Court and began moving in the District of Columbia Court of Appeals to vacate convictions under the statute in 2019 because "the statutory language, structure, and legislative history do not render a clear answer to that question, the rule of lenity required that ambiguity to be resolved in the defendant's favor...." *See e.g., Motion to Vacate Convictions for Attempted Unlawful Transportation of a Firearm under D.C. Code §§ 22-1803, -4504.02, Akeem Beatrice, Timothy O. Bandy v. United States of America.* [17] Pls.'s Ex. # 20.

---

[17] *Akeem Beatrice, Timothy O. Bandy v. United States of America*, Nos. 18-CF-757 & 18-CF-724 (Cr. Nos. 2017-CF2-20184 & 2017-CF2-20178).

b) *Prosecutions.*

The District's policy was for the MPD to refer every arrest on gun charges to the prosecutor unless the arrestee were released under the Detention Journal. Haines depo, p. 57. Both the OAG and the U.S. Attorney are state actors, each tasked with authority to prosecute the District's criminal laws, and each acted on the District's behalf. *Smith, 387 F. Supp. 3d at* 21 n.11.

The moving force for initial prosecutions by either prosecuting authority is CPWL/ UF/ UA even where the prosecutor has charged and prosecuted under a restricted category offense because the main charge is still CPWL/ UF/ UA.

c) *Re-prosecutions.*

In certain cases the District picked up a prosecution after the U.S. Attorney dismissed the prosecution, or, as in the case of Mr. Rouse, only the OAG prosecuted an arrestee.

The OAG has no authority to charge any restricted category offenses because they carry penalties in excess of one year's jail time. D.C. Code § 23-101; *Smith,* 387 F. Supp. 3d at 14. Therefore, the restricted category offenses played no part in the re-prosecutions or initial prosecution.

## IV. Claim 3: The District's Total Ban on Gun Ownership by Non-Residents Violated the Fifth Amendment.

Plaintiffs Maggie Smith, Gerard Cassagnol, Frederick Rouse and Delontay Davis (the "Non-resident Plaintiffs") are entitled to summary judgment on their equal protection and right-to-travel claims since the combined effect of §§ 7-2502.01, 7-2506.01, and 22-4504 distinguish between D.C. and non-D.C. residents in a way that jeopardizes their fundamental rights. *Smith, 387 F. Supp. 3d at* 26. As this Court pointed out, the "home limitations" of § 7-2502.02(a)(4) imposed a total ban on gun *registration* by non-residents because § 7-2502.02 did not provide an avenue for people without a home in D.C. to register guns in D.C. *Smith,* 387 F. Supp. 3d at 28.

Thus, although the treatment of residents and non-residents was the same as to carrying pistols outside the home, the reason non-residents could not register a pistol at all was their non-residency, and thus non-residents could not own guns in the District.

The District conceded in the *Palmer* case that during the Class Period the District maintained a custom, practice and policy of refusing to entertain gun registration applications by individuals who did not reside in the District of Columbia. *Palmer, 59 F. Supp. 3d at 173, 176*; Plaintiffs' SMF [5-3] # 9, *Palmer v. D.C.*, 09-CV-1482-HHK; Defendants' Opposition to Plaintiffs' Separate Statement of Undisputed Material Facts [6-3], # 9, *Palmer v. D.C.*, 09-CV-1482-HHK (The District does not dispute paragraph 9 of the Plaintiff's SMF # 9);[18] s*ee also Palmer, 59 F. Supp. 3d at 173, 176* (The District required gun registration applicants to submit "[p]roof of residency in the District of Columbia (e.g., a valid DC operator's permit, DC vehicle registration card, lease agreement for a residence in the District, the deed to your home or other legal document showing DC residency.").

A state law treating non-state residents differently on the basis of a fundamental right presents a paradigmatic equal protection problem. And a law forcing plaintiffs to surrender a fundamental right before traveling interstate impacts the right to travel. *Smith, 387 F. Supp. 3d at 27*.

So for Ms. Smith and other non-residents the same conduct (carrying a pistol in public) gave rise to two separate claims because for them the same conduct "affect[ed] more than a single [Constitutional] right." *Soldal,* 506 U.S. at 70.

---

[18] *Taylor v. Blakey,* 490 F.3d 965, 973 (D.C. Cir. 2007), *rev'd on other grounds,* 553 U.S. 880 (2008) (party's statement in his motion for discovery, however, may be treated as an 'admission on file' under Fed. R. Civ. P. 56(c)[(A)]. Earlier versions of Fed. R. Civ. P. 56(c) used the term "admissions on file."

This Court denied Defendant's motion to dismiss the Named Plaintiffs' Fifth Amendment claim. Order denying Plaintiffs' motion to reconsider, p. 3.[19]

**A. The Non-residents Plaintiffs are entitled to summary judgment on their equal protection claim: the "home limitations" of § 7-2502.02(a)(4) distinguished between D.C. residents and non-D.C. residents at the expense of the latter's equal protection rights, and the District cannot show the statutes are narrowly tailored to effectively advance a compelling interest.**

The Non-residents Plaintiffs are entitled to summary judgment on their equal protection claim because the District cannot show the at home limitation and the CPWL/ CP statutes are narrowly tailored to effectively advance a compelling interest. The District has conceded by competent summary judgment facts that there was a differential in its treatment of residents and Non-residents on registering and thus owning a gun in the District during the Class Period. SMF ## 109-111. At trial, the District bears the burden under strict scrutiny of proving that the infringement is narrowly tailored to serve a compelling state interest. *Smith*, 387 F. Supp. 3d at 29-30. Therefore, even though Plaintiffs are movants, the District still bears the burden of putting on facts to establish a justification at summary judgment. *Tech 7 Sys. v. Vacation Acquisition*, LLC, 594 F. Supp. 2d 76, 80 (D.D.C. 2009)(JDB); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 79 F. Supp. 3d 60, 73-74 (D.D.C. 2015). In such a case, Plaintiffs as the moving party can meet its burden by showing there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

There is no evidence in the record providing a justification for the differential treatment. Moreover, the District is foreclosed from offering a justification at this point because in this lawsuit the District has consistently denied that the statute treats residents and non-residents differently. As the District phrased it, "[a]t the time of plaintiffs' arrests and seizures, no person — resident or non-

---

[19] Judge Scullin in Palmer did not rule on Plaintiff Raymond and the other non-residents' Fifth Amendment claims. *Palmer*, 59 F. Supp. 3d at 183-84.

resident —could carry a handgun or ammunition outside the home." "Defendant's Statement of the Bases for its Defenses," Meet and Confer Statement, p. 5. And the District forfeited any opportunity to put on a justification because the District never pleaded an affirmative defense in its answer and Plaintiffs would be prejudiced if the District attempted to do so now.

> ### 1. In violation of equal protection, the "home limitations" of § 7-2502.02(a)(4) treated residents differently from non-residents by limiting registration of pistols by "[a]ny person" for use for use in self-defense in the registrant's home.

The "home limitations" of § 7-2502.02(a)(4) treated residents differently from non-residents by limiting registration of pistols by "[a]ny person" for use for use in self-defense in the registrant's home in violation of the equal protection component of the Fifth Amendment.

Introduced by the "Firearms Control Emergency Amendment Act of 2008," the "home limitations" of § 7-2502.02(a)(4) limited registration of pistols by "[a]ny person" for use in self-defense in the registrant's home.[20] This Court held as a matter of law that during the Class Period D.C. Code § 7-2502.02(a)(4)(C) decreed that a D.C. "registration certificate shall not be issued for" a pistol unless the registrant "seeks to register [the] pistol for use in self-defense within that person's home." *Smith, 387 F. Supp. 3d at* 28. Moreover, the District conceded in the Palmer litigation that during the Class Period the District maintained a custom, practice and policy of refusing to entertain gun registration applications by individuals who did not reside in the District of Columbia. SMF # 110.

And yet:

> [t]he Fifth Amendment's due process clause forbids the District from denying equal
> protection of its laws to anyone in the District. Essentially, this protects against

---

[20] Prior to that 2008 amendment, D.C. Code § 7-2502.02(a)(4) barred registration of handguns by anyone. D.C. Code § 7-2502.02(a)(4) ("A registration certificate shall not be issued for a . . . (4) Pistol not validly registered to the current registrant in the District prior to September 24, 1976."). *See Parker v. District of Columbia,* 311 F. Supp. 2d 103, 103 n.1 (D.D.C. 2004)(appellate history).

discrimination: the District cannot treat people ' differently without a satisfactory justification.

*Smith*, 387 F. Supp. 3d at 27(internal citations omitted).

### 2. The District cannot carry its burden under strict scrutiny of proving that the infringement is narrowly tailored to serve a compelling state interest.

"Strict scrutiny—the most demanding variety—is warranted" here because the restriction "jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic.'" *Id.* at 28; *see also* at 29. This *de facto* residency requirement restricted Plaintiffs' fundamental right to have a handgun for individual self-defense. *Id.*

To satisfy strict scrutiny, the District must show §§ 7-2502.01, 7-2506.01, and 22-4504 are narrowly tailored to effectively advance a compelling interest. *Id.* at 29.

But, there is no evidence in the record showing either a compelling interest or that the statutes were narrowly tailored to effectively advance it. *Celotex*, at 322 (Plaintiffs as the moving party can meet its burden by showing there is an absence of evidence to support the nonmoving party's case).

Moreover, the District is foreclosed from offering a justification at this point because the District has consistently denied that the statute treats residents and non-residents differently. As the District phrased it, "[a]t the time of plaintiffs' arrests and seizures, no person—resident or non-resident—could carry a handgun or ammunition outside the home." "Defendant's Statement of the Bases for its Defenses," Meet and Confer Statement, p. 5.

Likewise, in support of Claim 3 in Plaintiffs' Third Amended Complaint Plaintiffs' alleged (in part) "the MPD police Chief refused to register [non-residents'] hand guns or issue them licenses until at least October 2014.' 2d Am. Compl. ¶ 294. The District's answer to the factual portion of the allegation is "denied." District's Answer [ECF 79], ¶ 294.

Finally, the District forfeited any affirmative defenses to this claim because the District asserted no affirmative defenses to this claim in its Answer to Plaintiffs' Third Amended Complaint. "["A"] party's failure to plead an affirmative defense . . . generally results in the waiver of that defense and its exclusion from the case," and that under Rule 8(c) "a party must first raise its affirmative defenses in a responsive pleading before it can raise them in a dispositive motion." *Harris v. Secretary, U.S. Department of Veterans Affairs*, 126 F.3d 339, 343, 345 (D.C. Cir. 1997) (internal quotation marks and citations omitted). *Harris* suggests that the pleading requirements of Rule 8 are designed to provide notice to the parties, and rejects the practice of other circuits permitting parties "to raise affirmative defenses for the first time in dispositive motions even where no prejudice is shown. *Butler v. White*, 67 F. Supp. 3d 59, 66 (D.D.C. 2014).

By failing to give Plaintiffs notice of any defense while simultaneously denying that the law treated residents and non-residents differently, the District would cause Plaintiffs' prejudice if the District were to offer a justification in its opposition or cross motion. Allowing the District to assert an affirmative defense at this point would prejudice Plaintiffs because Plaintiffs would be surprised and Plaintiffs no longer have any opportunity to explore the basis of the District's defense in discovery. See *Harris*, 126 F.3d 339, 343, 345 (D.C. Cir. 1997).

### B. D.C. Code §§ 7-2502.01, 7-2506.01, and 22-4504 penalized the Non-residents Plaintiffs for traveling interstate by treating D.C.-resident gunowners differently from non—D.C.-resident gunowners.

The Non-residents Plaintiffs are entitled to summary judgment on their right-to-travel claim because §§ 7-2502.01, 7-2506.01, and 22-4504 penalized them for traveling interstate by treating D.C.-resident gun owners differently from non—D.C.-resident gun owners, and the District has conceded the factual predicate of the claim in the *Palmer* litigation. *Smith*, 387 F. Supp. 3d at 29; SMF ## 109-111.

At trial, the District bears the burden under strict scrutiny of proving that the infringement is narrowly tailored to serve a compelling state interest. *Smith*, 387 F. Supp. 3d at 29-30. Therefore, even though Plaintiffs are movants, the District still bears the burden of putting on facts to establish a justification at summary judgment. *Tech 7 Sys., 594 F. Supp. 2d at 80; Paleteria La Michoacana, Inc., 79 F. Supp. 3d at 73-74.* In such a case, Plaintiffs as the moving party can meet its burden by showing there is an absence of evidence to support the nonmoving party's case. *Celotex*, at 322.

There is no evidence in the record providing a justification for the differential treatment. Moreover, the District is foreclosed from offering a justification at this point because in this lawsuit the District has consistently denied that the statute treats residents and non-residents differently. As the District phrased it, "[a]t the time of plaintiffs' arrests and seizures, no person — resident or non-resident —could carry a handgun or ammunition outside the home." "Defendant's Statement of the Bases for its Defenses," Meet and Confer Statement, p. 5. And the District forfeited any opportunity to put on a justification because the District never pleaded an affirmative defense in its answer and Plaintiffs would be prejudiced if the District attempted to do so now.

### 1. The right to travel protects the right of a citizen of one State to enter and to leave another State is a fundamental right and the District's "at home" limitation on gun registration impinged on the Non-residents's right.

The right to travel protects the right of a citizen of one State to enter and to leave another State is a fundamental right and the District's "at home" limitation on gun registration impinged on the Non-residents' rights.

The right to travel:

protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the Second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

*Smith*, 387 F. Supp. 3d at 29 (*quoting Saenz v. Roe*, 526 U.S. 489, 500 (1999).

State laws "penalize the exercise of" the right to travel interstate when they "prohibit[] a person who has recently traveled to the state from" enjoying a right "available to a longer-term resident of that state." *Id.* at 30 (*quoting Pollack v. Duff*, 793 F.3d 34, 47 (2015)). Moreover, any government impingement on the fundamental right to move between states is measured under a strict scrutiny standard and would be justified only if the infringement is narrowly tailored to serve a compelling state interest. *Id.*

The District impinged on the Non-residents Plaintiffs' fundamental rights by restricting gun registration – and thus gun ownership – to residents. This Court held as a matter of law that during the Class Period D.C. Code § 7-2502.02(a)(4)(C) decreed that a D.C. "registration certificate shall not be issued for" a pistol unless the registrant "seeks to register [the] pistol for use in self-defense within that person's home." *Smith*, *387 F. Supp. 3d at* 28. Moreover, the District conceded in the Palmer litigation that during the Class Period the District maintained a custom, practice and policy of refusing to entertain gun registration applications by individuals who did not reside in the District of Columbia. SMF ## 109-111.

### 2. The District cannot carry its burden under strict scrutiny of proving that the infringement is narrowly tailored to serve a compelling state interest.

The District cannot carry its burden under strict scrutiny of proving that the infringement is narrowly tailored to serve a compelling state interest. The District still must carry this burden when Plaintiffs are the movants in a summary judgment motion. *Tech 7 Sys., 594 F. Supp. 2d at 80; Paleteria La Michoacana, Inc., 79 F. Supp. 3d at 73-74.*

First, there is no evidence in the record showing either a compelling interest or that the statutes were narrowly tailored to effectively advance it. *Celotex*, at 322 (Plaintiffs as the moving

party can meet its burden by showing there is an absence of evidence to support the nonmoving party's case).

Second, as with the equal protection claim, the District is foreclosed from offering a justification at this point because in this litigation the District has consistently denied that the statute treats residents and non-residents differently. "Defendant's Statement of the Bases for its Defenses," Meet and Confer Statement, p. 5.

Finally, the District forfeited any affirmative defenses to this claim because the District asserted no affirmative defenses to this claim in its Answer, and allowing the District to assert an affirmative defense at this point would prejudice the Non-residents Plaintiffs, because the Non-residents Plaintiffs would be surprised and Plaintiffs no longer have any opportunity to explore the basis of the District's defense in discovery. See *Harris*, 126 F.3d 339, 343, 345 (D.C. Cir. 1997).

## V.  Claim 6: The District's Policy of Retaining Weapons Past the Date Their Cases Were Dismissed Violated Owners' Fourth Amendment Rights.

Plaintiffs Ms. Smith, Mr. Cassagnol, Mr. Rouse and Mr. Davis are entitled to summary judgment on their Claim 6 because the record shows the MPD seized their guns, ammunition, and gun-related property incident to arrest, classified it as evidence, and held it long after their U.S. Attorney cases were over.

The following chart based on data from the data export from EvidenceOnQue, the Property Clerk's property database, shows the Named Plaintiffs from whom the District seized guns as evidence, the dates the U.S. Attorney dismissed their cases, and the date the District returned their guns (if ever). Grabowsky, Decl., ¶ 9.

| Named Plaintiffs | Date indictment dismissed | Items seized | Date gun returned |
|---|---|---|---|
| Ms. Smith | September 29, 2014<br><br>Pls.'s Ex. # 41, Smith U.S. Attorney docket, 2014 CF2 | Bersa 380 worth approximately $400.00, SMF 15. | Never<br><br>Pls.'s Ex. # 40, ¶ 17 |

|  | 011408 |  |  |
| --- | --- | --- | --- |
| Mr. Cassagnol | July 29, 2014<br><br>Pls.'s Ex. # 51, 2013 CF2 017982 | 9 mm pistol, make KIMBER, model DP51, worth approximately $500.00, and some ammunition; SMF # 42 | Never<br><br>Pls.'s Ex. # 50; Grabowsky, Decl., ¶ 9. |
| Mr. Rouse | No US prosecution | Glock 33 Pistol worth approximately $550.00, FN Five-Seven Pistol worth approximately $1,200.00 and TLR2 Scope worth approximately $300.00; SMF # 58 | July 28, 2017<br><br>SMF # 65 |
| Mr. Davis | 1/16/2015<br><br>Pls.'s Ex. # 71, 2014 CF2 005034 docket | Bersa 380 pistol worth approximately $400.00; SMF # 80 | Never<br><br>Pls.'s Ex. # 13; Grabowsky, Decl., ¶ ¶ 9 |
| Ms. Buffaloe | No gun |  |  |
| Mr. Atkinson | No gun |  |  |

The District's policy was to hold guns seized as evidence from persons arrested on gun charges during the Class Period indefinitely or never give them back. There is no evidence in the record which justifies this policy of retaining guns and ammunition and gun related property such as scopes and holsters seized as evidence. The only justification the District's 30(b)(6) deponent offered for the policy was that during the Class Period it was illegal for owners to register guns and so the District the MPD refused to return guns to them. And yet, sometimes if a Non-resident owner called or went by the Property Clerk's Evidence Control Branch which handled storage and

release of property kept as evidence the clerks there might help an owner Fed Ex their guns to an out of state address.

### A. The District's policy of retaining Plaintiffs' guns, ammunition and related property past the date their cases were dismissed violated owners' Fourth Amendment rights.

The District's policy of retaining Plaintiffs' guns, ammunition and related property past the date their cases were dismissed violated owners' Fourth Amendment rights. *Smith, 387 F. Supp. 3d at 25*("Clearly any need to preserve evidence for the ongoing prosecutions ended when those prosecutions were dismissed."). D.C. Code § 22-4517 implicates plaintiffs' fundamental right to have a handgun for individual self-defense, and thus enjoys no presumption of validity. *Smith, 387 F. Supp. 3d at 25.*

Even if the initial seizure were reasonable, "the Fourth Amendment permits seizures only for as long as necessary. Clearly any need to preserve evidence for the ongoing prosecutions ended when those prosecutions were dismissed." *Smith*, 387 F. Supp. 3d at 25. "Once a justification loses force, the government must cease the seizure or come up with a new justification." *Id.*

Here, the justification of the seizures ended for two reasons when the U.S. Attorney dismissed the cases: (1) the U.S. Attorney cases were over; and (2) the U.S. Attorney stopped prosecuting gun cases under D.C. Code § 4504(a) in 2014 after *Palmer* was decided; and (3) the OAG does not prosecute gun cases so guns were not needed as evidence by the OAG. D.C. Code § 23-101; *Smith*, 387 F. Supp. 3d at 14.

### 1. The MPD classified all guns and ammunition seized by the MPD incident to arrest on gun or ammunition charges as evidence.

During the Class Period the MPD seized all guns and ammunition for persons arrested for violations of the District's firearms offenses including CPWL/ UF/ UA because it was unlawful for people to have them. Pls.'s Ex. # 34, Manigault depo., p. 14. The MPD classify guns seized incident to arrest on gun or ammunition charges "as evidence" upon seizure on the PD 81

(property record). Manigault depo., p. 23-24. In fact, the MPD classified all handguns coming into the possession of the department as evidence. SMF # 129; Pls.'s Ex. # 32, MPD "Teletype," TT-80-31-13_Carrying-a-Pistol_080913.

The guns and ammunition were not "released from evidence" until the owners got PD 81-Cs from the relevant prosecutor. Manigault depo., p. 24-45. Yet, the MPD General Orders provide for the officer in charge of the gun as evidence to get a signed PD 81-C from the USAO handling the case when the case is dismissed. SMF # 141 (MPD General Order 601.1, p. 26 (III,F,4).

Seizing officers enter the gun into EvidenceOnQue, the Property Clerk property database. *Id.* at 21 EvidenceOnQ is the database for keeping track of the property coming into the possession of the District's MPD. *Id.* at 20. Then, the gun is delivered to the Property Clerk who stores it in the Evidence Control Branch of the Property Clerk's office and scans the barcode on the evidence wrapper into EvidenceOnQue to enter its location as EvidenceOnQue. *Id.* at 21.

Clerks in the Evidence Control Branch enter remaining details about the gun into EvidenceOnQue, the Property Clerk property database. Manigault depo., p. 21. EvidenceOnQ is the evidence control branch database for keeping track of the property coming into the possession of the District's MPD. *Id.* at 20.

### 2. *The District did not send notice to gun owners telling them when or if they could retrieve their guns.*

The District did not send notice to gun owners telling them when or if they could retrieve their guns. Manigault depo., p. 39. The ECB waited for owners to call or come by and ask about their guns. *Id..* The Property Clerk simply retained their guns until an owner came to pick it up. *Id.*

### 3. *The ECB would not release guns to owners without a registration certificate and a license to carry in public even when their cases were over.*

Even if the prosecutor gave a PD 81-C the ECB would not release the gun without follow-up in WALES to make sure the person was actually cleared to possess a weapon. Manigault depo., p. 28.

During the Class Period the ECB would not release guns to District residents without a registration certificate or a license to carry in public. *Id.* at 31-32; 33.[21] If an owner called about their gun at this time they would be told it's unlawful for them to have it. *Id.* at 32. And the gun would stay with MPD. *Id.* The rationale for keeping the gun with MPD was because it was unlawful for them to have it. *Id.* The guns just stayed at the ECB, *Id.* at 33, or were destroyed. *Id.* at 34.

Sometimes the ECB would ship a gun via Fed Ex to an owner or police station or gun dealer shop outside the District if the owner set up the account. Manigault depo., p. 29, 36. But, the only way for an owner to know about this procedure was to call or come to the ECB and ask. Manigault depo., p. 30. The practice of FedEx-ing guns to owners out of the District was not popularized on the MPD website or anywhere else. *Id.* at 36-37.

So during the Class Period there was no way for owners to get their guns back because guns were illegal. *Id.* at 31-32. Even after *Palmer* and the replacement legislation owners residing in the District could not retrieve their guns because the "good cause" replacement legislation was still a total ban on the right to carry firearms for personal self-defense beyond the home. *Wrenn*, 864 F.3d at 667.

Such guns were kept at ECB or destroyed. Manigault depo., p. 33-34. The disposition was not documented in EvidenceOnQue. *Id.* at 34.

---

[21] Generally a person wishing to register a gun had to appear in person and bring the gun to be registered with them. § 7-2502.04(c); *Heller v. District of Columbia*, 670 F.3d 1244, 1248 (2011).

4. *The District cannot carry its burden of justifying retention of Plaintiffs' guns as evidence after their cases were dismissed.*

The burden is on the District to justify retention of Plaintiffs' guns, ammunition and gun-related property after their cases were dismissed. *Smith*, 387 F. Supp. 3d at 25 ("Once a justification loses force, the government must cease the seizure or come up with a new justification.").

Therefore, even though Plaintiffs are movants, the District still bears the burden of putting on facts to establish a justification at summary judgment. *Tech 7 Sys., 594 F. Supp. 2d at 80; Paleteria La Michoacana, Inc., 79 F. Supp. 3d at 73-74.* In such a case, Plaintiffs as the moving party can meet its burden by showing there is an absence of evidence to support the nonmoving party's case. *Celotex*, at 322.

Here, there is no evidence in the record justifying holding Plaintiffs' guns, ammunition and gun-related property after their prosecutions were dismissed. See *Celotex*, at 322.

And, assuming *arguendo* that Code § 22-4517 was the reason for holding their guns after their cases were over, the District cannot overcome the presumption that D.C. Code § 22-4517 is unconstitutional. *Smith*, 387 F. Supp. 3d at 25.

Holding guns seized from owners and classified as evidence without sending notice or publicizing in any way the District's procedure for returning guns violated the Fourth Amendment because the District had no interest in retaining the guns. Even an unconstitutional gun control regime is not a reasonable justification for retaining guns as evidence after the case is over.

## Conclusion.

Wherefore Plaintiffs move this Court to grant Plaintiffs' partial motion for summary judgment.

Respectfully submitted,

<u>/s/ William Claiborne</u>
William Claiborne
DC Bar # 446579
Counsel for Plaintiffs

717 D Street, NW
Suite 300
Washington, DC 20004
Phone 202/824-0700
Email claibornelaw@gmail.com