

Deposition of:

**Commander John Haines**

*January 13, 2021*

In the Matter of:

**Smith, Maggie et al. v. District of Columbia**

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLUMBIA

 3        ----------------------------

          MAGGIE SMITH, et al.,         :

 4                                       :

              Plaintiffs,               :

 5        vs.                            :  Civil Action No.:

                                         :

 6        DISTRICT OF COLUMBIA,          :  15-737 (RCL)

                                         :

 7            Defendant.                 :

          ----------------------------

 8

 9

10                  Virtual Zoom Deposition of

11                   COMMANDER JOHN HAINES

12                    Washington, D.C.

13                    January 13, 2021

14               9:00 a.m. to 12:20 p.m.

15

16

17        Job No. PA-4411856

18        Pages 1 - 124

19        Reported by:  Felicia A. Newland, CSR

20

21

22
```

Pls.'s Ex. 33, p. 2

Smith v. DC, 15-737 (RCL)

Page 2

1

2          Deposition of COMMANDER JOHN HAINES, held via

3      Zoom video conference:

4

5          Pursuant to Notice, before Felicia A. Newland,

6      CSR, a Notary Public in and for the District of

7      Columbia, when were present on behalf of the

8      respective parties:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Pls.'s Ex. 33, p. 3
Smith v. DC, 15-737 (RCL)

Page 3

1                A P P E A R A N C E S

2

3       On behalf of the Plaintiffs:

4            WILLIAM CLAIBORNE, ESQUIRE

5            717 D Street, Northwest,

6            Suite 300

7            Washington, D.C.  20004-2815

8            (202) 824-0700

9            claibornelaw@gmail.com

10           -- and --

11           CHRISTOPHER P. CULLEN, ESQUIRE

12           Faegre Drinker Biddle & Reath, LLP

13           1500 K Street, Northwest

14           Suite 1100

15           Washington, D.C.  20005

16           (202) 842-8800

17           christopher.cullen@faegredrinker.com

18

19

20

21

22

Pls.'s Ex. 33, p. 4
Smith v. DC, 15-737 (RCL)

Page 4

1              A P P E A R A N C E S (Cont'd)

2

3        On behalf of the Defendant:

4              ANDY SAINDON, ESQUIRE

5              BRENDAN HEATH, ESQUIRE

6              Assistant Attorney General

7              400 Sixth Street, Northwest

8              Suite 10100

9              Washington, D.C.  20001

10             (202) 724-6643

11             andy.saindon@dc.gov

12

13       *(All attendees appeared remotely.)

14

15

16

17

18

19

20

21

22

Pls.'s Ex. 33, p. 5
Smith v. DC, 15-737 (RCL)

1                    C O N T E N T S

2       EXAMINATION BY:                              PAGE

3            Counsel for Plaintiffs                   6

4                  HAINES DEPOSITION EXHIBITS

5       NO.   DESCRIPTION                            PAGE

6       20    22-4503. Unlawful Possession of Firearm    12

7       22    22-4504 DC Council                     14

8

        (*Exhibits attached to transcript.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Pls.'s Ex. 33, p. 6
Smith v. DC, 15-737 (RCL)

Page 6

                         P R O C E E D I N G S

1

2                            * * * * * * * *

3                 (Agreement was made with all counsel for

4                    reporter to remotely swear in witness.)

5       WHEREUPON,

6                         COMMANDER JOHN HAINES

7       called as a witness, appeared remotely before me,

8       having been first duly sworn, was examined and

9       testified as follows:

10             EXAMINATION BY COUNSEL FOR PLAINTIFFS

11        BY MR. CLAIBORNE:

12              Q      Good morning, Commander Haines.

13              A      Good morning.

14              Q      My name is William Claiborne.  I'm

15        the lawyer for the Plaintiffs in this case.  Do you

16        understand me?

17              A      Yes, sir.

18              Q      Can you spell your -- well, first say

19        and then spell your full name, please.

20              A      It's John R. Haines.  It's J-O-H-N,

21        my middle name is Riley, R-I-L-E-Y, Haines,

22        H-A-I-N-E-S.

Pls.'s Ex. 33, p. 7

Smith v. DC, 15-737 (RCL)

Page 7

1           Q       Thank you.

2                   Who's your employer?

3           A       The Metropolitan Police Department

4      with the District of Columbia.

5           Q       And what's your rank?

6           A       I'm a commander.

7           Q       And what's a commander?

8           A       I run the division.  I run the

9      Narcotics and Special Investigation Division.

10          Q       And how many commanders are there in

11     the department?

12          A       It's roughly about 13.  I don't know

13     that that's an exact number, but roughly.

14          Q       I see.

15                  Now that I've got you identified and

16     you know who I am, I just want to say two things to

17     you.  One, is there anything that impairs your

18     ability to take this deposition this morning?

19          A       No, sir.

20          Q       And the other thing is if at any time

21     you need to take a break, let me know.

22          A       Okay.  Yes, sir.

Page 8

1          Q      The only thing is that I'd like to

2     finish whatever question we're on, but if you need

3     to get a drink of water or just for any reason that

4     you need a break, just let us know.

5          A      Okay.  I will.

6          Q      And so the division that you're a

7     commander of, what does that division do?

8          A      We're -- I oversee -- so the

9     Narcotics and Special Investigations Division, I

10    oversee serval units within this division,

11    including the Gun Recovery Unit, the Narcotics

12    enforcement Unit, the Electronics Surveillance

13    Unit, the Criminal Apprehension Unit, the Asset

14    Forfeiture Unit.  I have an administrative staff,

15    as well as civilians, who work here with -- we do

16    various functions as well.  And I also have the

17    Violence Reduction Unit.

18         Q      So you have a lot on your plate.

19         A      Yes, sir.

20         Q      What were you doing during the period

21    from 2011 until, let's say, 2000- -- the start of

22    2015?

Pls.'s Ex. 33, p. 9

Smith v. DC, 15-737 (RCL)

Page 9

1          A     The first part of 2011 I was assigned

2     as the vice lieutenant for the Fourth District Vice

3     Unit.  And all of 2012, I transferred over to as a

4     lieutenant in the Criminal Investigations Division,

5     and then I was assigned to the Fifth District

6     Detective's Office.  And I stayed there -- and I

7     was in that position through 2015.

8          Q     Did somebody show you the list of

9     topics for today's deposition?

10         A     Yes, sir.

11         Q     Do you have a copy of that with you?

12         A     I do not.

13         Q     Well, I'm going to follow it pretty

14    closely.  If you'd like to have a copy for

15    reference, perhaps, Andy could send you one,

16    otherwise --

17         A     He probably did, I just don't have

18    it.  I can try and pull it up.

19         Q     You don't need it.  You don't need

20    it.  It's just kind of a roadmap.  And I'm not

21    going to switch things up too much, but it's just

22    up to you.

Page 10

1                      So my understanding is --

2                      MR. CLAIBORNE:  Is this correct,

3          Andy, Commander Haines is not doing Topics 1 and 2?

4                      MR. SAINDON:  That is correct.

5                      And, Commander, I just sent you

6          another copy.

7                      THE WITNESS:  Thanks.

8          BY MR. CLAIBORNE:

9              Q      Yeah, you don't need it, but just in

10         case you want to, you know, have it there.

11             A      I have it.

12             Q      Okay.  So the first topic is what

13         policies and practices did the MPD follow for

14         making arrests on weapons charges during the class

15         period.  And just for our purposes of today,

16         roughly speaking, the class period we'll say is --

17         starts sometime in 2011 and goes up until October

18         of 2014, when the mayor signed the emergency

19         legislation introducing the Good Cause Program for

20         licensing firearms in the District.

21                      So you understand that period?

22             A      Yes, sir.

**Pls.'s Ex. 33, p. 11**
**Smith v. DC, 15-737 (RCL)**

Page 11

1          Q      Commander, are you familiar -- what's

2     the difference between a weapon and a firearm in

3     MPD terminology?

4          A      The legal definition of a firearm is

5     a device that it -- that it -- I'm trying to think

6     of the actual word.  I'm sorry.  It emits a

7     projectile by means of an explosive.  That is the

8     definition of a firearm.  A weapon can literally be

9     anything.

10          Q      And so let's -- No. 4 is, "What

11     policies and practices did the MPD follow" -- well,

12     No. 3, let me -- let me just restrict it then to

13     what you just called firearms -- really pistols is

14     what I really want to talk about, is pistols and

15     handguns.

16               So are you familiar with the statutes

17     that were -- or let's say the primary statutes that

18     were endorsed in the District during the class

19     period that I've defined for you?

20          A      Yes, sir.

21          Q      And so one of them was D.C. Code

22     22-4503.  Is that right?

**Pls.'s Ex. 33, p. 12**

**Smith v. DC, 15-737 (RCL)**

Page 12

1          A      I believe so.  Yes, sir.

2          Q      When you say you believe so, what

3     does that mean?

4          A      I don't have the code in front of me,

5     but that sounds correct.

6          Q      Well, then, let me pull up that code

7     for you because I want you to take a look at it and

8     make sure that we're on the same page because I'm

9     going to ask you some questions about that.

10               Now, this is the first time I've used

11    this software, so I'm going to try to pull this --

12    pull this up on the screen.

13               Can you see it on your screen,

14    Exhibit No. 20?

15         A      No, sir.

16          (Discussion had off the record.)

17          (Haines Deposition Exhibit Number 20

18           marked for identification.)

19    BY MR. CLAIBORNE:

20         Q      Okay.  Commander, are you able to see

21    that?

22         A      Yes, sir.

Pls.'s Ex. 33, p. 13
Smith v. DC, 15-737 (RCL)

Page 13

1          Q      And do you recognize this?

2          A      Yes, sir.

3                 MR. SAINDON:  Chaz, what version of

4      the code is this?

5                 MR. CLAIBORNE:  It's the current

6      version.

7                 MR. SAINDON:  Okay.

8      BY MR. CLAIBORNE:

9          Q      So do you see --

10                MR. CLAIBORNE:  Chris, can you scroll

11     it back up so the unlawful possession of firearm is

12     at the top of the screen?  There we go.

13     BY MR. CLAIBORNE:

14         Q      So, Commander, you see we have these

15     categories here.  There's five that you can see

16     here, "Convicted in any court of a crime punishable

17     by imprisonment for a term exceeding one year"?

18         A      Yes, sir.

19         Q      And then there's -- do you see No. 2

20     there?

21         A      Yes, sir.

22         Q      And No. 3?

Pls.'s Ex. 33, p. 14

Smith v. DC, 15-737 (RCL)

Page 14

1           A      Yes, sir.

2           Q      What's No. 3?

3           A      "Is a fugitive from justice."

4           Q      And No. 4, what's No. 4?

5           A      "Is addicted to any controlled

6     substances defined in D.C. Code 48-901.02."

7           Q      And you don't have to read all of No.

8     5, but do you see that No. 5 relates to certain

9     court orders?

10          A      Yes, sir.

11                 MR. CLAIBORNE:  And, Chris, could you

12    scroll until we can see No. 6, please?

13    BY MR. CLAIBORNE:

14          Q      Okay.  Do you see No. 6 there?

15          A      Yes, sir.

16          Q      So now are you familiar with what

17    Section 4503 is?

18          A      Yes, sir.

19          Q      So I've got another exhibit I'd like

20    to show you.

21                 (Haines Deposition Exhibit Number 22

22                  marked for identification.)

Pls.'s Ex. 33, p. 15
Smith v. DC, 15-737 (RCL)

Page 15

1        BY MR. CLAIBORNE:

2              Q      Commander Haines, are you able to see

3        this exhibit marked 22, which is Section 22-4504?

4              A      Yes, sir.

5              Q      And can you take a look at that,

6        please, at the text of Section A and B?  Do you see

7        that?

8              A      Yes, sir, I'm reading.

9              Q      Oh.  I'm sorry.  Let me know when

10       you're done, please.

11             A      Yes, sir, I'm good.

12             Q      So do you recognize this as an CPWL

13       statute?

14             A      Yes, sir.

15             Q      And do you recall that sometime

16       during the class period this was amended to take

17       out the references without a license?

18             A      Yes, sir.

19             Q      Okay.  So we've got these two

20       statutes here, 4503 and 4504.  So with respect to

21       4504, what were the policies and the practices that

22       the MPD followed during the class period with

Page 16

1    respect to making an arrest on this 4504?

2                    MR. SAINDON:  Objection.  Broad.

3                    You can answer.

4                    THE WITNESS:  I'm sorry, I didn't

5    catch the last part of that.

6    BY MR. CLAIBORNE:

7         Q    Yeah.  My question is:  During the

8    class period, with respect to this D.C. Code

9    Section 4504, CPWL, which at one point was just CP,

10   what were the policies and practices that the MPD

11   followed for making arrests under this statute?

12        A    That all of your policies and

13   practices were guided by our general orders, which

14   they're very extensive.  There's a lot that

15   involves specifically field operations, which is

16   our 300 series.  And all the arrests are based on

17   probable cause.

18        Q    Well, what if a person came into

19   contact with the MPD and the person -- and the MPD

20   discovered that the person had a pistol on them

21   during the class period, would the MPD make an

22   arrest?

```
 1            A     If there was probable cause to make

 2      an arrest, yes.

 3            Q     Well, what would -- were there any

 4      situations during the class period if the MPD found

 5      that somebody had a pistol on them and it was in

 6      public, then what were the -- what would be the

 7      circumstances when there was not probable cause to

 8      make an arrest?

 9                  MR. SAINDON:  Objection.

10      Speculation.

11                  Go ahead, Commander.

12                  THE WITNESS:  No, that's -- it would

13      all -- each individual circumstance would be judged

14      by the circumstances of that individual incident.

15      So that's -- again, it would be guessing to go

16      beyond that.  You would have to give me specific

17      circumstances.

18      BY MR. CLAIBORNE:

19            Q     Well, what I'm saying is, are you

20      unable to formulate a general policy, that the

21      District simply did not have a general policy with

22      respect to making arrests under this statute?
```

**Pls.'s Ex. 33, p. 18**

**Smith v. DC, 15-737 (RCL)**

1        A       Arrests are made based on probable

2    causes and the set of circumstances surrounding the

3    incident that an officer or a member of the

4    department would be -- would encounter.  And every

5    single incident where we encounter individuals is

6    different, so there's no -- again, that -- you

7    would have to give me a more-specific scenario,

8    then I could give you based on that what a prudent

9    officer would do.

10       Q       Well, let me ask you this -- I'm not

11   asking you what a prudent officer would do.  I

12   mean, what is the District's policy -- what was the

13   MPD's policy.  So I'm not asking you what a prudent

14   officer would do.

15               I mean, what were the officers

16   instructed to do if they encountered an individual

17   who was carrying a pistol in public during the

18   class period?

19       A       If the Metropolitan police officer

20   encountered someone who's committing a felony in

21   their presence, they're required to make an arrest.

22       Q       That's not what I mean.  Now you've

**Pls.'s Ex. 33, p. 19**

**Smith v. DC, 15-737 (RCL)**

Page 19

1          just kind of gone -- I mean, you asked me to get

2          specific, I got extremely specific and then you got

3          extremely general.

4               A     No, you're not --

5               Q     I mean, you --

6               A     You're not being specific because --

7               Q     Well, the police find somebody and

8          he's carrying the pistol outside in public during

9          the class period, so what were the police

10         instructed to do in that very particular set of

11         circumstance?

12              A     As I said, if they had committed a

13         felony and there was probable cause for an arrest,

14         they would make an arrest.  That's what they should

15         do.

16              Q     Well, is carrying a pistol outside

17         the home without a license or let's say carrying a

18         pistol in public during the class period outside

19         the home a felony?

20              A     It can be, yes, but, again, it

21         depends on the specific circumstances that that

22         officer is -- is -- encounters for that -- again,

**Pls.'s Ex. 33, p. 20**

**Smith v. DC, 15-737 (RCL)**

Page 20

1    you'd have to give me more specifics, because the

2    law is not -- it -- the facts dictate whether or

3    not there would be probable cause.

4          Q    The police officer walks up to a

5    person on the streets, the person -- well, let me

6    give you this fact scenario:  The person is walking

7    down the street, the police officer says, "Sir, do

8    you have a pistol on you?"  The person says, "Yes

9    I, do.  It's right here."

10         A    And if that person was in violation

11   of the law, they would be arrested.

12         Q    So what would cause the person --

13   beyond the facts that I'm telling you, what other

14   facts would be needed to know whether the person

15   was in violation of the law?

16         A    Well, if they were a police officer

17   or there's several other exceptions within the law

18   that would allow someone to have a pistol.  There

19   could be other set of circumstances.  If they

20   were -- there could just be other circumstances

21   that would not lead to their arrest.

22         Q    Okay.  So let's say a person were

Pls.'s Ex. 33, p. 21

Smith v. DC, 15-737 (RCL)

Page 21

1          arrested for a suspected -- oh, earlier you were

2          saying probable cause, you know, you kept saying

3          "Was there probable cause," when I was asking you.

4          What would be probable cause under the statute?

5          Probable cause as to what?

6                    MR. SAINDON:  Objection.  The

7          deponent is not a lawyer.

8                    But you can answer.

9                    THE WITNESS:  Probable cause is

10          defined as a set of facts and circumstances that

11          leads a prudent officer to believe that a crime has

12          been committed and a specific person has committed

13          it.  Based on that, they can make an arrest.

14          That's our standard for arrest.

15          BY MR. CLAIBORNE:

16               Q    Well, what about -- what probable

17          cause is needed under this statute that we just

18          reviewed, 4504, carrying a pistol outside the home

19          or business without a license?

20               A    The individual would have to be in

21          possession of a pistol, which would be in violation

22          of that D.C. code.

Page 22

1        Q     Well, what is -- I mean, you just got

2   extremely general on me again.

3               A pistol that was in violation of the

4   code.  So is it the pistol itself that is violating

5   the code?

6        A     It can be the pistol, it can be the

7   ammo or it can be a high-capacity magazine.  All of

8   those could be a violation.

9        Q     Does 4504(a)(2) deal with the

10  high-capacity magazine?

11       A     (a)(2), no.

12       Q     Does it deal with weapons?

13       A     That's -- this is the -- (a)(2)?  No.

14       Q     Does it deal with ammunition?

15       A     No.

16       Q     Does it deal with pistols?

17       A     Again, it's referring to the other

18  subsections.

19               And you're pointing to 4504(a)(2)?

20       Q     Right.

21       A     Yeah, this speaks as the -- it's not

22  referring to any of that, this is speaking about

**Pls.'s Ex. 33, p. 23**

**Smith v. DC, 15-737 (RCL)**

Page 23

1          punishment and fines.

2                  Q     Okay.  What about (a)(1) then, what

3          does -- does (a)(1) deal with pistols?

4                  A     It's referring to the carrying of a

5          rifle or a shotgun.

6                  Q     And (a)(1)?

7                        I'm not talking about A-1, I'm

8          talking about --

9                  A     Oh.

10                 Q     -- (a) and then the first paragraph.

11                 A     And what's your question again, sir?

12                 Q     Does that deal with pistols, that

13         paragraph, that paragraph 1?

14                 A     Yes, sir, it does.

15                 Q     So under 4504(a)(1), what probable

16         cause would an officer need -- what probable cause

17         facts would an officer need to find probable cause

18         for a violation of (a)(1)?

19                 A     A person carrying a pistol outside

20         their home who's in violation of that section, home

21         or --

22                 Q     Well, what is in violation of that

**Pls.'s Ex. 33, p. 24**
**Smith v. DC, 15-737 (RCL)**

Page 24

1      section?

2                  This is kind of a -- we're going in

3      circles here.  I'm asking you what makes them in

4      violation of the section?

5           A     Carrying the pistol outside a home or

6      business.

7           Q     Okay.  So --

8           A     And the other exceptions, such as --

9           Q     What -- okay.  So let's suppose none

10     of the other exceptions that you've mentioned are

11     present, the police encounterers a person in public

12     carrying a pistol, they're a citizen, they do not

13     have a -- any authorization from the MPD or any

14     other police agency or any -- just any of the other

15     exceptions that you've mentioned to carry the

16     pistol, would they be arrested?

17          A     They could be, yes.

18          Q     Well, if a person -- if probable

19     cause existed to find that a person were in

20     violation of (a)(1), what are the circumstances

21     under which they would not be arrested?

22                  A     It would be up -- there are

**Pls.'s Ex. 33, p. 25**

**Smith v. DC, 15-737 (RCL)**

Page 25

1    circumstances where you could apply for an arrest

2    warrant.  You don't necessarily have to arrest

3    someone at that time.

4         Q    Is that the practice that the MPD

5    followed, they would -- I mean, I've read a lot of

6    probable cause statements in this case and having

7    to do with the Gun Recovery Unit.  I've never

8    encountered the case where the MPD encounters

9    somebody carrying a pistol in public and they did

10   not arrest them.  I never heard where they went and

11   got a warrant to arrest them.

12              Why would they go get a warrant

13   instead of just arresting them?

14        A    It is an option.  It is not --

15   normally we would make a probable cause arrest.

16        Q    So how -- under -- like what

17   percentage of cases would it be an option?

18        A    In every case we could -- there --

19   there could be that option.

20        Q    I understand the option exists, but

21   how often would that option -- forgoing the on-site

22   arrest and instead going and applying for a

Pls.'s Ex. 33, p. 26

Smith v. DC, 15-737 (RCL)

Page 26

1          warrant, how many -- what's the percentage of

2          encounters where that would exist?

3                   A     It doesn't happen often.

4                   Q     So do you know how often the Gun

5          Control Unit would stop somebody and ask them

6          whether they had a pistol and if the person

7          answered yes or if the person gave reasonable

8          suspicion or probable cause for a stop rather than

9          making an arrest, the police would go and get a

10         warrant?

11                         MR. SAINDON:  Objection.

12         BY MR. CLAIBORNE:

13                  Q     How many times has that happened?

14                         MR. SAINDON:  Objection.  Compound.

15         Foundation.

16                         MR. CLAIBORNE:  Well, that's kind of

17         a tough question, you've got a lot of facts in

18         there.

19         BY MR. CLAIBORNE:

20                  Q     How often would that happen, that the

21         Gun Recovery Unit did that?

22                  A     I'm sorry.  Can you repeat the

**Pls.'s Ex. 33, p. 27**

**Smith v. DC, 15-737 (RCL)**

Page 27

```
 1          question?

 2                  Q     Well, just the facts that you've

 3          given, the police encountered a person not meeting

 4          one of the exceptions that you've mentioned, has no

 5          license -- has no license and the Gun Recovery Unit

 6          encounters this person.  To your knowledge, during

 7          the class period, how many times would the Gun

 8          Recovery Unit have forgone an arrest on-site and

 9          gone to get a warrant?

10                  A     I don't have an accurate number for

11          that.

12                  Q     You just have -- you just have no

13          experience?

14                        I mean, this is the unit that you

15          supervise, right?

16                  A     Correct, but you're asking during the

17          class -- the class time.  I was not assigned here

18          then, so I have no accurate information on exactly

19          who was and wasn't arrested during that specific

20          time.  I can tell you that in most cases, an arrest

21          would be made.

22                  Q     Well, how about now, how often does
```

Pls.'s Ex. 33, p. 28
Smith v. DC, 15-737 (RCL)

Page 28

1      it happen that the Gun Recovery Unit encountered a

2      person carrying a pistol in public, they have no

3      license and they don't meet one of the exceptions

4      to carry a pistol, such as you mentioned the law

5      enforcement exception, how often does it happen

6      that the police would simply go get a warrant

7      instead of arresting the person?

8                    MR. SAINDON:  Objection.  Relevance.

9                    You can answer.

10                   THE WITNESS:  It's very few cases.

11     BY MR. CLAIBORNE:

12          Q    What does "very few" mean?

13          A    I don't have an accurate number.  It

14     would not be many.

15          Q    Okay.  So to go back to something you

16     just said, it seems like you don't really know what

17     happened during the class period, because I asked

18     you how many times that happened during the class

19     period and you said you're not able to say, you

20     didn't supervise the unit.

21          A    I don't have these numbers in front

22     of me.  That would take a large data pool and

Pls.'s Ex. 33, p. 29

Smith v. DC, 15-737 (RCL)

1      gathering of information and I was not asked to

2      prepare for that.

3              Q     Okay.  So let me ask you this

4      question:  During the class period, with respect to

5      persons carrying a pistol outside of the home

6      without a license and the person is not otherwise

7      authorized to carry a pistol by exception, such as

8      being a law enforcement officer, did the -- did the

9      District have a policy with respect or a practice

10     that it followed with respect to making arrests

11     under that set of circumstances that I've given

12     you?

13             A     Again, all arrests are based on

14     probable cause based on the officer's knowledge of

15     the specific incident that they're presented with.

16             Q     Well, I know, but I'm -- I'm asking

17     you a question and you're just give of giving me a

18     general statement.  I've given you a very specific

19     set of facts.  Are you able to address --

20             A     Your statement is very general.

21             Q     Okay.

22             A     It doesn't work that way.

Pls.'s Ex. 33, p. 30

Smith v. DC, 15-737 (RCL)

```
1            Q     How does it work?

2            A     Again, you're giving a very general

3      statement.  You have to present with specific facts

4      of a specific case.  So arrests are based on

5      probable cause.  We teach our officers and we tell

6      our officers, and our policy is, if you're

7      presented with probable cause for arrest, you may

8      make an arrest or you may seek an arrest warrant.

9            Q     All right.  Well, let's just do this

10     one more time.  This is going to be your answer for

11     the record -- this will be your answer on the

12     transcript.

13                 So we're dealing with a class period,

14     MPD officers -- let me give you this scenario

15     first.  The scenario would be the MPD officer is in

16     the District of Columbia on duty, encountered an

17     individual carrying a pistol in public without a

18     license, the person is not otherwise authorized by

19     one of the exceptions to carry the pistol in

20     public, did the MPD have a policy or practice with

21     respect to making arrests in that fact pattern?

22           A     Again, if probable cause exists, an
```

**Pls.'s Ex. 33, p. 31**

**Smith v. DC, 15-737 (RCL)**

Page 31

```
1        arrest would most likely be made.

2                    MR. SAINDON:  I think you guys are

3        going around in different directions.  I mean, we

4        can stipulate that the general policy is that

5        people presenting out on the street carrying a

6        pistol by license would be arrested if there's

7        probable cause.  I think Commander Haines, it

8        sounds to me like, he's getting hung up on he

9        doesn't want to generalize because the facts of

10       each specific arrest are important.

11                   MR. CLAIBORNE:  Well, I'm definitely

12       not trying to tangle with the Commander.  I've got

13       too much respect for the office for that.  I don't

14       want to waste anybody's time.  The topic of the

15       deposition dealt with some very general questions

16       and some very general topics.  And the lawyers and

17       the judge in this case will understand that the

18       District either had some policies and practices or

19       they didn't.  So if the Commander is not the one to

20       answer these questions, then let's not waste his

21       time.

22                   If you would like to take a moment
```

Pls.'s Ex. 33, p. 32
Smith v. DC, 15-737 (RCL)

Page 32

1       and talk with the Commander, that's fine.  Maybe

2       he can tell you there's something about the way

3       that I'm asking the questions or something.  I

4       mean, I'm happy to do that.

5                       MR. SAINDON:  Okay.  Let's take a

6       break and come back at 10:00.

7                       Commander Haines, I'll give you a

8       ring on your office line and we'll chat and then

9       we'll come back at 10:00 and restart.  Okay?

10                      MR. CLAIBORNE:  Like I say, I've got

11      too much respect, I've read about the Commander,

12      I've got too much respect to try to toy with him in

13      any way.  That's not what I'm trying to do here.

14                      MR. SAINDON:  Not a problem.  We

15      understand.  We'll take a break and come back.

16                      MR. CLAIBORNE:  Okay.  Thank you.

17                  (Recess from 9:51 a.m. to 9:55 a.m.)

18      BY MR. CLAIBORNE:

19              Q     Commander Haines, can we go back to

20      the question that I was asking you about the CPWL

21      statute during the class period?

22                      And what I'd like to know is did the

Pls.'s Ex. 33, p. 33
Smith v. DC, 15-737 (RCL)

Page 33

1        MPD have either a written policy or just a

2        collection of policies or a general practice about

3        what officers should do when they encounter a

4        person carrying a pistol outside -- in public and

5        the person was in violation of the CPWL statute,

6        did the department have a policy with respect to

7        making arrests under that statute during the class

8        period for that fact pattern?

9                A       Yes, sir.

10               Q       And can you tell me, was it a policy

11       or a collection of policies or a practice?  What

12       was it?

13               A       It would be all of the above.

14               Q       Okay.  And just what was the general

15       practice then?

16               A       That individual would be arrested.

17               Q       Thank you.

18                       Now, to your knowledge, during the

19       class period, apart from Section 4504, was there

20       any other statute that governed carrying a pistol

21       in public during the class period?

22                       MR. SAINDON:  Objection.  The

Pls.'s Ex. 33, p. 34
Smith v. DC, 15-737 (RCL)

Page 34

1       deponent is not a lawyer.

2                       But you can answer if you know.

3                       THE WITNESS:  A person could be

4       subject to violations of federal law.  The

5       Metropolitan Police Department, members,

6       officers -- sworn officers can enforce federal code

7       as well, so there is a possibility that someone

8       could be in violation of that and make an arrest, a

9       weapons charge under the federal statute.

10      BY MR. CLAIBORNE:

11              Q     Well, then, let me be just a little

12      bit more precise, tighten it up a little bit, and

13      just say District of Columbia law.

14                      Other than 4504, was there any other

15      District of Columbia law governing carrying a

16      pistol in public --

17              A     That would be --

18              Q     -- during the class period?

19              A     I'm sorry.

20              Q     -- during the class period?

21              A     That would be the most appropriate

22      charge.

Pls.'s Ex. 33, p. 35

Smith v. DC, 15-737 (RCL)

Page 35

1          Q     So let me go back to my list of

2     topics here.

3               Now, after an officer made an arrest

4     out on the street, how does the officer go about

5     processing their arrest during the class period?

6               All of these questions are during the

7     class period.

8          A     After the officer has taken,

9     physically seized that person, arrested them, they

10    would be -- initially a field search would be done

11    wherever the arrest took place, any specific items

12    may be removed from the individual, obviously

13    weapons, things of that nature.  A 256 Quick

14    Booking Form should be done prior to being

15    transported.

16               A transport vehicle, if one is not

17    available, would be requested.  Once that got on

18    the scene, the arrestee will be placed in the

19    transporting vehicle.  If it was a separate

20    officer, another officer or member who came to

21    transport them down, they would do another field

22    search.  Once taken in custody of that person,

**Pls.'s Ex. 33, p. 36**

**Smith v. DC, 15-737 (RCL)**

Page 36

```
 1        placed them in the transport, they would be given

 2        the 256 booking form.

 3                   They would be transported to the

 4        closest -- usually the closest District station

 5        where they would be accepted into the District

 6        cellblock where the District cellblock personnel

 7        would take the booking form and the individual and

 8        do their procedures for searching them in the

 9        cellblock, placing them in the cell and doing the

10        initial Quick Booking Form.  The arresting officer

11        would then respond.

12                   Sorry, do you have a question?

13            Q     No, I -- go ahead.  I just was

14        moving.

15            A     Okay.

16                   The arresting officer would then go

17        and complete the paperwork within -- at the time we

18        were using a different RMS system.  I -- and it

19        might have been two different systems during that

20        time, maybe even three, however, whichever one

21        during that particular time, they would essentially

22        be doing the arresting paperwork and complete the
```

**Pls.'s Ex. 33, p. 37**

**Smith v. DC, 15-737 (RCL)**

Page 37

1        property paperwork because we're --

2                Q     Excuse me.  Can I stop you here?

3                A     Yes, sir.

4                Q     Because what I would like to do is

5        break these down into segments.

6                A     Yes, sir.

7                Q     But let me go back to the officer

8        encounters on the street a person and the officer

9        decides that the person is in violation of the CPWL

10       statute.  Rather than taking the person into

11       physical custody, taking them to some lockup,

12       during the class period did the officers have

13       discretion to just release that person -- well,

14       just give that person a posted forfeit or a

15       citation on the street, something like that, as

16       opposed to taking them into custody?

17               A     No, sir, not for that charge.

18               Q     Now, you mentioned when the officer

19       takes the person to a lockup, it sounds like

20       there's some sort of split, there's a -- you have

21       the arresting officer and then there's a booking

22       team.  Is that right?

Pls.'s Ex. 33, p. 38
Smith v. DC, 15-737 (RCL)

Page 38

```
 1              A     The cellblocks within the District

 2       where the cells are, the physical cells where

 3       arrestees are held, that's handled -- that area is

 4       handled by the cellblock technicians and officers,

 5       and they take custody from the transporting

 6       officer.  And they take the Quick Booking Form

 7       from -- that goes along with that arrestee, they

 8       take control of the arrestee, do their part putting

 9       them into the cell, and then they initially take

10       the Quick Booking Form for their part of the Quick

11       Booking.

12              Q     Okay.  If I could stop you here.

13                    So the officer is the one that fills

14       out the quick -- the arresting officer is the one

15       who fills out the Quick Booking Form.  Is that

16       right?

17              A     Correct, yes.

18              Q     Does the Quick Booking -- does the

19       officer write the charge that he's arrested a

20       person onto the Quick Booking Form?

21              A     Yes.

22              Q     And so after the officer -- the
```

**Pls.'s Ex. 33, p. 39**

**Smith v. DC, 15-737 (RCL)**

Page 39

1          arresting officer is handed the body over to the --

2          and I don't mean any disrespect -- hands the

3          arrestee over to the booking team, you say the

4          officer goes to the -- was it the RMC, RCM, you

5          were talking about the database?

6                   A     RMS.

7                   Q     RMS.

8                   A     Report Management System.

9                   Q     Okay.  I see.

10                        And so then the arresting officer

11         would use the RMS to fill out the arrest form?

12                  A     Yes, sir.  Our internal -- the

13         paperwork that goes along with the arrest.

14                  Q     Did the officer actually fill out

15         paper or did the officer make entries into an

16         electronic RMS?

17                  A     It can be both.

18                  Q     And so when the officer is filling

19         out these forms, does the officer enter charges

20         into the forms?

21                  A     Yes.

22                  Q     Does somebody review the officer's

Pls.'s Ex. 33, p. 40
Smith v. DC, 15-737 (RCL)

Page 40

```
 1        selection of charges?

 2                 A     Yes, sir.

 3                 Q     So before we get to the review

 4        process, so let's suppose the officer has arrested

 5        some person and the person has, in addition to a

 6        pistol, some ammunition.  What was the practice

 7        with respect to charging the arrestee with a

 8        violation of the statute regarding ammunition for

 9        failure to register -- or for having ammunition

10        without a registered pistol?

11                 A     It would be appropriate to place that

12        charge on the -- as part of the arrest.

13                 Q     And how about there's also a statute

14        dealing with possession of an unregistered pistol.

15        Would the person routinely have been charged with

16        that offense as well as the CPWL?

17                 A     It's actually unregistered firearm.

18        Yes.

19                 Q     So UA and UF, right?

20                 A     Yes, sir.

21                 Q     So UA is having the unregistered --

22        is it ammunition, having ammunition not connected
```

Pls.'s Ex. 33, p. 41
Smith v. DC, 15-737 (RCL)

Page 41

1          with a registered firearm?

2                  A     Yes, sir, unregistered ammunition's

3          charge.

4                  Q     And so UF is unregistered -- having

5          an unregistered firearm?

6                  A     Yes, sir.

7                  Q     And then CPWL.  Is that right?

8                  A     Yes, sir.

9                  Q     So typically if the person is

10         arrested for having a loaded pistol, they're going

11         to be charged with all three of these offenses.  Is

12         that right?

13                 A     Yes, sir.  In most cases, yes, sir.

14                 Q     And I don't want to split hairs here,

15         but just, generally speaking, what would be the

16         circumstances in which a person was not charged

17         with all three of the offenses, you know, assuming

18         the gun was loaded?

19                 A     Placing of charges can be

20         discretionary to the officers.  So sometimes it can

21         be -- in a nutshell, the charge of carrying a

22         pistol without a license is a felony that's going

Pls.'s Ex. 33, p. 42
Smith v. DC, 15-737 (RCL)

Page 42

1    to be presented.  It has to go before a grand jury.

2    So any additional charges would be -- could be

3    picked up later within the court proceedings.  So

4    that they could just charge the CPWL knowing that

5    additional charges will be picked up later down the

6    line through the judicial system.

7             Q      I see.

8                    So at any point up the point in the

9    arrest process that we've talked about, would the

10   arresting officer have made any sort of background

11   check or criminal records check to see if the --

12            A      It's --

13            Q      Excuse me, I've got to finish the

14   question.

15                   -- to see if the arrestee had any

16   criminal arrest history?

17            A      It is not a requirement of the

18   arresting officer.

19            Q      Well, sticking with our fact pattern

20   where the person is arrested for CPWL during the

21   class period, was it typically done by the

22   arresting officer?

Pls.'s Ex. 33, p. 43
Smith v. DC, 15-737 (RCL)

Page 43

1          We're focusing on the arresting

2     officer right now.

3          A    For a criminal history?

4          Q    Yes.   In WALES, NCIC, this type of

5     thing, would the arresting officer have done that

6     kind of check?

7          A    So criminal histories are not

8     provided through WALES and NCIC.  Those checks are

9     completed when -- typically they're completed

10     officially by the cellblock technicians.  That's

11     part of their responsibility, not the arresting

12     officer.

13          Q    Okay.  And just a second -- we're

14     kind of like at a fork in the road, we're got the

15     arresting officer and the cellblock technician.  So

16     let's just stick with the arresting officer.

17          So typically would the arresting

18     officer have done any kind of background check of

19     any sort, going onto Justice, looking in Court

20     View, anything like this, to see if the person, for

21     example, had a prior gun offense?

22          A    No, there was no policy that -- that

**Pls.'s Ex. 33, p. 44**

**Smith v. DC, 15-737 (RCL)**

Page 44

1      required an officer to do that.

2            Q    So do you know the difference between

3      a practice and a policy?

4            A    Yes, sir.

5            Q    So how would you articulate the

6      difference between a practice and a policy?

7            A    So a practice is -- is something

8      that -- is normally done in the course of business

9      and a policy is something that's required in the

10     course of business.

11           Q    All right.  So what was the practice

12     in this situation, would the officers do a

13     background to see if the person had a prior felony

14     or something like that or leave it to the booking

15     team?

16           A    For a background check, neither is --

17     was a practice by either, by either the booking

18     team or the arresting officer.

19           Q    All right.  Well, let's focus on the

20     arresting officer at the moment.  Okay.  We'll get

21     to the booking team.

22                When I say -- we've been using this

Pls.'s Ex. 33, p. 45

Smith v. DC, 15-737 (RCL)

Page 45

1          term "background check."  What does that mean to

2          you?

3                    A     So a background check, in the law

4          enforcement world for a criminal history,

5          essentially I assume we're talking about prior

6          convictions, would require III check.  And that is

7          not done as a matter of routine or policy for

8          arrestees.

9                    Q     What's a III check?

10                   A     Interstate -- it's basically -- I

11         forget exactly what it stands for, but it's a --

12         it's a background criminal history check through

13         the FBI nationwide.  So it'll give you --

14         essentially should give you a criminal background

15         check of an individual for the entire country.

16                   Q     And what do you get when you look in

17         WALES?

18                         Doesn't WALES bring back some version

19         of that?

20                   A     No, it does not.  It's simply --

21         WALES simply does a wanted check to see if there

22         are any active warrants or protective orders,

**Pls.'s Ex. 33, p. 46**

**Smith v. DC, 15-737 (RCL)**

Page 46

1          things of that nature, that are active as -- at the

2          time you run a person or you can run their driver's

3          license information to see if they have a valid

4          driver's license.

5                    Q     Well, when the officers -- we looked

6          at 4503, right, Section 22-4503.  That was the

7          first statute that I showed to you.

8                    A     Yes, sir.

9                    Q     So 4503(a)(1) is an offense for a

10         person that has been convicted of an offense

11         punishable by more than a year in jail, right?

12                   A     Yes, sir.

13                   Q     So would an officer do any kind of

14         check to see whether that offense should be

15         charged?

16                   A     So it would be up to -- and nothing

17         prevents an officer from doing a criminal history

18         check.  Now, they can check through III, however

19         not all officers on the department have access to

20         III, or they could do a local check through the

21         Justice system, through the D.C. Superior Court

22         records, which gives them access to those records

Pls.'s Ex. 33, p. 47

Smith v. DC, 15-737 (RCL)

Page 47

```
 1        to determine if anyone potentially has been

 2        convicted of a felony in the past.

 3             Q      Well, how would -- if the officer

 4        didn't do a background check, how would the officer

 5        know whether a person was subject to being charged

 6        under 4503(a)(1)?

 7             A      It could be prior knowledge, a

 8        personal knowledge that they know or somebody that

 9        they work with.

10             Q      Well, how about apart from that?

11             A      They would have to do a check.

12             Q      And we're dealing once again with

13        these arrests for CPWL and possibly UA/UF.  So in

14        these circumstances, was it the practice for the

15        officer to do whatever check was required to

16        determine if the arrestee was subject to being

17        charged, met the probable cause standard for

18        4503(a)(1)?

19             A      The only way that they could charge

20        them is if they've somehow verified that they had

21        a -- that the individual that they were charging,

22        again the probable cause, would be that they --
```

**Pls.'s Ex. 33, p. 48**
**Smith v. DC, 15-737 (RCL)**

Page 48

1        they would have to have knowledge that they had a

2        felony conviction essentially.  So they would

3        have -- they would have to do some kind of check.

4                  Q       Right.

5                          So, I mean, was it the practice to do

6        the check?

7                  A       No, sir, it was not.

8                  Q       Then how did -- I see.

9                          How about the other -- we looked at

10       4503, and you can take a look, I think you've got

11       it before you, there were five other categories.

12       So for any of these other categories, did the

13       arresting officer make any inquiry as a matter of

14       practice to see whether the person or subject being

15       charged in any of the other five categories of

16       4503?

17                 A       So for -- as part of the normal

18       routine of arrests, the WALES/NCIC checks are done.

19       If a -- the -- and there, again, they're done by

20       the cellblock technicians, would come back and say,

21       "This person, for example, had an warrant in

22       another jurisdiction," and that would mean that

**Pls.'s Ex. 33, p. 49**

**Smith v. DC, 15-737 (RCL)**

Page 49

1          they were a fugitive from justice.  If the

2          cellblock technicians said, "Hey, this person has a

3          felony warrant that's" --

4                  Q      Can I stop you, please?

5                  A      Uh-huh.

6                  Q      Lawyers are very plotting people when

7          we do these depositions, so what I -- my map is

8          when I ask you questions about what the arresting

9          officer did up to the time the arresting officer

10         sought review of their charging decisions, then

11         we'll go through that process, then we'll get over

12         to what the cellblock technicians did.

13                 A      But this is specific to the arresting

14         officer.  So if the arresting officer was made

15         aware that that person was a fugitive from justice,

16         then this statute would apply and they would add

17         that charge or could add that charge.

18                 Q      So you're saying it was discretionary

19         within the officer?

20                 A      Yes.

21                 Q      And this is a -- I don't need the

22         complete answer at this time about how it was done,

**Pls.'s Ex. 33, p. 50**

**Smith v. DC, 15-737 (RCL)**

1          but just generally, which -- which person or which

2          unit, the arresting officer or the booking team,

3          had responsibility for determining whether a person

4          were subject to being charged under one of these

5          restricted categories in 4503(a)(1) to (a)(6)?

6                    A      I'm sorry.  Can you repeat that?

7                    Q      Yeah.

8                           We've got this statute, 4503, and

9          it's got some -- it's got six restricted

10         categories, people who are restricted from owning

11         or possessing a weapon -- possessing a pistol,

12         actually it's a firearm, I think.  So there's these

13         six categories that I'm interested in, 4503(a)(1)

14         to 4503(a)(6).

15                          So as between the arresting officer

16         and the booking team, which of those two sides was

17         responsible for seeing whether the arrestee should

18         have been charged under any of these six restricted

19         categories?

20                    A      Neither.

21                    Q      Who had that responsibility?

22                    A      Nobody.  It was not a requirement.

Page 51

1          Q     Why is that?

2          A     It's not.

3          Q     I know, but I'm asking you, during

4     the class period why was that not a requirement?

5     Why?

6          A     I can't answer that.

7          Q     Okay.  I don't want to start us down

8     a bad path again, but I'm just trying to understand

9     the situation, that's why I'm asking you the

10    follow-up question.

11               When you say -- I think you said you

12    don't know.  Is that right?

13         A     No, there was no policy or procedure

14    requiring the officer -- the arresting officer or

15    the cellblock technicians to complete a history

16    check and add additional charge.

17         Q     Okay.  Then when I asked you why

18    there was no policy, I think you said you don't

19    know or you said you can't answer.

20         A     That would be purely speculative.

21    There's no policy or procedure that requires it.

22         Q     Okay.  I understand that.  But for

**Pls.'s Ex. 33, p. 52**

**Smith v. DC, 15-737 (RCL)**

Page 52

1      me, for my case, I'd like to know why that was.

2      The why I'm looking at it you've got these statutes

3      on the book, I understand that from reading

4      counsel -- from reading testimony, that a joint

5      statement that then Attorney General Nichols and

6      Chief Lanier gave to the Council in 2009, that

7      there was a big focus on making sure that people

8      with prior felony convictions didn't have illegal

9      guns.  So I want to know if there was a big concern

10     and the statute were on the books, why weren't

11     steps made to see whether the person -- to see

12     whether an arrested person was liable for arrest

13     and prosecution under that statute?

14          A     That part of -- part of what you're

15     looking at, as far as having those people charged

16     with that, would be picked up later in the process,

17     not necessarily at the time of arrest and booking.

18               So the arresting officer would not be

19     responsible for doing that.  That would be a

20     decision made by the United States Attorney's

21     Office once they reviewed the facts and

22     circumstances of the case.  And they did -- they're

Pls.'s Ex. 33, p. 53
Smith v. DC, 15-737 (RCL)

Page 53

1    the ones in the process to do a complete criminal

2    background check and make sure that they're

3    qualifying the -- the qualifiers are there to

4    charge this particular charge.

5         Q    I see.

6              In this case the District has

7    produced data from the MPD booking database and

8    they've also produced data from the court view, the

9    prosecution database.  They gave us a list of

10   everybody that was charged with actually a weapons

11   offense during the class period.

12             And so I've looked at the charges

13   that were brought against persons arrested under

14   the CPWL statute and a lot of them in addition

15   to -- well, actually 4504 has got a provision for a

16   charge in a prior felony.  The MPD charged a lot of

17   people with some version of FIP, felon in

18   possession, it was either 4504 or it was

19   4503(a)(1).  So how do we account for those

20   charges, where the MPD did charge a person with a

21   version of a felon in possession charge?

22        A    Nothing prevents an officer from

Pls.'s Ex. 33, p. 54

Smith v. DC, 15-737 (RCL)

Page 54

1  charging that.  If they choose to do the background

2  and gather that information to add additional

3  charges, but it was not a requirement or a

4  practice.

5          Q    So is it -- and just tell me what --

6  I'm going to sum up what I think you said.  If it's

7  not accurate, then tell me and we'll work to get an

8  accurate statement.

9               But what I think I'm hearing is that

10 during the class period, the MPD, neither the

11 arresting officer, nor the booking team had

12 responsibility for seeing whether persons arrested

13 on CPWL were also liable to charge under the -- one

14 of the felon in possession statutes.  Is that

15 correct?

16         A    Yes, sir.

17         Q    MPD relied on the arresting

18 officers -- I mean, they relied on the U.S.

19 Attorney's Office to do a complete background check

20 and decide whether an arrestee was liable for

21 prosecution or being charged under one of the felon

22 in possession statutes?

**Pls.'s Ex. 33, p. 55**

**Smith v. DC, 15-737 (RCL)**

Page 55

```
 1              A     So any time a CPWL charge or a felony

 2       charge, someone's charged with a felony, they must

 3       appear in court.  So there is a review process

 4       through the U.S. Attorney's Office where they make

 5       the final determination for all appropriate charges

 6       based on the totality of circumstances, to include

 7       full criminal background checks.  So that's the

 8       part of the process where that -- that review was

 9       done.  But that was outside -- in consulting with

10       MPD, but it was not MPD necessarily, it is not

11       ultimately up to us.

12                   And those are things that -- it also

13       would have been picked up later through the grand

14       jury process, because all of those charges,

15       assuming they were going to go forward with court

16       proceedings, would have to go through a grand jury

17       process.

18              Q     You said everybody arrested on CPWL

19       must appear in court.  Is that correct?

20              A     Yes, sir.

21              Q     Is that what you said?

22              A     Yes, sir.  It's -- under the felony
```

Pls.'s Ex. 33, p. 56

Smith v. DC, 15-737 (RCL)

Page 56

1          part of the statute, yes, sir.

2                    Q     When you say "under the felony part,"

3          you mean CPWL or some other --

4                    A     Yes.

5                    Q     -- felony part?

6                    A     So if you possessed it in your home

7          or business, you would not be charged with a

8          felony.

9                    Q     Okay.  Well, for all of these

10         discussions, right -- you know, let's focus solely

11         on CPWL.  So carrying the pistol without a license

12         in public, not home, not a place of business, so

13         are you saying that everybody that was -- during

14         the class period that was arrested on CPWL had to

15         appear in court?

16                   A     Yes, sir, they did.

17                   Q     Okay.  Well, let me stop you here

18         then, because the data that we have indicates a lot

19         of people were released without being -- well,

20         that -- a lot of the people that were arrested were

21         never charged, were never prosecuted.

22                        So let me ask you this question:  Did

**Pls.'s Ex. 33, p. 57**

**Smith v. DC, 15-737 (RCL)**

Page 57

1          the -- so when the -- during the class period when

2          the MPD arrested somebody for CPWL, did they refer

3          every single person arrested to the U.S. Attorney's

4          Office for prosecution?

5                  A      Yes, sir.

6                  Q      And so it was -- so did they -- so

7          the MPD never released persons arrested under CPWL

8          without referring them to the prosecutor's office?

9                  A      The only circumstances where that

10         would happen would be under a detention journal

11         case.  And that would -- and that essentially would

12         mean that through the course of the arrest, they

13         determined there was no probable cause for arrest

14         and that person was released without referring them

15         to the U.S. Attorney's Office.

16                 Q      So under what circumstances would a

17         person be released on the detention journal?

18                 A      For instance, someone had a license

19         to carry a gun and it was found out later during

20         the arrest process they're already at the

21         cellblock, they're being processed, if someone

22         comes up and says, "Here's their license," or,

Pls.'s Ex. 33, p. 58
Smith v. DC, 15-737 (RCL)

Page 58

1          "Their authorization under the law to carry it,"

2      they would -- rather than making them go through

3      the system and go to court, you know, probable

4      cause at that point no longer exists and then the

5      person would be immediately released.

6              Q      So other than a decision that

7      probable cause no longer existed, is there any

8      other reason that a person arrested for CPWL were

9      not referred to the prosecutor?

10             A      No.

11             Q      How about this circumstance:  What

12     if, say, under the fact pattern where initially

13     several people were in close proximity to the

14     pistol, police had probable cause to arrest all of

15     them, for example the police approached two people,

16     there's a gun at their feet, so in this situation

17     you're saying that there was no probable cause.

18     What if you had that situation, more than one

19     person were initially suspected of possessing

20     the -- or carrying the pistol without a license,

21     did the MPD ever exercise discretion to release one

22     of them because although the person did not have a

Page 59

```
 1       license, it was just determined that the person was

 2       not the one carrying the weapon?

 3            A     I'm assuming you would say that they

 4       would not be arrested -- if there were multiple

 5       people in a vehicle, in a -- and a handgun, based

 6       on the facts and circumstances, there may be

 7       probable cause to believe that one of the

 8       individuals possessed it over the others, so that

 9       one individual would likely be arrested and the

10       others would not.

11            Q     Well, what if, say, everybody in the

12       car were arrested, then at the station it's

13       determined that, well, to release one or more of

14       the people in the car, could that happen under the

15       MPD discretion or did that also have to be referred

16       to the prosecutor?

17            A     That would have -- that would be a

18       detention journal-type scenario if they were to be

19       released.

20            Q     Can you think of any other

21       circumstances where there would be a detention

22       journal release of a person arrested on suspicion
```

**Pls.'s Ex. 33, p. 60**
**Smith v. DC, 15-737 (RCL)**

Page 60

```
 1        of CPWL and then released without referral to the

 2        prosecutor by the MPD?

 3             A     There could be any number of

 4        scenarios, but it would be anything that would lead

 5        to there was no probable cause for that arrest and

 6        that person would be immediately released and not

 7        referred.

 8             Q     Do you know what the disposition

 9        codes entered into the database would have been?

10             A     It would be completely erased from

11        the database.

12             Q     From what database?

13             A     So if -- that person who -- if it was

14        determined that there was a detention journal done,

15        all that information would be scrubbed from the

16        database so there was no record of that arrest.

17             Q     Let me just clarify this.  During the

18        class period it happened that the MPD would arrest

19        somebody on suspicion of CPWL, take them to the

20        station, decide that probable cause was lacking,

21        but then released the person, and then -- under the

22        detention journal, and then all reference of that
```

Pls.'s Ex. 33, p. 61

Smith v. DC, 15-737 (RCL)

Page 61

1          person would be scrubbed from the electronic

2          database?

3                  A      It's supposed to be, yes, for that

4          particular incident.

5                  Q      Would any kind of record at all have

6          been kept, say a partial entry into the database,

7          without identifying information?

8                  A      There would probably be for the stop

9          database.  Currently we would keep information

10         because we're required to under different parts of

11         the D.C. code for the stop data.  It would probably

12         still be captured there.  Under the period that

13         we're talking about, I'm unsure because it's

14         changed several times over the last several years.

15                 Q      When you say "stop data," you're

16         talking about the NEAR Act stop data?

17                 A      Yes, sir.

18                 Q      Okay.  I think the NEAR Act came out

19         in 2016, right?

20                 A      I believe so.  There have been

21         different portions of it.  It's been phased in.

22                 Q      So let's go back just to the class

**Pls.'s Ex. 33, p. 62**

**Smith v. DC, 15-737 (RCL)**

Page 62

1        period, which ended in more or less for these

2        purposes October of 2014.  Would any kind of paper

3        records have been kept on these individuals that

4        were released on the detention journal?

5                A    There would be the detention journal

6        record, you know, recording those circumstances,

7        but as far as the arrest and the arrest in our

8        system, that would be taken out.

9                Q    Well, what's the detention journal?

10                Is that actually a book, a paper

11       journal or --

12               A    It actually is, yes.

13               Q    And would it have identified

14       information such as name, address, that sort of

15       thing?

16               A    I believe it does.  It's been quite a

17       while since I've actually looked at one.

18               Q    How long are they retained?

19               A    I don't know what the retention

20       record is on those.

21               Q    Just to the class period, maybe you

22       know the answer to this, maybe you don't.  During

**Pls.'s Ex. 33, p. 63**

**Smith v. DC, 15-737 (RCL)**

Page 63

1      the class period, do you know how many people were

2      typically released in any year on a detention

3      journal after having been arrested and now they're

4      released under the detention journal?

5            A     I do not.

6            Q     Okay.  What I'd like to do is set up

7      a -- well, let's stick with the arresting officer.

8            A     Yes, sir.

9            Q     So the arresting officer has made an

10     arrest under -- made an arrest for CPWL and has

11     decided the charge -- MPD or that arresting officer

12     wants to bring -- who reviews the MPD -- who in the

13     MPD reviews the arresting officer's charges and

14     decisions?

15                 And when I say "charges and

16     decisions," the charges that the arresting officer

17     has decided to make.

18           A     Arrest paperwork is reviewed and

19     approved by a manager, which is typically a

20     lieutenant.

21           Q     Did the lieutenant have a set of

22     policies or practices they followed for making

Pls.'s Ex. 33, p. 64

Smith v. DC, 15-737 (RCL)

Page 64

1          charging decisions for persons arrested during

2          CPWL -- arrested for CPWL during the class period?

3                    A     Yes, sir.

4                    Q     And what were they?

5                    A     Again, it would be a review of the

6          document to make sure that there's -- probable

7          cause is met for the appropriate charges, for the

8          charges the officer has placed against the

9          arrestee.

10                   Q     And so if the reviewing manager

11         decided the person should be charged, that person

12         is -- is it accurate to say that that person was

13         then referred to the prosecutor without being

14         released by the MPD?

15                   A     Yes.

16                   Q     Is it accurate to say that, you know,

17         during the class period, unless the MPD believed

18         that probable cause was lacking, then every single

19         person arrested for CPWL was referred to the

20         prosecutor?

21                   A     Yes, sir, if it was -- if it was a

22         felony charge or a must appear, they were all

Pls.'s Ex. 33, p. 65
Smith v. DC, 15-737 (RCL)

Page 65

1              referred to the prosecutor.

2                   Q     What's "must appear"?

3                   A     It's where they have to -- it's just

4              a classification that they have to be sent over to

5              appear in court -- and I know you said that not

6              everybody does have to appear, they're referred to

7              the prosecutor.  So all of those must appears are

8              cases that are referred to the prosecutor where

9              they make a decision on whether or not to move

10             forward with the case.

11                  Q     So we're talking about CPWL in

12             public?

13                  A     Yes, sir.

14                  Q     We're not talking about in the home

15             or place of business.  So just CPWL in person --

16             I'm sorry, CPWL in public, did the MPD classify all

17             of those arrests as must appear?

18                  A     Yes.  That's what they are.

19                  Q     So it sounds like there was -- there

20             were only two ways to go, if a person were

21             arrested, taken into custody for CPWL, they were

22             either released on the detention journal, which

Pls.'s Ex. 33, p. 66

Smith v. DC, 15-737 (RCL)

Page 66

1          means that there was no probable cause, or they

2          were referred to the prosecutor?

3                    A     Yes.

4                    Q     So you mentioned that at some times

5          it would be brought to the attention of an

6          arresting officer that a person had a prior felony

7          conviction, either the officer's personal

8          knowledge, checking the Superior Court records,

9          maybe somebody had done a records check, the

10         booking team and informed the officer.  But let's

11         say it was brought to the attention of the

12         arresting officer that a person arrested for CPWL

13         in public had a prior felony.  In those

14         circumstances, did the MPD have a policy or a

15         practice with respect to charging that person under

16         4503(a)(1)?

17                   A     No, sir.

18                   Q     Who had the discretion to decide

19         whether or not to make that charge, the 4503(a)(1)

20         charge?

21                   A     It would be the arresting officer.

22                   Q     The officer had complete discretion?

Page 67

```
 1              A      Yes, sir, subject to review by their

 2        manager or supervisor.

 3              Q      Well, did the -- the same fact

 4        pattern, the officer -- the arresting officer knows

 5        by the time the arresting officer goes to the

 6        manager for review that the arrestee has a prior

 7        felony conviction.  Was the arresting officer

 8        obligated to tell the reviewing manager that the

 9        arrestee had a prior felony conviction?

10              A      No, sir.

11              Q      So let's suppose the reviewing

12        manager came to know that the arrestee had a prior

13        felony conviction, did the reviewing manager have

14        any kind of obligation to make that charge in

15        addition to any other charge?

16              A      Obligation?  No, sir.

17              Q      And when I say "that charge," I mean

18        the felon in possession charge.

19              A      Yes, there was no policy that

20        required.

21              Q      How about a practice, was there a

22        general practice for that fact pattern?
```

**Pls.'s Ex. 33, p. 68**

**Smith v. DC, 15-737 (RCL)**

Page 68

```
 1            A      No, sir.

 2            Q      Well, how about people who were

 3      arrested under the detention journal and they're

 4      not somebody who was released because it was

 5      determined that that person was entitled to carry a

 6      pistol in public in the District during the class

 7      period, they were -- the person was released for

 8      some other reason.  Before releasing the person

 9      under the detention journal, was a records check or

10      any other attempt made to find out whether that

11      person had a prior felony?

12            A      No, sir.

13            MR. CLAIBORNE:  All right.  If I

14      could have just a moment, please.  If people would

15      like to take a five- or a ten-minute break, I'm

16      going to pull up an exhibit.  Would people like to

17      take a little break?

18                  MR. SAINDON:  Sure.

19                  THE WITNESS:  Yeah, I could.

20                  MR. SAINDON:  Five til?

21                  MR. CLAIBORNE:  Well, let's see, I've

22      good 9:43, so you're talking about 9:55.  Okay.
```

**Pls.'s Ex. 33, p. 69**

**Smith v. DC, 15-737 (RCL)**

Page 69

```
1                    MR. SAINDON:  10:55 here, sure.

2                    MR. CLAIBORNE:  Oh, 10:55 right.  I'm

3         trying to deduct that.

4                    MR. SAINDON:  You're from Hong Kong,

5         that's where this is happening.

6                    MR. CLAIBORNE:  Right.  10:55.  Okay.

7         Let's take five.

8              (Recess from 10:43 a.m. to 10:55 a.m.)

9                    MR. CLAIBORNE:  Okay.  Back on the

10        record.

11                   My colleague, Chris, is going to

12        try to get Exhibit No. 8 up on the screen.

13        BY MR. CLAIBORNE:

14             Q    Commander, would you please take a

15        look at this exhibit.

16                   MR. CLAIBORNE:  Chris, can you scroll

17        all the way down to show the entire page so we can

18        get the exhibit number?

19        BY MR. CLAIBORNE:

20             Q    Okay.  Commander Haines, we have

21        Exhibit No. 8 here.  And maybe if Chris could now

22        scroll up a little bit, there we go, so we see
```

Pls.'s Ex. 33, p. 70

Smith v. DC, 15-737 (RCL)

Page 70

```
 1          special order.  Do you recognize this special

 2          order?

 3                  A      I'm reviewing it.

 4                  Q      You can see a complete copy in

 5          your --

 6                  A      Yeah, that's what I'm looking at.

 7                  Q      I see.  Okay.

 8                  A      Okay.  Sir.

 9                  Q      Do you -- have you seen this special

10          order before?

11                  A      I probably have, but I just reviewed

12          it.

13                  Q      Okay.  What's a mobile AFIS device?

14                         Is that how you say it?

15                  A      Yes.

16                  Q      What's a mobile AFIS device?

17                  A      At this time it's essentially a

18          fingerprint scanner.  It runs a person's

19          fingerprints through our AFIS system, Automatic

20          Fingerprint Identification System.

21                  Q      So when you run a -- so it checks to

22          see if a person's fingerprints are in your AFIS
```

Pls.'s Ex. 33, p. 71
Smith v. DC, 15-737 (RCL)

Page 71

1       system?

2               A       It runs a -- yes, it runs the

3       individual who's scanned through the AFIS system to

4       see if there's a match to positively identify that

5       person.

6               Q       And so apart from getting a match to

7       positively identify the person, does any other

8       information about the person come back?

9               A       I'm -- I'm checking.  These are not

10      something that are -- that have been used in a

11      while.

12                      And when you say "come back," what

13      specifically do you mean?  As in a written report?

14              Q       Well, let me back up then.

15                      Here it says in paragraph 1, "Use of

16      Mobile AFIS will allow members to perform a rapid

17      field fingerprint search through the AFIS databases

18      and some specified agencies."

19              A       Yes, sir.

20              Q       So when they run the search, when I

21      say "come back," I mean the results of the search.

22      So you would have to tell me in what format the

**Pls.'s Ex. 33, p. 72**

**Smith v. DC, 15-737 (RCL)**

Page 72

1          results of the search --

2                A     I don't have specific familiarity

3          with these machines that were used then, but

4          typically they only give you whether or not a

5          person comes back as -- it identifies them and

6          whether or not they have a -- they're wanted, that

7          they may have an arrest warrant or similar detainer

8          in the system for them.

9                Q     Would it --

10               A     It's essentially a wanted -- a

11         wanted -- same thing as NCIC or a WALES check would

12         be, it's running the same information, but it's

13         basing it off of the fingerprint.  It runs the

14         fingerprint and identifies the person and runs the

15         checks that way.

16               Q     So would it show whether a person has

17         a prior felony conviction in any of these agencies?

18               A     No, not with this.  This is simply --

19         my understanding is that this is simply a wanted

20         check.  So it would -- and it talks about whether

21         or not you could get a hit.  And the "hit" would

22         refer to they would be an individual with an arrest

Page 73

1        warrant or a detainer from a court.

2              Q    So if I could then either -- I'll ask

3        Chris to put it up on -- well, I don't think it's

4        that really very useful.

5                    MR. CLAIBORNE:  Chris, would you take

6        this down please, this Exhibit 8?

7        BY MR. CLAIBORNE:

8              Q    And, Commander Haines, if I could ask

9        you to take a look at Exhibit No. 5 in the exhibit

10       folder.

11             A    Yes, sir.

12             Q    So are you familiar with Exhibit No.

13       5?

14             A    This is the -- I believe this isn't

15       the current version, but yes.

16             Q    So you think there is a -- do you

17       know when this version was no longer current?

18             A    That is current, that is the current

19       version.

20             Q    All right.  Well, would you take a

21       look at this, please, because I'd like to ask --

22       well, let me ask you this:  Are you generally

**Pls.'s Ex. 33, p. 74**

**Smith v. DC, 15-737 (RCL)**

Page 74

```
 1          familiar with the policies expressed in this
 2          written policy statement?
 3                   A     Yes, sir.
 4                   Q     And I'm going to Roman Numeral 1.  So
 5          it says in the second paragraph, "This" -- I'm
 6          sorry, the third paragraph it says, "Arrestees who
 7          are in lockup cases will be transported to the
 8          Central Cellblock, (CCB) to be livescanned and
 9          processed for court appearances."
10                   A     Yes, sir.
11                   Q     And then in the previous paragraph it
12          says, "The procedures in this SOP describe the
13          booking process at the District Booking Facility."
14                   A     Yes, sir.
15                   Q     So persons arrested on the CPWL
16          during the class period, which category did they
17          fall into?
18                   A     They -- they would be both, so
19          they -- an arrestee for CPWL would first go to the
20          District and then once they are -- the arrest
21          paperwork and everything is completed in the
22          District, they would be -- they would be a lockup
```

Pls.'s Ex. 33, p. 75
Smith v. DC, 15-737 (RCL)

Page 75

```
 1          case and be transferred to the Central Cellblock.

 2                  Q     Well, for example, with respect to

 3          the processes for -- and the procedures for the

 4          booking process, would the procedures described in

 5          this booking team procedures apply?

 6                  A     I'm sorry.  Repeat that.

 7                  Q     Yeah.

 8                        Would the procedures in this booking

 9          team procedures standard operating procedure, it

10          says -- the title is, "Booking Team Procedures."

11                        MR. SAINDON:  Is there a question

12          pending, Chaz?  I guess I don't understand.

13                        MR. CLAIBORNE:  Yes.

14          BY MR. CLAIBORNE:

15                  Q     The title of this document, is it,

16          "Booking Team Procedures"?

17                  A     Yes, sir.

18                  Q     So would the procedures described in

19          this Booking Team Procedures, Special Operating

20          Procedure, apply to persons arrested on a CPWL

21          during the class period?

22                  A     Yes, sir.
```

Pls.'s Ex. 33, p. 76

Smith v. DC, 15-737 (RCL)

Page 76

```
 1              Q     So if you would look on page 2, No.

 2       6.  Let me know when you have finished looking at

 3       it, paragraph 6 on page 2.

 4              A     Yes, sir.

 5              Q     What's Criminal Justice Information

 6       System?

 7              A     It's a computerized booking system

 8       that contains arrest information for the District

 9       of Columbia.

10              Q     Does the MPD still use this system?

11              A     Yes.

12              Q     What does it mean here when it says,

13       "It is an automated information application that

14       creates and maintains criminal history

15       information"?

16              A     So essentially when -- it's the

17       official -- I guess if you want to call it the

18       booking system where all of the information is

19       compiled for arrestees within the District,

20       regardless of the agency.  So if it's Federal

21       Protective Services, Secret Service, whoever, all

22       of the information would go into this database.
```

Pls.'s Ex. 33, p. 77

Smith v. DC, 15-737 (RCL)

Page 77

1          And this is where the PDID numbers, the unique

2          identifiers for individuals, are kept and stored.

3          There's true name, real name stuff -- this is

4          getting a little technical -- but all that

5          information on individuals is stored for arrests

6          within the District of Columbia.

7                    Q     You say for arrests.  These are

8          persons that have been arrested by an arresting

9          agency in the District of Columbia?

10                   A     Yes, sir.

11                   Q     Do you know what --

12                   A     It would not include people charged

13         federally.

14                   Q     Would it have prior conviction

15         history?

16                   A     No, only arrest.  It would not have

17         conviction.

18                   Q     So is it accurate to say that the

19         procedures is a practice required by this special

20         operating procedure were followed with respect to

21         persons arrested for CPWL during the class period?

22                   A     I'm sorry.  Repeat that.

Pls.'s Ex. 33, p. 78

Smith v. DC, 15-737 (RCL)

Page 78

1          Q     Yeah.

2                Is it accurate to say that the

3     procedures specified in this special operating

4     procedure were followed with respect to persons

5     arrested for CPWL during the class period?

6          A     Yes.

7          Q     Let me ask you this question:  This

8     is a little bit separate from this document, but if

9     a person were charged with -- let me just kind of

10    set the question up.

11               We talked about D.C. Code Section

12    22-4503, and we talked about the restricted

13    categories that are described in 22-4503(a)(1) to

14    (a)(6).  Do you recall those restricted categories?

15         A     Yes, sir.

16         Q     If a person were charged with one of

17    the offenses that are set forth in 22-4503(a)(1),

18    dash, all the way up to (a)(6), they were charged

19    with one or more of those offenses, does that mean

20    that there was information in the possession of

21    some person in the MPD at the time a charge was

22    made that probable cause existed to charge that

Pls.'s Ex. 33, p. 79
Smith v. DC, 15-737 (RCL)

Page 79

1          person with the offense?

2                    A     Yes, sir.

3                    Q     And how do you know that?

4                    A     It would have to be -- it would be

5          explained in the charging document, the PD1673, the

6          arrest paperwork.  So any -- any part of the

7          manager's review is to make sure when they review

8          the arrest paperwork, that every charge that's on

9          there that there's probable cause and the statement

10         of facts supports that charge.  So it would have to

11         be in there.

12                   Q     Well, if the person -- the arrestee

13         were charged, not only with CPWL, but were charged

14         with, say, being a felon in possession, what would

15         supply probable cause if the person actually had a

16         prior felony conviction?

17                   A     It would be as simple as the

18         arresting officer putting in their statement of

19         facts that John Haines was previously convicted of

20         a felony within the District of Columbia under Case

21         No. ABCDEFG, and, therefore, is in violation of a

22         felony possession.

Pls.'s Ex. 33, p. 80

Smith v. DC, 15-737 (RCL)

Page 80

1           Q      So if it's not -- if that information

2    about the prior felony conviction is not in the

3    arrest report, then does that mean that the person

4    does not have a prior felony conviction?

5           A      No.

6           Q      Well, explain.  How would the -- how

7    would the person -- well, let's say a prior felony

8    conviction -- what I'm trying to understand is if

9    the officer made a charge of prior -- you know,

10   felon in possession, but the information that you

11   just mentioned, the particulars of the prior felony

12   conviction were not in the arrest report, does that

13   mean that there's no probable cause to support the

14   charge?

15          A      They certainly have -- they would

16   have -- there would have to be within their

17   statement of facts something to support the charge.

18   If there wasn't something to support the charge,

19   then whoever reviewed that paperwork would have to

20   have that officer address it, either add in the

21   particular facts or eliminate the charge from that

22   particular arresting officer.

Pls.'s Ex. 33, p. 81
Smith v. DC, 15-737 (RCL)

Page 81

```
 1              Q    Okay.  So then I think it's fair to

 2        say that if a person were charged by MPD -- and

 3        when I say that, if the charge appeared in the --

 4        in the MPD booking database, that the person were

 5        charged with being a felon in possession, then that

 6        means the officer had some information that the

 7        person actually had a prior felony conviction?

 8              A    Yes, sir.

 9              Q    But flip it around the other way, can

10        you say that the MPD database does not have any of

11        the restricted category offenses in 4503(a)(1) to

12        (a)(6), can you say that the person -- that the

13        arresting officer had no information that the

14        person fell into one of those categories?

15                   MR. SAINDON:  Objection.  What do you

16        mean by "MPD database," Chaz?

17                   MR. CLAIBORNE:  The MPD booking

18        database that we just discussed in the previous

19        question.

20        BY MR. CLAIBORNE:

21              Q    Do you -- do you need -- do you know

22        what I'm talking about when I say the MPD booking
```

Pls.'s Ex. 33, p. 82
Smith v. DC, 15-737 (RCL)

Page 82

1      database, Commander?

2            A      No, I don't.  Honestly, I don't

3      understand what you're asking.

4            Q      Does the MPD have a booking database

5      that it makes -- that it enters the -- the officer

6      enters information about arrests into?

7            A      Yes, sir.

8            Q      Okay.  What do you call that?

9            A      Currently it's -- it's Cobalt.

10           Q      Okay.

11           A      Like I said, I think we had a couple

12     of different ones during the time period that we're

13     talking about.

14           Q      And what did you call them, generally

15     speaking, earlier?

16           A      It's a --

17           Q      RMS?

18           A      Yeah, Record Management System.

19     Whatever we were using at the time.

20           Q      All right.  So that's what I'm

21     talking about then.  We'll just use the term of

22     Record Management System, because that covers

Page 83

1          whatever booking database was in use at the time,

2          right?

3                    A      Yes, sir.

4                    Q      Okay.  So if a person has a -- one of

5          the 4503(a)(1) to (a)(6) charges in their Record

6          Management System, then it's your position that

7          the -- that there was probable cause to support

8          that charge?

9                    A      No, it would not be.

10                   Q      Why is that?

11                   A      Because the Record Management System

12         is not an official -- doesn't give conviction

13         information or -- that specific information that's

14         in here.  It would have -- there would have to be

15         either III or through the Justice system through

16         the D.C. Superior Court system to look up any of

17         that information.

18                   Q      Well, I think you might be

19         anticipating my next question.

20                          What I'm saying is if you look in the

21         system and there's one of these charges, the

22         person -- MPD charged the person with one of these

Pls.'s Ex. 33, p. 84

Smith v. DC, 15-737 (RCL)

Page 84

1        restricted category offenses in 4503(a), that means

2        there was probable cause to support that charge.

3        Is that right?

4                A     Yes, sir.

5                Q     Okay.  Now let's flip it around, and

6        maybe this is what you're saying.  Can you say if

7        the person -- let me just kind of step back for a

8        minute.

9                      I'm using this phrase, "Fell into one

10       of the restricted category offenses."  So when I

11       say "restricted category offense," what I mean is

12       one of these offenses, 4503(a)(1) through (a)(6).

13                     So do you know now what I mean when I

14       say "restricted category offense"?

15               A     Yes, sir.

16               Q     Okay.  And when I say "Fell into one

17       of these categories," that means -- when I say

18       that, I mean the person -- there was probable cause

19       to believe the person had committed or was subject

20       to prosecution on one of these six categories.  The

21       person was -- basically had a prior felony

22       conviction, was a fugitive, so forth.

**Pls.'s Ex. 33, p. 85**

**Smith v. DC, 15-737 (RCL)**

Page 85

1                    So if a person was not charged by MPD

2          with one of these restricted category offenses,

3          does that mean that there was no probable cause to

4          support the charge of one of these restricted

5          category offenses?

6                    A     No.

7                    Q     Okay.  And I understand your answer.

8          So why is that?

9                    A     It could be that the officer or the

10         arresting officer may not know the criminal

11         history, the full criminal history, and that there

12         would be a qualifying charge, one of these -- it

13         fell into one of these categories in order to

14         charge that, or they may know about it and they

15         used their discretion not to charge it for any

16         number of reasons.

17                   Q     So you said full criminal history.

18         So what's a full criminal history?

19                   A     That would be essentially any

20         individual's full criminal history anywhere within

21         the United States.

22                   Q     And that's a -- what you called a

Pls.'s Ex. 33, p. 86

Smith v. DC, 15-737 (RCL)

Page 86

1      III?

2              A     Yes.   That's what we use to run those

3      backgrounds.

4              Q     Does the "I" stand for something?

5              A     It does.   I should have looked it up.

6      I just --

7              Q     Okay.   Take a moment.

8              A     Of course it doesn't tell me anything

9      here.   Interstate Identification Index.

10             Q     Now, what is the Interstate

11     Identification Index?

12             A     It's a national index of criminal

13     histories in the United States.   It's held by the

14     FBI, Federal Bureau of Investigations.

15             Q     And it's referred to as III?

16             A     Yes.

17             Q     Does it have any other name?

18             A     No, that's -- it's commonly referred

19     to as III.   That's the most common -- that's what

20     we refer to it as.

21             Q     All right.   Are you familiar with the

22     term, "Criminal History Record Information"?

Page 87

```
 1              A     Specifically within MPD, no.

 2              Q     Well, no.  It's a term defined in the

 3       Code of Federal Regulations.

 4              A     Again, it's not a term we typically

 5       use.

 6              Q     Are you familiar with the term,

 7       "Criminal History Record Depository"?

 8              A     Yes, sir.

 9              Q     And what's that?

10              A     I don't know the actual definition.

11              Q     Well, isn't it true that the District

12       of Columbia -- that the MPD is the designated

13       agency and the District of Columbia is the criminal

14       history record repository?

15              A     Yes, sir.

16              MR. SAINDON:  Objection.  Let me --

17              THE WITNESS:  I'm sorry.

18              MR. SAINDON:  That's okay.

19              Objection.  Beyond the scope.

20              You can answer.

21       BY MR. CLAIBORNE:

22              Q     Okay.  And isn't that where criminal
```

Page 88

1          history record information is stored, in the record

2          repository?

3                    A     Yes, sir.

4                    Q     And how about "Criminal History

5          Record Information System," doesn't the District of

6          Columbia maintain a Criminal History Record

7          Information System?

8                    A     I -- I'm not -- I'm unsure.

9                    Q     Well, a person can go down to the MPD

10         and get a records check and show to an employer or

11         for some other person.  They can do that, right?

12                   A     Yes, sir.

13                   Q     And so isn't that -- doesn't that

14         contain their criminal record history information?

15                   A     For the District of Columbia, yes,

16         yes.

17                   Q     And it doesn't have any information

18         about whether or not they have convictions in any

19         other jurisdiction?

20                   A     I do not know.  I'm not that familiar

21         with it.

22                   Q     I see.  Okay.

Page 89

```
 1                  So let's get back to III.  So is it
 2        accurate to say that sometimes during the class
 3        period before referring an -- you know, when I say
 4        "arrestee," I'm talking about people arrested on
 5        CPWL in public, the felony version.
 6                  So is it fair to say that during
 7        the -- well, let me back up a little bit.
 8                  In the MPD, who is the division or
 9        element or group that -- okay.  Commander Haines,
10        who in the MPD performs these III checks?
11            A    I don't know that anyone -- there's
12        no one specifically assigned to do that.  They are
13        limited -- they do limit access to the database,
14        but there are no specific restrictions on that.
15        Any sworn member may be granted access, but they
16        don't -- it is not given out.
17            Q    So somebody with access.  Is that
18        correct?
19            A    Correct.  Anyone with access can run
20        the check.
21            Q    Did the booking team members have
22        access?
```

Pls.'s Ex. 33, p. 90
Smith v. DC, 15-737 (RCL)

Page 90

1          A      I do not know.

2          Q      Does somebody on the booking team

3     have access?

4          A      I do not know.

5          Q      But sometimes during the class

6     period, when a person was arrested for CPWL in

7     public, a III check was made on those arrestees.

8     Is that correct?

9          A      Repeat the question, please.

10         Q      Yeah.

11                During the class period, sometimes

12    III searches were conducted for arrestees who were

13    arrested on the CPWL in public?

14         A      Yes.

15         Q      How would you know if such a search

16    had been conducted?

17         A      There are all -- I mean, me

18    individually, I would not.  But all of those --

19    those searches are done within the WALES system, so

20    it's all -- there are records kept to be able to

21    determine who searched what and who -- and what

22    they -- you know, what the individual members, what

Page 91

1       they've done within the system.

2              Q     Well, can you tell me -- can you

3       flesh out what you just said about the search was

4       done through the WALES system, III search was done

5       through the WALES system?

6              A     Yeah.  We -- our access through III

7       is we have to go into the WALES system and it's

8       some menu within the WALES system that accesses

9       III.  But there's levels of access, so every member

10      of the department, sworn members, has access to

11      WALES.  Not all members are granted access into the

12      III part to run criminal history checks.

13             Q     But there are people in the MPD who

14      have access to the III menu in WALES, correct?

15             A     Yes.

16             Q     And sometimes during the class

17      period, these authorized persons would conduct III

18      checks for arrestees who are arrested on CPWL in

19      public.  Is that correct?

20             A     Yes, sir.

21             Q     So what's the terminology in the MPD?

22      Do you say, "Run a III check," or, "Conduct a III

Pls.'s Ex. 33, p. 92

Smith v. DC, 15-737 (RCL)

Page 92

1       search"?  How do you say that?

2               A       Any number of ways:  Run, check,

3       review.

4               Q       Well, can you just tell me what some

5       of them are please, because I don't know and I

6       would like to know?

7               A       I mean, it's -- it's simply, "Check

8       III."  I mean, there's no official terminology for

9       it.

10              Q       Yeah, sure, I know, but, I mean,

11      you've got to communicate with people.  "Did you

12      check III," is that what one would say?

13              A       That could be, yes.

14              Q       "Did you search III?"

15              A       Yes, sir, that could be another one.

16              Q       And what would you say if some

17      results came back?  "Did you get a hit?"  Did you

18      get results?"  How would you say that?

19              A       That would depend on the individuals

20      in the conversation.

21              Q       Well, just -- I mean, you don't have

22      to give me every single one and you don't have to

Pls.'s Ex. 33, p. 93

Smith v. DC, 15-737 (RCL)

Page 93

1          say that there's a standard way of saying it, but

2          what are some of the ways that people say this?

3                    A      I mean, it would simply be, "What

4          was" -- I mean, it's purely speculative, but it's,

5          "What were the results?"

6                    Q      So if I said to an MPD officer, "What

7          were the results of the III check," that would

8          convey the question, "Did you check this out for

9          III and did you get any results"?

10                   A      Yes.

11                   Q      "Have you ever done a III check?"

12                   A      Yes, sir.

13                   Q      Are you authorized -- one of these

14         people authorized to look at the III menu inside

15         WALES?

16                   A      Yes, sir.

17                   Q      Currently.

18                   A      Yes.

19                   Q      What about during the class period?

20                   A      Yes.  I've had my access for quite a

21         long time.

22                   Q      So if you wanted to convey to another

**Pls.'s Ex. 33, p. 94**
**Smith v. DC, 15-737 (RCL)**

Page 94

1        member of the MPD during the class period that you

2        had accessed the III menu in WALES with respect to

3        a particular arrestee, how would you have said

4        that?

5                A       Simply, you know, "I did a III and

6        here were the results."

7                Q       Gotcha.

8                        So when you do a III check, what

9        format do the results come in?

10               A       They come in by jurisdiction, which

11       essentially states the District of Columbia.  And I

12       think there are some territories that are included

13       in that as well.

14               Q       Okay.

15               A       But they only come back if there's

16       a -- so it's run by an FBI number.  So each

17       individual is arrested and they've been -- who have

18       an FBI number would generate a record within the

19       III system.  And then when you run their unique

20       identifier by the FBI number through the system, it

21       will give you results back anywhere within, you

22       know, the United States where there was a record.

**Pls.'s Ex. 33, p. 95**
**Smith v. DC, 15-737 (RCL)**

Page 95

```
 1              Q      How does a person get an FBI number?

 2              A      A felony arrest or conviction, I

 3     believe.  I don't know -- you know, to be honest, I

 4     don't know what their criteria is, so I probably

 5     shouldn't comment.

 6              Q      Well, to the extent of your

 7     knowledge, how does a person come into an FBI

 8     number?

 9              A      It's -- it's my understanding is if

10     they've been fingerprinted, if that information has

11     been sent to the FBI as part of their database for

12     people -- because it does include arrests and

13     convictions that was sent to the FBI, it is then

14     generated an FBI number.  But it doesn't

15     necessarily have to be an arrest, but you can have

16     an FBI number and not be arrested.

17                     So Armed Services people who have

18     been fingerprinted, things of that nature, the

19     background check has been completed on individuals

20     for security clearances, they generate an FBI

21     number for them as well.

22              Q      Well, when you want to conduct an FBI
```

**Pls.'s Ex. 33, p. 96**
**Smith v. DC, 15-737 (RCL)**

Page 96

1        search then -- I mean, when you want to run a III

2        search, you've got to know the person's FBI number.

3        Is that correct?

4                A     Yes.

5                Q     So how do you find out the person's

6        FBI number?

7                A     Within the III system, you run their

8        name, date of birth, and then it will give you back

9        their FBI number.  And sometimes within our own RMS

10       system, we have captured that if they've had a

11       criminal history, but not always.

12               Q     Is there anything captured by the MPD

13       to indicate that a III search was done with respect

14       to a particular arrestee?

15               A     I mean, that information would be

16       captured, but not in the RMS system.

17               Q     Where would it be captured?

18               A     Again, everything in every officer

19       searches through WALES and through III, a record of

20       that is kept, but that's a completely separate

21       database.

22               Q     What database is?

Pls.'s Ex. 33, p. 97

Smith v. DC, 15-737 (RCL)

Page 97

1          A      That I -- it's within the WALES

2      system.

3          Q      Okay.  Are there any MPD general

4      orders -- well, let's say, are there any MPD

5      written directives, such as general orders, special

6      orders, standard operating procedures, teletypes,

7      just any kind of written documents relating to this

8      III system and III searches?

9          A      Specifically on III, there probably

10     is, but I don't know specifically which ones.

11         Q      How did you learn how to do a III

12     search?

13         A      I've been doing it for about probably

14     almost 20 years.  I don't recall specifically.

15     Somebody along the way taught me.

16         Q      Was there a manual?

17         A      No.

18                MR. CLAIBORNE:  Can we take a short

19     break?

20                MR. SAINDON:  Sure.  Five minutes?

21                MR. CLAIBORNE:  Let's see, it's 11:33

22     there, right?

Pls.'s Ex. 33, p. 98

Smith v. DC, 15-737 (RCL)

Page 98

```
1                    MR. SAINDON:  Yes, sir.

2                    MR. CLAIBORNE:  Why don't we come

3         back at 11:43, a ten-minute break.

4                    MR. SAINDON:  Okay.

5               (Recess from 11:33 a.m. to 11:38 a.m.)

6         BY MR. CLAIBORNE:

7               Q    Okay.  Commander Haines, is there a

8         reason why some of the people arrested for CPWL in

9         public during the class period were sent to Central

10        Cellblock?

11              A    All individuals who were arrested for

12        CPWL, during that time period, the felony CPWL,

13        were sent to the Central Cellblock.

14              Q    I see.

15                   And how do arrestees get from the

16        Central Cellblock to the courthouse for their court

17        appearances?

18              A    Physically?  I honestly don't know.

19        I don't know if they walk them over or if they bus

20        them over, but it's literally the building next

21        door to the Central Cellblock.

22              Q    Well, people spend the night at
```

**Pls.'s Ex. 33, p. 99**
**Smith v. DC, 15-737 (RCL)**

Page 99

1          Central Cellblock, don't they?

2               A     Yes, sir.

3               Q     Do they sometimes spend a couple of

4          nights there?

5               A     They can if there's, say, for

6          instance, arrested on a Saturday, when court is not

7          open until Monday, it could be two nights.

8               Q     I see.  Okay.

9                     Back during the class period, when a

10         person was arrested for CPWL in public, was there a

11         papering conference in each one of these cases

12         involved in the MPD and the prosecutor?

13              A     Yes, sir.

14              Q     Can you tell me how that worked?

15              A     So the -- the next day that court's

16         open for presentments, the arresting officer has to

17         go down to check in.  Through our Court Liaison

18         Division, they get the packet, the arrest packet.

19         They take that over and met with the United -- a

20         member of the United States Attorney's Office

21         through what we call the papering process, where

22         they review all the facts and circumstances of the

Pls.'s Ex. 33, p. 100

Smith v. DC, 15-737 (RCL)

Page 100

1    case.  They interview the officer and then make a

2    decision right then and there based on the totality

3    of everything whether they're going to proceed with

4    prosecution of the case or refer it for further

5    investigation or essentially later grand jury

6    proceedings or at that point just decide not to go

7    forward with -- with formal proceedings.

8         Q    Do you know what the term "no

9    papered" means?

10        A    Yes, sir.

11        Q    What does "no papered" mean?

12        A    No paper -- no paper is a decision

13   made by the United States Attorney's office to at

14   that time not proceed with criminal proceedings.

15        Q    And how does the U.S. Attorney's

16   Office communicate to the MPD that there is going

17   to be a no paper?

18        A    During the class action -- during the

19   time period that we're talking about, it was -- the

20   officer would be sitting right there and they would

21   tell the officer who is presenting -- or the

22   member, it could be a detective, the member

Pls.'s Ex. 33, p. 101

Smith v. DC, 15-737 (RCL)

Page 101

1         presenting the case that they are going to no paper

2         the case.

3               Q      So then the member, that is the MPD

4         officer, the member would be -- what would that

5         member do that with information, the fact that

6         their case is going to be no papered?

7               A      Do with it?  It would depend on the

8         circumstances, but in most cases, at that point

9         there's -- I shouldn't say in all cases.  It would

10        depend on the -- if it's a no paper, why it was a

11        no paper.

12              Q      Okay.  So what are some of the

13        circumstances for which a case would be no papered?

14              A      If the case was no paper because

15        there was no probable cause for arrest, you could

16        assume that the case would be done and not moved,

17        that would be the end of it.  If the case required

18        additional investigation, they may no paper it at

19        that time and assign it to a grand jury and then a

20        U.S. Attorney assigned to the grand jury branch

21        would then be assigned the case, and then an

22        officer or a detective would do additional

Pls.'s Ex. 33, p. 102
Smith v. DC, 15-737 (RCL)

Page 102

1      followup, or what have you, for grand jury

2      proceedings.

3                    And that would -- that would pretty

4      much be where that would go.  It would either be a

5      no paper, done with it, for whatever reason, or it

6      would be moved to a no paper grand jury or what we

7      can GDO, grand jury original, assigned it.

8           Q     What does grand jury original mean?

9           A      It means essentially they -- it's --

10     it's just a -- I don't know the -- it's a U.S. --

11     the United States Attorney's Office term.  So it's

12     essentially that they would go in and meet with the

13     United State's Attorney and do an indictment

14     through the grand jury process.

15          Q     When you say "they," the MPD

16     officers, the members?

17          A      Well, that member at that point is a

18     witness, so it would be the U.S. Attorney's Office

19     would do charges through the grand jury process.

20          Q     I see.

21                    And how did a member document that

22     the case had been no papered?

Page 103

1          A     They would not.  The Court Liaison

2     Division follows up with the U.S. Attorney's Office

3     at the end of the day and gets all that information

4     and keeps track of it that way.

5          Q     And the Court Liaison Office, is that

6     the MPD Court Liaison Office?

7          A     Yes.

8          Q     So these are -- are they MPD members

9     or MPD civilian staff or both or --

10         A     I think it's a combination of both.

11    I think it's mostly sworn, but they are both.

12         Q     So the Court Liaison Office would

13    document that a case was no papered?

14         A     Yes, they would get that information.

15         Q     Would they document whether it was

16    the no paper over and done or the no paper further

17    investigation?

18         A     They do keep notes on both, yes.

19         Q     To your knowledge, are any entries

20    made in the MPD booking database Cobalt, or

21    whatever was enforced at that time?

22         A     No.

**Pls.'s Ex. 33, p. 104**

**Smith v. DC, 15-737 (RCL)**

Page 104

1          Q     Do you know what an arrest

2     disposition is?

3          A     Yes, sir.

4          Q     Is there a disposition --

5          A     Go ahead.

6          Q     Go ahead.

7          A     No, go ahead.

8          Q     I was just going to ask you, was

9     there a disposition code for no paper?

10          A     Yes.  And I think what you're

11     referring to in the one special order we looked at,

12     it says arrest disposition.  And that simply refers

13     to whether it was elected to forfeit, citation

14     release, court appearance.  That's what that refers

15     to.  But that does not give a determination on

16     whether or not that -- that is not where we specify

17     whether a case was papered or not.

18          Q     So where do you specify that?

19          A     We don't.

20          Q     What do you mean you don't?  In the

21     database or you don't anywhere?

22          A     No, we don't capture that within the

Pls.'s Ex. 33, p. 105

Smith v. DC, 15-737 (RCL)

Page 105

1      database, whether a case is papered or not.

2              Q      But in court -- a court liaison

3      might?

4              A      To my knowledge, they do not.  It's

5      not captured.

6              Q      Well, somebody's got to keep a

7      record, right?

8                     I mean, the MPD records everything,

9      just like the Army.

10             A      Well, those -- because that -- at

11     that point that part of it is part of the court

12     system, so it is captured within the court

13     database, which we commonly refer to as Justice.

14     We can access it that way, but we do not capture

15     that information.

16             Q      I see.

17                    So during the class period, in the

18     District of Columbia, did other agencies besides

19     the MPD make arrests under District of Columbia

20     statutes for carrying a pistol without a license in

21     public?

22             A      Yes, sir.

Pls.'s Ex. 33, p. 106

Smith v. DC, 15-737 (RCL)

Page 106

1          Q      And, for example, Metropolitan

2     Transit Police could be one?

3          A      Yes.  Metro Transit, yes, sir.

4          Q      Any other agencies?

5          A      The District of Columbia has over 30

6     sworn police agencies, so any of those agencies

7     could make an arrest for that.

8          Q      Well, when those agencies made an

9     arrest under the D.C. statute, did they bring their

10    arrestee to one of the MPD District or Central

11    Cellblock for processing?

12         A      The only exceptions, to my knowledge,

13    would be U.S. Park Police and U.S. Capitol Police

14    have their own facilities.  There might be others,

15    but they're the only two that I could think of.

16         Q      So when the U.S. Park Police or the

17    U.S. Capitol Police made an arrest and charged

18    somebody with the D.C. version of CPWL, would they

19    have booked the person in the D.C. booking

20    database?

21         A      During that time, I actually don't

22    know the answer to that.  We currently all capture

Page 107

1    it in the same.  Though at that time, I honestly

2    don't know.  I believe they had separate systems.

3              Q     Would they share that information

4    with the MPD?

5              A     It all -- it all eventually gets put

6    into CJIS and also into Justice.  So it's something

7    that we can gain -- we would gain access to see

8    that there was arrest information, but maybe not

9    the specifics to the arrest.  We might have to

10   reach out to that individual agency to get it.

11             Q     But that's just for the Park Police

12   and the Capitol Police, right?

13             A     Again, there might be others, but

14   those are the two big ones that I know right

15   offhand that most likely make those arrests.

16             Q     Now, what about, say, MTP, Metro

17   Transit Police, or University Police, something

18   like that, would they bring their arrestees to the

19   MPD for booking?

20             A     Yes, Metro Transit would take their

21   arrestees to our facility to book and to do the

22   arrest paperwork.

Pls.'s Ex. 33, p. 108

Smith v. DC, 15-737 (RCL)

Page 108

1             Q      And they would be booked into the MPD

2        Cobalt, or whatever the booking database was?

3             A      Yes.  It wasn't in Cobalt, but

4        whatever the RMS system was at the time.

5             Q      So what do you know about how the

6        prosecuting authorities do in terms of making III

7        searches?

8                    MR. SAINDON:  Objection.  Vague.

9        Beyond the scope.

10                   You can answer.

11                   THE WITNESS:  So as part of the

12       papering decision by the U.S. Attorney's Office,

13       they do a complete criminal history check --

14       background check, and based on that, and sometimes

15       that information, you know, it's often used for

16       prosecutorial purposes, but they do the complete

17       criminal history background checks on their end.

18       BY MR. CLAIBORNE:

19            Q      So let's suppose a member -- a MPD

20       member took a case over for a papering conference,

21       would the -- to your knowledge, would the U.S.

22       Attorney make the III check before deciding whether

Pls.'s Ex. 33, p. 109
Smith v. DC, 15-737 (RCL)

Page 109

1        to paper the case?

2              A     Yes.  All of that stuff, they have

3        people within their office to prepare those

4        packages.  So when the officer sit -- at that time

5        when the officer would sit down with the attorney

6        for the -- there's a screening process to determine

7        if a case is going to be papered and then it moves

8        on.  If the case is papered, they send the officer

9        to another attorney who actually does the complete

10       workup case jacket.  So during the screening

11       process, before it's screened, the U.S. Attorney

12       gets that full complete background packet and then

13       with the arrest paperwork to make the -- to help

14       make their determinations.

15             Q     So the screening process, that's

16       before the papering decision is made?

17             A     No, that's where the papering

18       decision is made.  This is -- the screening

19       attorney determines whether or not a case is going

20       to be papered.  If the case is -- if they make a

21       determination to paper the case, it then gets

22       assigned to an attorney who does the jacket, the

Pls.'s Ex. 33, p. 110
Smith v. DC, 15-737 (RCL)

Page 110

1        court jacket, for everything.

2                Q      Okay.  But what I want to know is, is

3        the III check done before the decision to paper the

4        case is made?

5                A      Yes.

6                Q      So does the MPD ever -- does the U.S.

7        Attorney's Office transmit to the MPD the results

8        of the III search?

9                A      No.

10               Q      Where, to your knowledge, does the

11       U.S. Attorney's Office store the results of these

12       III searches?

13               A      I don't have any idea.

14               Q      So, once again, during the class

15       period, with respect to persons arrested for CPWL

16       outside the home, you're aware that sometimes those

17       arrestees were charged by the U.S. Attorney's

18       Office with some version of felon in possession.

19       Is that right?

20               A      Yes, sir.

21               Q      So if the U.S. Attorney charged an --

22       an arrestee on CPWL in public with felon in

Page 111

1      possession, does that mean that the III search

2      returned a -- evidence of a prior felony

3      conviction?

4              A    It would have to, yes.  Whether it

5      was III, or however they did their criminal history

6      check, they would need that information.

7              Q    Well, what about the other categories

8      of -- under 4503 -- let me pull them up so I can

9      ask you.

10             If a person were charged with -- do

11     you have 4503 with you?  Can you pull that up,

12     please?

13             A    Yes, sir.

14             Q    Okay.  Let's look at No. 3 -- well,

15     let's look at No. 2, if the person was not licensed

16     to sell weapons, would that be -- if that were

17     charged, does that indicate that the U.S.

18     Attorney's Office had some information indicating

19     that the person was not licensed to sell weapons?

20             A    That would be my assumption, yes.

21             Q    And why do you assume that?

22             A    Again, I -- I -- I can't speak for

Pls.'s Ex. 33, p. 112

Smith v. DC, 15-737 (RCL)

Page 112

1        the U.S. Attorney's Office or what they would do in

2        the process --

3               Q     No, I'm not asking you to speak for

4        them.  I'm just -- you're head of the NSID, right,

5        and you've been in this business, you're a

6        commander, you've got to have some knowledge.

7               A     Yes, sir.

8               Q     Okay.  So what's your knowledge, if

9        the U.S. Attorney charges one of these offenses

10       under (a)(1) through (a)(6), does that indicate

11       that they have information to indicate that the

12       person violated that provision?

13              A     Yes, sir.

14              Q     Well, let's flip it around the other

15       way.  By the time we get to grand jury, we've gone

16       through the grand jury stage, based on the

17       information that you have, if the U.S. Attorney

18       during the class period did not charge somebody

19       arrested on CPWL in public with felon in

20       possession, does that indicate to you that the

21       person did not have prior felony convictions?

22              A     Not necessarily.

Pls.'s Ex. 33, p. 113
Smith v. DC, 15-737 (RCL)

Page 113

1          Q     So can you say why not necessarily?

2          A     It would be -- either prosecution has

3     discretion to charge essentially what they wish to

4     or not depending on the facts and circumstances and

5     what they feel they could obtain a conviction on.

6          Q     So then let's kind of step back and

7     take a global look at things.  So, once again,

8     we're talking about during the class period and

9     we're talking about people arrested for CPWL in

10    public.

11               So if the person were charged by

12    either MPD or the U.S. Attorney's Office with one

13    of these six categories under 4503(a), then your

14    knowledge is that there was probable cause to

15    believe that that person had, in fact, violated one

16    of those provisions of the statute?

17          A     Yes.

18          Q     But talking about the people that

19    were not charged, either by the MPD or the

20    prosecuting authority, they were not charged with

21    any one of these violations under 4503(a), can you

22    make any observations about what the absence of a

Pls.'s Ex. 33, p. 114
Smith v. DC, 15-737 (RCL)

Page 114

1          charge means?

2                A      No.

3                Q      Okay.  So let me check my list here.

4                       When a person is arrested by the MPD,

5          and the MPD does their search for warrants, how

6          does the MPD know whether the warrant is from a

7          foreign jurisdiction?

8                A      Foreign, meaning outside the District

9          of Columbia?

10               Q      Right.

11               A      The warrant will -- on the warrant --

12         on the check, it will tell you where the

13         originating agency, where that warrant comes from

14         and whether or not it's extraditable, and if it is

15         extraditable, if there's any restrictions on that

16         extradition.

17               Q      Well, if a warrant is

18         nonextraditable, is that entered into RMS during

19         the class period?

20               A      I don't understand your question.

21               Q      Well, suppose during the class period

22         there was a person arrested for CPWL in public and

Pls.'s Ex. 33, p. 115

Smith v. DC, 15-737 (RCL)

Page 115

1          the check returned the fact that that person was

2          subject to an extraditable warrant from another

3          jurisdiction, is that fact entered into the RMS, or

4          was that fact entered into the RMS?

5                    A     Yes.  It would be the holding charge

6          of fugitive from justice.

7                    Q     So if there's no charge, fugitive

8          from justice, that means that the person did not

9          have a foreign extraditable warrant?

10                   A     That would be the assumption, yes.

11                   Q     Well, what do you mean "assumption"?

12                   A     Assume --

13                   Q     If I --

14                   A     Sorry.

15                         Assuming somebody didn't miss it when

16         they did the check, yes, that should be correct.

17                   Q     Okay.  So when you say -- okay.

18                         So if the -- but the MPD did checks

19         for foreign warrants, correct, as part of the check

20         for warrants?

21                   A     Yes.

22                   Q     So unless a mistake were made, if the

Pls.'s Ex. 33, p. 116

Smith v. DC, 15-737 (RCL)

Page 116

1          person was the subject of a foreign extraditable

2          warrant, the person was charged with being a

3          fugitive.  Is that correct?

4                    A     Yes, sir.

5                    Q     Is that the correct term, being a

6          fugitive?  I think you said that.

7                    A     "Fugitive from justice" is the

8          actual --

9                    Q     Oh.

10                   A     It's a holding charge.  It's not a --

11         there's no penalty associated with it, it's simply

12         a placeholder to keep them in custody.

13                   Q     I see.  Thank you.

14                         Here's another question I have.

15         Apart from some version of felon in possession,

16         that is you arrest somebody for being a -- for CPWL

17         or UA or UF, and there's reason to believe that the

18         person does not have a prior felony conviction, it

19         has not been brought to the officer's attention,

20         what is the point of charging one of the other

21         provisions of 4503(a)?

22                         MR. SAINDON:  Objection.  Vague.

Pls.'s Ex. 33, p. 117

Smith v. DC, 15-737 (RCL)

Page 117

1    BY MR. CLAIBORNE:

2         Q    Well, I mean, it -- do you understand

3    the question?

4         A    Can you repeat it?

5         Q    Sure.

6              Let's suppose, for example -- let me

7    ask you about 4503(a)(5), for example.  That means

8    the person is subject to a court order of a

9    particular type that says they cannot own a -- or

10   cannot possess a firearm.  Is that more or less

11   what 4503(a)(5) says?

12        A    In a nutshell.  Looking at it, it

13   would be anybody who essentially would have some

14   sort of protection order --

15        Q    Right.

16        A    -- against them, yes.

17        Q    And then C says, (5)(c) says,

18   "Requires the person to relinquish possession of

19   any firearms."

20        A    Yes, sir.

21        Q    So let's suppose they satisfy all

22   these conditions of 4503(a)(5), what was the

Pls.'s Ex. 33, p. 118

Smith v. DC, 15-737 (RCL)

Page 118

1      practice of the MPD with respect to seeing whether

2      some arrestee, a person arrested on CPWL, actually

3      was in violation of this No. 5?

4              A     The only difference is with No. 5,

5      when we would run -- as part of the booking

6      procedure, they run the WALES/NCIC checks, if

7      someone has a protective order, it will come up as

8      part -- in the WALES check, and sometimes in the

9      NCIC check, depending on what type of protection

10     order.  That would become apparent -- the officer

11     should be -- especially if it's a gun charge, there

12     should be a process that the officer is made aware

13     of that, and then at that point they could charge

14     this offense if they were in violation of that, if

15     the protection order was valid and was within that

16     time period.

17             Q     During the class period, was it the

18     MPD's position that -- (5) says subject to a court

19     order, was that a court order anywhere in the

20     country or just in the District?

21             A     Well, it could be anywhere in the

22     country.  The only issue is sometimes those

Pls.'s Ex. 33, p. 119

Smith v. DC, 15-737 (RCL)

Page 119

1          protective orders are not -- when we run the

2          NCIC/WALES checks, don't necessarily come up in an

3          NCIC check.

4                    Q     Okay.

5                    A     So if they had a protective order

6          from the California when we run that person through

7          NCIC, that may not come back as part of that

8          return.

9                    Q     Let's suppose it did come back that

10         the person was subject to one of these qualifying

11         protective orders, let's say, in the District of

12         Columbia, if they're already being charged with a

13         felony CPWL, and perhaps a misdemeanor UA/UF,

14         there's a total band on possession of handguns

15         anyway, why would the -- I mean, why would the MPD

16         charge them with this particular offense?

17                   A      If there's probable cause to charge

18         them would be the number one reason.  The other

19         reason would be for prosecutorial purposes, the

20         standard of proof for the conviction down the road

21         would be different depending on the charge and what

22         standards they would have to meet.

Page 120

1               MR. CLAIBORNE:  Okay.  If I could

2       just take five minutes, I want to check my notes.

3               Can you go another five minutes?

4               THE WITNESS:  I can, yes.

5               MR. CLAIBORNE:  So we'll take another

6       short break for five minutes and then I'll come

7       back with no more than five minutes' worth of

8       questions.

9               MR. SAINDON:  Okay.

10              MR. CLAIBORNE:  Thank you.

11              (Recess from 12:14 p.m. to 12:19 p.m.)

12              MR. CLAIBORNE:  Commander Haines, I

13      want to thank you.  And I don't have any more

14      questions.

15              THE WITNESS:  Okay.

16              MR. SAINDON:  We'll read and sign.

17              (Whereupon, at 12:20 p.m., the deposition

18              of COMMANDER JOHN HAINES was concluded;

19              signature reserved.)

20

21

22

Pls.'s Ex. 33, p. 121

Smith v. DC, 15-737 (RCL)

Page 121

1                  CERTIFICATE OF NOTARY PUBLIC

2           I, FELICIA A. NEWLAND, CSR, the officer before

3      whom the foregoing videoconference virtual

4      deposition was taken, do hereby certify that the

5      witness whose testimony appears in the foregoing

6      deposition was duly sworn by me; that the testimony

7      of said witness was taken by me in stenotype and

8      thereafter reduced to typewriting under my

9      direction; that said deposition is a true record of

10     the testimony given by said witness; that I am

11     neither counsel for, related to, nor employed by any

12     of the parties to the action in which this

13     deposition was taken; and, further, that I am not a

14     relative or employee of any counsel or attorney

15     employed by the parties hereto, nor financially or

16     otherwise interested in the outcome of this action.

17

18

19     _____

20           FELICIA A. NEWLAND, CSR

             Notary Public

21

       My commission expires:

22     September 15, 2024

Pls.'s Ex. 33, p. 122

Smith v. DC, 15-737 (RCL)

Page 122

1     Andy Saidon, Esquire

2     andy.saindon@dc.gov

3                      January 27, 2021

4     RE:    Smith, Maggie Et Al v. District Of Columbia

5        1/13/2021, Commander John Haines (#4411856)

6        The above-referenced transcript is available for

7     review.

8        Within the applicable timeframe, the witness should

9     read the testimony to verify its accuracy. If there are

10    any changes, the witness should note those with the

11    reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13    Deponent and Errata and return to the deposing attorney.

14    Copies should be sent to all counsel, and to Veritext at

15    cs-midatlantic@veritext.com

16

17     Return completed errata within 30 days from

18    receipt of testimony.

19      If the witness fails to do so within the time

20    allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Pls.'s Ex. 33, p. 123

Smith v. DC, 15-737 (RCL)

Page 123

1    Smith, Maggie Et Al v. District Of Columbia

2    Commander John Haines (#4411856)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Commander John Haines                            Date

25

Pls.'s Ex. 33, p. 124
Smith v. DC, 15-737 (RCL)

Page 124

1    Smith, Maggie Et Al v. District Of Columbia

2    Commander John Haines (#4411856)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Commander John Haines, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Commander John Haines                        Date

13   *If notary is required

14                     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                     _____ DAY OF _____, 20___.

16

17

18                     _____

19                     NOTARY PUBLIC

20

21

22

23

24

25

Pls.'s Ex. 33, p. 125

Smith v. DC, 15-737 (RCL)