

Deposition of:

# Lt. Debra Manigault

*January 22, 2021*

In the Matter of:

# Smith, Maggie et al. v. District of Columbia

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Pls.'s Ex. 34, p. 1

Smith v. DC, 15-737 (RCL)

```
                                            Page 1

 1              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
 2     - - - - - - - - - - - - - - - - :
                                       :
 3     MAGGIE SMITH, et al.,           :
                                       :
 4              Plaintiffs,            :   CASE NO.
                                       :
 5              vs.                    :   15-757
                                       :
 6     DISTRICT OF COLUMBIA,           :
                                       :
 7              Defendant.             :
                                       :
 8     - - - - - - - - - - - - - - - - :
 9              DEPOSITION OF LT. DEBRA MANIGAULT
10
11     DATE:              January 22, 2021
12     TIME:              9:33 a.m.
13     LOCATION:          Via Zoom Videoconference
14
15     REPORTED BY:       Constance H. Rhodes
                          Reporter, Notary
16
17
18              Veritext Legal Solutions
               1250 Eye Street, Northwest
19               Washington, DC 20005
20
21
22
```

Page 2

```
 1                A P P E A R A N C E S
 2
 3     On behalf of Plaintiffs:
 4          WILLIAM CLAIBORNE, ESQUIRE
            ClaiborneLaw
 5          717 D Street Northwest
            Suite 300
 6          Washington, DC 20004
            (202) 824-0700
 7          Claibornelaw@gmail.com
 8          CHRISTOPHER P. CULLEN, ESQUIRE
            Faegre Drinker Biddle & Reath
 9          1500 K Street, Northwest
            Washington, DC 20005
10          202) 230-5317
            Christopher.cullen@faegredrinker.com
11
12
13     On behalf of Defendant:
14          ANDREW SAINDON, ESQUIRE
            BRENDAN HEATH, ESQUIRE
15          Office of the Attorney General
            500 C Street, Northwest
16          Room 501
            Washington, DC 20001
17          (202) 442-9700
18
19                      *  *  *  *  *
20
21
22
```

Pls.'s Ex. 34, p. 3
Smith v. DC, 15-737 (RCL)

Page 3

```
 1                     C O N T E N T S

 2    EXAMINATION BY:                              PAGE

 3         Counsel for Plaintiffs                     4

 4

 5    MANIGAULT DEPOSITION EXHIBITS:*

 6    (Exhibits marked prior to deposition)

 7    Exhibit 1   Notice of Deposition

 8    Exhibit 2   EvidenceOnQ Spreadsheet

 9    Exhibit 3   MPD Property Record  PD81

10    Exhibit 5   DC.gov web page DC Code Section 22-4517

11    Exhibit 5A  DC Code Section 22-4517

12

13

14

15

16

17

18

19

20

21

22    (* Exhibits attached to transcript.)
```

**Pls.'s Ex. 34, p. 4**
**Smith v. DC, 15-737 (RCL)**

Page 4

1              P R O C E E D I N G S

2    WHEREUPON,

3                   LT. DEBRA MANIGAULT

4    called as a witness, and having been first duly

5    sworn, was examined and testified as follows:

6              EXAMINATION BY COUNSEL FOR PLAINTIFFS

7    BY MR. CLAIBORNE:

8         Q    Lt. Manigault?

9         A    Good morning.

10        Q    My name is William Claiborne.  I'm the

11   lawyer for the plaintiffs in this case.

12        A    Okay.

13        Q    Could you -- well, first, say your full

14   name, including your middle name, and spell all of

15   your names.

16        A    Debra Denise Manigault.  D-E-B-R-A,

17   D-E-N-I-S-E, M-A-N-I-G-A-U-L-T.

18        Q    Thank you.  Who is your employer?

19        A    Metropolitan Police Department.

20        Q    And what division do you work in?

21        A    Corporate support bureau, evidence

22   control branch.

Pls.'s Ex. 34, p. 5

Smith v. DC, 15-737 (RCL)

1      Q      And how long have you had that position?

2      A      Seven years.  Eight years next month.

3      Q      So that would be roughly 2013?

4      A      Yeah.

5      Q      Okay.  What did you do before that?

6      A      I was in the school security division.

7      Q      And how long have you actually been on

8   the force?

9      A      This is my 32nd year.

10      Q      Congratulations.

11      A      Thank you.

12      Q      Most people -- I'll never be married

13   that long.  I can say that.  And your rank is

14   lieutenant; is that right?

15      A      Yes.

16      Q      So now that we've got that out of the

17   way, I'd just like to say before we really jump

18   into things, if at any time you need to take a

19   break, just let me know and we can stop.

20      A      Okay.

21      Q      I'd like to finish whatever question

22   we're on, but if you need a break, just say so and

**Pls.'s Ex. 34, p. 6**

**Smith v. DC, 15-737 (RCL)**

Page 6

1     for any reason.  We can take five or ten, whatever

2     you need.

3          A     Okay.

4          Q     Do you know what this case is about?

5          A     Roughly it's about, I guess, the DC gun

6     law policy.

7          Q     That's right.  It's a class action, and

8     so the class period -- that's the period covered

9     by the case -- goes roughly from 2011 and it

10    covers some people who were still being prosecuted

11    in 2015.  And so we've got basically two sets of

12    claims:  People claims and property claims.  And

13    the people claims are people say that they were

14    arrested and detained and prosecuted under

15    unconstitutional laws.  And then the property

16    claim is the District took their guns and

17    ammunition and either never gave it back or held

18    on to it a long time.  So that's what this

19    deposition is about.

20              I want to talk about the guns and the

21    ammunition that were seized from people and that

22    guns and ammunition that otherwise came into the

Pls.'s Ex. 34, p. 7

Smith v. DC, 15-737 (RCL)

1    possession of the MPD during that period of time.

2    So do you understand that?

3         A    (Nonverbal response.)

4         Q    Can you say yes, please.

5         A    Yes.

6         Q    You've got to say yes so the court

7    reporter can take it down.

8         A    Yes.

9         Q    Thank you.  And then just -- I don't

10   know -- you may want to make a note that the

11   period of time we're going to be talking about

12   unless I say otherwise is from 2011 through 2015.

13            Now, do you know what was going on in the

14   evidence control branch during the period of time

15   from 2011 to 2013?

16        A    No.  I didn't arrive until 2013.

17        Q    Has anybody told you what was going on,

18   prepared you, so you could answer questions about

19   that period?

20        A    No.

21        Q    To your knowledge is there any

22   difference in the procedures that were followed

Pls.'s Ex. 34, p. 8
Smith v. DC, 15-737 (RCL)

Page 8

1    2011 to 2013 and the procedures that were followed

2    in the rest of the period?

3         A    Difference in what type of procedure?

4         Q    Just any of the procedures that were in

5    place.  I mean, I don't know what the procedures

6    were yet.

7         A    It could possibly be.  Yeah.

8         Q    But also possibly not; you just don't

9    know?

10        A    Yes.  I don't -- I wouldn't know unless

11   you get to the period where I came.  And then if

12   there's something that I know that they used to do

13   that we are no longer doing, then I can say that.

14        Q    I understand.  Were you able to see the

15   exhibits in the folder?

16        A    No.

17             MR. CLAIBORNE:  Okay.  Andy, would you

18   mind, if you have access to them, could you email

19   Exhibit Number 1 to Lt. Manigault, please?

20             MR. SAINDON:  Yes.  I'm going to have

21   Brendan do that if he can -- if he can do it.  And

22   Lt. Manigault, you'll get an email from Brendan

Pls.'s Ex. 34, p. 9
Smith v. DC, 15-737 (RCL)

1    Heath, and we'll just work through the exhibits as

2    Mr. Claiborne talks about them.  Let us know when

3    you get that email, please.

4                    THE WITNESS:  Okay.

5                    MR. HEATH:  Which exhibit did you want?

6                    MR. CLAIBORNE:  Exhibit Number 1.  It's

7    the depo notice.

8                    THE WITNESS:  Okay.  You said from Heath.

9                    MR. SAINDON:  Yes.  It's the man in the

10   pink shirt on the screen there.

11                   THE WITNESS:  Okay.  I have the notice.

12   BY MR. CLAIBORNE:

13        Q    So can you see just below the caption it

14   says Plaintiff's Notice of Deposition Pursuant to

15   and then abbreviation 30(b)(6)?

16        A    Yeah.

17        Q    Could you go to page 3, please.

18        A    Okay.  Three.

19        Q    Do you see on the top of page 3 it says:

20   MPD EvidenceOnQ/guns and ammunitions and related

21   weapons equipment process 30(b)(6) topics?

22        A    Yes.

**Pls.'s Ex. 34, p. 10**

**Smith v. DC, 15-737 (RCL)**

Page 10

1          Q    So I would like to ask you to scroll

2      through pages 1 -- actually 3, 4, and 5.  There's

3      15 of these topics.

4          A    Okay.

5          Q    And you've been presented to us as the

6      person most knowledgeable about the topics that

7      are not marked in red.  So topics 8 and 9 have

8      little red boxes around the numbers.

9          A    Okay.

10         Q    And then topics 14 and 15 are all in

11     red.  So exclude 8, 9, 14, 15.  The others are

12     yours.

13         A    Okay.

14         Q    And then I don't know if you are sitting

15     in front of EvidenceOnQ, if you're sitting in

16     front of a computer.

17         A    I am in front of the computer.

18         Q    Well, on page 4 there is a screen shot

19     of EvidenceOnQ, but if you're -- yesterday I

20     deposed Mr. Cotter.  He was just looking at

21     EvidenceOnQ in his computer, but I'm going to ask

22     you some questions about which fields you

Pls.'s Ex. 34, p. 11
Smith v. DC, 15-737 (RCL)

1    populate.  Do you understand the fields that you

2    populate on EvidenceOnQ?

3         A    Wait one second.  So when you say

4    "populate," you mean the field that we complete?

5         Q    Yeah.  Enter data into.

6         A    Okay.

7         Q    Do you want to take a moment to look at

8    the topics?  I think that might be helpful.  Take

9    a moment, took at them, and let me know when

10   you've looked at them.

11        A    Okay.

12        Q    All right.  Another thing I'd like to

13   tell you is, are you aware that, you know, during

14   the period of time from -- including 2011 up

15   through October 2014, the District did not issue

16   licenses to people to carry pistols in public?

17        A    Repeat your question again.  Was I aware

18   of that?

19        Q    Yes.

20        A    Yeah, yeah.

21        Q    All right.  And did you know that during

22   that period of time nonresidents could not

**Pls.'s Ex. 34, p. 12**

**Smith v. DC, 15-737 (RCL)**

Page 12

1    register pistols in the District?

2         A    I -- I -- I did know there was a time

3    when they could not register pistols in the

4    District.  The exact period of time I can't say

5    specifically.  But I do know, yes, there was a

6    time when they could not register guns.

7         Q    Also, during that time residents could

8    register a pistol for use in the home but not

9    outside of the home or place of business.  Did you

10   know that?

11        A    No.  No.

12        Q    Okay.  So basically, nobody could carry

13   a pistol in public because there was no system set

14   up to give them licenses.

15             So the people in this case are people that

16   were arrested.  Some of them -- well, everybody was

17   detained.  Some of them were also prosecuted for

18   violating the District's gun laws about carrying a

19   pistol in public.

20             And so what I want to ask you is when the

21   people got arrested during that time, what happened

22   to their guns?  If a person were arrested for

**Pls.'s Ex. 34, p. 13**

**Smith v. DC, 15-737 (RCL)**

1    violating the District's gun control laws during

2    this class period, did the police officer seize

3    their guns and ammunition?

4         A    I would say yes.

5         Q    Well, what do you -- when you say "I

6    would say," I mean is that a yes or is that --

7         A    Yes.

8         Q    -- you don't know?

9         A    Yes.  If they were arrested for having a

10   gun unlawfully in the District, they would seize

11   the gun and the ammunition if there was ammunition

12   with it.

13        Q    Now, do you know why the guns and

14   ammunition were seized?

15        A    Because it was unlawful for them to have

16   them I would assume.

17        Q    Well, apart from assuming, do you

18   know -- it's best if you don't know to just say I

19   don't know.

20        A    Okay.  If the weapon and the ammo was

21   seized, it was in reference to the violation of

22   not being lawfully authorized to carry it.

**Pls.'s Ex. 34, p. 14**
**Smith v. DC, 15-737 (RCL)**

Page 14

1     Q   Thank you.  I just want to step back for

2 a minute here.  You may feel like I'm trying to

3 pin you down on things.  Actually, I am because

4 we're doing this deposition so I can get

5 information about these topics.

6     A   Okay.

7     Q   And the way the rules are set up, your

8 answers are the District's answers.  And so the

9 parties -- we have to file motions and do things

10 and other things as well.  So that's why I'm

11 asking you these questions and trying to pin you

12 down.  So nobody likes to be pinned down I know,

13 but -- dissected, but that's what's going on here.

14 So I ask you to bear with me.

15     A   Okay.

16     Q   All right.  Do you know what happened to

17 the guns after the officers seized them from --

18 and once again, we're talking about people during

19 that class period who were arrested for violating

20 the District's gun control laws.

21     So do you know what happened to the guns

22 and ammunition?

**Pls.'s Ex. 34, p. 15**
**Smith v. DC, 15-737 (RCL)**

Page 15

```
1        A     The gun would be processed by the crime

2   scene technician as well as the weapons.  And

3   after it's recovered it would be submitted to the

4   property office.  And then from there, if it was a

5   request from an attorney to have it tested, it

6   would be tested.

7        Q     Okay.  Let's stop there where it goes to

8   the property office.  When you say property office

9   do you mean you evidence control branch?

10       A     No.  It would go to the district first.

11       Q     What do you mean when you say "the

12  district"?

13       A     So if it was recovered in a certain area

14  of the city, whatever police district that is,

15  that's where the weapon would go to.

16       Q     Oh, you mean like first district, second

17  district?

18       A     Yes.

19       Q     And how long would the guns and

20  ammunition stay at the district?

21       A     I can't say for sure.

22       Q     And then how did they get from the --
```

Pls.'s Ex. 34, p. 16

Smith v. DC, 15-737 (RCL)

1    well, when they were at the district, were they at

2    the district to be stored, or were they just at

3    the district on their way to evidence control

4    branch to be stored?

5        A    Yes.  They would be at the district

6    until it was time to bring them to the evidence

7    control branch which is mostly on their

8    evidence-intake day.

9        Q    Oh, there's just one day a week?

10       A    Yes.  Unless there's some extreme or

11   extraordinary circumstances where they needed to

12   bring something that needed to get over here right

13   away.

14       Q    I see.  So that's why the guns and

15   ammunition were at the district waiting to come to

16   the -- for evidence-intake day?

17       A    That could be one reason.  And another

18   reason could be because maybe there was something

19   missing with the weapon as far as paperwork or

20   maybe there needed to be a correction or

21   something.  I can't say specifically why, you

22   know, the delaying from one place to another.

Page 17

1        Q    I understand.  Thank you.  So we've been

2    using the term evidence control branch.  Is

3    evidence control branch part of the property

4    clerk's office?

5        A    Well, there are property clerks at the

6    district.  The evidence control branch is the

7    central place where all evidence comes after it's

8    been processed at the district.

9        Q    Well, I'm talking about the person who

10    is the property clerk for the entire MPD.

11        A    Oh, yes.  Yes, yes.  That would be --

12    that's the location.  Yes.

13        Q    So evidence control branch is part of

14    the property clerk?

15        A    Yes.

16        Q    So who is the property clerk now?

17        A    I would be the acting property clerk

18    now.

19        Q    Well, let's see.  When did you start

20    being the acting property clerk?

21        A    November the 19th of 2020.

22        Q    Who was the property clerk before that?

Pls.'s Ex. 34, p. 18

Smith v. DC, 15-737 (RCL)

Page 18

1        A     Commander Willie Dandridge.

2        Q     Do you know when Commander Dandridge

3     started being the property clerk?

4        A     I can't remember exactly when because he

5     came two times.  So I can't really remember.  But

6     I know it was probably around -- it wasn't in '15.

7     So it might have been after '15 or a little bit

8     before '15.  It could have been before -- it could

9     have been maybe '14 and then after '15.

10       Q     So I'm drawing a blank.  Who was the

11    property clerk before that?

12       A     Before Commander Dandridge?

13       Q     Right.

14       A     I think it was Essray Taliaferro.

15       Q     Well, there was one before that.

16       A     Before Essray Taliaferro?

17       Q     Yeah.  Because I remember deposing him.

18    His name escapes me.

19       A     When I came it was Essray Taliaferro,

20    and then it was Commander Dandridge.  I don't know

21    who it was before then.

22       Q     So --

Page 19

1     A     Oh, no, no.  I do know.  I do know.  It
2   was Inspector Nathan Sims.
3     Q     Well, there was somebody before him --
4   right -- actually during this period of time that
5   we're talking about?
6     A     I'm sure it was, but I don't know who it
7   was.  Unless it may have been Commander Keith
8   Williams.
9     Q     Does the name Derek Gray ring a bell?
10    A     He's a lieutenant, but he wouldn't have
11   been the property clerk.  I believe there would be
12   someone over him.
13    Q     Well, in an affidavit he said he was the
14   property clerk as of November 6, 2000.
15    A     Well, if they designated him that, then
16   okay, I can't dispute that.
17    Q     Okay.  Well, I remember the last time I
18   deposed you he was either still the property clerk
19   or he had --
20    A     I replaced him.  I replaced him.
21    Q     Is that right?  That's what I thought.
22    A     Yeah.

Pls.'s Ex. 34, p. 20
Smith v. DC, 15-737 (RCL)

Page 20

1        Q    So I deposed you on February 27, 2017,

2    and it says you came to the property clerk's

3    office in February of 2013.  Does that sound

4    right?

5        A    Yes.

6        Q    Okay.  So when the guns and ammunition

7    came to the evidence control branch, were they

8    booked into EvidenceOnQ?

9        A    No.  That was done prior to getting to

10   us.

11       Q    Let's just take a moment.  EvidenceOnQ

12   is the evidence control branch database for

13   keeping track of the property coming into the

14   possession of the District's MPD?

15       A    Yes.  It's at the evidence control

16   branch, and it's at all seven patrol districts, to

17   include NSID.

18       Q    Why do you single out NSID?

19       A    Because it's not a patrol district.

20       Q    I see.  What is it?

21       A    It's a narcotics special investigation

22   division.

**Pls's Ex. 34, p. 21**

**Smith v. DC, 15-737 (RCL)**

Page 21

1        Q     And NSID includes the gun recovery unit?

2        A     Yes.

3        Q     Have you ever worked with the gun

4    recovery unit?

5        A     No.

6        Q     Did they also bring their firearms and

7    ammunition to the evidence control branch?

8        A     Yes.

9        Q     So when a gun was brought to the

10   evidence control branch, were any entries made

11   into EvidenceOnQ to indicate that it was no longer

12   at a district?

13       A     It wouldn't be an entry made into

14   EvidenceOnQ.  The barcode for the weapon would be

15   scanned to document the date that it actually came

16   into our building.  They would transfer it to a

17   location.

18       Q     I see.  And so when you say barcode,

19   that's each gun was assigned a barcode?

20       A     Yes.  Every piece of property has a

21   barcode.

22       Q     And each barcode has a unique

Pls.'s Ex. 34, p. 22
Smith v. DC, 15-737 (RCL)

Page 22

```
 1      identifying number?

 2           A     Yes.

 3           Q     So if you look at topic number 2 --

 4           A     Okay.  Let me get back to that.  One

 5      second.  Okay.

 6           Q     Can you read it out loud, please?

 7           A     What are possible dispositions of guns

 8      and ammunition and related weapons and equipment.

 9           Q     Now, that word "dispositions," do you

10      know what I mean when I use that word dispositions

11      there?

12           A     I think I do, but I would like for you

13      to clarify.

14           Q     I will.  I mean what happened to the

15      guns and ammunition.  So when guns and ammunition

16      came into the possession of the evidence control

17      branch, I understand that they may be taken out

18      for testing or have to go to court or something.

19      But we're talking about guns and ammunitions taken

20      from people who were arrested for these gun

21      control violations.

22                 So what happened to the guns at the end of
```

**Pls.'s Ex. 34, p. 23**
**Smith v. DC, 15-737 (RCL)**

1    the day?  Do you know?  Suppose they did not have a

2    case; they were released before having a case.  What

3    happened to their gun?

4        A    So if there was not a case or the gun

5    was released from evidence, then we would wait

6    until we have an 81C, and then once that 81C came,

7    then we would declare the weapon or the ammunition

8    eligible to be released.  And most times if

9    someone knew that their case was over, then before

10   we knew it, they would contact us.

11       Q    Let's go back.  You say if it was

12   released from evidence, what does that mean?

13       A    That it was no longer associated --

14   since they got arrested for carrying the weapon

15   unlawfully.  So it would be classified as

16   evidence.  And then if that person said that their

17   case was over or the case got dismissed because

18   they called us, then at that point we would wait

19   for an 81C, which is a release from the attorney's

20   office, and the gun would be eligible to be

21   returned to the person that's claiming the weapon

22   or the person that was arrested for the weapon.

**Pls.'s Ex. 34, p. 24**

**Smith v. DC, 15-737 (RCL)**

Page 24

1       Q     Well, let's go back a step.  So when the

2   gun was seized, it was classified as evidence; is

3   that correct?

4       A     If there was an arrest with it, it

5   should be classified as evidence.

6       Q     What if the gun were just simply found

7   or somebody brought it to a station or something?

8   Was it still classified as evidence?

9       A     No.  It would be just that.  They found

10  it or it was classified as found, or if it was

11  brought in to be destroyed, it would be classified

12  as turned over for destruction.

13      Q     Well, my understanding was that since

14  nobody was allowed to have a gun at this time

15  unless they were a police officer or something

16  like that, all guns were considered illegal and

17  all guns were classified as evidence.

18      A     I can't say that that happened.

19      Q     All right.  So let's suppose a person,

20  they were arrested -- well, let's talk about this

21  release from evidence.  So before a gun could be

22  released from the evidence, the US attorney had to

**Pls.'s Ex. 34, p. 25**

**Smith v. DC, 15-737 (RCL)**

Page 25

1    provide a PD81?

2         A    PD81 C, as in Charlie.

3         Q    PD81C.  Did the evidence control branch

4    take any steps to go to the US attorney and obtain

5    PD81Cs?

6         A    That would happen if the claimant came

7    or called us and said that -- and I'm talking

8    about my team since I've been here.  That would

9    happen if the claimant came or called and said

10   that their case was dismissed or it's been

11   adjudicated, and they were told by their attorney

12   or their representative that they could come and

13   reclaim their weapon.  So of course they would not

14   have the 81C, so we would have to call the US

15   attorney's office to verify that.  And so through

16   a paralegal or direct contact with the attorney we

17   would verify that that -- what the claimant was

18   reporting was true, and if it was, then that

19   paralegal or the attorney would email us an 81C.

20        Q    That started in February of 2013?

21        A    No, I wouldn't say that.  I don't know

22   what happened before me.  I can only speak to what

**Pls.'s Ex. 34, p. 26**

**Smith v. DC, 15-737 (RCL)**

Page 26

1      happens -- what would happen while I was here.

2           Q    When you started in February of 2013

3      that's what the practice was?

4           A    Yes.

5           Q    So when a person called about getting

6      their gun back was a notation made in EvidenceOnQ?

7           A    Not necessarily, because it could have

8      been a person who works in the customer service

9      booth who takes all the phone calls.  And then

10     depending on what the person was reporting on the

11     phone, then they would take the information and

12     then from there reach out to the US attorney or

13     paralegal -- one of their paralegals to find out

14     if the paper was actually resolved or adjudicated.

15     And then they would again request a PD81C; or if

16     it was not, then they would notify the person that

17     they had been told that the case was not dismissed

18     yet.

19          Q    Well, how would the person contact the

20     -- this information booth person, do you have a

21     name?

22          A    Yeah.  They would take a name, yes.

**Pls.'s Ex. 34, p. 27**
**Smith v. DC, 15-737 (RCL)**

Page 27

1        Q    No.  Do you know the name of the

2    information booth person?

3        A    Oh, there were several people there.  It

4    could be one person -- she's no longer here, but

5    her name was Lisi Ferguson.  And then depending on

6    the day, if they were assigned up there, depending

7    on who was assigned on any given day to the booth.

8        Q    So when the -- do you know how the

9    information booth person contacted the US

10   attorney?

11       A    Yeah.  By telephone or sometimes an

12   email.  But not the US attorney, but -- yeah,

13   either a US attorney or a paralegal.  If we have a

14   working relationship especially with the

15   paralegals, that's how we a lot of communicating.

16   And there were two people that were kind of really

17   instrumental with helping us to get 81Cs.

18       Q    Who were they?

19       A    I think her name is Debra McPherson and

20   Linda Randolph.

21       Q    Now, so if the US attorney gave a PD81,

22   is it your understanding that the evidence control

**Pls.'s Ex. 34, p. 28**
**Smith v. DC, 15-737 (RCL)**

Page 28

1    branch would return the weapon?

2         A    If they gave a PD81C it wouldn't be just

3    that simple because we would do a little more

4    follow-up to make sure the person was actually

5    cleared to possess a weapon.  So we would go kind

6    of go through verification if it was actually

7    their gun.  And we would do a WALES check and make

8    sure that -- and WALES is our database.  We would

9    make sure that there was nothing outstanding as

10   far as an arrest warrant or anything for that

11   person.  And then also we would ask for, you know,

12   proof of ownership or proof of purchase that that

13   was their weapon.

14        Q    What if the person did not have a

15   registration certificate?

16        A    So we would probably ask for a bill of

17   sale or receipt.

18        Q    So let me get this straight.  A person

19   gets arrested for not having a registration

20   certificate or a license to carry a pistol in

21   public.  The gun is seized in connection with that

22   arrest.  Then if the case is dropped the gun is

Pls.'s Ex. 34, p. 29
Smith v. DC, 15-737 (RCL)

Page 29

1    returned to the person?

2         A    If we can verify that that's actually

3    their weapon.

4         Q    But why would you give it to them if

5    they don't have a registration certificate or a

6    license to carry the gun in public?

7         A    It's their personal property.  It

8    wouldn't be given to them exactly if they came to

9    our building because -- no, we would have that gun

10   shipped to a police station or a gun dealer

11   registration -- I mean a gun dealer shop.

12        Q    Were there gun dealer shops in the

13   District at that time?

14        A    Not to my knowledge, no.

15        Q    So you are talking about out of state?

16        A    Yes.

17        Q    How were people supposed to know about

18   this process?

19        A    What process?  As far as getting their

20   gun back?

21        Q    Well, you are telling me if a person

22   didn't have a registration certificate and they

Pls.'s Ex. 34, p. 30
Smith v. DC, 15-737 (RCL)

Page 30

1    didn't have a license because licenses weren't

2    available and it's still illegal to carry the gun

3    outside the home, so if you are not going to give

4    it to the person, just hand it over to them, this

5    process you're talking about, sending it to a gun

6    dealer, how are people supposed to know that was

7    the process.

8          A    When the person came to us, we would

9    tell them that.

10         Q    What if they didn't come to you?  Is it

11   in a statute?  Is it published online or something

12   like that?

13         A    I don't think it's specifically -- the

14   process is specifically published online.  I don't

15   think so.

16         Q    So that's my question.  How did a person

17   know that were -- that they could have their gun

18   shipped to a out-of-state dealer?

19         A    When they called us that's when we would

20   notify them as to how they would get their weapon

21   back.

22         Q    Now, when that notification was made,

**Pls.'s Ex. 34, p. 31**

**Smith v. DC, 15-737 (RCL)**

Page 31

1    was an entry made in EvidenceOnQ?

2          A    I'm not necessarily sure.

3          Q    What do you mean "not necessarily sure"?

4          A    Because it depends on who was talking to

5    them on the phone.  They could or could not have

6    made the entries on EvidenceOnQ.

7          Q    So you saying some people did, some

8    people didn't?

9          A    That's a possibility.  I'm not sure.

10         Q    What if the person lived in the

11   District?  There's no way to get a registration

12   certificate to carry a gun outside in public.

13   There's no way to get a license to carry a gun in

14   public.  It's a felony to carry a gun in public

15   without a license.

16         A    So during that period of time then, we

17   wouldn't release it.  Because, again, if it was

18   lawful to have it, then we wouldn't release it.

19         Q    So okay.  So, well, I mean -- so let's

20   talk about the period when it was no license to

21   carry a pistol out in public.  Nobody could

22   register a pistol to carry it in public.  So even

**Pls.'s Ex. 34, p. 32**

**Smith v. DC, 15-737 (RCL)**

Page 32

1      if their case got dismissed, the District would

2      not release the gun; is that correct?

3           A    Yes.

4           Q    So if somebody called out wanting their

5      gun during this period, what would you tell them

6      or what would they be told?

7           A    They would probably be told it's

8      unlawful for them to have it.

9           Q    Then what?

10          A    And the gun would stay with MPD.

11          Q    What was the rationale for keeping the

12     gun with MPD?

13          A    Because it was unlawful for them to have

14     it.

15          Q    Seems like a catch 22.

16               So then during this period if a person

17     didn't have a registration for the pistol, if they

18     didn't have a license, then the disposition of the

19     pistol was that it was not returned to the owner; is

20     that correct?

21          A    Yes.

22          Q    I can't see you.  Are you doing

Pls.'s Ex. 34, p. 33

Smith v. DC, 15-737 (RCL)

Page 33

1    something else?

2         A    Oh, I'm sorry.  Yes.

3         Q    Are you free now?

4         A    Am I?

5              MR. SAINDON:  We can't hear you, Chas.  I

6    don't know what happened.

7              MR. CLAIBORNE:  I was asking Lt. Manigault

8    if I had her full attention now.

9              THE WITNESS:  Yes.  I'm paying attention.

10   BY MR. CLAIBORNE:

11        Q    So the only possible disposition with

12   respect to the owner was, if the owner didn't have

13   a license or a registration to carry the gun

14   outside in public, then they didn't get their gun

15   back.

16        A    Yes.

17        Q    So what happened to the gun?

18        A    It stayed at the evidence control

19   branch.

20        Q    Are they still at the evidence control

21   branch?

22        A    I don't know if all of them are still at

Pls.'s Ex. 34, p. 34
Smith v. DC, 15-737 (RCL)

Page 34

1    the evidence control branch.  But if those who --

2    those that were seized and they didn't have a

3    lawful right to have them, they could have been

4    destroyed.

5         Q    Well, how would you -- okay, so

6    disposition in topic number 2 means what happened

7    to the gun -- destroyed, kept, whatever.  So was

8    the disposition of the pistol recorded in

9    EvidenceOnQ.

10        A    Probably not.  Unless -- probably not.

11   No.  I don't think it was documented in

12   EvidenceOnQ

13        Q    Was it documented anywhere?

14        A    I'm not sure.

15        Q    How does somebody know -- if they want

16   to get their gun back, how do they know where it

17   is, what happened to it?

18        A    We would know that it's here, and if the

19   person called and inquired about their gun, we

20   would tell them what the disposition was.

21        Q    So how about now?  All the people whose

22   guns were taken during this period from 2011 to

**Pls.'s Ex. 34, p. 35**

**Smith v. DC, 15-737 (RCL)**

Page 35

1    2015, what if they want their guns back?  What do

2    they do?

3         A    Do they have -- if they have a license

4    to carry, then their guns will probably be

5    returned to them.  But if they don't have a

6    license to carry it, then they wouldn't receive

7    it.

8         Q    What about FedEx send the gun or

9    otherwise sending the gun to some location where a

10   person doesn't need a license?

11        A    Yes.  We do that.

12        Q    So is there anywhere on the website

13   where people know they can do that?

14        A    I don't think it's posted on the

15   website.

16        Q    Is it posted anywhere?

17        A    I don't think so.

18        Q    Are there regulations?

19        A    About how to return the weapon?

20        Q    Yeah.  About this -- about the District

21   will provide the service of sending the weapon to

22   a place where the person either has a license or

**Pls.'s Ex. 34, p. 36**

**Smith v. DC, 15-737 (RCL)**

Page 36

1    doesn't need a license.

2         A    The District doesn't provide that -- the

3    District doesn't provide that service.  The owner

4    or the claimant of the weapon would set up the

5    account, and then we would get it to FedEx to have

6    them ship it to that location.  That's the service

7    that we provide.

8         Q    You mean set up a FedEx account?

9         A    No.  The claimant would do that, not

10   MDP.

11        Q    Right.  So the claimant would have to

12   set up the FedEx claim.

13        A    Yes.

14        Q    So if a gun was sent to a claimant that

15   way, is an entry made in EvidenceOnQ?

16        A    I have to check.  I'm not exactly sure

17   what the entry would be made.  It probably would

18   be -- the disposition would probably change to

19   "released to own."  That would probably change.

20   So that's when it would probably change.  Once it

21   gets shipped it would probably -- the

22   classification would be release to own.

Pls.'s Ex. 34, p. 37

Smith v. DC, 15-737 (RCL)

1           THE REPORTER:  I apologize.  Could you

2      repeat that.  I didn't hear that very well.  I've

3      got chainsaws going on in the background.

4           THE WITNESS:  So if the weapon was going

5      to be returned to the owner who lived out of state.

6      The claimant or the owner would set up a FedEx

7      account.  And then once the account was set up, MPD

8      would verify that the account was set up.  Then we

9      would box the weapon up and take it to a FedEx

10     location, and then FedEx would ship it to the

11     designated location.

12     BY MR. CLAIBORNE:

13          Q    So let's go to the situation where, you

14     know, during this time period roughly 2011 to

15     roughly 2015.  We're talking about the period

16     where there was no way for people to get a license

17     to carry a gun in public.  There's no way to

18     register a gun to carry it in public.  The MPD

19     arrests a person, they seize the gun, they release

20     them -- they release the person without

21     prosecution.  In that set of circumstances would

22     the MPD send a notice to the person from whom the

Page 38

1   gun was seized telling them anything about their

2   gun?

3        A    I can't speak for 2011, but during my

4   tenure I have seen circumstances where we have

5   sent a letter to the owner in reference to a gun.

6   I'm not sure if that was because they were

7   arrested and then there was no prosecution.  But

8   I've seen cases -- I've seen incidents where we

9   have sent a letter to an owner regarding a weapon

10  I do believe.

11       Q    So what do you mean?  Is this during the

12  period of time where nobody could get a license to

13  carry a pistol in public?

14       A    No.  I wouldn't say that.

15       Q    It was after when people could get a

16  license to carry a pistol in public?

17       A    Yes.

18       Q    Well, how about people who were arrested

19  and their guns were seized during the period of

20  time when there was no way they could get a

21  license to carry a gun in public and then at some

22  point the District makes it possible for some

Pls.'s Ex. 34, p. 39
Smith v. DC, 15-737 (RCL)

Page 39

1    people to carry a license in public?

2            Was notice sent to the person at that time

3    telling them that they could do something to get

4    their gun back?

5        A    I don't think so.

6        Q    How about this period of time where

7    nobody could have a license to carry a gun?  The

8    person, they're arrested, gun's taken, not

9    charged.  They live in another jurisdiction.

10   Maybe in that jurisdiction -- for example,

11   Maryland, Virginia -- they either don't need a

12   license or they have one.

13           Was notice sent to those people telling

14   them that the District would cooperate with them in

15   having the gun shipped to a foreign jurisdiction.

16       A    I don't think a notice was sent to them

17   initially because most times if the person thought

18   that they should have their weapon back, then

19   again, that would be through a phone call to us.

20   And then once that phone call came to us, then we

21   will go through the steps to get the gun back to

22   them.

**Pls.'s Ex. 34, p. 40**
**Smith v. DC, 15-737 (RCL)**

Page 40

1       Q    Okay.  So let me summarize.  If I'm

2   wrong, tell me.  But here's what I understand you

3   to be telling me.  For people whose guns were

4   ceased during this period when there was no way to

5   get a license to carry a pistol in public, the

6   District didn't send notice.  The District's

7   practice was to wait for people to call the

8   evidence control branch and ask for their pistol

9   back.

10      A    These are the people you said that could

11  not have a gun?

12      Q    These are people that are arrested

13  for -- yes, they were arrested because they didn't

14  have a license and their gun wasn't registered.

15  They were carrying it in public, and they -- maybe

16  I'm asking specifically -- well, some of the

17  people didn't have -- well, actually, what I'm

18  just talking about -- yeah, these people that were

19  arrested -- I mean my understanding is nobody

20  could have a license to carry a gun up until

21  October of 2014.

22              So the District -- what I'm saying is,

Pls.'s Ex. 34, p. 41
Smith v. DC, 15-737 (RCL)

Page 41

1    summarizing what you've told me, is the District

2    didn't send people, like, this notice at all about

3    their guns.  The District just waited for them to

4    contact evidence control branch about retrieving

5    their guns.

6         A    I'm not going to say that they didn't

7    ever send a letter to anybody whose gun was taken

8    who wasn't supposed to have it.  But to my

9    knowledge when I got here, I don't remember -- I

10   don't recall a lot of letters being sent for

11   people to come and get their weapon.

12        Q    Well, when you say letters, how many did

13   you see during the period until it became possible

14   to get a license to carry a gun?

15        A    Again, I think -- I haven't because I'm

16   not that closely into that process, but I do

17   recall having a conversation with a couple of my

18   staff people, and they were talking about they

19   sent people a letter.  They sent a letter for

20   someone who owned a gun to respond to them, and it

21   did not happen.

22             But I'm not sure if the case was -- if the

**Pls.'s Ex. 34, p. 42**

**Smith v. DC, 15-737 (RCL)**

Page 42

1    situation was the same in terms of the weapon being

2    taken because they didn't have a license.  It could

3    have been because the weapon was taken for

4    safekeeping.

5        Q    Are you aware of a DC statute called DC

6    Code 22-4157?

7        A    Yes.  A little.  I am, yes.

8        Q    That's the statute dealing with the

9    dangerous articles.

10       A    Yes.  I read it a little bit.

11       Q    And doesn't that statute say that if the

12   District takes a gun from a person, the property

13   clerk will have a hearing and the person can --

14       A    I thought I read that the person has 30

15   days or something to request that hearing.  I've

16   never heard anyone requesting a hearing with MPD,

17   if they've done that, since I've been here.

18       Q    All right.  Now, what if a person didn't

19   have a -- so the MPD did not send out notice

20   telling people that they had a right to a hearing?

21       A    No.  Not to my knowledge, no.  Since

22   I've been here, no.

Pls.'s Ex. 34, p. 43

Smith v. DC, 15-737 (RCL)

Page 43

1        Q    Do you know why?

2        A    No.

3        Q    So the statute says if you request a

4    hearing the only way to get your gun back is if

5    you have a registration certificate; isn't that

6    right?

7        A    I'll have to read it to make sure.

8        Q    Okay.  Do you have a copy?  Can you get

9    it online?

10            MR. SAINDON:  If you've got a copy, Chas,

11   you can send it along or make it an exhibit.

12            MR. CLAIBORNE:  Okay.  Give me a sec.  If

13   people want to take a little break while I do this,

14   I'm going to get it off DC Counsel Library.

15            MR. SAINDON:  Break until 10:30 our time.

16            (Whereupon, a brief recess was taken.)

17   BY MR. CLAIBORNE:

18       Q    Okay.  Lt. Manigault, I was asking you,

19   didn't the statute say the only way to get your

20   gun back under the statute was to present a

21   registration certificate.  You said you'd have to

22   look at the statute.  So Mr. Heath has emailed you

**Pls.'s Ex. 34, p. 44**

**Smith v. DC, 15-737 (RCL)**

Page 44

1    Exhibit 5A.  Can you take a look at Exhibit 5A and

2    let me know when you've had a chance to look at

3    it, please.

4         A    Okay.  I think I've read it.

5         Q    Okay.  If I may, I'd ask you to take a

6    look at the paragraph on the second page,

7    paragraph (e).

8         A    Okay.

9         Q    So that paragraph said -- I mean this is

10   a -- you know, if my summary is incorrect, let me

11   know; but it basically says if a person claiming

12   the article shall be entitled to its possession

13   only if the person shows that such person is the

14   owner or the representative.  And then it also

15   says and that the ownership is lawful.

16        A    Okay.

17        Q    So to show that the ownership is lawful,

18   you got to have either a registration for use in

19   the home or place of business or -- and basically

20   that's it, right?  Because nobody had a license,

21   and for a period of time -- so there's no way to

22   show that possession outside of the home is

Pls.'s Ex. 34, p. 45

Smith v. DC, 15-737 (RCL)

Page 45

1     lawful; is that correct?

2               MR. SAINDON:  Objection.  Lt. Manigault is

3     not a lawyer.  But you can answer.

4               THE WITNESS:  Yeah.  I'm not understanding

5     your question.

6     BY MR. CLAIBORNE:

7          Q    Well, then take a look at -- I mean I

8     asked you -- okay.  Well, then are you able to

9     tell me how a person -- what a person had to do to

10    get their gun back under this statute?

11              I mean this was a statute that was in

12    effect when you were at evidence control branch, and

13    you are now currently the acting property clerk.  So

14    I'm asking you, under section (e), what's a person

15    got to do to get their gun back?

16         A    And this is a person that lawfully or

17    unlawfully possessed it?

18         Q    Well, what I was saying is I thought the

19    person under the statute had to show that their

20    ownership was lawful.  I mean that's what it says

21    to me in paragraph (e)(1).

22         A    Okay.

**Pls.'s Ex. 34, p. 46**
**Smith v. DC, 15-737 (RCL)**

Page 46

1      Q    So what do you got to do during this

2    period we're been talking about to show that your

3    ownership of a pistol was lawful?

4      A    To show that it was lawful?

5      Q    Yes.

6      A    And you are talking about 2011 and '15?

7      Q    Well, 2011 and the period of time before

8    the statute was amended in October of 2014 to

9    allow registration for good cause?

10     A    I don't know.

11     Q    Okay.  So let's go back to our list of

12   topics.

13          MR. SAINDON:  That's Exhibit 1.

14   BY MR. CLAIBORNE:

15     Q    Exhibit 1, page 3.  Could you take a

16   look at number 6, please?

17     A    I don't have it back on my screen.  Let

18   me open it again.  Number 6?

19     Q    Right.

20     A    Okay.

21     Q    So could you read number 6 out loud,

22   please?

**Pls.'s Ex. 34, p. 47**
**Smith v. DC, 15-737 (RCL)**

Page 47

1      A     Field report for lost and stolen guns

2    and ammunition and related weapons equipment.

3      Q     Okay.  So my question is, you know,

4    during this period of time we're talking about

5    when all guns were -- nobody in the District other

6    than this limited category of law enforcement

7    officers and similar folk could carry pistols

8    outside the home, what paperwork was filled out

9    for a gun that was just either found or otherwise

10   came into the possession of the MPD that was not

11   seized from an arrestee or suspect?

12     A     That would probably be a 251 and a PD81.

13     Q     And was that gun entered into

14   EvidenceOnQ?

15     A     I don't know when we got EvidenceOnQ.  I

16   don't know if that was before.  I think that was

17   after 2011 or it may have been.  If it was found

18   and EvidenceOnQ was up, it would have been entered

19   in EvidenceOnQ.

20     Q     Well, yesterday, Mr. Carter testified

21   that EvidenceOnQ came online in 2009, but I hear

22   what you're saying.  So after EvidenceOnQ came

**Pls.'s Ex. 34, p. 48**

**Smith v. DC, 15-737 (RCL)**

Page 48

1    online, if the gun came into the possession of the

2    District otherwise than being seized from a

3    suspect or an arrestee, you do believe it was

4    entered into EvidenceOnQ?

5         A    Yes.

6         Q    Now, do you know how it was classified?

7         A    If they found it, it would be classified

8    as found.

9         Q    Okay.  Could I ask you to bear with me

10   for just one moment, please.

11              Can you either -- on the Exhibit Number 1

12   look at the screen shot or take a look in

13   EvidenceOnQ and tell me what field a person entered

14   "found" into.

15        A    It would be the one that says Property

16   Class.

17        Q    Okay.  There's three columns here.

18   Which column is it in -- first, middle, or right.

19              MR. SAINDON:  I object.  This is beyond

20   the scope of the depo, but you can answer, Ms.

21   Manigault.

22              THE WITNESS:  The first column.

Pls.'s Ex. 34, p. 49
Smith v. DC, 15-737 (RCL)

Page 49

```
 1              MR. CLAIBORNE:  Well, Andy, it's in number

 2      10, number 11, several of these.  Number 1.  It's

 3      covered under number 1.  Just because the screen

 4      shot is here in number 9 doesn't mean it's not

 5      covered under number 1.

 6      BY MR. CLAIBORNE:

 7          Q    But anyway you can still answer the

 8      question.  What field was populated -- I mean what

 9      field did the person make the entry into?

10          A    It would go under property class in the

11      first column on the left.

12          Q    I see.  And what would -- is that a

13      drop-down menu?

14          A    Yes.

15          Q    And so what does the entry say?

16          A    Well, my screen is blank.  I don't have

17      an entry in it, but there are several entries you

18      can make.

19          Q    No.  On the drop-down menu.

20          A    Right.  There are several different

21      classifications.

22          Q    So which one would you choose for a gun
```

**Pls.'s Ex. 34, p. 50**

**Smith v. DC, 15-737 (RCL)**

Page 50

1    on found?

2         A    F-found.

3         Q    That's on the drop-down menu?  F-found?

4         A    Yes.

5         Q    How many choices are there?

6         A    I see 23.  I count 23.

7         Q    Okay.  Now, when guns, pistols, came

8    into the possession of the MPD during this period

9    we're talking about, did the MPD try to assign a

10   fair market value for the guns?

11        A    No.  I've never seen that done, and I

12   don't think that's something that we do.

13        Q    Okay.  Could you take a look at topic

14   number 12, please.

15        A    Okay.  What do the terms and in the

16   Location Name column in the EvidenceOnQ

17   database -- no.

18             What do the terms in the Location Name

19   column and the EvidenceOnQ data export.

20        Q    If we showed you a copy of the data

21   export, that's a spreadsheet that's got some data

22   that was exported from -- well, let me -- let's go

**Pls.'s Ex. 34, p. 51**

**Smith v. DC, 15-737 (RCL)**

1    at it another way.

2           Can you take a look at this either -- you

3    got EvidenceOnQ open, right?

4           A    Yes.

5           Q    Do you see a field marked Location Name?

6           A    I see Location Category.

7           Q    All right.  Which column is Location

8    Category in?

9           A    It's, like where it says Current

10   Location.  It's across -- it's not one of the

11   columns.  It's up top, but let me -- I haven't

12   finished scrolling down.  I see the Recovery

13   Location.  I'm not seeing Location Name.  Maybe

14   because my screen is probably not big enough, but

15   I'm not seeing.

16          Q    Okay.

17          A    Maybe I should move it over.  No.  I

18   don't see Location Name.

19          Q    Okay.  If I showed you this spreadsheet

20   with the data export, do you believe that you

21   would be able to tell me what the terms in there

22   mean?

Pls.'s Ex. 34, p. 52
Smith v. DC, 15-737 (RCL)

```
                                              Page 52

 1          A     I can try, yes.

 2                (Brief pause)

 3     BY MR. CLAIBORNE:

 4          Q     Ms. Manigault -- I'm sorry.  Lt.

 5     Manigault.

 6          A     It's okay.  Yes.

 7          Q     Were you able to find that field on the

 8     spreadsheet?

 9          A     Yes.  I found it.

10          Q     Okay.  And do you know what it means or

11     what it's used for?

12          A     I think what it's trying to communicate

13     is where the property is probably located, the

14     name of the place where it's stored.  Because

15     Warehouse Librarian, that's the name of the

16     software.  17 DC Village Lane is our address.

17          Q     So you believe that if it were -- if

18     location name means it's in the warehouse, then

19     that's the location of the item?

20          A     No.  This is not saying that that's the

21     physical location in the warehouse.  This is

22     saying -- Warehouse Librarian is saying that
```

Pls.'s Ex. 34, p. 53

Smith v. DC, 15-737 (RCL)

Page 53

1    represents the type of software that we have to

2    track evidence as well.  That's not saying that's

3    where it is.  17 DC Village Lane is our address,

4    so that's not giving you the specific location as

5    to where the property is.  If 17 DC Village Lane

6    says it's here, but Warehouse Librarian is the

7    software.

8         Q    What does it mean then?

9         A    What does what mean?  The Warehouse

10   Librarian or 17 DC Village Lane?

11        Q    Well, as I'm looking at it, the first

12   entry says -- under location name it says

13   Warehouse Librarian, 17 DC Village Lane.  Is that

14   what it says?  Is that what you're looking at?

15        A    Yes.  That's what I'm looking at.

16        Q    So just what does that mean?

17        A    I'm not sure what the person who did

18   this spreadsheet is trying to communicate, but if

19   I were to interpret it, it would be, again, that

20   the property is at 17 DC Village Lane.  And

21   Warehouse Librarian, again, is our software.  So

22   that wouldn't be a location.

Page 54

1        Q    But since it says 17 DC Village Lane, is

2    that -- is your understanding that the property is

3    actually at that location?

4        A    I wouldn't say specifically, no.

5    Because there's another way to identify exactly

6    where it is, and this doesn't say that.

7        Q    What's the other way to identify where

8    it is?

9        A    There's a shelf and there's a row or

10   there's a space saver location that's identified

11   by either a barcode or by a specific alphabet and

12   numbers to tell you it's in row 28, shelf 3 -- you

13   know, specific like that.  I wouldn't say that

14   this specifically says that it's in the warehouse.

15       Q    Okay.  If you scroll down it looks

16   like .

17       Q    Lines 204 to 207?  It says Warehouse 17

18   Daily Intake.

19       A    Okay.  That says -- that means it was

20   brought into the warehouse.

21       Q    Does it say where it still is?

22       A    No.  That doesn't say it.

**Pls.'s Ex. 34, p. 55**
**Smith v. DC, 15-737 (RCL)**

Page 55

1      Q    So that -- as far as we know that item
2   could have been destroyed?
3      A    I wouldn't say it was destroyed, but it
4   could still be here.
5      Q    I see.  Well, I'm just saying possibly,
6   right?  Because if it's not -- if you can't say
7   definitely it's there, that's one of the possible
8   dispositions, right?
9      A    No.  Based on what I'm saying -- based
10  on what you're asking, I'm saying based on this
11  data, this doesn't tell me enough to say whether
12  we have it or not.
13     Q    Right.  So if you don't have it what's
14  the other possibility?
15     A    That it was either returned or it could
16  have been destroyed.
17     Q    Okay.  So how about the next entry --
18     A    Or it could be checked out by an officer
19  or a detective, or it could have been sent out for
20  testing.  There are several dispositions.
21     Q    I see.  Now, what about the next set of
22  entries there -- safe, found, prisoners?

**Pls.'s Ex. 34, p. 56**
**Smith v. DC, 15-737 (RCL)**

Page 56

1          A    Where are you?

2          Q    227 to 228.

3          A    Okay.  That's the classification.

4          Q    Why is the classification in Location

5     Name?

6          A    I didn't put the spreadsheet together.

7     I cannot tell you that.

8          Q    Okay.  The next entry starting at number

9     279, line number 279 is released to owner?

10         A    279?

11         Q    Yes.

12         A    My 279 says received at first district.

13         Q    I'm sorry.  How about 265?

14         A    Okay.

15         Q    So what does that mean?

16         A    That means it was returned to the person

17    that is the designated owner or claimant.

18         Q    The property classification for those

19    items is -- seems to be evidence, every one.

20              MR. SAINDON:  Under column T, Chas?

21              MR. CLAIBORNE:  Correct.

22              THE WITNESS:  Okay.

Pls.'s Ex. 34, p. 57

Smith v. DC, 15-737 (RCL)

Page 57

1   BY MR. CLAIBORNE:

2        Q    If it's still classified as evidence,

3   why was it returned to the owner?

4        A    Well, here's the difference, because I

5   see it probably was not upgraded in the system to

6   be changed from evidence to safekeeping.  The

7   classification probably wasn't changed.  In order

8   for it to be released to the owners, it will have

9   to have some type of release for it.  And they

10  probably just didn't upgrade the system to change

11  it from evidence to safekeeping.

12       Q    I see.  Can you look down --

13       A    But let me go back and clarify

14  something, because although those are the --

15  that's just a original classification when it came

16  in.  And so it wouldn't be classified as evidence.

17  But again, once it's released, then they would

18  release it to the owner and not necessarily make a

19  change in evidence.

20       Q    I see.  Okay.  Now I have another

21  question.  We're going to have to get you another

22  exhibit.  Is Brendan still on?

Pls.'s Ex. 34, p. 58
Smith v. DC, 15-737 (RCL)

Page 58

```
 1              MR. HEATH:  Yeah, go ahead, Chas.  Which
 2     one would you like?
 3              MR. CLAIBORNE:  Exhibit Number 4.
 4              MR. SAINDON:  You don't have an Exhibit 4,
 5     Chas.
 6              MR. CLAIBORNE:  Hang on a second.  Let me
 7     put it in there.
 8     BY MR. CLAIBORNE:
 9        Q    Exhibit Number 4 is the PD81 correct?
10        A    Yes.
11        Q    Can you look at the second page where it
12     says, Part V, Property Ownership Claim
13     information?
14        A    Okay.
15        Q    And do you see just the first line
16     underneath that it says, "Use the following codes
17     in item B."
18        A    Okay.
19        Q    And there's O, owner; C, claimant; D,
20     defendant; L, lienholder; and F, finder?
21        A    Yes.
22        Q    Now, under B it says Type of Associate.
```

**Pls.'s Ex. 34, p. 59**
**Smith v. DC, 15-737 (RCL)**

Page 59

1          A      Okay.

2          Q      So D/O, that's defendant owner?

3          A      Based on the codes that's what that

4     would be probably communicated.  But because I

5     didn't complete the PD81, I can't say for sure.

6     But based on the codes, that is what that looks

7     like it would mean.

8          Q      Well, do you think these codes are used

9     only on this PD81?

10         A      What do you mean?  Defendant/owner?

11         Q      Well, no.  You said you didn't complete

12    this PD81.  So -- I mean, I thought these codes --

13    I thought that was part of the form.

14         A      No.  But what I'm saying is, if that's

15    what the person so -- the arresting officer did in

16    terms of putting those codes there.  Based on the

17    codes I would say that that's what they are trying

18    to communicate, defendant/owner; but I didn't

19    complete the -- I didn't do it myself, I can't

20    speak for the officer that did it.

21         Q      Okay.  But just looking at that, D

22    Stands for defendant, C stand for owner, correct?

**Pls.'s Ex. 34, p. 60**

**Smith v. DC, 15-737 (RCL)**

Page 60

1        A    According to the code, yes.

2        Q    Is there any reason that you think it

3    doesn't mean that?

4        A    I don't know, because I'm not -- again,

5    the officer -- because what I may do and what

6    another officer or member may do totally

7    different.  I don't know.

8        Q    Okay.  Well, let's talk about that for a

9    minute.  So it seems what you're saying is you

10   read one of these documents, unless you yourself

11   wrote it, you can't say what it meant, because

12   maybe the officer did something different.

13            Is that what you're saying?

14       A    No.  What I'm saying is, based on the

15   code, D stands -- based on the sheet, D stands for

16   defendant and O stands for the owner.  However,

17   because we have to screen documents all the time,

18   the person who completed this, I can't say for

19   sure if that's what they intended or not.  That's

20   what I'm saying.  But those codes, yes, that's

21   what that represents.

22       Q    Well, when people in -- I mean I thought

**Pls.'s Ex. 34, p. 61**

**Smith v. DC, 15-737 (RCL)**

Page 61

1    these documents were very important because they

2    circulated throughout the police department

3    telling people what happened.  I mean, like, for

4    example, I thought this PD81 was to tell people

5    this is a piece of property and here's how it's

6    classified and so forth.

7              Is that right?  That's what these forms

8    are for?

9        A    On the front side it tells the

10   classifications of it.  On the back side when you

11   are trying to now identify who the person was that

12   they retrieved the property from, then that's who

13   have those codes.

14       Q    Well, right.  But what I'm saying is, it

15   seems to me like you're saying unless you filled

16   out the form yourself, you can't really be sure

17   what it means.

18       A    No.  I can't -- I'm not telling you I

19   can't be sure what it means, but I'm telling you I

20   can't speak for somebody else.

21             Now, if I did it, I could tell you, yes, I

22   put D there because that's a defendant and O because

Pls.'s Ex. 34, p. 62

Smith v. DC, 15-737 (RCL)

Page 62

1    that's the owner.  But I don't know what the officer

2    was specifically trying to say with D/O.  Looking at

3    the codes, yes, that would be what he or she was

4    trying to communicate based on the codes.

5         Q    It sounds like --

6         A    We do have --

7         Q    If you do have what?

8         A    We do have instances sometimes where the

9    officer could put several codes and they're not

10   applicable.  I don't know for sure.

11        Q    Well, how can you rely on the accuracy

12   of these records?

13        A    What do you mean, how can I rely on --

14   as far as what?

15        Q    Well, how could anybody rely on the

16   accuracy of these records?  Because what you just

17   told me, sometimes somebody would put stuff in

18   there that's not a code.

19        A    That's not -- what I'm saying is because

20   if an officer is communicating D/O, then that's

21   what he or she is possibly intending to say or I

22   don't know that because they followed something

**Pls.'s Ex. 34, p. 63**

**Smith v. DC, 15-737 (RCL)**

Page 63

1    that someone else has done, it could be that

2    because they've seen it done, D/O, they just did

3    the same thing.

4           What I'm saying is, again, if it's a

5    defendant and it's a "slash O," then that's what

6    those codes mean.  I can't speak for specifically if

7    that's what the person who completed this 81

8    intended to do.  However, those codes do mean that.

9        Q    Well, if you can't say that's what the

10    person intended, then --

11       A    Because I'm not the person.  I wasn't

12    there.  I'm not the person that completed the 81.

13       Q    I know.  I know.  Let's -- let's just

14    take a deep breath.  Okay.  Here's where this is

15    leading me:  If you can't just look at that and

16    says yes, when a person in the MPD sees that code,

17    here's what it means, then how does anybody know

18    what anything on these documents means?

19       A    Speaking for me, again --

20       Q    Yeah, yeah.

21       A    And again, if they put those codes, D/O,

22    then that's what they're communicating on the

**Pls.'s Ex. 34, p. 64**

**Smith v. DC, 15-737 (RCL)**

Page 64

1    form.  Anything beyond whether that was the

2    officer's intent to put both, I cannot say that.

3    Yes, D means defendant; O means owner.

4        Q    Do you ever have a situation where the

5    type of associate could be a person who's both the

6    owner of property and he's the defendant from whom

7    the property was seized?

8        A    Sure.

9        Q    You do?  How is that relation -- how is

10   that type of associate entered into EvidenceOnQ?

11       A    EvidenceOnQ doesn't capture it --

12   defendant/owner, because it's the evidence

13   database.  So more than likely in EvidenceOnQ,

14   they're going to enter the person's name.  And if

15   it's the defendant, that's what they're going to

16   put.  They are not going to put owner unless it's

17   a nonevidence -- a noncriminal offense.

18       Q    What if there's a gun, the person is

19   both the owner of the gun and they're also the

20   defendant in the case?

21       A    Yeah, but they're going to put -- based

22   on EvidenceOnQ.  Because EvidenceOnQ does not

Pls.'s Ex. 34, p. 65
Smith v. DC, 15-737 (RCL)

Page 65

1    necessarily -- does not -- EvidenceOnQ and the

2    PD81 are -- are -- are completed differently from

3    my understanding.  And so EvidenceOnQ, it's going

4    to class- -- it's going to -- the first thing it's

5    going to do is capture the defendant for the

6    crime.  And then the PD81 that's attached to

7    EvidenceOnQ would then -- if you wanted to come

8    back and find out additional information about the

9    person, then that would tell you who the owner was

10   based on the information on the PD81.

11           So it's not necessarily that, because they

12   probably took a interest in information about a

13   piece of evidence is going to simultaneously put the

14   owner of the evidence as well as the -- it's not

15   simultaneous you going to make the person the owner

16   as well as the defendant in the case.

17       Q    How would you know if you ever wanted to

18   send notice, how would you know who the owner was

19   if you wanted to send notice to the owner?

20       A    Because they would put the information

21   in the field in EvidenceOnQ or if it's on the

22   PD81.

Pls.'s Ex. 34, p. 66
Smith v. DC, 15-737 (RCL)

1        Q    Well, that's my question.  What if the

2    person is the defendant and the owner?

3        A    So then the information that's in the --

4    because we have what we call COBALT, and COBALT

5    gives you information about the defendant.  And if

6    the COBALT says that that's the owner of the

7    property, then we would follow that.

8        Q    So you can't know who's the owner unless

9    you look in COBALT?

10       A    COBALT or PD81.

11       Q    So COBALT -- if a person seizes a gun

12   from an owner who is also a defendant in the case,

13   is that information listed in COBALT?

14       A    Well, you mean would it say that they

15   are the owner of the weapon as well?

16       Q    Yes.

17       A    It depends on -- it depends on the

18   information that arresting officer documents in

19   the report.

20       Q    But COBALT is set up to handle that type

21   of information, to record that information; is

22   that right?

Page 67

1          A     I think you can add that information.

2     If it's not a field necessarily, it can be

3     communicated in a narrative.

4     BY MR. CLAIBORNE:

5          Q     Is that the practice?

6               MR. SAINDON:  Objection.  Beyond the

7     scope.

8               THE WITNESS:  I can't be sure how people

9     complete their reports.

10    BY MR. CLAIBORNE:

11         Q     So you are saying if you want to know

12    who's the owner of a gun, you've got to look at

13    the PD81.  You can't just look at -- in

14    EvidenceOnQ.

15         A     Not necessarily.  It depends on -- let

16    me -- let me explain.  So the property clerk gets

17    the weapon and PD81.  The property clerk, who is

18    not the officer or the arresting member is going

19    to enter exactly what they've been -- what they've

20    gotten from the PD81.  However, if you want to go

21    back and find out who the owner of the gun is,

22    that's why we would use WALES if it's not

**Pls.'s Ex. 34, p. 68**

**Smith v. DC, 15-737 (RCL)**

1    communicated in EvidenceOnQ

2         Q    That's why you'd use what?

3         A    WALES.

4         Q    And WALES is the --

5         A    Washington Area Law Enforcement System.

6         Q    And what would that tell you about the

7    owner of a gun?

8         A    We would run the serial number on the

9    gun to see who the owner is or who is it

10   registered to.

11        Q    Is the serial number captured in

12   EvidenceOnQ?

13        A    Sometimes it is and probably sometimes

14   it's not.  It depends on how detailed the person

15   who is entering the data is.

16        Q    I see.  So this box B on the PD81 where

17   you have these codes and then it says, B, Type of

18   Associate.  What's the corresponding field in

19   EvidenceOnQ for Type of Associate?

20        A    So let's look at it.  It probably would

21   go under Subject Type.

22

**Pls.'s Ex. 34, p. 69**
**Smith v. DC, 15-737 (RCL)**

Page 69

1        Q    Okay.  So under Subject Type you have

2    information about the person with whom the item is

3    associated.  Is that correct?  Arrest number one?

4            So let's suppose a person was a defendant

5    and an owner.  Would it ever be that two of these

6    were filled out, arrest number one, let's say Joe

7    Smith is an owner; and then arrest number two, Joe

8    Smith is the defendant to indicate that the person

9    is both the owner and the defendant.

10       A    I can't say yes or no to that, because,

11   again, it depends on how detailed the person who

12   is entering the information wants to be.

13       Q    Well, where it says D/O?

14       A    Yes.  And so I don't know.  It depends

15   again on the person that's entering the data,

16   whether or not they want to enter that information

17   in the second column, which says Subject Type

18   number two.

19            MR. CLAIBORNE:  Could we go off the record

20   for just a minute, please.

21            (Brief pause.)

22            All right.  I don't have any questions.

Page 70

1    Thank you, Lieutenant.

2              THE WITNESS:  Okay.  Thank you.

3              MR. CLAIBORNE:  Thank you, Andy.

4              MR. SAINDON:  We'd like to read and sign,

5    please.

6              (Whereupon, at 11:26 a.m., the

7              deposition of LT. DEBRA MANIGAULT was

8              concluded.)

9                     *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

**Pls.'s Ex. 34, p. 71**
**Smith v. DC, 15-737 (RCL)**

Page 71

```
 1
 2              CERTIFICATE OF NOTARY PUBLIC
 3              I, CONSTANCE HUNT RHODES, the officer
 4      before whom the foregoing deposition was taken, do
 5      hereby certify that the witness whose testimony
 6      appears in the foregoing deposition was duly sworn
 7      by me; that the testimony of said witness was
 8      taken by me in stenotypy and thereafter reduced to
 9      typewriting under my direction; that said
10      deposition is a true record of the testimony given
11      by said witness; that I am neither counsel for,
12      related to, nor employed by any of the parties to
13      the action in which this deposition was taken; and
14      further, that I am not a relative or employee of
15      any attorney or counsel employed by the parties
16      thereto, nor financially or otherwise interested
17      in the outcome of the action.
18
                       Constance Hunt Rhodes
19                     _____
                       CONSTANCE HUNT RHODES
20                     Notary Public in and for
                       the District of Columbia
21
        My commission expires:
22      January 14, 2023
```

Pls.'s Ex. 34, p. 72

Smith v. DC, 15-737 (RCL)

Page 72

1    Andrew Saindon, Esquire

2    andy.saindon@dc.gov

3                    February 5, 2021

4    RE:    Smith, Maggie Et Al v. District Of Columbia

5         1/22/2021, Lt. Debra Manigault (#4425096)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

**Pls.'s Ex. 34, p. 73**

**Smith v. DC, 15-737 (RCL)**

Page 73

1    Smith, Maggie Et Al v. District Of Columbia

2    Lt. Debra Manigault (#4425096)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Lt. Debra Manigault                      Date

25

Pls.'s Ex. 34, p. 74

Smith v. DC, 15-737 (RCL)

Page 74

1    Smith, Maggie Et Al v. District Of Columbia

2    Lt. Debra Manigault (#4425096)

3                ACKNOWLEDGEMENT OF DEPONENT

4        I, Lt. Debra Manigault, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Lt. Debra Manigault                        Date

13   *If notary is required

14                     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                     _____ DAY OF _____, 20___.

16

17

18                     _____

19                     NOTARY PUBLIC

20

21

22

23

24

25

**Pls.'s Ex. 34, p. 75**

**Smith v. DC, 15-737 (RCL)**