## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAGGIE SMITH, *et al.*,<br><br>        Plaintiffs,<br><br>        v.<br><br>DISTRICT OF COLUMBIA,<br><br>        Defendant. | Civil Action No. 15-737 (RCL) |

## DEFENDANT'S OPPOSITION TO PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT AND
## CROSS-MOTION FOR SUMMARY JUDGMENT

Defendant the District of Columbia (the District) opposes plaintiffs' motion for summary judgment, and cross-moves for summary judgment on all claims in plaintiffs' Third Amended Complaint. Fed. R. Civ. P. 56(a); LCvR 7(h).

Plaintiffs challenge their arrests and aborted prosecutions under the District's superseded firearms laws, arguing that their rights under the Second, Fourth, and Fifth Amendments were violated. Plaintiffs' motion for summary judgment is a mix of disjointed arguments and citations to irrelevant evidence. Worse, plaintiffs' statement of material facts is unnecessarily long, running to 143 paragraphs and containing legal argumentation and conclusions.

As discussed in the attached memorandum, and as the evidence reveals, the District's actions here did not violate the Constitution because plaintiffs were never deprived of the right to possess a firearm at home for self-defense. To the extent that "fundamental" right was extended after *Heller I*, that decision itself, and those

subsequent, confirmed that such rights may require licenses for their exercise. None of the plaintiffs have ever sought to acquire any such licenses or registrations from the District.

Similarly, the District did not violate the Fifth Amendment because plaintiffs' claims are simply a "repackaging" of their Second Amendment claims, and because plaintiffs fail to argue or provide any evidence that their travel into or through the District was impeded or discouraged by the former laws.

Finally, plaintiffs' Fourth Amendment claims are meritless because, notwithstanding that neither the Supreme Court nor the D.C. Circuit has approved the "continuing seizure" theory argued by plaintiffs, any "balancing" required here tips in favor of the District:  Plaintiffs' property was all legally classified as "dangerous items," *i.e.*, contraband under District law, and need not be returned given the District's compelling interest in public safety.

The Court should deny plaintiffs' motion for summary judgment and grant the District's cross-motion for summary judgment on all of plaintiffs' claims. Proposed orders are attached, along with the District's response to plaintiffs' statement of material facts, and the District's separate statement of undisputed material facts.

Dated:  April 16, 2021.                     Respectfully submitted,

                                            KARL A. RACINE
                                            Attorney General for the District of Columbia

                                            */s/ Fernando Amarillas*
                                            FERNANDO AMARILLAS [974858]
                                            Acting Deputy Attorney General
                                            Public Interest Division

*/s/ Andrew J. Saindon*
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
BRENDAN HEATH [1619960]
Assistant Attorney General
Equity Section
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 724-6643
(202) 730-1470 (fax)
andy.saindon@dc.gov

*Counsel for Defendant*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAGGIE SMITH, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 15-737 (RCL) |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiffs seek damages for arrests and aborted prosecutions under superseded District of Columbia law. Specifically, plaintiffs contend that their arrests and subsequent legal proceedings (all prosecutions were abandoned) under District firearm laws, before those laws were amended to conform to court rulings, violated their rights under the Constitution. Plaintiffs claim that their arrests and brief detentions violate the Second Amendment (Claim One), violate their right-to-travel and the rights to equal protection encompassed by the Fifth Amendment (Claim Three), and that the Metropolitan Police Department's (MPD's) "continuing" retention of their firearms and ammunition violates their rights under the Fourth Amendment (Claim Six).

But none of the plaintiffs have ever—to this day—attempted to comply with the District's promptly amended firearms licensing regime, undercutting their Second Amendment claims. And plaintiffs have always had the ability to legally travel into and through the District with their handguns, as a matter of federal law, so their claims under the Fifth Amendment should be rejected. Finally, even if the Fourth Amendment was relevant to the retention of property the District legally seized—which it is not—the District's retention of plaintiffs' property was justified because it was all contraband. Summary judgment should be awarded to the District on all remaining claims.

## BACKGROUND

### I.  Statutory Background

Shortly after the Home Rule Act was enacted in 1973, *see* D.C. Code §§ 1-201.01 *et seq.*, the newly constituted D.C. Council passed a general ban on the possession of handguns. D.C. Code §§ 7-2502.01(a), 7-2501.01(7) (2001 ed.). Def.'s Statement of Undisputed Material Facts (SMF) ¶ 1. The Supreme Court found this handgun ban unconstitutional in the seminal decision *District of Columbia v. Heller*, 554 U.S. 570 (2008) (*Heller I*), holding that the Second Amendment codified a pre-existing, individual "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 592, 635; SMF ¶ 2. The Court emphasized, however, that this right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller I*, 554 U.S. at 627; SMF ¶ 2. The Supreme Court did not delineate the full scope of the Second Amendment, and cautioned that

"nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller I*, 554 U.S. at 626–27.

The District's elected leaders immediately amended its firearms laws to comply with *Heller I*, establishing a system for registering handguns for home possession and instituting requirements for registrants. SMF ¶ 3. *See Heller v. District of Columbia*, 45 F. Supp. 3d 35, 38–39 (D.D.C. 2014), *aff'd in part and rev'd in part*, 801 F.3d 264 (D.C. Cir. 2015) (*Heller III*). These and other post-*Heller I* firearms regulations have been upheld by the D.C. Circuit. *See Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*) (registration of handguns and prohibitions on assault weapons and high-capacity magazines); *Heller III*, 801 F.3d at 275–76 (in-person appearance, fingerprinting and photographing of applicants, completion of safety-training course)); *see also Wrenn v. District of Columbia*, 864 F.3d 650, 666 (D.C. Cir. 2017) (acknowledging "reasonable regulations" upheld in *Heller II and Heller III*). The District has continued to amend its laws to comply with court rulings regarding the Second Amendment. SMF ¶ 4.

Plaintiffs commenced this lawsuit almost six years ago, on May 18, 2015. *See* Compl. [1]. Plaintiffs challenge their arrests, aborted prosecutions, and seizures and retention of their property pursuant to the District's firearms laws in effect prior to the amended law enacted in response to the Court's decision in *Palmer v. District of*

*Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). *See* Third Am. Compl. [114] (TAC) ¶ 6 (defining "Class Period" as terminating after such legislation took effect).

The Court in *Palmer* enjoined the District from enforcing D.C. Code § 7-2502.02(a)(4) (2012 ed.), which at that time prohibited "the registration of handguns to be carried in public for self-defense," *Palmer*, 59 F. Supp. 3d at 183; from enforcing D.C. Code § 22-4504(a) (2012 ed.), which criminalized the act of carrying a weapon in public without a license; and from enforcing either statute "against individuals based solely on the fact that they are not residents of the District." *Palmer*, 59 F. Supp. 3d at 183; SMF ¶ 5. The *Palmer* Court's injunction was effective "unless and until such time as the District [ ] adopt[ed] a licensing mechanism consistent with constitutional standards enabling people to exercise their Second Amendment right to bear arms." *Palmer*, 59 F. Supp. 3d at 183; SMF ¶ 5.[1]

Moving swiftly to comply, on September 23, 2014, the Council of the District of Columbia (the Council) voted unanimously to pass Bill 20-926, the License to Carry a Pistol Emergency Amendment Act of 2014 (Emergency Act). *See* 61 D.C. Reg. 10765 (Oct. 17, 2014); SMF ¶ 6. The bill was signed by the Mayor on October 9, 2014, and became effective upon signing. *See* TAC ¶ 27 and n.1; D.C. Official Code § 1-204.12(a) (2014 Supp.); SMF ¶ 6. The Council subsequently passed a series of additional

---

[1]    *Cf. Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (invalidating Illinois' prohibition on the public carry of firearms but staying mandate "for 180 days to allow the Illinois legislature to craft a new gun law that will impose reasonable limitations, consistent with the public safety and the Second Amendment as interpreted in this opinion, on the carrying of guns in public"). In contrast to *Moore*, the District enacted a regime compliant with *Palmer* in 77 days.

emergency and temporary statutes, to maintain a public-carry regime pending enactment of permanent legislation and congressional review. SMF ¶ 7; *See, e.g.*, License to Carry a Pistol Second Emergency Declaration Resolution of 2014, Res. 20-741 (Dec. 17, 2014), 62 D.C. Reg. 1964 (Feb. 13, 2015). The permanent legislation, the License to Carry a Pistol Amendment Act of 2014, Law No. 20-279 (Concealed Carry Law or CCL), became effective—after passing the period of congressional review—on June 16, 2015. SMF ¶ 7; *See* http://lims.dccouncil.us/Legislation/B20-0930?FromSearchResults=true (last visited Mar. 23, 2021).[2]

## II.  <u>Procedural Background</u>

After the District moved to dismiss plaintiffs' original complaint, plaintiffs filed an amended complaint. *See* Am. Compl. [22] (Sept. 15, 2015). Again, the District moved to dismiss, *see* Def.'s Mot. [23], and plaintiffs again sought leave to amend their complaint. *See* Pls.' Am. and Restated Mot. for Leave to Amend First Am. Compl. and to File Second Am. Compl. [43].

The Court granted plaintiffs' motion and the Second Amended Complaint (SAC) became operative. Order (Sept. 18, 2018) [48]. After additional briefing, the Court granted in part the District's motion to dismiss the SAC, dismissing all claims except for Counts One, Three and Six. May 16, 2019 Order [59] (*Smith v. District of*

---

[2]    Subsequently, the D.C. Circuit invalidated the requirement that applicants for a concealed-carry license have a "good reason." *Wrenn*, 864 F.3d at 666.

*Columbia*, 387 F. Supp. 3d 8, 33 (D.D.C. 2019)).[3]

Subsequently, the Court granted leave for plaintiffs to file their Third Amended Complaint, *see* Order [110], adding two new plaintiffs, Kimberly Buffaloe and Carl Atkinson. *See* Pls.' Mot. for Leave to Amend Second Amended Complaint [95].

III.   <u>Factual Background</u>

Plaintiff Maggie Smith, then a resident of North Carolina, was stopped by police while driving in the District on June 29, 2014, and arrested and charged with carrying a pistol without a license. TAC ¶¶ 31–34 (citing D.C. Code § 22-4504(a) (2012 ed.)); SMF ¶ 8.[4] She was subsequently indicted by the U.S. Attorney's Office (USAO) and arraigned on charges of carrying a pistol without a license, possession of an unregistered firearm, and unlawful possession of ammunition. TAC ¶136; SMF ¶ 8. The USAO dismissed the indictment on September 29, 2014, *id.* ¶ 137, "in light of" the July 2014 decision in *Palmer*, but the D.C. Office of the Attorney General (OAG) had previously filed a criminal information on similar charges (possession of unregistered firearm and unlawful possession of ammunition, *see* Pls.' Ex. 45), although it subsequently dismissed the information. TAC ¶¶ 137–41; SMF ¶ 8. The

---

[3]   The Order also allowed plaintiffs to "continue pursuing injunctive and declaratory relief nullifying their arrests and expunging records relating to their arrests and prosecutions." *Smith*, 387 F. Supp. 3d at 32.

[4]   At the time of her arrest, Ms. Smith had a concealed-carry license from North Carolina. *See* TAC ¶ 31.

District seized her pistol at the time of her arrest and has not returned it. SMF ¶ 8;
TAC ¶¶ 142–43.[5]

Ms. Smith never attempted to retrieve her pistol from MPD. SMF ¶ 10; Ex. 1
(M. Smith Tr.) at 14:2–14:7. Nor did she ask her attorneys to assist in retrieving her
property. Ex. 1 at 14:20–15:1; SMF ¶ 10. "Since her arrest, Ms. Smith never
attempted to register a gun or obtain a license or permit in the District or in any other
state or jurisdiction." Ex. 2 (M. Smith Interrogatory Responses) at 5; SMF ¶ 11. Before
her arrest, Ms. Smith never familiarized herself with the District's firearms laws. Ex.
2 at 4, SMF ¶ 12.[6]

Plaintiff Gerard Cassagnol, a Maryland resident, was stopped by police while
driving through the District on October 9, 2013, and arrested for carrying a pistol
without a license. TAC ¶¶ 146–160; SMF ¶ 13.[7] Mr. Cassagnol was subsequently
indicted by the USAO and arraigned on charges of carrying a pistol without a license,
*see* D.C. Code § 22-4504(a)(1), possession of an unregistered firearm, *see* D.C. Code §

---

[5]    The plaintiffs had their firearms seized pursuant to D.C. Code § 22-4517(b),
which mandates seizure by the police of pistols "unlawfully owned, possessed, or
carried[.]" SMF ¶ 9. *See* TAC ¶¶ 144 (M. Smith), 183 (G. Cassagnol), 206 (F. Rouse),
228 (D. Davis).

[6]    Because they contain information designated by plaintiffs as confidential
pursuant to the Protective Order [83], defendant's exhibits 2, 3, 5, and 6 will be filed
subsequently under seal.

[7]    At the time of his arrest, Mr. Cassagnol claimed that his pistol was "licensed
and registered in Maryland." TAC ¶ 150; SMF ¶ 14. *But cf.* Ex. 3 (Cassagnol
Interrogatory Responses) at 5 ("He did not have or attempt to obtain a permit for
concealed carry. He never attempted to obtain a permit or license in any other state
either."); SMF ¶ 14.

7-2502.01, and unlawful possession of ammunition, *see* D.C. Code § 7-2506.01. TAC ¶¶ 167–68; SMF ¶ 15. The USAO dismissed the indictment against Mr. Cassagnol "apparently in light of the *Palmer* decision," but OAG filed a criminal information against him the same day. TAC ¶¶ 170–71; SMF ¶ 15. On April 20, 2015, OAG "*nolle'd* the case against Mr. Cassagnol[.]" TAC ¶ 175; SMF ¶ 15. When he was arrested, the police seized Mr. Cassagnol's nine-millimeter pistol and some ammunition and have not returned them. TAC ¶¶ 176–182; SMF ¶ 15.

Mr. Cassagnol did not seek the assistance of his attorney to obtain the return of his property. SMF ¶ 16; Ex. 4 (Cassagnol Tr.) at 14:9–14:13; 24:2–24:4. "Since his arrest, Mr. Cassagnol never attempted to register a gun or obtain a license or permit in the District or any other state." Ex. 3 (Cassagnol Interrogatory Responses) at 6; SMF ¶ 17. Although Mr. Cassagnol had previously looked up the District's gun laws online, before his arrest he believed that the District would apply Maryland's gun laws while he was traveling through the District. Ex. 3 at 5; SMF ¶ 18.

Plaintiff Frederick Rouse, also a Maryland resident, was arrested by police on August 30, 2014, while at a hotel in the District, for possession of unregistered firearms and ammunition. TAC ¶¶ 185–197; SMF ¶ 19. On April 22, 2015, OAG dismissed the charges against Mr. Rouse. TAC ¶ 203; SMF ¶ 19.[8] At his arrest, the police seized from Mr. Rouse two handguns and a scope, which were subsequently returned. TAC ¶¶ 204–205; SMF ¶ 19. "Mr. Rouse has successfully registered 20 to

---

[8]   The TAC, at ¶ 203, carries over the mistake from the SAC, stating "April 22, 2014," but the year is incorrect, as it precedes the date of Mr. Rouse's arrest.

30 handguns in Maryland since 2003." Ex. 5 (Rouse Interrogatory Responses) at 5;
SMF ¶ 19. Mr. Rouse has never attempted to register a firearm in the District and
has never attempted to obtain a concealed-carry license or permit in the District. Ex.
5 at 5; SMF ¶ 20. Before his arrest, Mr. Rouse believed that the District had legalized
firearms as a result of *Heller*. Ex. 5 at 4; SMF ¶ 21.

Plaintiff Delontay Davis, a Virginia resident, was stopped in his car on March
23, 2014, while driving through the District and arrested for carrying an unregistered
handgun and ammunition. TAC ¶¶ 210–213; SMF ¶ 22. Mr. Davis's indictment was
subsequently dismissed by the USAO, as was the criminal information filed by OAG.
TAC ¶¶ 223–24; SMF ¶ 22. *See also* Pls.' Ex. 75 (Notice of Dismissal). At his arrest,
police seized Mr. Davis's pistol and have retained it. TAC ¶¶ 225–26; SMF ¶ 22.
"Since his arrest, Mr. Davis never attempted to obtain a license or permit to carry a
gun in any state. Mr. Davis never attempted to register a gun in D.C. or obtain a
license or permit in D.C. before or since his arrest." Ex. 6 (Davis Interrogatory
Responses); SMF ¶ 23. Mr. Davis did not know anything about gun laws in the
District before his arrest, besides believing them to be similar to those of Virginia.
SMF ¶ 24.

Plaintiff Kimberly Buffaloe, a Maryland resident, was arrested in the District
on July 21, 2012, after an unregistered, loaded pistol was found in the parked vehicle
in which she was sitting with her then-boyfriend. TAC ¶ 249; SMF ¶ 25. She was
subsequently indicted by the USAO on charges of carrying a pistol without a license,
possession of an unregistered firearm, *see* D.C. Code § 7-2502.01, unlawful possession

of ammunition, *see id.*, § 7-2506.01, and presence in a motor vehicle containing a firearm, *see id.*, § 22-2511. TAC ¶ 260; SMF ¶ 25. All charges against Ms. Buffaloe were dismissed on March 19, 2013. TAC ¶ 264; SMF ¶ 25. She currently possesses a Maryland Handgun Qualification License, which she obtained in May 2019, Ex. 7 (Buffaloe Interrogatory Responses)[9] at 5, but "[s]ince her arrest, Ms. Buffaloe never attempted to register a gun or obtain a license or permit in the District[.]" *Id.* at 6. SMF ¶ 26.

Plaintiff Carl Atkinson, a Maryland resident, was arrested on January 28, 2014 after MPD officers stopped his car and found a loaded pistol. TAC ¶¶ 265–70; SMF ¶ 27. The following day he was charged with carrying a pistol without a license. TAC ¶ 276 (*see* D.C. Code § 22-4504(a)); SMF ¶ 27. On July 25, 2012, Mr. Atkinson was indicted for carrying a pistol without a license, possession of an unregistered firearm, *see* D.C. Code § 7-2502.01, unlawful possession of ammunition, *see* D.C. Code § 7-2506.01, and presence in a motor vehicle containing a firearm, *see* D.C. Code § 22-2511. TAC ¶ 279; SMF ¶ 27. On March 19, 2013, all charges against Mr. Atkinson were dismissed. TAC ¶ 282; SMF ¶ 27. "Mr. Atkinson has never made any attempts to register and/or obtain a concealed-carry license or permit, in the District of Columbia or any other state or jurisdiction." Ex. 8 (Atkinson Interrogatory Responses) at 6; SMF ¶ 28. Before his arrest, Mr. Atkinson had no knowledge of the District's gun laws and never attempted to familiarize himself with them. SMF ¶ 29.

---

[9]     Plaintiffs did not provide the District with a signed copy of Ms. Buffaloe's Interrogatory Responses. *See* Fed. R. Civ. P. 33(b)(5).

IV.   <u>Plaintiffs' Motion for Summary Judgment</u>

Plaintiffs seek summary judgment, for the Class Period from May 15, 2012 to October 10, 2014, on their remaining claims that the District is liable for the enforcement of its gun laws against them. Claim One alleges that their arrests, detentions, and aborted prosecutions under D.C. Code §§ 7-2502.01, 7-2506.01, and 22-4504 violated their rights under the Second Amendment. Pls.' Mot. for Summary Judgment (Pls.' Mot.) [121] at 12–22; *see also* TAC ¶¶ 56, 285–92; *Smith*, 387 F. Supp. 3d at 15. Claim Three alleges that those laws violate plaintiffs' rights under the Fifth Amendment to equal protection and the right to travel. Pls.' Mot. at 22–30; *see also* TAC ¶¶ 294–300; *Smith*, 387 F. Supp. 3d at 15. And Claim Six alleges that the District's retention of plaintiffs' guns and ammunition violates their rights under the Fourth Amendment. Pls.' Mot. at 30–35; *see also* TAC ¶¶ 302–305; *Smith*, 387 F. Supp. 3d at 15.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

Rule 56 requires courts to grant summary judgment when the "materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations[,] … admissions, interrogatory answers, or other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c); *see George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005). The mere existence of a factual dispute does not preclude summary judgment; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is material if, under the substantive law applicable to the case, it can affect the outcome of the litigation. *Id.* A dispute is "genuine" for summary judgment purposes if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Doe v. Dep't of the Treasury*, 706 F. Supp. 2d 1, 5 (D.D.C. 2009). A "complete failure of proof concerning an essential element of the non-moving party's case necessarily renders other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). At summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law[.]" *Anderson*, 477 U.S. at 251.

## ARGUMENT

I.  <u>The District Did Not Violate Plaintiffs' Second Amendment Rights Because the Right to Carry a Firearm in Public Did Not Exist Prior to *Palmer* and Because Licensing Schemes Are Permissible to Regulate the Right (Claim One).</u>

"[T]he Second Amendment does not guarantee an unlimited right to 'keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Caniglia v. Strom*, 953 F.3d 112, 134 (1st Cir. 2020), *cert. petition filed* (Aug. 13, 2020,

No. 20-157) (quoting *Heller I*, 554 U.S. at 626). The Supreme Court has repeatedly emphasized that the right to bear arms leaves ample room for "such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (Alito, J., plurality opinion). Since *Heller I*, it is abundantly clear that governments may "set substantive requirements for [gun] ownership," and thus "may use a licensing system to enforce them." *Berron v. Illinois Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 847 (7th Cir. 2016); *see also Wrenn*, 864 F.3d at 667 ("At the Second Amendment's core lies the right of responsible citizens to carry firearms for personal self-defense beyond the home, subject to longstanding restrictions. These traditional limits include, for instance, licensing requirements[.]").

The first step in analyzing a challenge to a law under the Second Amendment is to determine whether the regulated activity is "outside the Second Amendment's protections." *Medina v. Whitaker*, 913 F.3d 152, 156 (D.C. Cir. 2019) (quoting *Schrader v. Holder*, 704 F.3d 980, 988–89 (D.C. Cir. 2013)). If the conduct is "outside," only rational basis scrutiny applies. *Id.* If not, the burden shifts to the government to demonstrate that the regulation is "substantially related to an important government objective." *Id.* (quoting *Schrader*, 704 F.3d at 989).

Plaintiffs argue that the District's "total ban" on carrying handguns in public violated the Second Amendment. Pls.' Mot. at 12. But the right to carry a firearm in

public—even subject to reasonable licensing regulations—did not exist in the District prior to *Palmer*. *Palmer* held that the Second Amendment protects some form of "public carry" and directed the District to "adopt[ ] a licensing mechanism" to enable both residents and non-residents to apply for and receive a license to carry a handgun. 59 F. Supp. 3d at 183. Prior to that decision, there was no constitutional right to carry a firearm in public in the District of Columbia; there existed only the right of District residents to possess a registered firearm in their residences. *Cf. Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 717 (1978) (Rehnquist, J., dissenting) ("Since [*Monroe v. Pape*, 365 U.S. 167 (1961)], municipalities *have* had the right to expect that they would not be held liable retroactively for their officers' failure to predict this Court's recognition of new constitutional rights.") (emphasis in original). *But see Owen v. City of Independence*, 445 U.S. 622, 638 (1980) (holding that municipalities may not invoke the "good faith" immunities available to its officers or agents).

The Court previously noted that "these plaintiffs plausibly allege the allegedly unconstitutional criminal laws besiege free-standing substantive rights … ." *Smith*, 387 F. Supp. 3d at 27. But that right did not exist pre-*Palmer* and there is no free-standing Second Amendment right to carry a firearm without needing to acquire any permit whatsoever. *See Wrenn*, 864 F.3d at 667. And the District—then as now—is not required to simply accept, on their face, concealed-carry licenses from other jurisdictions as prima facie proof of a "right to carry." *See Culp v. Raoul*, 921 F.3d 646, 656 (7th Cir. 2019). Plaintiffs do not indicate that, prior to their arrests, they made any attempt to fully familiarize themselves with the District's firearms

14

regulations nor have they—at any time—attempted to obtain a District of Columbia registration or license. *See* SMF ¶¶ 11, 12 (Smith), 17, 18 (Cassagnol), 20, 21 (Rouse), 23, 24 (Davis), 26 (Buffaloe), 28, 29 (Atkinson). While it is true that "someone prosecuted under a criminal law can challenge its constitutionality regardless of whether they consciously committed the offense," *Smith*, 387 F. Supp. 3d at 21, plaintiffs' underlying conduct is not constitutionally protected. In other words, even if the District had a *Palmer*-compliant gun control regime in place at the time of plaintiffs' arrests, by failing to properly familiarize themselves with District firearms laws, plaintiffs' conduct would have violated it all the same. *See McFadden v. United States*, 576 U.S. 186, 192 (2015) ("[I]gnorance of the law is typically no defense to criminal prosecution … ."); *Green v. District of Columbia*, 710 F.2d 876, 878 (D.C. Cir. 1983) ("[a]n arrest pursuant to a presumptively valid ordinance is lawful even if the ordinance is later held invalid.") (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36–37 (1979)).[10]

The Court should grant judgment as a matter of law in favor of the District on plaintiffs' Second Amendment claim.

---

[10]     The chain of causation between the District's licensing provisions and Ms. Buffaloe's prosecution is even more attenuated, because she asserts that she did not own the gun that was seized, and was not aware of its presence. Plaintiffs' Statement of Material Facts (PSMF) ¶ 86. Ms. Buffaloe's ability to obtain a license under District law therefore has no bearing on her criminal case, because her boyfriend may have concealed the firearm in the vehicle with her regardless of her own licensure status, and she had other valid defenses to her charges. *See Conley v. United States*, 79 A.3d 270, 274 (D.C. 2013) (noting that the offense of Presence in a Motor Vehicle Containing a Firearm required knowledge of the presence of the firearm); *Eady v. United States*, 44 A.3d 257, 268–70 (D.C. 2012) (indicating that a valid defense to Carrying a Pistol Without a License includes not possessing the firearm).

II.   **The District Did Not Violate Plaintiffs' Rights Under the Fifth Amendment Because There is No Evidence That Plaintiffs' Travel to the District was Ever Impeded (Claim Three).**

A law implicates the right to travel in three situations: when it actually deters travel, when impeding travel is its primary objective, or when it uses a classification that penalizes the exercise of the right. *Attorney General of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (plurality opinion); *Pollack v. Duff*, 793 F.3d 34, 45 (D.C. Cir. 2015); *Kansas v. United States*, 16 F.3d 436, 441 (D.C. Cir. 1994).

In their motion, plaintiffs fail to argue or provide any evidence that their travel into or through the District has been impeded or even discouraged by the former laws. *See* Pls.' Mot. at 22–30. Indeed, that failure is made even more stark by the fact that *none* of the named plaintiffs has since felt the need to register a firearm or apply for a license to carry a gun in the District. SMF ¶¶ 11, 17, 20, 23, 26, 28. *See Robinson v. Huerta*, 123 F. Supp. 3d 30, 46 (D.D.C. 2015) ("[W]here a law may make a citizen marginally less likely to travel, the resulting effect on the individual's willingness to exercise his constitutional right to travel is 'negligible and does not warrant scrutiny under the Constitution.'") (quoting *Pollack*, 793 F.3d at 45).

This Court found previously that plaintiffs had adequately stated a right-to-travel claim because they allege that the challenged laws "use a classification—gun ownership—to penalize exercising" Second Amendment rights. *Smith*, 387 F. Supp. 3d at 29. The Court also noted that "strict scrutiny" applied, because the laws discriminated between residents and non-residents in allowing the exercise of a "fundamental right," *i.e.*, carrying a handgun for self-defense. *Id.* at 27–29.

16

Again, the Supreme Court in *Heller I* emphasized that the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose[,]" and specifically cautioned that "nothing in [its] opinion should be taken to cast doubt on" certain "longstanding," traditional regulatory measures. 554 U.S. at 592, 626–27. And while the D.C. Circuit extended the reach of the Second Amendment to protect "the right of responsible citizens to carry firearms for personal self-defense beyond the home," it too clarified that the right was "subject to longstanding restrictions" such as "licensing requirements[.]" *Wrenn*, 864 F.3d at 667.

In this sense, the right allegedly circumscribed by the laws challenged here is not "fundamental" requiring strict scrutiny and entitling plaintiffs to summary judgment.

In *Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013), a resident of the state of Washington applied for and was denied a concealed-carry license in Denver, Colorado, and sued, alleging violations of his Second Amendment rights and his right to travel. *Id.* at 1201. The Tenth Circuit affirmed judgment to the government defendants, holding that plaintiff's right to travel claim was "coterminous" with his claim under the Privileges and Immunities Clause of Article IV of the Constitution. *Id.*

> As the Supreme Court explained in *Supreme Court of Virginia v. Friedman*, 487 U.S. 59 (1988), "it is only with respect to those 'privileges' and 'immunities' bearing on the vitality of the Nation as a single entity that a State must accord residents and nonresidents equal treatment." *Id.* at 64–65 (quotations and citations omitted). Because the

17

> concealed carrying of firearms has been prohibited for
> much of our history, we conclude that this activity fails the
> *Friedman* test.

*Id.* at 1201–1202.[11]

Under that test, courts first ask whether the restricted activity is "sufficiently basic to the livelihood of the Nation" and then, if it is, whether the restriction deprives nonresidents of a protected privilege. *Id.* at 1213–14. The Tenth Circuit carefully outlined the "not unlimited" right to keep and bear arms protected by the Second Amendment and, specifically, the long history of prohibitions on carrying concealed weapons, *id.* at 1210, and detailed the case law elaborating the types of activities protected by the Constitution in this context, such as "the pursuit of a common calling," the right to abortion, and the right to access the court system. *Id.* at 1214 (citing cases). Ultimately, the Tenth Circuit rejected Peterson's claims. *Id.* at 1216 ("Given that the concealed carrying of firearms has not been recognized as a right, and the fact that concealed carry was prohibited for resident and non-resident alike for much of our history, we cannot declare this activity 'sufficiently basic to the livelihood of the Nation.'") (quoting *Friedman*, 487 U.S. at 64). So too here—because concealed carry of firearms is not a fundamental right, like the pursuit of a common calling, the District's failure to have a mechanism to exercise that right, seen in hindsight, did not violate the right to travel.

---

[11]    The Privileges and Immunities Clause of Article IV does not apply to the District. *Duehay v. Acacia Mut. Life Ins. Co.*, 105 F.2d 768, 775 (D.C. Cir. 1939). *Cf. Pollack v. Duff*, 958 F. Supp. 2d 280, 289 (D.D.C. 2013) ("The Court holds that the Privileges and Immunities Clause of Article IV applies only to the states … .") (citing *Duehay*), *affirmed*, 793 F.3d 34 (D.C. Cir. 2015).

The Seventh Circuit recently conducted a similar analysis in a challenge to a law prohibiting nonresidents from applying for Illinois concealed-carry licenses if those nonresident states did not have licensing standards "substantially similar" to those of Illinois. *Culp*, 921 F.3d at 649. The Seventh Circuit rejected plaintiffs' argument that "the Second Amendment confers a fundamental right to carry a firearm in public for self-defense" and that Illinois' prohibition foreclosing "the law-abiding residents of 45 states from acquiring" such a license must therefore be subject to "strict scrutiny." *Id.* at 654. Like the Tenth Circuit, the Seventh Circuit utilized a quasi-Privileges and Immunities analysis, detailing the limited nature of the rights protected by the Second Amendment, *id.*, and rebuffing plaintiffs' equal protection claim:

> [R]epackaging a claim that is more appropriately brought under a different constitutional provision—here the Second Amendment—as an equal protection claim will not usurp the settled legal framework that has traditionally applied. Regardless, even if we were to consider this claim independent of the plaintiffs' Second Amendment claim, the relevant question under the Equal Protection Clause is whether the Illinois Concealed Carry Act impermissibly discriminates against a suspect class or deprives out-of-state residents of a fundamental right. The answer here is no for all the reasons in our analysis of the plaintiffs' Second Amendment challenge to the Illinois statute.

*Id.* at 658 (citations omitted).

As noted previously, the court in *Palmer* declined to rule on the right-to-travel and equal protection claims there, finding that they were not ripe because the District had not yet enacted a concealed-carry licensing scheme for firearms. *Palmer*, 59 F. Supp. 3d at 184 and n.5. The court also suggested that those claims were simply "co-extensive" with the Second Amendment claims. *Id.* at 184. Here, plaintiffs' putative

right-to-travel and equal protection claims are similarly co-extensive with their Second Amendment claims and fail for the same reasons. *See* Pls.' Mot. at 29 (noting that the challenged statute restricted registration to self-defense within the home).

Finally, plaintiffs argue that, prior to the current licensing scheme, "non-residents could not own guns in the District," Pls.' Mot. at 23, but that assertion was incorrect at the time of plaintiffs' arrests and remains so. Since 1986, any person legally possessing a handgun in any State may lawfully transport that weapon into or through the District, so long as it is properly stored according to the mandates of federal law. *See* Firearms Owners' Protection Act, Pub. L. 99-360, § 1(a), 100 Stat. 766 (July 8, 1986), codified at 18 U.S.C. § 926A (FOPA).[12] Travel through or into the District with a legally carried handgun from elsewhere has never been deterred in any meaningful sense. Summary judgment on Claim Three should be awarded to the District.

## III. The District's Retention or Destruction of Plaintiffs' Property After Their Arrests Did Not Violate the Fourth Amendment Because That Property Was Contraband (Claim Six).

This Court held that "the District reasonably detained" plaintiffs, "given the ample probable cause that plaintiffs violated" the District laws at issue. *Smith*, 387 F. Supp. 3d at 24. Similarly, plaintiffs' guns and ammunition were lawfully seized because "police can seize weapons found in plain view or following a lawful search

---

[12]     FOPA requires that lawful owners of firearms must transport such weapons unloaded and that neither the gun nor any ammunition be "readily accessible" or "directly accessible from the passenger compartment … ." 18 U.S.C. § 926A. In vehicles without compartments separate from the driver's compartment, the gun and ammunition must be "contained in a locked container other than the glove compartment or console." *Id.*

incident to arrest to ensure officer safety and to preserve incriminating evidence." *Id.* (citing *United States v. Castellanos*, 731 F. 2d 979, 984 (D.C. Cir. 1984) and *Chimel v. California*, 395 U.S. 752, 762–63 (1969)). Plaintiffs argue, however, that the District's retention of their guns and ammunition after charges were dropped violated their Fourth Amendment rights. *See* Pls.' Mot. at 32. But plaintiffs fail to demonstrate that the Fourth Amendment is even applicable to the disposition of property lawfully seized by the government. Neither the Supreme Court nor the D.C. Circuit has embraced the "continuing seizure" of property theory espoused by plaintiffs here.[13]

On the contrary, once probable cause is established the Fourth Amendment is satisfied, and the question of whether and how property should be returned is properly analyzed under different constitutional provisions. *E.g.*, *Bennett v. Dutchess County*, 832 Fed. Appx. 58, 59 (2d Cir. 2020); *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004); *Lee v. City of Chicago*, 330 F.3d 456, 465–66 and n.5 (7th Cir. 2003). Fundamentally, the Fourth Amendment simply protects different interests than those advanced by plaintiffs here: "The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all." *Martin v. Marinez*, 934 F.3d 594, 601 (7th Cir. 2019) (quoting *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999). If plaintiffs' privacy

---

[13]     *Cf. Denault v. Ahern*, 857 F.3d 76 n.2 (1st Cir. 2017) ("The Supreme Court recently endorsed the theory of continuing seizure of persons.") (citing *Manuel v. City of Joliet*, 137 S. Ct. 911, 919 (2017)).

was invaded in any sense in this case, it was at the time their firearms were seized from them, an invasion this Court held was reasonable. *Smith*, 387 F. Supp. 3d at 24. Plaintiffs' claims of a Fourth Amendment violation "are simply too attenuated from and unrelated to" their claims that they were arrested and their property seized under a law they claim violated the Second Amendment. *See Martin*, 934 F.3d at 605–06.

Even the retention of plaintiffs' property after the underlying cases were dismissed does not necessarily implicate the Fourth Amendment. Although, as the Court noted, *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) states that "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringe[d] possessory interests," that case examined an investigative detention of a person rather than a seizure of property. *See also United States v. Place*, 462 U.S. 696, 705–10 (1983) (holding that a brief "investigative detention[] of personalty" was converted to a seizure when the property was retained for a prolonged period and sent to a different location). In other words, *Place* and *Jacobsen* are "ultimately concerned only with the initial loss of that possessory interest and whether the existence of probable cause renders that loss reasonable. [They have] no application after probable cause to seize has been established." *Lee*, 330 F.3d at 464. Here, the Court held that plaintiffs' property was lawfully seized at the time plaintiffs were detained. *Smith*, 387 F. Supp. 3d at 24. As a result, the Fourth Amendment is simply not relevant to the question of the District's retention of the seized firearms and ammunition.

22

Even if, however, the Fourth Amendment was applicable to plaintiffs' property, plaintiffs' claim should nonetheless be dismissed. The Court noted previously that, to determine whether the "ongoing seizure" of plaintiffs' guns and ammunition after the charges against them were dismissed complied with the Fourth Amendment, it must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Smith*, 387 F. Supp. 3d at 25 (quoting *Place*, 462 U.S. at 703). Such balancing tips in favor of the District here.

All property seized here were "dangerous items," *i.e.*, contraband, and subject to destruction. *See* D.C. Code § 22-4517 (defining pistols as "dangerous articles" which, if "unlawfully … carried" "shall be destroyed"); D.C. Code § 48-905.02(b) ("Contraband is not subject to forfeiture under this section, but may be seized and disposed of in accordance with applicable law").[14] And as shown, none of the plaintiffs ever made any attempt to register a firearm in the District or acquire a license to carry.

The government has a compelling interest in public safety, prevention of crime and the protection of law-enforcement officers. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984). Indeed, a government's

---

[14]    At all relevant times here—at the time of plaintiffs' arrests and currently— unregistered firearms and ammunition are contraband *per se*, objects which are "intrinsically illegal in character," "the possession of which, without more, constitutes a crime." *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 699–700 (1965). "Individuals have no property right in contraband materials and contraband materials may not be returned to them." *Boggs v. Rubin*, 161 F.3d 37, 40 (D.C. Cir. 1998).

foremost function is to ensure the safety of all its citizens. *Kelley v. Johnson*, 425 U.S. 238, 247 (1976) ("[The] promotion of safety of persons and property is unquestionably at the core of the State's police power."). The seizures here were reasonable under the Fourth Amendment because, at the time of seizure, there was no licensing scheme allowing guns to be carried in public. *See Sandoval v. County of Sonoma*, 912 F.3d 509, 516 (9th Cir. 2018) ("[A] prolonged seizure may not violate the Fourth Amendment if the government retains justification for the seizure after the initial justification dissipates."); *cf. Jacobsen*, 466 U.S. at 125 (approving seizure of property that was suspected to be contraband). Plaintiffs fully acknowledge that they would have had to meet the then-current registration or licensing standards to justify the retrieval of their weapons; otherwise, the District would have potentially returned a weapon to a person not legally entitled at the time to have it. Pls.' Mot. at 34. As plaintiffs note, the "good reason" requirement continued to limit the right to possess and carry firearms. *Id*. While that requirement was later struck down in *Wrenn*, "police are charged to enforce laws until and unless they are declared unconstitutional … ." *Smith*, 387 F. Supp. 3d at 23 (quoting *DeFillippo*, 443 U.S. at 38).

Plaintiffs offer no compelling counterbalancing interest. "Lawful seizure and retention of firearms … does not violate the Second Amendment." *Rodgers v. Knight*, 781 F.3d 932, 941 (8th Cir. 2015). Moreover, to the extent plaintiffs claim that their firearms were seized unlawfully, "even the *unlawful* retention of specific firearms does not violate the Second Amendment, because the seizure of one firearm does not

24

prohibit the owner from retaining or acquiring other firearms." *Id.* at 941–42 (emphasis in original); *see also Walters v. Wolf*, 660 F.3d 307, 318 (8th Cir. 2011) (holding no Second Amendment violation when municipal policy leading to plaintiff's gun confiscation "affected *one* of [plaintiff's] firearms, which was lawfully seized," and the municipality "did not prohibit [plaintiff] from retaining or acquiring other firearms"); *Pierner-Lytge v. Mitchell*, 412 F. Supp. 3d 1012, 1020 (E.D. Wis. 2019) (rejecting argument that confiscation of one farm violates Second Amendment where government officials "did not prohibit [plaintiff] from retaining or acquiring other firearms"). No plaintiff has claimed that the District's retention of property after their cases were dismissed hindered his or her ability in any way to acquire other firearms.

As to the weapons that were seized, even after the District enacted a scheme to allow non-residents to seek a license to possess a firearm in public in the District, not a *single* plaintiff came forward to apply for the appropriate license. SMF ¶¶ 11, 17, 20, 23, 26, 28. And only *one* plaintiff even bothered to attempt to get his property back. *Id.* ¶ 19 (Rouse). Plaintiffs acknowledge that such efforts would not have been futile: They concede that the District, during the relevant period, assisted out-of-District individuals who reached out for assistance in retrieving seized weapons. *See* Pls.' Mot. at 31–32. That procedure included returning firearms to claimants with proper licenses, including to residents of other states. *See* Pls.' Ex. 34 at 35:3-8; PSMF ¶ 140. Plaintiffs' *laissez faire* attitude towards their own property pales in comparison

to the District's substantial interest in keeping dangerous items off the streets.[15] "Law enforcement must maintain a difficult balancing act in respecting 'an individual's right to possess a firearm' while continuing to be able 'to take appropriate action when they are confronted with a firearm that may or may not be lawfully possessed, and which, irrespective of the owner's right to possess the firearm, may pose a danger to the owner or others.'" *Richer v. Parmelee*, 388 F. Supp. 3d 97, 104 (D.R.I. 2019) (quoting *Sutterfield v. City of Milwaukee*, 751 F.3d 543, 572 (7th Cir. 2014)). As this Court held, plaintiffs had recourse to a constitutionally sufficient procedure to obtain the release and return of their property. *See Smith*, 387 F. Supp. 3d at 31–32. As a result, plaintiffs' Fourth Amendment claim is effectively based on their own failure to avail themselves of that procedure.

Instead, plaintiffs simply rely on the standard for summary judgment. *See* Pls.' Mot. at 35. But the record shows that the District indeed had a valid interest in retaining plaintiffs' seized firearms, as they were contraband and plaintiffs failed to avail themselves of the established procedure for retrieving them. By failing to point to any record evidence contrary to the District's interest, plaintiffs' motion for summary judgment on their Fourth Amendment claim should be denied, and the District's motion should be granted.

---

[15]    Plaintiffs' protest that the District did not send notice is insubstantial. *See* Pls.' Mot. at 33. Because plaintiffs' firearms were seized in the course of their arrests for firearms offenses, plaintiffs "knew who took the guns [they] owned; [they] knew exactly which guns were taken; and [they] knew why they were seized." *Bennett*, 832 Fed. Appx. at 61. And the District is not "obligated to instruct [them] on the law." *Id.*; *see also Brown v. District of Columbia*, 115 F. Supp. 3d 56, 69–70 (D.D.C. 2015).

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for summary judgment, and grant the District's cross-motion for summary judgment.

Dated: April 16, 2021.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Acting Deputy Attorney General
Public Interest Division

*/s/ Andrew J. Saindon*
ANDREW J. SAINDON [456987]
Senior Assistant Attorney General
BRENDAN HEATH [1619960]
Assistant Attorney General
Equity Section
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001
(202) 724-6643
(202) 730-1470 (fax)
andy.saindon@dc.gov

*Counsel for Defendant*