# Defendant's Exhibit No. 4

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

+ + + + +

---
IN THE MATTER OF:          :
                           :
MAGGIE SMITH, et al.,      :
                           :
         Plaintiff         :
                           :
    v.                     :   Civil Action No.
                           :   15-737(RCL)
GOVERNMENT OF THE DISTRICT :
OF COLUMBIA, et al.,       :
                           :
         Defendant         :
                           :
---

                Tuesday,
                November 24, 2020

                Via Video Teleconference


**DEPOSITION OF:**


                GERARD CASSAGNOL


called for examination by Counsel for the

Defendant, pursuant to Notice of Subpoena, when

were present on behalf of the respective parties:

12

1  Q  Okay.  How are hollow-point bullets
2  different than regular bullets?
3  A  I would suppose that they're --
4  they're sharper.
5  Q  Okay.
6     MR. CLAIBORNE:  Well, Mr. Cassagnol,
7  if you don't know, don't speculate.  I mean, if
8  you do know, answer.  But if you don't --
9     MR. CASSAGNOL:  Yeah, I'm just --
10    MR. CLAIBORNE:  -- know, don't --
11    MR. CASSAGNOL:  -- saying I suppose or
12  I -- you're right.  I'm speculating.  I don't
13  know.
14    BY MR. SAINDON:
15  Q  Okay.  So why did you buy hollow-point
16  bullets instead of regular bullets?
17  A  I bought those when I purchased the
18  gun many, many years earlier.  And that was what
19  they issued to me.
20  Q  And do you know why someone would use
21  hollow-point bullets instead of regular bullets?
22  A  No.

13

1  Q  Okay.  If you look, Mr. Cassagnol,
2  paragraphs 12 and 13 of the affidavit, it says,
3  on July 22nd, 2015, I called the Evidence Control
4  Branch of the Metropolitan Police Department.
5  And I spoke to Technician Ferguson of the
6  Evidence Control Branch and requested the return
7  of my property.  And paragraph 13 says,
8  Technician Ferguson informed me that I would have
9  to contact my lawyer if I wanted my property
10 back.  Do you see that?
11 A  Yes.
12 Q  Did you do that, contact your lawyer
13 and ask for him to help you get your property
14 back?
15 A  Yes.
16 Q  And what happened?
17    MR. CLAIBORNE:  Well, don't repeat
18 what your lawyer told you.
19    BY MR. SAINDON:
20 Q  Right.  What was the result of the
21 conversation?
22 A  The result of the conversation with

14

1  whom?
2  Q  Your lawyer.
3  A  Oh, I don't quite understand what
4  you're asking.
5  Q  Sure.  I'll go back.  Paragraph 13,
6  you had talked to Technician Ferguson with MPD in
7  the Evidence Control Branch?
8  A  Yes.
9  Q  Right.  And he said, contact your
10 lawyer to get your property back.  And so my
11 question was, did you contact your lawyer to get
12 your property back?
13 A  No.
14 Q  Okay.
15 A  I had already contacted by lawyer
16 before calling him.
17 Q  Okay.  Mr. Cassagnol, do you currently
18 own any firearms?
19 A  No.
20 Q  And do you have a license to carry
21 firearm in any jurisdiction?
22 A  No.

15

1  Q  Mr. Cassagnol, who is Noah A.
2  Clements?
3  A  My attorney that was assigned to me
4  when I was arrested.
5  Q  So you didn't hire him.  He was
6  appointed for you by the court.  Is that right?
7  A  That is correct.
8  Q  Same question, Richard P. Goldberg,
9  who is that?
10 A  That was an attorney also of mine.
11 Q  And was he appointed, or did you hire
12 him?
13 A  He was hired.
14 Q  And how much did you pay him?
15 A  Zero dollars.
16 Q  Okay.  And why was that?  Did he work
17 -- was he working pro bono?
18 A  To the best of my knowledge.
19 Q  Okay.  Same question, who is Susan
20 Wuchinich, W-U-C-H-I-N-I-C-H?
21 A  That is the attorney for my
22 unemployment case.

16

1  Q  In Virginia. Is that right?
2  A  Yes.
3  Q  And it's the same question. Was she
4  appointed to you, or did you hire her?
5  A  I don't remember.
6  Q  What was the result of that
7  unemployment case?
8  A  She was successful.
9  Q  And what does that mean?
10 A  I was awarded unemployment.
11 Q  Okay. And how much and for how long
12 if you remember?
13 A  I don't remember exactly how much, but
14 it was for a six-month period.
15 Q  Okay. Mr. Cassagnol, are you
16 currently employed?
17 A  No, I'm self employed.
18 Q  Okay. And what do you do?
19 A  I'm a handyman.
20 Q  Okay. And how much do you make on
21 average annually?
22 A  On average? It fluctuates.

17

1  Q  And how much did you make last year?
2  A  Approximately 120,000 dollars.
3  Q  Okay. And are your billings this year
4  higher or lower than that do you expect?
5  A  I expect them to be higher.
6  Q  I think you said in some -- in one of
7  your answers that you had formed your own
8  company, Trebor Technical Solution. Is that
9  right?
10 A  Yes.
11 Q  Is that still an active concern? Is
12 it still an operating company is what I mean?
13 A  Yes.
14 Q  Okay. And does that company have any
15 income?
16 A  Yes.
17 Q  How much?
18 A  For this year? For last year? For
19 what period?
20 Q  For each, how much did they make last
21 year and how much for this year?
22 A  Last year, approximately 120,000. Now

18

1  is this net or is this gross?
2  Q  Either way, whatever -- you tell me.
3  A  About 120,000 gross.
4  Q  Okay. Is this what you're talking
5  about for your handyman income, or is this
6  separate?
7  A  No, this would be as part of my
8  handyman income.
9  Q  Okay. And how much -- well, never
10 mind. So what kind of things does Trebor
11 Technical Solutions do?
12 A  Things such as installing
13 communication wiring, installing flat TV wall
14 mounts, installing smart devices, things of that
15 sort.
16 Q  Does the company have any employees
17 other than you?
18 A  No.
19 Q  And does the company have any
20 outstanding contracts that are being worked on
21 right now?
22 A  No.

19

1  Q  Are you right now actively looking for
2  another job?
3  A  Yes.
4  Q  Okay. Tell me about those efforts,
5  what you've done recently.
6  A  I've submitted resumes to
7  approximately maybe 20 or so technical
8  communication type companies.
9  Q  Okay. When was the last resume you
10 sent out?
11 A  About -- maybe about five days ago.
12 Q  Okay. And how long have you been self
13 employed with Trebor Technical?
14 A  Approximately five years.
15 Q  Okay. And before that, what did you
16 do?
17 A  Prior to my arrest, I was the
18 engineering and operations manager at Cox.
19 Q  And after Cox, before you started
20 Trebor Technical, you were unemployed for a time.
21 And then was there something that you did before
22 you started Trebor Technical?

                                                                    20

1    A    No. When you ask me, is there
2   something I did --
3    Q    As far --
4    A    -- you mean --
5    Q    Employment?
6    A    -- pertaining to employment? All
7   right.
8    Q    Yes.
9    A    I was actively looking for employment.
10   Q    Do you remember how long you were
11  unemployment after your arrest?
12   A    I would say over two years.
13   Q    Okay. Well, Mr. Cassagnol, I
14  understand that at some point, the DMV, I think
15  that's in Virginia, took away your driver's
16  license. Is that right?
17   A    No.
18   Q    No? They never took away your
19  driver's license?
20   A    The DMV in Maryland took away my
21  driver's license.
22   Q    I'm sorry. Okay. When did that

                                                                    21

1   happen?
2    A    Are you asking when did it happen or
3   when did I know?
4    Q    Either one, and it could be an
5   approximation. It doesn't have to be exact.
6   It's not a test.
7    A    I discovered it when I went to renew
8   my license. That would've been approximately --
9   to the best of my recollection, it would've been
10  in May of 2014.
11   Q    Okay. And why did Maryland take away
12  your driver's license?
13   A    For failure to pay child support.
14   Q    Okay. Did you get that driver's
15  license back?
16   A    Yes.
17   Q    And when did that happen?
18   A    That would have -- I don't exactly
19  remember. But I would say -- I would -- I don't
20  -- I don't want to speculate. But it was -- it
21  was several months if not a year later.
22   Q    Okay. Do you currently owe child

                                                                    22

1   support?
2    A    Do I currently owe child support?
3    Q    Yes.
4    A    Yes.
5    Q    Okay. Is there an arrears, or is it
6   just a monthly payment?
7    A    Both.
8    Q    Okay. And how much for each?
9    A    Arrears is approximately 6,000
10  dollars. Monthly is approximately 500 plus 100
11  of the arrears.
12   Q    Now after you were fired from Cox
13  Communications, you say you couldn't get your car
14  back. Is that right?
15   A    Yes.
16   Q    And why was that?
17   A    You're asking me -- could you restate
18  the question?
19   Q    Sure. You say after you're fired from
20  Cox Communications, you could not get your car
21  back. That was the 2008 Audi A4. Is that right?
22   A    Yes.

                                                                    23

1    Q    So what happened? Why couldn't you
2   get it back?
3    A    I couldn't -- I couldn't get access to
4   the vehicle to retrieve it.
5    Q    And did you try to get access to the
6   vehicle?
7    A    Yes.
8    Q    And what did you do?
9    A    I contacted Cox Communications.
10   Q    And what was the result of those
11  conversations, if any?
12   A    I was unsuccessful in getting my
13  vehicle back.
14   Q    As far as you know, Cox Communications
15  still has the Audi?
16   A    No.
17   Q    Where is the car now?
18   A    To the best of my knowledge, it was
19  impounded and I could not find where or who --
20   Q    Did you --
21   A    -- off of their property, Cox's
22  property. It was impounded.

24

1  Q   Impounded from their property?  Okay.
2  Did you ask any of your attorneys to help you get
3  the car back?
4  A   No.
5  Q   Okay.  Do you own a car now?
6  A   No.
7      MR. SAINDON:  Okay.  I think that is
8  all I have here.  I'd like to take a little break
9  if we could, consult with my co-counsel, and then
10 we'll come back.  And we should be just about
11 done.  So let's get back about 20 till, if that's
12 all right with everybody.
13     MR. CASSAGNOL:  Yes, is it -- do I
14 just leave this screen up?
15     MR. SAINDON:  Yeah, you can leave it
16 up.
17     MR. CASSAGNOL:  Okay.
18     MR. SAINDON:  Put it on mute and we'll
19 just -- I'll chat with co-counsel.  We'll come
20 back in about seven minutes.
21     MR. CASSAGNOL:  Okay.
22     (Whereupon, the above-entitled matter

25

1  went off the record at 9:33 a.m. and resumed at
2  9:37 a.m.)
3      BY MR. SAINDON:
4  Q   Mr. Cassagnol, at your arrest, October
5  of 2013, the police found a gun in your truck.
6  Is that right?
7  A   Yes.
8  Q   Why did you have the gun with you?
9  A   Can you rephrase the question?
10 Q   Sure.  Why was the gun in your truck?
11 A   For self defense.
12 Q   And were there any specific incidents
13 you were worried about?  Have you been threatened
14 before?
15 A   No.
16 Q   Okay.  Did you ever use the gun in
17 self defense?
18 A   No.
19 Q   And how long had you been carrying a
20 gun in your truck at that point?
21 A   Two or three days.
22 Q   I think you said you had bought the

26

1  gun many years ago.  Is that right?
2  A   Yes.
3  Q   Where was the gun before you had put
4  it in your truck?
5  A   Locked in the gun safe in my home.
6      MR. SAINDON:  All right.  That's all
7  I have.  Your counsel may have some questions for
8  you.
9      MR. CLAIBORNE:  No, I don't have any
10 questions.  Thank you.
11     MR. SAINDON:  All right.
12     (Whereupon, the taking of deposition
13 in the above-entitled matter was concluded at
14 9:39 a.m., signature having NOT been waived.)
15
16
17
18
19
20
21
22