## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MAGGIE SMITH, et al.,**

     *Plaintiffs,*

**v.**

**DISTRICT OF COLUMBIA,**

     *Defendant.*

**Case No. 1:15-cv-00737-RCL**

## MEMORANDUM OPINION

The District of Columbia is no stranger to challenges to its gun laws. After the Supreme Court struck down a District law banning all handgun possession, *see District of Columbia v. Heller*, 554 U.S. 570 (2008), the District has been stuck in a back-and-forth with residents and non-residents alike who seek to register and carry firearms. Important to this case are a trio of the District's laws: D.C. Code § 22-4504, the ban on carrying a weapon, which a judge of this Court struck down in 2014, *see Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), *appeal withdrawn*, No 14-7180, 2015 WL 1607711 (D.C. Cir. Apr. 2, 2015); D.C. Code § 7-2502.01 (2012) (repealed 2015), which criminalized the possession of non-D.C. registered firearms; and D.C. Code § 7-2506.01 (2013), which criminalized the possession of ammunition by one who does not have a D.C. registered firearm. When combined with a provision that essentially limited handgun registration to D.C. residents, D.C. Code § 7-2502.02 (2012) (repealed 2015) and a District policy of refusing to entertain non-resident gun registration applications, *see* ECF No. 133-1 ¶ 109, these provisions effectively banned non-residents from possessing a firearm. And all people, resident and non-resident alike, were prevented from carrying a weapon in public.

The six plaintiffs in this case, four non-residents and two District residents, were all arrested and charged with some combination of §§ 22-4504 (carrying ban), 7-2502.01 (unregistered firearm), and 7-2506.01 (unregistered ammunition). They bring a putative class action challenging their arrests and ultimately aborted prosecutions under 42 U.S.C. § 1983 asserting claims under the Second, Fourth, and Fifth Amendments. Plaintiffs moved for partial summary judgment regarding liability, requesting the expungement of their arrest records and a declaration of nullity as to their arrests. ECF No. 121. The District filed a cross-motion for summary judgment regarding liability. ECF No. 134. Upon consideration of these motions, the respective oppositions and replies, and the record, the Court will **GRANT** plaintiffs' motion for partial summary judgment as to Counts I and III, **DENY** plaintiffs' motion for partial summary judgment as to Count VI, **DENY** the District's motion for summary judgment as to Counts I and III, and **GRANT** the District's motion for summary judgment as to Count VI.

## I. BACKGROUND

The material facts of this case are undisputed. Plaintiffs are four non-residents and two residents of the District of Columbia who, over the course of time between May 15, 2012, and October 10, 2014, were arrested by the Metropolitan Police Department ("MPD") on gun-related charges. *See* ECF No. 121-1 ¶1.

The MPD pulled over Maggie Smith, a nurse from North Carolina and the first plaintiff in this case, on June 29, 2014, for a routine traffic stop. ECF No. 133-1 ¶ 3, 8. At the time, Smith had no criminal record. *Id.* ¶ 4. During the stop, Smith promptly informed the MPD officers that she was carrying a pistol licensed in her home state of North Carolina. *Id.* ¶ 5. The police, in response, arrested Smith for § 22-4504(a), carrying a pistol, seized her gun, and held her overnight in the D.C. Jail until her presentation in court the next day. *Id.* ¶ 6–8, 15. The U.S. Attorney's Office first

2

charged her with § 22-4504(a)[1] by complaint, then obtained an indictment which added additional charges under § 7-2502.01[2] and § 7-2506.01.[3] *Id.* ¶ 10–11. Though the U.S. Attorney's Office dismissed the indictment, the D.C. Attorney General ("OAG") recharged Smith under § 7-2502.01 and § 7-2506.01 on September 12, 2014, before ultimately dropping the charges seven months later. *Id.* ¶ 12–15. Smith's gun remains in police custody. *Id.* ¶ 17.

Gerard Cassagnol, a resident of Maryland, was driving home from his office in Northern Virginia when he was pulled over by MPD police officers. *Id.* ¶ 24–26. While searching his truck, the police officers asked Cassagnol whether he had a gun in his vehicle. *Id.* As "he had been taught," Cassagnol informed the police officers that he had a firearm locked in a safe in his trunk and gave the officers the combination. *Id.* ¶¶ 26, 28. Like Smith, Cassagnol was arrested and held in D.C. jail for two nights. *Id.* ¶ 31–34. The U.S. Attorney charged him with § 22-4504(a), § 7-2502.01, and § 7-2506.01 before dropping the charges after the District Court's decision in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.C. Cir. 2014). *Id.* ¶ 38–39. Undeterred, the OAG refiled charges under § 7-2502.01, and § 7-2506.01 against Cassagnol. *Id.* ¶ 40. Those charges were ultimately not prosecuted. *Id.* ¶ 41. Cassagnol was fired from his job after his arrest. *Id.* at ¶ 37. Cassagnol's gun remains in police custody. *Id.* ¶ 42–44. Though he reached out to the Evidence Control Branch at MPD to request the return of his gun after all charges were dropped,

---

[1] The relevant portion of D.C. Code § 22-4504(a) at the time stated that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, or any deadly or dangerous weapon capable of being so concealed." *Id.*

[2] The relevant portion of § 7-2502.01 at the time provided that "no person . . . in the District [of Columbia] shall possess or control any firearm, unless the person . . . holds a valid registration certificate for the firearm." *Id.* at (a). A related provision, § 7-2502.02(a)(4)(C) made it impossible to register a pistol unless the registrant sought the gun for self-defense "within that person's home," effectively requiring the person to live in D.C. to register their handgun.

[3] The relevant portion of § 7-2506.01 requires that "no person shall possess ammunition in the District of Columbia unless . . . [h]e is the holder of the valid registration certificate for a firearm." *Id.* at (a).

they informed him that he would have to contact his lawyer and the prosecutor to get his property returned. *Id.* ¶ 45–48.

Corporal Frederick "Cornelius" Rouse, a veteran and resident of Maryland, was staying in a hotel in downtown D.C. when police searched his hotel room for guns. *Id.* ¶ 50–57. When the police discovered two handguns and a scope, Rouse admitted they were his and were lawfully registered in Maryland. *Id.* ¶ 51. Rouse was arrested, his guns were seized, and he was charged by the OAG with § 7-2502.01 and § 7-2506.01. *Id.* ¶ 61–63. The OAG ultimately *nolle presse*'d the charges against Rouse. *Id.* ¶ 62. Rouse secured the return of his guns and scope in July 2017 after multiple attempts. *Id.* ¶ 64–65. After his arrest, his Top Secret Security Clearance was placed under review. *Id.* ¶ 54.

The next plaintiff, Delontay Davis, was a resident of Virginia who was arrested on March 23, 2014, after police spotted his pistol during a traffic stop. *Id.* ¶ 66. Virginia at the time did not require any license or registration for the open carry of pistols outside the home. *Id.* ¶ 68. After his arrest, Davis's gun was seized and he was held in D.C. jail for four nights. *Id.* ¶ 73, 80. The U.S. Attorney first charged Davis with § 7-2502.01 and § 72506.01 before dismissing the charges on January 16, 2015. *Id.* ¶ 77. The OAG promptly refiled the same charges the same day before ultimately dismissing them two months later. *Id.* ¶ 78–79.

The plaintiffs' most recent Amended Complaint, ECF No. 114, added Kimberly Buffaloe and Carl Atkinson as plaintiffs. Buffaloe and Atkinson are unique from the other plaintiffs in that, at the time of their arrests, they were both residents of the District of Columbia. ECF No. 133 ¶ 85, 97. Buffaloe was arrested on July 21, 2012, when MPD officers approached the car she was sitting in with her then-boyfriend. *Id.* ¶ 84. Buffaloe was held in D.C. jail overnight and then released to a halfway house. *Id.* ¶ 91. The U.S. Attorney charged Buffaloe with § 22-4504(a), § 7-2502.01, §

7-2506.01, and § 22-2511. *Id.* ¶ 94. Nearly eight months later all charges against Buffaloe were dismissed. *Id.* ¶ 95.

Atkinson, the final plaintiff, was arrested after a traffic stop by MPD on January 28, 2014. *Id.* ¶ 96. Officers arrested Atkinson after finding a loaded pistol in the backseat during a search. *Id.* ¶ 100. He was held overnight in D.C. jail and charged with § 22-4504(a) at presentment in court the next day, but the U.S. Attorney ultimately dismissed the charges three months later. *Id.* ¶ 102–105.

Both parties agree that when the arrests occurred, no person in the District of Columbia, resident and non-resident alike, could carry either a handgun or ammunition outside the home. *Id.* ¶ 108. And at the time of these arrests, the District of Columbia refused to even *entertain* gun registration applications by individuals who were not residents of the District of Columbia. *Id.* ¶ 109. Gun registration applicants were required to submit "[p]roof of residency in the District of Columbia (e.g., a valid [D.C.] operator's permit, [D.C.] vehicle registration card, lease agreement for a residence in the District, the deed to your home or other legal document showing [D.C.] residency)." *Id.* ¶ 110. Non-residents without such proof of residency had no recourse to seek a District of Columbia gun registration. *Id.* It is also undisputed that during the time of these arrests the MPD seized handguns and other evidence from people arrested on gun offenses. *Id.* at ¶ 127.

On July 24, 2014, the District Court struck down § 22-2404(a), the prohibition against open carry, and § 7-2502.02(a), which prohibited persons from registering a handgun unless it was "for use in self-defense within that person's home." *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). The Court in *Palmer* enjoined the District from enforcing those two statutes against individuals "based solely on the fact that they are not residents of the District of Columbia." *Id.* at 184.

As in the examples above, when a suspect was arrested on a District gun offense, the MPD would seize handguns and other evidence. ECF No. 133-1 ¶ 127. Handguns and ammunition were initially classified as "evidence" in these situations. *Id.* ¶ 128. To obtain release of these seized firearms, there is a set procedure. MPD must present a Form 81-C for the U.S. Attorney's Office to sign indicating that there is no objection to the release. *Id.* ¶¶ 131, 134. As the plaintiffs note, MPD's Evidence Control Branch would sometimes assist owners in retrieving their seized firearms by shipping guns to either the owner themselves in a different state, a police station in a different state, or a gun dealer outside of the District. *Id.* ¶ 140.

Plaintiff Smith filed this lawsuit in 2015 as a putative class action. ECF No. 1. Plaintiffs Cassagnol and Rouse were subsequently added in the first Amended Complaint, ECF No. 22, and all plaintiffs moved for class certification, ECF No. 26. This court denied the motion after both parties consented to deferring class certification until after liability was determined. ECF Nos. 36 & 38.

Plaintiffs next filed a Second Amended Complaint with ten claims against the District of Columbia, alleging violations of their Second, Fourth, and Fifth Amendment rights. ECF No. 50. The District moved to dismiss under Rule 12(b)(1), arguing that plaintiffs lacked standing and the Court lacked jurisdiction. ECF No. 53. The District also moved to dismiss for failure to state a claim. ECF No. 53. This Court found that the plaintiffs had standing but dismissed seven of the plaintiffs' claims under Rule 12(b)(6). *Smith v. District of Columbia*, 387 F. Supp. 3d 8 (D.D.C. 2019).

Plaintiffs then filed a Third Amended Complaint, adding Atkinson and Buffaloe, the first resident plaintiffs. ECF No. 114. The complaint contains their three remaining claims: Count I, that District of Columbia's "gun control regime" during the time of the arrests violated their

Second Amendment rights; Count III, that District of Columbia's "gun control regime" during the time of arrests violated their Fifth Amendment rights to travel and equal protection with respect to non-residents; and Count VI, that the retention of handguns and ammunition after all plaintiffs' cases were closed violated their Fourth Amendment rights. *Id.* ¶ 39–43. Both parties moved for summary judgment as to liability on these three claims. ECF Nos. 121 & 134.

## II. LEGAL STANDARDS

### A. Summary Judgment

For a movant to succeed on a motion for summary judgment, she must "sho[w] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a summary judgment motion, all inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute about a material fact is "genuine" if the nonmovant presents evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When facing cross-motions for summary judgment, neither party "waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989).

### B. Claims Under 42 U.S.C. § 1983

To succeed on a 42 U.S.C. § 1983 claim against a municipality, the plaintiffs must prove that there was (1) a "predicate constitutional violation" and (2) that a "custom or policy of the municipality caused the violation." *Louis v. District of Columbia*, 59 F. Supp. 3d 135, 150 (D.C.

Cir. 2014) (quoting *Baker v. District of Columbia*, 326 F.3d 1302, 1305 (D.C. Cir. 2003). The custom or policy must be the "moving force" behind the constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Section 1983 "creates liability for a local government when 'the action that is alleged to be unconstitutional implements or executes a[n] . . . ordinance . . . officially adopted and promulgated by that body's officers." *Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 282 (D.D.C. 2011) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).

## III. DISCUSSION

### A. There is No Genuine Dispute of Material Fact Regarding Plaintiffs' Second Amendment Claims, and No Reasonable Jury Could Find for The District

Plaintiffs first argue that three now-repealed D.C. statutes, §§ 7-2502.01, 7-2506.01, and 22-4504, infringe on their Second Amendment rights. They argue that these statutes in combination made it impossible for all persons, both non-residents and residents, to lawfully carry a handgun for self-defense. ECF No. 121 at 12. The District argues in response that its actions did not violate the Constitution, because "the right to carry a firearm in public . . . did not exist in the District prior to *Palmer*" and because there has never been a right to carry a firearm without "needing to acquire any permit whatsoever." ECF No. 134 at 12–14.

Because the three statutes in question—§§ 7-2502.01, 7-2506.01, and 22-4504—were part of the District of Columbia Code, there is no question here that the unconstitutional action here, if there was any, was executed pursuant to an ordinance "officially adopted and promulgated by that body's officers." *Barnes*, 493 F. Supp. 2d at 282. The parties here rightfully focus the majority of their energy on whether there was a predicate constitutional violation, the second requirement for a *Monell* claim.

As plaintiffs note, ECF No. 121 at 13, complete prohibitions of Second Amendment rights are always invalid. *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017). It is undisputed that during the period in question here, there was a complete ban on carrying handguns in public—§ 22-4504(a) banned carrying weapons in public until it was held unconstitutional in 2014, and § 7-2502.01 and § 7-2506.01 banned carrying weapons or ammunition without a license, which non-residents could not acquire. It is further undisputed that plaintiffs were arrested, detained, prosecuted, and had their guns seized pursuant to these laws.[4] ECF No. 133-1 ¶ 1–2.

In response, the District first recites the two steps for analyzing a challenge to a law under the Second Amendment. ECF No. 134 at 13. First, the Court determines whether the regulated activity is "outside the Second Amendment's protections." *Medina v. Whitaker*, 913 F.3d 152, 156 (D.C. Cir. 2019). Next, if the activity is *within* the Second Amendment's protections, the burden shifts to the government to show that the regulation is "substantially related to an important government objective." *Id.* But this analysis is unproductive here because § 22-2504 has been held unconstitutional and this Circuit has firmly stated that at the "Second Amendment's core lies the right of responsible citizens to carry firearms for personal self-defense beyond the home, subject to longstanding restrictions.*"* *Wrenn*, 864 F.3d at 667. It is beyond argument that these statutes, which both parties agree made it effectively impossible for *any* person to carry a gun "beyond the home," ECF No. 133 ¶ 108, regulated activity within the Second Amendment's protections. And the District makes no further argument as to how these laws were substantially related to an important government objective.

---

[4] The District notes that Buffaloe was also charged by the arresting officer with the National Firearms Act. ECF No. 133-1 ¶ 1. This fact is immaterial, as she was formally charged and further detained based solely on D.C. laws. ECF No. 123-3 at 28–30.

The District's next argument strays further from the point. Despite what the District half-heartedly argues, ECF Nos. 134 at 14 & 140 at 5, constitutional rights do not spring out of thin air. Judge Scullin did not singlehandedly manifest a constitutional right into existence in *Palmer*. ECF No. 140 at 5. The Second Amendment "codified a pre-existing right," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)—and that right includes the right of "responsible citizens to carry firearms for personal self-defense beyond the home." *Wrenn*, 864 F.3d at 667. To the extent that the District claims it could not have violated plaintiffs' rights because they did not exist at the time of their arrests, that argument fails.

The District finally points out that there is *no* constitutional right "to carry a firearm without needing to acquire any permit whatsoever." ECF No. 134 at 14. This is true. Traditional limits to the Second Amendment include licensing requirements. *Wrenn*, 864 F.3d at 667. Building off this point, the District argues that plaintiffs' conduct was not protected because they did not "attempt to fully familiarize themselves with the District's firearms regulations" nor "attempt to obtain a [D.C.] registration or license." ECF No. 134 at 14–15. The District notes that under the current D.C. Code, carrying without a license is still prohibited. *Id*. at 7. Put simply, the District reasons that because there is a counterfactual world where it had a *constitutional* gun control regime in place during the arrests that could criminalize plaintiffs' conduct, there was no constitutional violation.

Again, the District misses the mark. It cites no support for the proposition that constitutional analysis implicates what plaintiffs would have done in a different world under different laws. It fails to support the idea that for plaintiffs' actions to be constitutionally protected they were required to go through futile actions, like attempting to obtain a D.C. gun registration, in anticipation of a future set of *Palmer*-compliant law. The District fails to address the key,

undisputed fact in this case. There were *no* actions that the plaintiffs could have taken during the time period in question that would have allowed them to carry a gun for self-defense in the District of Columbia. Even if the plaintiffs had "properly familiarize[d] themselves with District firearm laws," ECF No. 134 at 15, they would not have had any avenue to constitutionally carry for self-defense. These laws "besiege[ed their] free-standing substantive rights." *Smith*, 387 F. Supp. 3d at 27.

In sum, plaintiffs were arrested, detained, and had their guns seized under a gun control regime that completely banned carrying handguns in public. That fact is undisputed. ECF No 133-1 ¶ 1–2. The same set of laws barred non-residents from obtaining a gun registration, and then permitted the arrest of non-residents for carrying weapons or ammunition without a license. *Id.* These laws go to the core of the Second Amendment, which preserves the "right of responsible citizens to carry firearms for personal self-defense beyond the home, subject to longstanding restrictions." *Wrenn*, 864 F.3d at 667. The District was thus burdened with showing the law was "substantially related to an important governmental objective." *Medina*, 913 F.3d at 156.  It has failed to do so.

Accordingly, this Court finds that there is no genuine dispute of material fact as to the District's liability on Claim 1. Construing the facts most favorably to the defendants, the District violated the plaintiffs' Second Amendment rights by arresting them, detaining them, prosecuting them, and seizing their guns based on an unconstitutional set of D.C. laws. This Court will **GRANT** plaintiffs' motion for partial summary judgment and **DENY** the District's motion for summary judgment as to liability on Count I.

**B. There is No Genuine Dispute of Material Fact Regarding Plaintiffs' Fifth Amendment Claims, and No Reasonable Jury Could Find for the District**

Plaintiffs next argue that the District's gun laws violated their Fifth Amendment rights to travel and equal protection. ECF No. 121 at 22. Only the non-resident plaintiffs—Smith, Cassagnol, Rouse, and Davis—bring this claim. They argue that the District's gun laws discriminate against non-residents by denying them the fundamental right to carry a weapon for self-protection.

This Court has previously explained that §§ 7-2502.01 and 7-2506.01, which banned possession of an unlicensed firearm or ammunition, when combined with § 7-2502.02, which barred gun registration unless the registration sought the weapon for "self-defense within that person's home," treated D.C. residents and non-residents differently. *Smith*, 387 F. Supp. 3d at 28. Neither party disputes that the District also maintained a policy of refusing to entertain gun registration applications by non-residents during the period in question. ECF No. 133-1 ¶ 109. The District allowed residents to register their guns but "made it impossible for [non-residents]." *Smith*, 387 F. Supp. 3d at 28. In combination, these practices made it impossible for any non-resident to carry (or even possess) a gun in the District.

Before turning to the equal-protection and right-to-travel claims, the Court will first address the District's arguments that these two claims are either not ripe or are coextensive with the Second Amendment claims. Turning first to ripeness, the court in *Palmer* held that the right-to-travel and equal-protection claims were not ripe because at the time of the case residents and non-residents were equally unable to carry a handgun in public for self-defense in the District. 59 F. Supp. 3d at 183. But these the claims are now ripe. At least one non-resident plaintiff, Frederick Rouse, was arrested *after* the court invalidated § 22-4504(a), which barred open or concealed carry in the District, but *before* the District began allowing non-residents to register for a gun license. ECF No.

133-1 ¶ 1.[5] Second, the equal-protection and right-to-travel claims are not coextensive. Here, non-residents were banned from possessing guns *at all*, while residents were banned only from carrying them in public. Non-residents thus faced a unique injury—the inability to possess a gun *anywhere* in the District.

  i.   *Equal Protection*

The Fifth Amendment prohibits the District from denying the equal protection of its laws to any person within the District. *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954). The first issue in equal-protection analysis is what level of scrutiny applies. *Banner v. United States*, 428 F.3d 303, 307 (D.C. Cir. 2005). "Strict scrutiny . . . is warranted if the restriction 'jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic.'" *Id.* (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). Generally, a "bona fide residence requirement implicates no 'suspect' classification" that would require strict scrutiny. *Martinez v. Bynum*, 461 U.S. 321, 328 n.7 (1983). But when the right being denied to a non-resident is a fundamental right protected by the Constitution, strict scrutiny applies. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). And the de-facto residency requirement at issue here affected the fundamental right to keep and bear arms, including for personal self-defense. Strict scrutiny therefore applies to the plaintiffs' equal protection claims. *See also Smith*, 387 F.3d at 29 (concluding that outside

---

[5] The Court also rejects the District's argument that non-residents could transport a gun into the District under federal law. ECF No. 134 at 20. The District fails to explain how, if the Firearm Owners' Protection Act protected those lawfully possessing a handgun in any State to transport that weapon unloaded and "contained in a locked container other than the glove compartment or console," 18 U.S.C. § 926A, Cassagnol was arrested. Plaintiffs attest—and the District did not dispute—that Cassagnol had an unloaded gun in a locked safe when he was arrested. ECF No. 133-3 ¶ 27. Clearly FOPA does not foreclose plaintiffs' claims here.

of the equal-protection context, the Circuit's Second Amendment jurisprudence further supports applying strict scrutiny here).

Strict-scrutiny analysis requires the District to show that the gun laws in question are "narrowly tailored to effectively advance a compelling interest." *Id.* at 29. The District, however, declines to make this showing. Instead, it focuses all its energy on arguing that strict scrutiny should not apply because the right in question is not fundamental. ECF No. 134 at 17–22.

The District cites two cases to illustrate that the right in question here is not fundamental. Both are unpersuasive. It first cites *Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013), a case where a Washington resident applied for a concealed-carry license in Colorado and was denied based on residency and reciprocity requirements. The Tenth Circuit affirmed the district court's rejection of plaintiff's claims under the right to travel and the Privileges and Immunities Clause of Article IV, reasoning that the concealed carry of firearms had not been recognized as a right "basic of the livelihood of the nation." *Id.* at 1216. The District argues that we should apply the Tenth Circuit's analysis here and hold that the concealed carry of firearms is not a fundamental right. ECF No. 134 at 18. But unlike in *Peterson*, where the plaintiff could carry his concealed firearm in his home and automobile, *Peterson*, 707 F.3d at 1202, the District's gun laws amounted to a *total* ban on any possession of a firearm for non-residents—plainly invading the fundamental right to keep and bear arms for personal self-defense. *See McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 775–76 (2010). And, as the District concedes in a footnote, the Privileges and Immunities Clause of Article IV, the basis of the Tenth Circuit's decision, does not apply to the District of

Columbia. ECF No. 134 at 18 n.11; *Duehay v. Acacia Mut. Life Ins. Co.*, 105 F.2d 768, 775 (D.C. Circ. 1939).

The District's second case is equally inapposite. *Culp v. Raoul*, 921 F.3d 646, 657 (7th Cir. 2019) involved a concealed-carry licensing scheme that required all registrants, resident and non-resident alike, to undergo ongoing record monitoring. *Id.* at 651. Because only states with "substantially similar regulatory schemes" allowed Illinois to obtain enough information for this ongoing monitoring, only non-residents from certain states could acquire an Illinois concealed carrying license. *Id.* at 650–51. But non-residents were not denied the right to licensure *solely* based on their non-resident status, like here. Another state could, for example, alter its regulatory scheme to provide Illinois the required information. And, again, this is another Circuit applying the Privileges and Immunities Clause of Article IV, a section that does not apply to the District.

Nothing the District provides dissuades the Court from its original analysis and conclusion that strict scrutiny applies to the plaintiffs' equal protection claims, because those claims affect their fundamental rights to keep and bear arms for self-defense. *Smith*, 387 F.3d at 29. And because the District puts forth *no* showing regarding how these laws were narrowly tailored to achieve a compelling government interest, the Court finds that there is no genuine dispute of material fact and the plaintiffs are entitled to partial summary judgment regarding their equal protection claim.

ii.   *Right to Travel Claim*

As the Court has previously noted, the "right to travel analysis refers to little more than a particular application of equal protection analysis" scrutinizing the distinction between newcomers and longstanding residents. *Smith*, 387 F.3d at 30 (quoting *Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982)). Government infringement on the fundamental right to travel is measured under a strict scrutiny standard. *Id.* A law implicates the right to travel when it utilizes "any classification which

serves to penalize the exercise of that right." *Att'y Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (plurality opinion). The right to travel can be violated when it impairs a plaintiff's "right to go from one place to another or to cross state borders while en route." *Pollack v. Duff*, 793 F.3d 34, 48 (D.C. Cir. 2015).

Previously, this Court explained that "if [the gun laws] take away the fundamental right to have a handgun for individual self-defense from non-D.C. residents who enter the District, this Court must apply strict scrutiny." *Smith*, 387 F. Supp. 3d at 30. Neither party disputes that, at the time in question, non-residents in the District could not possess a gun. And, again, the District fails to even put forth a showing regarding how these laws were narrowly tailored to achieve a compelling government interest. Accordingly, this Court finds there is no genuine dispute of material fact regarding plaintiffs' right to travel claim, and no reasonable jury could find for the District.

This Court will **GRANT** plaintiffs' motion for partial summary judgment as to liability on Count III and **DENY** the District's motion for summary judgment.

### C. There is No Genuine Dispute of Material Fact Regarding Plaintiffs' Remaining Fourth Amendment Claim, and No Reasonable Jury Could Find for the Plaintiff

Plaintiffs Smith, Cassagnol and Davis's final remaining claim is to challenge the ongoing seizure of their guns and ammunition, long after the District aborted their prosecutions. ECF No. 115 ¶ 301–04. Each of these plaintiffs had their gun seized during their arrest. ECF No. 133-1 ¶ 133. None of them have recovered their guns. *Id.* Previously, this Court explained that it must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion" when evaluating this claim. *Smith*, 387 F. Supp. 3d at 25 (quoting *United States v. Place*, 462 U.S. 696,

703 (1983)). In other words, the "Fourth Amendment permits seizures only for as long as necessary." *Id*.

In *Smith*, this Court posed a simple question to the District: what justification could it possibly have for still holding plaintiffs' guns and ammunition years later? *Id*. Now, the District answers. The District has an interest in keeping its community safe, preventing crime, and protecting law enforcement officers. ECF No. 134 at 23. That interest, it argues, includes retaining contraband, such as unlawfully carried firearms. *Id*. At the time—and still to this day—District law defines a firearm that is "unlawfully owned, possessed, or carried" as a nuisance. D.C. Code § 22-4517. It was reasonable, then, for "MPD to require verification that a claimant was authorized to possess a weapon before returning it to them." ECF No. 140 at 11. In simplest terms, the District argues that its governmental interest in keeping unregistered firearms and ammunition off the streets justified the invasion of plaintiffs' rights.

Plaintiffs argue that § 22-4517, which declares unregistered firearms a nuisance, is unconstitutional under the Second Amendment because it was part of the gun-control regime in the District at the time. ECF No. 137 at 38–40. Accordingly, they argue, continued seizure of their unregistered firearm pursuant to this statute cannot be warranted. *Id*. This argument echoes many of the points made in their Fifth and Second Amendment claims. In essence, plaintiffs claim that because they were unable to secure a District firearm registration during the time period in question, the continued seizure of their guns based on the *lack* of a firearm registration cannot be reasonable and must be unconstitutional.

If the District required the firearm to be registered *in the District* to return it to plaintiffs or only accepted proof of a District-issued firearm registration during the time period in question, plaintiffs may have had a point. But their argument fails for a simple reason. Plaintiffs do not

dispute that the District would, if requested, acknowledge the registration status of firearms from *other* states and ship the firearms to owners there. ECF No. 121-1 ¶ 140. Plaintiffs did not have to possess a *District* gun registration to secure the return of their firearm—instead, they merely needed to show that the gun was registered in their home state. ECF No. 130-1 at 34–36. It is undisputed that basic registration requirements are constitutional. *See Wrenn*, 864 F.3d at 667 ("[T]raditional limits include, for instance, licensing requirements."). And plaintiffs do not put forth any argument that the gun registration laws in their home states were constitutionally lacking.

Plaintiffs confusingly counter that because these procedures were not published online or expressly delineated in statutes, they had "no way of knowing" they could get their guns back this way. ECF No. 137 at 41. But they cite no support for the proposition that this affects the Fourth Amendment analysis. Instead, they cite a set of cases related to Fourteenth Amendment due-process rights and forfeiture. *Id.* at 42. Not only is this case law off-point, but this Court has already held that the District's mechanism to challenge the guns' seizure satisfied the Fifth Amendment's due process requirement. *Smith*, 387 F. Supp. 3d at 31.

The District no doubt had a governmental interest in protecting the community from the potential violence wrought by unregistered firearms. It is undisputed that the District would release a firearm to a gun-owner in another jurisdiction if it was properly registered there. On balance, the District's interest in preventing unregistered firearms from circulating in the community greatly outweighs the intrusion caused by requiring plaintiffs to prove that the seized firearms were registered. The Court finds that no reasonable jury could conclude that retaining these firearms, lawfully seized, *id.* at 25, until plaintiffs prove they are registered *somewhere* violates their Fourth

Amendment rights. Accordingly, plaintiffs' motion for partial summary judgment on Count VI is **DENIED**, and the District's motion for summary judgment on Count VI is **GRANTED**.

### IV. CONCLUSION

For the foregoing reasons, the Court will **GRANT** plaintiffs' motion for partial summary judgment as to Counts I and III, **DENY** plaintiffs' motion for partial summary judgment as to Count VI, **DENY** the District's motion for summary judgment as to Counts I and III, and **GRANT** the District's motion for summary judgment as to Count VI by separate Order.

Date: September 29, 2021

Hon. Royce C. Lamberth
United States District Judge

19