BH edits 8.22.23

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAGGIE SMITH, *et al*.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 15-737 (RCL)** |
| **GOVERNMENT OF THE DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

## PLAINTIFFS' UNOPPOSED MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

### INTRODUCTION

Plaintiffs move for preliminary approval of the proposed class action settlement set forth in the Settlement Agreement and for this Court to authorize them to send notice to the class defined in the Settlement Agreement, because Plaintiffs and Defendant the District of Columbia ("the District") demonstrate that the Court will "likely be able to" grant final approval to the settlement. Fed. R. Civ. P. 23(e)(1);[1] see also William Rubenstein, 4 <u>Newberg on Class Actions</u>, § 13:15 (5th ed.) (Standard for granting preliminary approval—Substantive requirements). That is, "the terms of the Settlement Agreement are within the range of what would constitute a fair, reasonable, and adequate settlement in the best interests of the Class as a whole." <u>Bynum v. Gov't of the D.C.</u>, 384

---

[1] In 2018, Congress adopted changes to Fed. R. Civ. P. 23(e) which essentially codified prior case law regarding the standard for evaluating whether to grant preliminary approval in a proposed class action settlement and to send notice of it to the class. <u>See generally</u> 4 <u>Newberg on Class Actions</u> § 13:13 (5th ed.). Plaintiffs discuss the effect of the amendments on pre-existing caselaw below in the section on the discussion of the standard.

F. Supp. 2d 342, 343 (D.D.C. 2005). The full Settlement Agreement, proposed Order of Preliminary Approval, proposed Claim and Release Forms and the proposed Class Notice are attached.

## ARGUMENT

Maggie Smith, Gerard Cassagnol, Frederick Rouse, Delontay Davis, Kimberly Buffaloe, and Carl Atkinson (individually, a "Plaintiff" and collectively "Plaintiffs"), individually and as representatives of the classes they represent, and Defendant the District of Columbia, reached an agreement to settle this case as memorialized in the attached Settlement Agreement.[2] By agreement of the Parties, upon finalization of the Settlement and entry of final approval, this matter will be dismissed with prejudice and this Court shall retain jurisdiction for the sole purpose of enforcing the Settlement. Plaintiffs also move to eliminate the Non-Resident Class because it is a sub-class of the Second Amendment Class and to revise the Second Amendment Class Definition to conform to the terms of the Settlement Agreement.

The proposed settlement represents a fair and reasonable compromise of Plaintiffs' claims and the District's defenses. Undersigned counsel strongly believe that the proposed settlement is fair, reasonable, and in the best interest of the class.

## I.   Procedural History of the Case

Plaintiff Maggie Smith filed this case as a single plaintiff complaint for money damages on May 15, 2015. Complaint [1], Smith v. Government of the District of Columbia, 15-737 (D.D.C.) (RCL). Ms. Smith later twice amended the complaint by adding several plaintiffs and several claims and adding class action allegations. The operative complaint is the Third Amended

---

[2]     The defined terms used in this motion have the same meanings assigned in the Settlement Agreement.

Complaint. [114].

On May 16, 2019, this Court decided the District's motion to dismiss the Second Amended Complaint and the following claims survived: Claim One, Second Amendment claim for damages for arrest, detention, and/or prosecution of any person (resident or non-resident) pursuant to the District's unconstitutional gun control regime; Claim Three, Fifth Amendment claim for damages for arrest, detention, and/or prosecution of any non-resident pursuant to the District's unconstitutional gun control regime; Claim Six, retention of handguns and ammunition seized as evidence after the case was over in violation of the Fourth Amendment. Memorandum Opinion [59], Order [60] reported at Smith v. District of Columbia, 387 F. Supp. 3d 8 (D.D.C. 2019).[3]

The Parties engaged in a lengthy period of discovery which began when the Court issued a Scheduling Order [80] on December 26, 2019 and continued until 2021, during which the Parties exchanged written discovery, took numerous depositions, and Plaintiffs requested and received data exports from the MPD arrest booking database, the Superior Court's docketing database, and the District of Columbia Department of Corrections' inmate accounting system database, JACCS. During this time, Plaintiffs filed the Third Amended Complaint [114], adding Plaintiffs who were residents of the District of Columbia. Plaintiffs also filed a motion [ECF No. 96] to compel certain criminal history information about potential class members which the Court denied without prejudice. *See* Mem. Op. & Order [143].

The Parties filed cross motions for summary judgment in 2021 and on September 29, 2021, this Court granted in part and denied in part Plaintiffs' Motion for Partial Summary Judgment, and granted in part and denied in part Defendant's Motion for Summary Judgment. See Order [142].

---

[3]      Claim Ten, for failure to notify owners of secret proceedings, was dismissed later. See Order [158].

Plaintiffs' Second Amendment claim (Claim One) and Plaintiffs' Fifth Amendment claim (Claim Three) survived summary judgment, but the Court entered judgment for the District on Claim Six (retention of guns and ammunition seized as evidence after the underlying case was over).

On October 8, 2021, the Court referred this case for mediation. *See* Order [147]. The Parties engaged in a lengthy mediation process with the District of Columbia Circuit Mediation Program. On June 9, 2023, the District filed a notice indicating Mayoral approval of the settlement. *See* Notice [167].

## II.   Incentive Payments for Class Representatives

The Parties ask the Court to award incentive payments of $50,000 to each Class representative for the Settlement Class to compensate class representatives for their service to the classes and for the risks they took in stepping forward to represent the classes. This sum includes their damages awards as well as their incentive awards. The basis for incentive payments is the services Class representatives provide to the class, such as monitoring class counsel, responding to interrogatories and document production requests, being deposed by opposing counsel, keeping informed of the progress of the litigation, and serving as a client for purposes of approving any proposed settlement with the defendant. 5 Newberg on Class Actions § 17:3 (Rationale for incentive awards); see also Wells v. Allstate Ins. Co., 557 F. Supp. 2d 1, 8-9 (D.D.C. 2008) ("In deciding whether to grant incentive awards and the amounts of such awards, courts consider factors such as the actions the plaintiff[s] [have] taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff[s] expended in pursing the litigation.") (internal quotations omitted); Hoyte v. Gov't of the D.C., 13-567 (CRC) (incentive payments of $10,000 to each Class representative for the Vehicle Forfeiture Class and $3,500 to each Class representative of the Forfeiture Notice Class). Each of the Class

representatives provided these services and the class has benefitted from those actions, and each Class representative has participated in over eight years of litigation and settlement negotiations. They also provided invaluable information to Class Counsel about the District's method of enforcing its gun control regime and other issues throughout the litigation. These awards are reasonable considering the size of the settlement fund.

There was no *ex ante* agreement between putative class counsel and putative class representatives containing any assurances with regard to incentive awards, and each Class representative understands that whether to award incentive payments is within the discretion of the Court. See, e.g., 5 Newberg on Class Actions § 17:17 (Judicial review—Disfavored practices— Ex ante incentive award agreements); Rodriguez v. West Publishing Corp., 563 F.3d 948, 959–60 (9th Cir. 2009) (finding that a requirement in the retainer agreement between some class representatives and their counsel that counsel seek incentive awards created a conflict of interest). The amounts of the proposed incentive payments are within the range awarded by Courts in this District in similar cases. See, e.g., Kifafi v. Hilton Hotels Ret. Plan, 999 F. Supp. 2d 88, 105 (D.D.C. 2013) (awarding named plaintiff $50,000 as an incentive award); Advocate Health Care v. Mylan Labs. Inc. (In re Lorazepam & Clorazepate Antitrust Litig.), 2003 U.S. Dist. LEXIS 12344, *34 (D.D.C. 2003) (awarding $20,000 to each plaintiff in an antitrust case); Cobell v. Jewell, 802 F.3d 12, 18 (D.C. Cir. 2015) (noting District Court had granted four of the Class Representatives a total of $2.5 million in incentive awards); Wells, 557 F. Supp. 2d at 9 (awarding $10,000 to each of two class representative).

**III.**     <u>**Proposed Changes to the Settlement Class Definitions**</u>

The Parties propose revisions to the class definitions set forth in the Third Amended Complaint by eliminating the Non-Resident Class, because it is a sub-class of the Second Amendment class, and revising the Second Amendment Class Definition to conform to the terms of the Settlement Agreement, that is, specifying the categories of persons who are excluded from the class because they are disqualified by convictions of certain offenses. The Parties also rename the Second Amendment Class the Settlement Class for ease of administration. The proposed revisions do not depart from the rationale of the Court's prior rulings on summary judgment or any of the elements of Rule 23(a) or (b).

This is a settlement class and the Parties, with Court approval, can always amend the class definitions to fit the terms of the settlement, especially in the wake of a liability determination. <u>Fonder v. Sheriff of Kankakee Cty.</u>, 823 F.3d 1144, 1147 (7th Cir. 2016). "The class definition must yield to the facts, rather than the other way 'round." <u>Id.</u>; <u>see also</u> <u>In re White</u>, 64 F.4th 302, 315 (D.C. Cir. 2022).

**A.**     <u>**Class Definition**</u>

The class definition contained in the Third Amended Complaint and the proposed revised class definition are both set forth below.

| Third Amended Complaint, ¶ 307 | Proposed Settlement definition |
|---|---|
| (i) in the period beginning three years before the date of filing of the original complaint in this case and going forward up to October 10, 2014; (ii) was arrested and/or arrested and detained (including subjected to conditions of release) in the District of Columbia for violation of any of the District's gun control regime; (iii) for conduct involving any of, or any combination of, carrying or possessing a | 1. **Settlement Class Member** means each person who:<br>(i) in the period from May 15, 2012 (three years before the date of filing of the original complaint in this case) until October 10, 2014; (ii) was arrested or prosecuted, or whose prosecution started before the Class Period and continued during and after the Class Period; (iii) in the District of Columbia; (iv) for a violation of any of the District's gun |

| | |
|---|---|
| pistol or unlicensed firearm or ammunition outside their home or place of business. | control laws; (v) outside their home or place of business; except that the following groups of people are excluded from the class:<br>1) persons who were convicted of a felony before their arrests or prosecutions;<br>2) persons who were convicted of a domestic violence misdemeanor within the five-year period before their arrests or prosecutions;<br>3) persons who were subject to a judicial order compelling them to relinquish any firearms in their possession or barring them from possessing any firearms at the time of their arrests or prosecutions; and<br>4) persons who were convicted of at least one felony or violent misdemeanor charge arising out of the arrest. |

The Parties' proposed revised Class definition: (1) merges the Second Amendment Arrest Class and the Nonresident Class Arrest Class from the Third Amended Complaint, because discovery showed that the proposed revision would encompass both categories, thereby allowing for more efficient administration of the class, (2) retains the designated Class Period and offenses covered by the original Second Amendment Arrest Class, and (3) omits persons who, at the time of their arrest or prosecution, would have been ineligible for a firearms permit due to certain disqualifying criminal histories.

## IV.   <u>The Settlement Terms</u>

The full Settlement Agreement is filed with this motion. The key terms are:

### 1.   <u>Settlement Amount</u>

The District has agreed to pay Five Million One Hundred Thousand Dollars and Zero Cents $5,100,000.00) ("the Settlement Amount"), which is divided as follows:

    a. $2,504,190.11 to be paid to the Settlement Class members ("SCM Fund");

    b. $300,000.00 for payment to the class representatives to pay their claims and for their special assistance in the case. Of that amount, each Settlement Class representative will receive $50,000 as a combined damages and incentive award;

    c. $100,000.00 for sending notice to Class Members and the other costs of administering the class settlement;

    d. $1,900,000.00 to Class Counsel for attorney's fees;

    e. $295,809.89 for Litigation Expenses for costs incurred by Plaintiffs' counsel.[4]

    f. In addition, the District will not oppose Plaintiffs' motion for an Order declaring the arrest of each Class Member null and void and a legal nullity substantially in the form of the attached order.

**2.**   **<u>Notice</u>**

    a. Class Administrator JND Legal Administration, which handled the administration of claims for the <u>Cobell v. Norton</u> "Indian Trust Fund" class action, and <u>Hoyte v. Government of the District of Columbia</u>, will send notice, which shall include:

    b. Sending notice to all Class Members;

    c. Pre-mailing address updates using U.S. Postal Service databases for address verification and mail forwarding for all Class Members;

    d. Post-mailing follow-up using a skip-tracing service for all mailed Notices returned undelivered and remailing to alternative addresses discovered by the skip-tracing service;

---

[4]    The Litigation Expenses originally totaled $438,714.83, of which $428,714.83 was earmarked for payment to Tritura Information Governance LLC ("Tritura") for discovery and data analysis services performed on behalf of the Class Members, and $10,000.00 was earmarked for miscellaneous expenses including depositions and other related items advanced by Class Counsel. An amount of $142,904.94 will be waived by Tritura and donated to increase the SCM Fund and the Class Representative Award, and has been incorporated in the figures above.

    e.   Mailing reminder postcards for large claims;

    f.   Maintaining an informational website; and

    g.   Sending notice to state officials of class residents pursuant to 28 U.S.C. § 1715(b).

**3.**    **Claims Process**

    a.   Class Administrator JND Legal Administration will administer the claims process, which shall include:

    b.   A 120-day claims period;

    c.   That each SCM who is a member of the Class and submits a valid, timely Claim and Release Form will receive one point for one or more arrests covered by the Class Definition and one point for one or more prosecutions covered by the Class Definition;

    d.   That each point is valued at $1,200.00, and that each SCM will receive an award equivalent to the value of the sum of their points, subject to adjustment as described below;

    e.   That, if the total cash value of the total number of points of valid, timely claims exceeds the value of the SCM Fund, each SCM will receive the *pro rata* value of their points;

    f.   That SCMs can choose among the following payment methods: (1) check sent by mail (valid for ten months) or (2) electronic payments ("e-payments") sent online using an e-payment provider; and

    g.   That, if any amount in the SCM Fund remains after all reasonable efforts to distribute funds to Class Members have been exhausted, the residual amount will be distributed in the following order of priority:  (1) to the Class Administrator, for an amount invoiced by the Class Administrator for Administrative Expenses, as described in Paragraphs 39.d and 40.d of the Settlement Agreement and/or approved by this Court in the Final Approval Order, (2) to Tritura, for an amount

up to the total Tritura SCM Fund Donation as described in Paragraph 39.b.i of the Settlement Agreement, (3) to the District of Columbia General Fund.

**V.     The Court Should Approve The Class Settlement**

The proposed settlement satisfies the criteria of Fed. R. Civ. P. 23(e) which sets forth the standard for granting preliminary approval of a class action settlement.

**A.     Standard for Preliminary Approval**

In 2018, Congress adopted changes to Fed. R. Civ. P. 23(e) which essentially codified prior case law. See generally, 4 Newberg on Class Actions § 13:13 (Standard for granting preliminary approval—Generally). Under the Rule, as amended, the Court preliminarily reviews a class action settlement to determine whether to grant preliminary approval of a proposed class action settlement and to send notice of it to the class if the movant demonstrates that the Court will "likely be able to" grant final approval to the settlement. Fed. R. Civ. P. 23(e).

Under case law pre-dating the 2018 amendments to the Rule, the Court reviewed a proposed settlement to determine whether it was "within the range such that final settlement approval may be appropriate." Bynum, 384 F.Supp.2d at 343. Plaintiffs and the District rely on case law predating the 2018 changes to Rule 23(e) in this motion because the Court continues to do so. See, e.g., Abraha v. Colonial Parking, Inc., No. 16-680 (CKK), 2020 U.S. Dist. LEXIS 136538, at *20 (D.D.C. July 31, 2020) (citing to Rule 23(e) and evaluating whether a proposed settlement is fair, reasonable, and adequate according to the usual five-factor test used in this Circuit before the 2018 amendments).

Although "[t]here is no single test in this Circuit for determining whether a proposed class action settlement should be approved under Rule 23(e)," the following factors are relevant:

(a) whether the settlement is the result of arm's length negotiations; (b) the terms of the settlement in relation to the strength of plaintiffs' case; (c) the status of the litigation at the time of settlement; (d) the reaction of the class; and, (e) the opinion of experienced counsel.

Wells, 557 F. Supp. 2d at 4-5; see also Hardy v. District of Columbia, 49 F. Supp. 3d 48, 49-50 (D.D.C. 2014) (final approval order).

In evaluating the reasonableness of a settlement under Fed. R. Civ. P. 23(e), "the issue is whether the settlement is adequate and reasonable, not whether one could conceive of a better settlement." Jackson v. Wells Fargo Bank, N.A., 136 F. Supp. 3d 687, 709 (W.D. Pa. 2015) (quoting In re Prudential Ins., 962 F.Supp. 450, 534-35 (D.N.J. 1997)). Moreover, although the Court should undertake careful scrutiny of the settlement terms, the discretion to reject a settlement is "restrained by the 'principle of preference' that encourages settlements." Trombley v. Nat'l City Bank, 826 F. Supp. 2d 179, 191 (D.D.C. 2011) (quoting and citing cases).

Applying these presumptions, each factor weighs in favor of approving the proposed Settlement Agreement.

### B.     This Settlement Is the Result of Arm's Length Negotiations.

A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." Livengood Feeds, Inc. v. Merck KGaA (In re Vitamins Antitrust Litig.), 305 F. Supp. 2d 100, 104 (D.D.C. 2004) (quoting Manual for Complex Litigation (Third), § 30.42 at 238 (1995)).

This settlement is the result of arm's length negotiations conducted by counsel with experience in civil rights class actions. Class counsel William Claiborne is experienced in litigating class actions, including actions pertaining to complex civil rights cases against the District, other governmental entities and private corporations. Attorney Joseph A. Scrofano is a criminal defense

lawyer with a specialty in Second Amendment issues. Defense counsel likewise has litigated numerous complex civil rights class actions on behalf of the District.

Moreover, the Parties vigorously litigated the case for many years and entered into negotiations only after the Court issued its summary judgment opinion. During the litigation, the District filed a motion to dismiss in response to each version of the complaint except for the final version, the operative complaint.

The Parties conducted a full panoply of discovery over a two-year discovery period and plaintiffs filed several contested discovery motions including a motion to compel production of conviction history information and other similar information about potential class members to identify any potential class members with disqualifying conviction or status history. Plaintiffs retained a data analysis company and associated discovery counsel to assist in planning discovery and analyzing and "joining" extensive amounts of electronically stored information, including data exports from the MPD's booking database, the Superior Court's docketing database, and the Department of Corrections' JACCS database.

The Parties filed cross motions for summary judgment, and only agreed to enter settlement negotiations after the Court issued a summary judgment opinion and referred the Parties to mediation in the District of Columbia Circuit Mediation Program. Counsel for the Parties drew on their extensive experience litigating class actions involving the District in drafting the details of the settlement such as the class definition, notice, and the distribution plan.  Here, "[t]he settlement agreement is the result of years of litigation, but neither party has yet to face the time and expense of trial (or the inevitable appeal) … the settlement has 'not come too early to be suspicious nor too late to be a waste of resources.'" Wells, 557 F. Supp. 2d at 5 (quoting In re Vitamins Antitrust Litig., 305 F. Supp. 2d at 105).

In contrast, "trial would have been costly, and the case would have undoubtedly continued through the appeals process after a trial." Id. (internal quotation omitted). Plaintiffs would have been forced to file a contested renewed motion to certify the class. Moreover, plaintiffs would likely have appealed any adverse ruling on that motion, and any resolution of the appeal would have consumed a year.

Each party has concluded, after arm's length negotiation, that settlement at this juncture is in their interests, and this settlement should be afforded the presumption of fairness, adequacy, and reasonableness on that criterion. See In re Vitamins Antitrust Litig., 305 F. Supp. 2d at 104.

## C.   The Terms of the Settlement Reflect the Strength of the Parties' Positions and the Risks of Continued Litigation.

"The most important factor in the Court's evaluation of a proposed class action settlement is how the relief secured by the settlement compares to the class members' likely recovery had the case gone to trial." Blackman v. District of Columbia, 454 F. Supp. 2d 1, 9-10 (D.D.C. 2006). Under the amended Rule, the standard is now formulated as whether the relief provided for the class is adequate, taking into account the costs, risks, and delay of trial and appeal. Fed. R. Civ. P. 23(e)(2)(C); see also 4 Newberg on Class Actions § 13:13 (Standard for granting preliminary approval—Generally).

Here, the settlement should be approved because the amount of the settlement is fair and recognizes the substantial risks and costs to each party of proceeding with the litigation, and the amount of time further litigation would consume. The Parties have extensively analyzed the strengths and weaknesses of their respective positions and the amount of the Settlement Fund reflects their analysis.

The District has agreed to pay $5,100,000.00 to resolve this case, of which $2,804,190.11 is available for payment to Class Members including both the Class Representatives and the absent

class members. Settlement Agreement ¶ 40. Of that amount, $2,504,190.11 is allocated for absent Class Members (not including Class Representatives) and $300,000.00 is allocated for Class Representatives for their incentive payments and the value of their individual claims. Id. This amount is extremely fair given the risks Plaintiffs face from certification of the class on the issues of liability and damages. Plaintiffs do not believe that the risks of further litigation would result in significantly higher recoveries for either class after discounting the recoveries for the amount of time involved. Even damages hearings tried to the Court would have taken a great deal of time.

The amount of money available for payment to Class Members includes $142,904.94 allocated for litigation expenses earmarked to Tritura Information Governance LLC ("Tritura") for discovery and data analysis services performed on behalf of the Class Members, which is being donated to the SCM Fund for distribution to Class Members. Settlement Agreement ¶ 41.[5]

The goal of the Distribution Plans is to get as much of the available damages remedy to Class Members as possible and in as simple and expedient a manner as possible, ensuring just compensation while avoiding windfalls to claimants. See 4 Newberg on Class Actions § 12:15 (Methods for determining individual awards).

The District asserts that it has strong defenses, which in the absence of a settlement might have foreclosed the possibility of any class-wide recovery. In re LivingSocial Mktg. & Sales Practice Litig., 298 F.R.D. 1, 12 (D.D.C. 2013). For example, in the absence of a settlement the District has indicated that it would oppose any renewed motion to certify the class, on the grounds that certain evidence produced in discovery tended to show that the individual circumstances of

---

[5]     As a base amount, the Settlement Agreement allocates $2,361,285.17 (the Base SCM Fund) for payments to the Settlement Class members. Id. ¶ 39(e). An additional $142,904.94 of the litigation expenses earmarked for Tritura are added to this amount, bringing the total amount available to absent Class Members to $2,504,190.11 (the SCM Fund). Id. ¶ 40(e).

class members' arrests and prosecutions predominate in their claims to relief. In particular, this case sought damages for arrests and prosecutions under District laws, such as Carrying a Pistol without a License, which were not themselves held to be unconstitutional.  As such, in the District's view, class members would have to substantiate claims that, despite their valid arrests for constitutional charges, they were nonetheless injured by the District's then-unconstitutional licensing regime itself.

Courts recognize that the comparison of settlements in similar cases can be relevant when evaluating the fairness, adequacy, and reasonableness of a proposed settlement. See, e.g., Trombley v. Nat'l City Bank, 759 F. Supp. 2d 20, 24-25 (D.D.C. 2011). One measure of the fairness of the settlement here is that this case is the only case Class Counsel knows of where plaintiffs prevailed at summary judgment or trial in a Second Amendment case for money damages. Plaintiffs have not found any other cases where plaintiffs prevailed at summary judgment on a Second Amendment claim under Section 1983 despite the extensive Second Amendment litigation in the last 15 years since *Heller v. District of Columbia*, 554 U.S. 570 (2008).

The absence of "similar cases" cuts in favor of viewing the settlement as reasonable because Class Counsel in this case were able to do what other plaintiffs' counsel have been unable to do or even to attempt.

Each eligible class member who submits a valid claim form is entitled to receive up to $1,200 if arrested and up to an additional $1,200 if prosecuted. Settlement Agreement ¶ 57. Although there are no other settlements or verdicts for Second Amendment cases of which Plaintiffs are aware this seems a fair amount for a jurisdiction such as the District where many residents and potential jurors have an antipathy towards guns. Although a court need not include in its approval order a specific finding of fact as to the potential recovery at trial for each of the

plaintiffs' causes of action, it is one method of measuring the fairness of a settlement. Marshall v. NFL, 787 F.3d 502, 517 (8th Cir. 2015) (citing Lane v. Facebook, Inc., 696 F.3d 811, 823 (9th Cir. 2012)).

Plaintiffs' team analyzed and modelled possible claiming rates and the team estimates that it would take a claiming rate of at least 20% to exhaust the $2,504,190.11 settlement pool set aside for the Settlement Class members at these rates. In the event that the total amount of claims exceeds the size of the fund for Settlement Class Members, the payments to members of the Settlement Class will be adjusted on a pro-rated basis among valid claimants. A claiming rate of at least 20% is quite high for these cases. The claim rate in Hardy was 14.1%. Hardy, 49 F. Supp. at 50. The claims rate in Bynum v. Gov't of the D.C. and Barnes v. Gov't of the D.C. was about 10% each.

At the end of the day, the settlement makes available—now—a total of $2,804,190.11 for distribution, of which $2,504,190.11 will be available for distribution to absent Class Members and $300,000.00 for distribution to Class representatives. As stated above, Plaintiffs' counsel are not aware of other cases which have resulted in recovery of damages for absent Class Members for violations of the Second Amendment.

The benefits to the Class Members are real and immediate upon final approval of the settlement, and involve the payment of cash. It is money that will surely be welcomed by claimants in this time of economic distress.

As to injunctive relief, the Settlement Agreement provides that the District will not oppose a motion by Class Counsel for an Order declaring the arrest of each Class Member null and void and a legal nullity substantially in the form of the attached order. Such relief will be of great value to class members especially class members who lost jobs or security clearances. Mr. Scrofano's firm regularly charges between $2,500 and $5,000 for an expungement. Additionally, the District's

unconstitutional firearms licensing regime, which had been in effect at the time of Class Members' arrests or prosecutions, has already been amended.

The Settlement Agreement provides that amounts not distributed to the Class representatives and eligible absent Class Members or returned to Tritura should revert to the District. Settlement Agreement ¶ 56. Although some courts closely scrutinize settlements with reversions or claims made settlements, a settlement with a reversionary clause is not *per se* collusive, Partl v. Volkswagen, AG (In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig), 895 F.3d 597, 611-12 (9th Cir. 2018). In fact, Courts recognize that, "[a] reversion provision might encourage a more generous settlement offer." Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 785 (7th Cir. 2004). Such is the case here.

Courts in this Circuit and other Circuits regularly approve settlements with reversions or claims made settlements. 4 Newberg on Class Actions § 13:7 (Terms of art in class action settlement agreements—"Claims-made" settlement). For example, Wells was a claims-made settlement, Settlement Agreement [234-1], ¶ 6(A) (at pages 8-9 of the agreement, at pages 9-10 on ECF), as was Barnes v. Government of the District of Columbia, 06-315 (RCL) (Settlement Agreement ¶ 36), and Stephens v. Farmers Rest. Group, 2019 U.S. Dist. LEXIS 103031, at *22-23 (D.D.C. 2019) (noting that "any unclaimed funds set aside for the Rule 23 classes will revert to Defendants"), and Hardy v. District of Columbia provided for a reversion of unclaimed funds to the defendant. Hardy, 1:09-cv-01062-(RLW/CRC) (Settlement Agreement [67-1] ¶ 55, providing for a reversion of unclaimed funds to the District).

The money is available for the claiming and claimants have only to file a claim—by mail or online—and eligible claimants will promptly receive their money by check or by electronic transfer using an e-payment provider such as Venmo or Pay Pal. Settlement Agreement ¶ 65. The

D.C. Council recognized in the Committee Report to the "Civil Asset Forfeiture Amendment Act of 2014" that about 11% of households in the District have no bank accounts. Pls.' Ex. 224 [220], Comm. on the Judiciary & Public Safety, Council of D.C., Report on Bill 20-48, "Civil Asset Forfeiture Amendment Act of 2014," at 20-21 (Nov. 12, 2014) ("Committee Report").[6] Allowing claimants to elect to receive their awards by electronic payment rather than by check will save the "unbanked" the typical 20% or 30% check cashing fee that Class Counsel have seen clients in previous cases pay.

The claims process in this case is not burdensome and it is provided as much for the protection of the Settlement Fund as for any other reason. The claiming period, 120 days, is long enough to ensure class members have an adequate opportunity to submit claims. Settlement Agreement ¶ 8. Class members may have large claims. Moreover, the addresses in the MPD database are old and many of the addresses the MPD has on file for Settlement Class Members are incorrect, so mailing checks without a claims process is not feasible. Hardy, 49 F. Supp. 3d at 51 (referring to the "transient nature of the class members").

**D.      The Litigation Has Already Progressed Through Discovery and Summary Judgment.**

In evaluating the terms of a proposed Settlement, the Court should "consider whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation *vis-à-vis* the probability of success and range of recovery." Advocate Health Care v. Mylan Labs. Inc. (In re Lorazepam & Clorazepate Antitrust Litig.), Nos. MDL 1290 (TFH), 00MS276(TFH), Civ. 99-0790 (TFH) 2003 U.S. Dist. LEXIS 12344, at *14-15 (D.D.C. June 16,

---

[6]      The Committee Report is available online at https://lims.dccouncil.us/downloads/ LIMS/29204/Committee_Report/B20-0048-CommitteeReport1.pdf (last accessed Aug. 31, 2020).

2003) (emphasis added).

Here, given that this settlement was reached after more than eight years of vigorously contested litigation, extensive discovery, and cross motions for summary judgment, this factor too plainly counsels in favor of approval. As in <u>Wells</u>, "[t]he settlement agreement is the result of years of litigation, but neither party has yet to face the time and expense of trial (or the inevitable appeal). Accordingly, the settlement has not come too early to be suspicious nor too late to be a waste of resources." 557 F. Supp. 2d at 5 (internal quotation omitted).

### E.    <u>Class Representatives Have Approved the Settlement.</u>

The Class Representatives have unanimously approved the settlement. The reaction of the absent Class Members can be reported to the Court after notice has been sent.

### F.    <u>Experienced Counsel Approve of the Settlement.</u>

Although courts do not defer blindly to the views of counsel with regard to the adequacy of a settlement, courts do recognize a presumption of reasonableness where, as here, the proposed settlement was the result of arms' length negotiations and is thus presumptively fair, adequate and reasonable. <u>Wells</u>, 557 F. Supp. 2d at 5. Attorney Claiborne has litigated numerous complex federal civil rights cases against government defendants in several jurisdictions including several cases against the District of Columbia. In addition, Attorney Claiborne has consulted on numerous class actions in this and other jurisdictions. Attorney Scrofano has developed a specialty in Second Amendment issues. Both counsel believe the proposed settlement is fair, adequate, and reasonable under Fed. R. Civ. P. 23(e).

Class Counsel have based their approval of settlement on the risks of certification, decertification, trial, and appeal. Moreover, even if Plaintiffs were to win at trial and on appeal, the protracted litigation would result in considerable delay to Plaintiffs' recovery. A lower,

guaranteed sum today over the possibility of getting a larger amount (with risk of getting nothing) in the future is a rational balance, especially in today's troubled economic environment. This settlement is based upon a reasonably-anticipated claims rate of 20% which is very high in this type of case and very unlikely to be exceeded. Further, the notice contains sufficient notice provisions and the Settlement Agreement provides a simple claims process.

This settlement provides for a claims process as fraud protection because the class has large claims. This is not to make the claims process unduly difficult, but to protect Class Members from fraud by non-Class Members since the Settlement Fund could get exhausted by claims, requiring a pro-rata adjustment on payments. See Manual for Complex Litigation § 21.66 (4th ed. 2020) (noting that the larger potential claims are, the more protections from fraud should be considered).

### G. The Attorney's Fees Request is Reasonable.

Class counsel seek a fee in this case of $1,900,000, which is about 37 % of the "Settlement Amount" of $3,950,000, and only about 80% of the fee calculated according to the lodestar rate using the Terris, Pravlik & Millian Laffey matrix. The percentage itself, 37%, although toward the high end of the range of percentages awarded by courts, is nonetheless within the range of reasonable percentages awarded by Courts in this District. See, e.g., Wells v. Allstate Ins. Co., 557 F. Supp. 2d 1, 7 (D.D.C. 2008); In re Ampicillin Antitrust Litigation, 526 F. Supp. 494, 498-499 (D.D.C. 1981) (awarding 45%, or about $3.3 million; noting that while the bulk of fee awards in antitrust cases are less than twenty-five percent, several courts have awarded more than forty percent of the settlement fund); Advocate Health Care, 2003 U.S. Dist. LEXIS 12344, at *25 (fee awards in common fund cases may range from 15% to 45%); Hoyte v. Gov't of the D.C., 13-567 (CRC) (awarding class counsel William Claiborne 45% of a class fund of $3.95 million which amounted to a "negative" multiplier of .6). Similarly, in this case, Class Counsel Claiborne's hours

determined using the lodestar method would amount to a multiplier of less than 1.

Class Counsel plan to file a separate Motion for Approval of Attorney's Fees before the final approval hearing but after notice has been sent and the reaction of the classes has become known.

Using the "percentage of the fund" method to calculate their fees, <u>Swedish Hosp. Corp. v. Shalala</u>, 1 F.3d 1261, 1265 (D.C. Cir. 1993), Class Counsel seeks a fee in this case of $1,900,000, which is 37% of the Settlement Amount of $5,100,000, the total amount the District is paying to settle the case. The requested fee will be paid out of the Settlement Amount. This fee award is reasonable using all of the yardsticks courts use to evaluate attorney's fees awards in class action cases using the "percentage of the fund" method:  the percentage itself, 37%, although toward the high end of the range of percentages awarded by courts, is nonetheless within the range of reasonable percentages awarded in this District;[7] Plaintiffs score high on all of the factors courts consider in evaluating the reasonableness of the percentage in attorney's fees awards;[8] and a cross-

---

[7]     <u>See</u>, <u>e.g.</u>, <u>Wells v. Allstate Ins. Co.</u>, 557 F. Supp. 2d 1, 7 (D.D.C. 2008); <u>In re Ampicillin Antitrust Litigation</u>, 526 F. Supp. 494, 498-499 (D.D.C. 1981) (awarding 45%, or about $3.3 million; noting that while the bulk of fee awards in antitrust cases are less than twenty-five percent, several courts have awarded more than forty percent of the settlement fund); <u>Advocate Health Care</u>, 2003 U.S. Dist. LEXIS 12344, at *25 (fee awards in common fund cases may range from 15% to 45%).

[8]     These factors include: (1) the percentage still leaves more than $2,500,000 of the fund available for distribution to  Class representatives and the other Class Members; (2) Class Counsel are experienced litigators with Class Counsel William Claiborne specializing in complex federal litigation who prosecuted the case for over **eight years** over the vigorous defense of the District's Office of the Attorney General; (3) Class Counsel William Claiborne undertook this case on a purely contingent basis so the risk of nonpayment through either summary judgment or loss at trial was significant; and finally, (4) the lawsuit and the settlement serve the public interest not only by conserving the resources that would be consumed by further litigation, but also by providing reasonable compensation to the Class Members for their arrests and prosecutions. <u>Wells</u>, 557 F. Supp. 2d at 7-8 (applying factors).

check of the "percentage of the fund" fee against the "lodestar" fee shows that the "percentage of the fund" fee is a significant reduction of approximately 20% of the actual "lodestar" fee expended by Class Counsel on behalf of the Classes.  Using last year's Laffey matrix as calculated by Terris, Pravlik & Millian for the period 6/1/2022 to 5/31/2023, Class Counsel William Claiborne's hourly rate for the period ending 5/31/2023 was $997 per hour. Class Counsel William Claiborne alone has billed 2,149 hours as of the end of the mediation, and estimates that he will have to spend an additional 200 to 250 hours papering and administering the settlement. That yields a total lodestar fee of $2,293,100. The fee of $1,900,000 is only 80% of the lodestar fee of $2,293,100.

Thus, this case is an outlier in that most "percentage of the fund" fee awards represent the "lodestar" fee multiplied by an enhancement factor (a multiplier) and courts check to ensure that the percentage award does not represent too much of a multiplier applied to the "lodestar fee." Ceccone v. Equifax Info. Servs. LLC, 2016 U.S. Dist. LEXIS 127942, at *34-35 (D.D.C. 2016); Advocate Health Care, 2003 U.S. Dist. LEXIS 12344, at *32. Courts routinely approve settlements where the portion of the settlement fund for attorney's fees results in an award that is 2-4 times higher than the lodestar amount under the lodestar cross-check. Advocate Health Care, 2003 U.S. Dist. LEXIS 12344, at *32 (noting that a fee award that is 1.15 or 1.36 times *greater* than the lodestar "falls near the low end of normal multipliers" and "multiples ranging up to four are frequently awarded in common fund cases when the lodestar method is applied") (internal quotation omitted).

In contrast, there is no "multiplier" in this case because counsel is seeking an award of only 80% of the fees expended on behalf of the class. Thus, rather than applying a multiplier to increase the fee paid to Class Counsel, the "percentage of the fund" fee is a **significant 20% reduction** to the "lodestar fee."

Attorney Joseph Scrofano billed about 155 hours on the case at a lodestar rate of $829 per hour (using last year's Laffey matrix as calculated by Terris, Pravlik & Millian for the period 6/1/2022 to 5/31/2023) for a total of $128,495.

## IV.    The Court Should Certify The Settlement Class

The Settlement Class satisfies each of the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3).[9]

Federal Rule of Civil Procedure 23(a) provides that a class may be certified when "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). The proposed Settlement Class satisfies each of these requirements.

 The proposed class has over 3,000 members, there is a common question and the Named Plaintiffs' claims are typical because the class members were all injured by the same unconstitutional policy, and the representative parties will fairly and adequately protect the interests of the class as they have demonstrated during the pendency of the case.

As stated above, the District will not oppose Plaintiffs' motion for an Order declaring the arrest of each Class Member null and void and a legal nullity substantially in the form of the attached order. Plaintiffs do not believe that it is necessary to certify the Settlement Class under Rule 23(b)(2) for this relief. Fed. R. Civ. P. 23(b)(2) (allowing for certification if "(2) the party

---

[9]    This Court granted Plaintiffs' motion to extend the 90 day period prescribed by LCvR 23.1(b) for filing their motion for class action treatment. *See* Order [18] (Sept. 1, 2015). Plaintiffs then moved for certification [ECF No. 26], but this Court denied the motion without prejudice. *See* Order [38] (Sept. 30, 2016).

opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole").

Plaintiffs are moving to certify the Settlement Class under Rule 23(b)(3), which allows for certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The requirements of predominance and superiority are both satisfied here. Under Plaintiffs' theory the moving force of their injury is the District's policy and so questions of law predominates over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy because most class members would not be able to bring individual claims.

<u>The District does not object to this Court certifying a settlement class with the following definition:</u>

Settlement Class Member means each person who:

(i) in the period from May 15, 2012 (three years before the date of filing of the original complaint in this case) until October 10, 2014; (ii) was arrested or prosecuted, or whose prosecution started before the Class Period and continued during and after the Class Period; (iii) in the District of Columbia; (iv) for a violation of any of the District's gun control laws; (v) outside their home or place of business; except that the following groups of people are excluded from the class:

    1)  persons who were convicted of a felony before their arrests or prosecutions;

2)  persons who were convicted of a domestic violence misdemeanor within the five-year period before their arrests or prosecutions;

3)  persons who were subject to a judicial order compelling them to relinquish any firearms in their possession or barring them from possessing any firearms at the time of their arrests or prosecutions; and

4)  persons who were convicted of at least one felony or violent misdemeanor charge arising out of the arrest.

## V.   The Court Should Approve the Proposed Form and Manner of Notice to the Class.

"The court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23I(1). Under that rule and the mandates of due process, class members must be given "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Hubbard v. Donahoe, 958 F. Supp. 2d 116, 122 (D.D.C. 2013) (quoting Fed. R. Civ. P. Rule 23(c)(2)(B)). However, "[n]either Rule 23 nor the requirements of due process require actual notice to each and every possible class member." In re Prudential Ins. Co. of Am. Sales Practices Litig., 177 F.R.D. 216, 233 (D.N.J. 1997); see also Pigford v. Veneman, 208 F.R.D. 21, 23 (D.D.C. 2002).

The Parties request that the Court direct the use of JND Legal Administration as class administrators, as contemplated by the Settlement Agreement. Settlement Agreement ¶ 7. This Court appointed JND Legal Administration as the class administrators in the $3.4 billion Indian Trust Fund Settlement case (Cobell v. Salazar). Judges Cooper and Jackson of this Court appointed JND as the class administrator in Hoyte v. Gov't of the D.C., 13-567 (CRC) and Alexander v. Gov't of the D.C., 17-1885 (ABJ), respectively.

### A.   The Proposed Notice Is Reasonable and Tailored to the Needs of Class Members.

Class Counsel have carefully considered various options for providing reasonable notice of the proposed settlement to Class Members. Class Counsel believe that the proposed notice clearly and concisely informs potential Class Members of the nature and scope of the Agreement and of their rights to object and be heard. The proposed notice provides a clear explanation of (i) the lawsuit, its history, and current procedural posture, (ii) how to determine if one is a member of the classes, (iii) the reasons for settlement, (iv) the key provisions of the Settlement Agreement, (v) the procedure for making objections and being heard at a final fairness hearing, and the procedure for "opting out" of the settlement.

Accordingly, the Court should approve the form of notice attached as Exhibit C to the Settlement Agreement.

**B.**      **The Manner of Notice Is the Best Practicable Notice Under the Circumstances.**

The Court should also approve the notice plan set forth in the Settlement Agreement. In formulating the notice plan, the Parties have given considerable thought to the difficulties involved in reaching many Class Members, and have developed a multi-faceted, comprehensive notice plan in order to reach as many Class Members as possible. The "transient nature of the class members" the Court referenced in Hardy presents the same challenges in this case. See Hardy, 49 F. Supp. 3d at 51. Plaintiffs plan to send notice to about 4,700 potential Settlement Class Members and to follow up returned notices with remailings when updated addresses can be obtained in an attempt to reach as many Settlement Class Members as practicable.

In addition to providing individual notice to Class Members (and/or their legal representatives) where practicable, the notice plan calls for posting of the notice on various websites. Plaintiffs also plan to enlist the help of the Public Defender Service for the District of Columbia and the "CJA" Bar (court-appointed attorneys representing indigents in criminal cases

pursuant to the Criminal Justice Act, D.C. Code § 11-2601, et seq.), many of whom have previously represented class members, in delivering class notice. Class Counsel will have a copy of the notice provided to PDS for distribution and a copy posted on the Superior Court Trial Lawyers Association, the electronic mailing list for CJA lawyers. Class Counsel also plan to email a copy of the notice to the Superior Court Trial Lawyers Association of the District of Columbia. The Court should therefore approve the notice plan set forth in the Settlement Agreement as providing the best notice practicable under the circumstances of this case.

## CONCLUSION

For the foregoing reasons, the Court should grant the Motion for Preliminary Approval, approve the manner and form of notice to be furnished to the class, and schedule a Fairness Hearing under Fed. R. Civ. P. 23(e)(1)(C) for the purpose of determining whether the settlement is fair, reasonable, and adequate.

Dated:  August 25, 2023                Respectfully submitted,

                                       /s/ William Claiborne
                                       WILLIAM CLAIBORNE
                                       D.C. Bar No. 446579
                                       717 D Street, NW
                                       Suite 300
                                       Washington, D.C. 20004
                                       Phone (202) 824-0700
                                       Email: claibornelaw@gmail.com


                                       *Counsel for Named Plaintiffs and the Class*