### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAGGIE SMITH,** *et al.*, **individually and on behalf of the Settlement Class,** *Plaintiffs,* v. **GOVERNMENT OF THE DISTRICT OF COLUMBIA,** *Defendant.* | **Civil Action No. 15-737 (RCL)** |

### PLAINTIFFS' SUBMISSION IN SUPPORT OF THE FAIRNESS OF THE SETTLEMENT

Since filing this case in 2015, Class Counsel have sought justice for people wrongly arrested and prosecuted for gun possession in public in the District of Columbia based on the District's Unconstitutional gun laws. Class Counsel have rigorously prosecuted this case for nine years against a municipal government fiercely opposed to gun ownership. Having reached a settlement with the District, Class Counsel welcome the Court's oversight and scrutiny. Class counsel believe this settlement, though not what Class Counsel had hoped for, is nonetheless fair, reasonable, adequate, in the best interest of the Class, and the best the District will agree to. *See* Fed. R. Civ. P. ("Rule") 23(e)(2). Given the risks, delays, and costs of continuing to battle against the District through trial and appeals, and the uncertainty for Class members that brings, Counsel asks the Court to approve this settlement for the immediate benefit of the Class.

### INTRODUCTION

During the December 4, 2023 hearing, the Court raised two concerns about the settlement. *See* Ex. 1, Tr. 3:14–7:1 (Dec. 4, 2023). First, the Court was concerned that the structure of the settlement—potentially leaving Class Counsel and the District (through a

reversion) with a lion's share of the class funds, when coupled with a recovery cap and an

agreement by Defendant not to contest attorney's fees—would raise a "presumption of

unfairness." *Id.* at 4:3–5:18 (citing *Reynolds vs. Beneficial National Bank*, 288 F.3d 277, 282

(7th Cir. 2002) *and Sylvester vs. Cigna Corporation*, 369 F. Supp. 2d 34, 47 (D. Me. 2005)).

Second, the Court voiced concerns about attorney's fees being calculated based on the

"constructive" common fund including the available settlement fund rather than the amount

claimed by class members.[1]

 This Court's questions demonstrate its concern that the proposed settlement shares

features with other cases where collusion was suspected between class counsel and the

defendant, leaving absent class members with little or nothing. However, the facts of the cases

the Court cited—*Reynolds vs. Beneficial National Bank*, 288 F.3d 277, 282 (7th Cir. 2002) and

*Sylvester vs. Cigna Corporation*, 369 F. Supp. 2d 34, 47 (D. Me. 2005)—the law in this Circuit,

and the history of this litigation and the relief for the class should dispel those concerns.

 First, it is important to recognize that the caps on individual recoveries, reversions, and

agreed upon fee provisions ("clear sailing agreements") which so troubled the Court in *Sylvester*,

are standard terms in Section 1983 class action settlements with the District. Judges in this Court

routinely approve proposed settlements of § 1983 class actions with the District that have caps

on individual recoveries, reversions, and clear sailing agreements. *Becker v. District of*

*Columbia*, 01-811 (PL.F/ JMF) [ECF No. 362] Final Approval Order, p. 2; *Barham v. District of*

*Columbia*, 02-2283 (EGH) [ECF No. 340] Final Approval Order, p. 2; *Schultz v. District of*

---

[1] The Settlement Agreement does not create a true common fund. Instead, the Parties established a "constructive" common fund, discussed later in this brief, composed of a separate fund for each component of the proposed settlement: payments to named representatives, a fund for payment to absent class members (the "SCM Fund"), administration expenses, a separate attorneys' fee fund, and litigation expenses. Settlement Agreement [ECF No. 169-1] ¶ 39.

*Columbia*, 18-00120 (ABJ) [ECF No. 46-1] Settlement Agreement, ¶ 2(d),3, Final Approval

Order [ECF No. 57]; *Alexander v. Government of the District of Columbia*, 17-1885 (ABJ) [ECF

No. 46-1] Final Approval Order, ¶¶ 2(d), 3; *Hoyte v. Government of the District of Columbia*,

13-569 (CRC) (*formerly Brown v. Gov. of the D.C.*), Final Approval Order [ECF No. 252], ¶¶

30–33.

These "troubling" provisions function as a mechanism to help bring lengthy litigation to

an end rather than a device to pump up fees based on a sham fund. The proposed settlement

should remain entitled to the "presumption of fairness, adequacy, and reasonableness [which]

may attach to a class settlement reached in arm's length negotiations between experienced,

capable counsel after meaningful discovery." *Randle v. SunTrust Bank, Inc.*, 2024 U.S. Dist.

LEXIS 29178, *19 (D.D.C. 2024),

Second, in fee shifting cases brought under Section 1983, Section 1988 provides

successful litigants with attorney's fees, at the Court's discretion. 42 U.S.C. § 1988(b). It is not

unusual for attorney's fees to be greater, sometimes far greater, than the damages award. *See,*

*e.g.*, *Riverside v. Rivera*, 477 U.S. 561, 574, 576 (1986) (rejecting rule of proportionality in §

1983/1988 cases); *see also Williams v. First Gov't Mortg. & Inv'rs Corp.*, 225 F.3d 738, 747

(D.C. Cir. 2000) (declining to "read a 'rule of proportionality' into [the DC Consumer Protection

Procedures Act]" and rejecting the defendant's argument that the attorney fee award should be

reduced to 10-15%). Attorney's fees in class actions are also frequently larger than the class's

recovery, and for a very good reason: lawyers must be willing to take on cases where individual

recovery would be impracticable and expensive. *See, e.g.*, *Gascho v. Global Fitness Holdings*,

LLC, 822 F.3d 269, 287 (6th Cir. 2016).

In "unique circumstances," such as § 1983 class actions and consumer class actions, attorney's fees' being greater than the monetary award claimed by class members stems from sound policy decisions, not collusion, or a breach of counsel's fiduciary relationship as the *Sylvester* Court suggested. *Compare* 369 F. Supp. 2d at 49 *with, e.g.*, *Riverside*, 477 U.S. 561 at 576; *Gascho*, 822 F.3d at 287; *Pete v. United Mine Workers Welfare & Retirement Fund of 1950*, 517 F.2d 1275, 1290 (D.C. Cir. 1975) (societal factors besides the amount of class recovery such as vindicating important rights must be considered in fixing fees for attorneys in class actions); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. Pa. L. Rev. 2043, 2047 (2010) (concluding that courts "should not be concerned about compensating class members in small-stakes class actions and, instead, should be concerned only with fully incentivizing class action lawyers to bring as many cost-justified actions as possible" because "the only function they serve is deterrence"); Hailyn Chen, *Comment, Attorneys' Fees and Reversionary Fund Settlements in Small Claims Consumer Class Actions*, 50 UCLA L. Rev. 879, 892 (2003) (arguing that courts should not limit attorney's fees to a percentage of actual claims because doing so will often "result in a fee that is so small as to prevent class action attorneys from pursuing such cases, which serve primarily a regulatory and deterrent function").

> Consumer class actions, furthermore, have value to society more broadly, both as deterrents to unlawful behavior—particularly when the individual injuries are too small to justify the time and expense of litigation—and as private law enforcement regimes that free public sector resources. If we are to encourage these positive societal effects, class counsel must be adequately compensated—even when significant compensation to class members is out of reach (such as when contact information is unavailable, or when individual claims are very small).

*Gascho*, 822 F.3d at 287.

The same principle is particularly true of civil rights class actions where, as here, a government has trampled on fundamental rights. Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely

in monetary terms. *Riverside*, 477 U.S. at 574. Therefore, the mere prospect of attorney's fees being greater than the monetary award claimed by class members should not prejudice this Court's opinion on the fairness of the settlement. *Id.* at 576 (rejecting rule of proportionality in § 1983/1988 cases).

## I.    THE SETTLEMENT IS FAIR TO ALL CLASS MEMBERS.

When viewed as a whole, the settlement is fair and provides substantial value to each class member in both monetary and equitable terms. First, each class member has a "present right" to access their share of the financial award upon submitting a claim form. *Gascho*, 822 F.3d at 282–283 (*quoting Boeing Co. v. Van Gemert*, 444 U.S. 472, 482 (1980); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1265 (D.C. Cir. 1993) (Sentelle, J.) (explaining equitable basis of common fund doctrine) (*relying on Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

Second, the "nullification" declaration the ¶¶ 34-35 of the proposed Final Approval Order provides significant value to every class member even if they do not submit claim forms.

### A.  The Fee Cap Is Reasonable.

Individual recoveries of "absent class members" [2] are capped at $1,200 for one or more arrests and $1,200 for one or more prosecutions. Settlement Agreement [ECF No. 169] ¶ 40. There are about 1,882 class members who were arrested. About 500 of those were also prosecuted. While less than what Plaintiffs fought for, the cap is nonetheless fair. Awards in § 1983 false arrest cases are often only a few thousand dollars, especially when the reaction rate is expected to be low. For example, in *Alexander*, each plaintiff was entitled to $4,000. 17-1885 (ABJ) (D.D.C) (arrest without probable cause for violating the "blocking the sidewalk" statute capped at $4,000 per person). The reaction rate in *Alexander* was only 12%. *Id.* In *Burgin v.*

---

[2] All class members other than the named plaintiffs are referred to as "absent class members."

*District of Columbia*, 03-2005 (EGS) (D.D.C.), the court approved a cap of $6,000 to First Amendment protestors arrested near the World Bank and IMF meetings of 2002 (based on conversations with counsel). And, in *Schultz v. District of Columbia*, 18-00120 (ABJ), Settlement Agreement [ECF No. 46-1], p. 6, class members arrested for protesting the 2017 Inaugural Day protests received about $5,680 each. While the monetary award in this action for each Class member is somewhat lower, given the complications of negotiating with a city that feels the way DC does about guns, discussed *infra*, and a jury's likely feelings about guns, the current fee cap is fair and reasonable, particularly in light of the declaratory relief the District agreed to.

### B.   The Declaratory Relief Available to All Class Members Has a Value Far Beyond the Monetary Awards Some Class Members Will Receive.

When the Court raised concerns about the percentage of absent class members whose recoveries would be capped at $2,400, Plaintiffs failed to sufficiently inform the Court about the details and value of the equitable benefit all class members will receive in the form of a "nullification" order declaring their arrests legal nullities, and "restor[ing] [them] in the contemplation of the law to the position they occupied before their arrests". Proposed Final Approval Order [ECF No. 174-1], ¶¶ 34–35. Each class member, absent or not, will receive considerable value based on the declaratory relief provided to the class. The declaratory relief alone, in monetary terms, dwarfs the value of the potential awards.

The District agreed to a "nullification" declaration, making class members' arrests "legal nullities," and "restor[ing] [them] in the contemplation of the law to the position they occupied before their arrests".  Proposed Final Approval Order, ¶¶ 34–35. The relief is the same as the relief available to persons who obtain sealing or expungement of their arrest, prosecution, and conviction records under the District's gold standard of expungement, the "actual innocence"

statute. *Compare* Proposed Final Approval Order [ECF No. 174-1], ¶ 35 *with* D.C. Code § 16-802(i); *see also* Scrofano Decl., ¶ 23. The language in the proposed Final Approval Order expressly references the text of the "actual innocence" statute D.C. Code § 16-802(i). Proposed Final Approval Order, ¶ 35. Class members do not have to satisfy any of the provisions of any District of Columbia sealing statute to obtain the declaratory relief given to them by the proposed settlement. The relief given to class members by the proposed settlement is based on the inherent power of the District Court and it is not limited by the relief available under the District statutes.[3] The District Court's inherent, equitable power is not limited to the statutory relief for expungement or sealing arrest, prosecution and conviction records available under the District's sealing statutes. *Sullivan v. Murphy*, 478 F.2d 938, 972 (D.C. Cir. 1973) (holding that § 1983 does not apply to District's statutes overruled by statute; no negative history on the expungement issue).

The "nullification" declaration incorporates language from the District's actual innocence "sealing statute," which will "restore [them] in the contemplation of the law to the position they occupied before their arrests," if the settlement is approved. Proposed Final Approval Order, ¶¶

---

[3] The D.C. Circuit has held that District Courts have the inherent, equitable power to expunge criminal records to remedy an arrest or conviction that was in violation of the Constitution. Courts appear have the authority to. *United States v. Graham*, 2022 U.S. Dist. LEXIS 123315, *3 (D.D.C. 2022); *Tatum v. Morton*, 562 F.2d 1279, 1285 (D.C. Cir. 1977); *United States v. McLeod*, 385 F.2d 734, 749 (5th Cir. 1967) (District Court's inherent, equitable power to expunge arrest records also extends to the power to expunge records relating to the effect of prosecutions such as records of convictions)(*quoted by Sullivan v. Murphy*, 478 F.2d at 968); *see, also, United States v. Wahi*, 850 F.3d 296, 303 (7th Cir. 2017); *United States v. Field*, 756 F.3d 911, 915-16 (6th Cir. 2014); *United States v.* Coloian, 480 F.3d 47, 49 n.4 (1st Cir. 2007); *United States v. Meyer*, 439 F.3d 855, 861-62 (8th Cir. 2006). The District Court's inherent, equitable power is not limited to the statutory relief for expungement or sealing arrest and conviction records available under the District's sealing statutes. *Sullivan v. Murphy*, 478 F.2d 938, 972 (D.C. Cir. 1973)(holding that § 1983 does not apply to District's statutes overruled by statute; no negative history on the expungement issue).

34–35. That is, each class member will have their arrests, prosecutions, and/or convictions effectively vacated. *Id.* This declaratory relief allows each class member to lawfully answer "no" to questions regarding "their arrest, or charge, or trial in response to *any inquiry* made of them for any purpose." *Id* (emphasis added).

The effect of the relief provides valuable collateral relief as well. For example, D.C. Code § 22–4503(a)(2) prohibits anyone convicted of a firearms offense in the District from registering or carrying a pistol in public. During the class period many persons arrested on firearms charges in the District pled to "UA" (D.C. Code § 7–2506.01, possession of ammunition without a registration certificate for the handgun the ammunition is for) or "UF" (D.C. Code § 7-2502.01, prohibits possession of an unregistered firearm). Any person convicted of UF or UA or attempt UA or UF or CPWL would have that conviction vacated and may have their Second Amendment rights restored in the District.

Another example of the value of the declaratory relief provided by the proposed settlement, if approved, is illustrated by a class member who has been in contact with Class Counsel. The class member has explained how expungement of his felony conviction for "CPWL" (carrying a pistol without a license) could improve his employment situation. He is an electrician in a union and due to his conviction, he cannot do jobs in government buildings. He stated that since his CPWL conviction, he has missed out on numerous opportunities to make more money as an electrician and that he has repeatedly gone to lawyers willing to pay large amounts of money to try and seal/expunge his record. All the lawyers have turned him away because he is not eligible to file a sealing motion in Superior Court under the District's sealing statutes.

Class members should also be able to have their credit report records amended to remove reference to their arrests, prosecutions, or convictions on firearms offenses covered by the class definition.

The District has agreed to the entry of a nullification order, which will declare class members' arrests null and void. That is, the "nullification" declaration will restore the class members to the position they occupied in the contemplation of the law before their arrests. *See* D.C. Code § 16-802(i).

Actually getting the records expunged or sealed based on the "nullification" declaration as provided in paragraph (h) of the statute will require a second step. *See* D.C. Code § 16-802(h).[4]

Class Counsel Scrofano has agreed to prepare a form application for class members to use and file to have their records "sealed" to the extent provided in D.C. Code § 16-802(h). Class Counsel will post to the class website. Class Counsel will also provide the form to the Federal Public Defender's office in D.C. The District will not agree, at this time, to *sua sponte* finding, sealing, and destroying all arrest and conviction records. But the District recognizes that since the class members will have a DC Code 16-802(i) nullification order in hand there probably would not be any grounds on the merits to oppose the applications to seal. So practically speaking the sealing relief is fully available to class members.

JND, the Claims Administrator, will also be available during any extended claims period to help class members obtain individual "nullification" orders. The "nullification" rights accrue

---

[4] Paragraph (i) effects making the arrests "legal nullities". D.C. Code § 16-802(i). This is the effect of the relief in the ¶¶ 34-35 of the proposed Final Approval Order. Paragraph (h) is the provision for removing them from view (except as provided by a court order). D.C. Code § 16-802(h).

to the full benefit of any absent class member regardless of whether an individualized entry of a nullification order (pursuant to ¶ of the proposed Final Approval Order) is entered. Proposed Final Approval Order, ¶ 34.

Class Counsel estimates that it would cost each class member at least $5,000 per class member to hire competent counsel to draft, file, and litigate motions to seal their arrest and prosecution records under the District of Columbia sealing statutes. Exhibit 1, Scrofano Decl., ¶ 25. However, the relief each would receive under available District "sealing" statutes is less than what they will receive under the declaratory relief declaring their arrests "legal nullities" and restoring each individual in the contemplation of the law to the positions they occupied before their arrests. Scrofano Decl., ¶¶ 19, 23; Proposed Final Approval Order [ECF No. 174], ¶¶ 34–45. 99.9% of the class members would not be eligible for relief under the "actual innocence" statute because they are not "innocent" under the statute; they violated the Unconstitutional statute. But the Court's "nullification" declaration and the language of ¶¶ 34-35 of the proposed Final Approval Order means the Parties agree to the effect of the "nullification" declaration. Given the vagaries of litigation and the backlog of matters before the Superior Court, it would likely take months, if not years, for each litigant to obtain a result, and there is no guarantee that their motions would be successful. Scrofano Decl., ¶ 18. Finally, even if class members were successful in getting their criminal records sealed as a subsequent legalized or decriminalized offense pursuant to D.C. Code § 16-803.02, the sealing of records would be less comprehensive than what is available through the Proposed Final Order.[5]

---

[5] The actual innocence statute at D.C. Code § 16-802(h)(4)(B) requires the "prosecutor to arrange for any computerized record of the movant's arrest, prosecution, or conviction to be eliminated except for a restricted-access file that would permit the prosecutor and law enforcement agencies to retrieve sealed records if ordered to do so by the Court" whereas the subsequent legalized or decriminalized statute at D.C. Code § 16-803.02 has no such provision.

The declaratory relief the District has agreed to is far greater than that which class members could achieve even if they filed and won sealing motions in Superior Court under the District's applicable "sealing" statute, which only allows the court to declare an arrest or conviction unlawful. Scrofano Decl., ¶¶ 19, 23. Therefore, the declaratory equitable relief here is a particularly significant—and valuable—component of the settlement. *See Ceccone v. Equifax Info. Servs. LLC*, 2016 U.S. Dist. LEXIS 127942, *29 (D.D.C. 2016) (Class Counsel represented at the Fairness Hearing that such injunctive relief—removal of burdensome and inaccurate water and sewer liens from class members' credit reports—would not have been available under the Fair Credit Reporting Act even if Plaintiffs had brought suit and prevailed, thereby making it a particularly significant component of the settlement).

Given the substantial nature of the declaratory relief, all Class members are receiving consideration for releasing their claims under the proposed settlement in addition to the "present right" to access their financial share of the SCM Fund upon submitting a claim. *See Gascho*, 822 F.3d at 282-283 (*quoting Boeing Co. v. Van Gemert*, 444 U.S. 472, 482 (1980); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d at 1265 (Sentelle, J.) (explaining the equitable basis of common fund doctrine) (*relying on Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). Seen with all its implications, the settlement is fair, reasonable, adequate, and in the best interest of the Class.

### C.  Settlement Is Reasonable Given the Additional Risks of Continued Litigation.

Beyond the substantial equitable and cash value class members will and can receive, the settlement is also reasonable in light of the risks of continued litigation. The settlement was not made in a vacuum. The District and many of its citizens share a strong antipathy toward guns. Mayor Muriel Bowser summed up the District's position on handguns at a public event on January 9, 2015: "You have a mayor who hates guns," she said. "If it was up to me, we wouldn't have any handguns in the District of Columbia. I swear to protect the Constitution and what the

11

courts say, but I will do it in the most restrictive way as possible." Mike DeBonis, *Muriel Bowser: 'You have a mayor who hates guns',* Washington Post (Jan. 9, 2015)[6]. Moreover, the recovery caps are bargained for amounts based on comparison with other class actions and inconsideration of the four subfactors of Rule 23(e)(2)(C) relating to adequacy of relief for the class. Class Counsel believed that the Mayor, whose consent was needed for the proposed settlement, would not consent without the caps.

Class Counsel believes that further litigation would not, in the final analysis, significantly improve the amount of damages recovery for the Class given the time-value of money, delays, and risks when measured against the present value of the proposed settlement. Further litigation would be expensive and risky and would be drawn out for an indeterminate but likely very long time, with likely appeals of the certification decision and any verdict. This is borne out not only by the mayor's comments but by other cases as well.

For example, in 2019 an individual security guard got in a shootout with three armed robbers trying to rob his employer's store. *Allen v. District of Columbia*, 2023 U.S. Dist. LEXIS 60950, *3–4 (D.D.C. 2023) (challenging Chief's policies on registration certificates and CPLs). Even though the security guard's use of his gun was in self-defense and defense of others—the basic right protected by the Second Amendment—the Chief's reaction was to institute a new policy for issuing and revoking "CPLs" (licenses to carry a pistol). *Id.* Under the new policy, the DC's Chief of Police revoked many existing CPLs and denied many applications based on the Chief's own ideas of "suitability" to carry a pistol in public. *Id.*; *see also Sanu Millard v. District of Columbia*, 22-02672 (CKK) (Second Amended Complaint [ECF No. 30] (class action

---

[6] Available at https://www.washingtonpost.com/blogs/mike-debonis/wp/2015/01/09/muriel-bowser-you-have-a-mayor-who-hates-guns/.

complaint challenging Chief's policies on registration certificates and CPLs)). The Chief's reaction to the legitimate use of a firearm in self-defense further underscores the District's harsh policy toward gun owners.

Police and many citizens, potential jurors, believe that merely allowing people to carry guns in public will make the District a more dangerous place. Underscoring this fear, many people in the District read about violent crimes involving guns and associate the same violence with legal gun ownership. Rightly or wrongly, many people in the District still associate guns with violence and murder without regard to whether the guns are registered or illegal.

The homicide rates in the District of Columbia are at their highest in years. Carjackings have skyrocketed in DC, 77% of which involved guns. Beatrice Peterson, *10 teens accused in DC carjacking rings, claiming it was like 'Grand Theft Auto,' officials say*, ABC News (Dec. 11, 2023)[7]; Jenny Gathright, *Homicides Are Falling In Other Major Cities. Why Are They So High In D.C.?*, DCist.com (Dec. 29, 2023)[8]. This provides additional fodder for District politicians to oppose anything that appears "weak on gun violence," likely including the issues in this case.

If this case were to proceed to trial, a significant hurdle to overcome before recovery on a class-wide basis would be the certification process and the risk of maintaining class action status throughout the trial. Given the Court's summary judgment ruling, Plaintiffs believe that they would obtain class action treatment for the case. However, the certification process would consume many months or even years because damages discovery was bifurcated until after liability discovery and motions. Scheduling Order [ECF No. 80] (discovery limited to liability and class issues).

---

[7] Available at https://abcnews.go.com/Politics/10-teens-accused-dc-carjacking-rings-claiming-grand/story?id=105561158.

[8] Available at https://dcist.com/story/23/12/29/dc-homicides-2023-highest-since-1997/#.

The outstanding issue of Plaintiffs Motion [ECF No. 96] to Compel class members' conviction and other disqualifying status history, which the Court deferred until after liability determinations, would have to be resolved. Order denying Motion to Compel. [ECF No. 143]. Moreover, pursuant to F.R.C.P. 23(f), defendants could consume more months or years on an appeal of any certification decision. Although a class can be certified for settlement purposes, the notion that a district court could decertify a class at any time is an inescapable and weighty risk that weighs in favor of a settlement. *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009).

Proceeding to trial also risks a verdict where the class members receive even less in compensation than is currently offered by the settlement. Plaintiffs considered but rejected the option of trying "general" damages on a class-wide basis for three reasons: (1) delay; (2) in the only two successful "general" damages trials Class Counsel is aware, the plaintiffs did not receive very much; and (3) unclaimed funds could very likely still revert to the District. For example, *In re Nassau Cnty. Strip Search Cases* a case about strip searches upon plaintiffs' commitment to a county jail on misdemeanor charges, the court awarded "general damages" of $500 per strip search based on a theory of an affront to human dignity. 742 F. Supp. 2d 304, 331 (E.D.N.Y. 2010).

In *Myatt v. Fries*, a jury awarded general damages to a class of persons who had been overdetained in the county jail based on a matrix ranging from $200 for zero to 12 hours of overdetention to $1,100 for more than 48 hours. Ex. 2, Jury verdict, 10-CV-64 (N.D. Indiana) [ECF No. 158]. But in *Myatt*, the Court later ruled that the unclaimed funds from the jury verdict in the class wide trial on general damages should be returned to the defendant rather than

to the class members *pro rata* or a *cy pres*. *Myatt v. Gladieux*, 2017 U.S. Dist. LEXIS 32001, *9 (N. D. Indiana 2017).

Given these potential awards and risks after trial and any appeals, and the fact that some precedent says unclaimed funds should return to the defendant, the settlement here likely provides about the same to class members without the further delay that a trial would require.

## II.     ATTORENYS FEES ARE REASONABLE AND NON-COLLUSIVE.

At the December 4, 2023, Final Settlement Hearing, the Court raised concerns about the settlement's potential collusiveness in light of the clear-sailing agreement. The Court's concerns are inherently responsible and reasonable, given its responsibility to safeguard class members under the rules. That said, Class Counsel respectfully submits that binding circuit court precedent, facts specific to this case, and special considerations for §1983 cases demonstrate the attorney's fees are reasonable and justified.

### A. Binding Circuit Precent Requires Attorney's Fees to be Calculated Based on a Percentage of the Fund.

In light of the clear sailing agreement, the Court raised concerns about Plaintiffs' calculation of attorney's fees, which are based on a percentage of the total fund, despite the possibility of a significant portion of the fund likely going unclaimed and then reverting to the District. Settlement Agreement ¶¶ 40(e), 54. The D.C. Circuit requires attorney's fees in a common fund or "constructive" common fund class case to be calculated as a percentage of the fund—a percentage based on the whole amount of funds available to all class members rather than the amount claimed. *Swedish Hosp.*, 1 F.3d at 1265 (emphasis added) (*quoting Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Gascho*, 822 F.3d 269, 278, 283 ("The Court has held that class plaintiffs' 'right to share the harvest of the lawsuit upon proof of their identity, *whether or not they exercise it*, is a benefit in the fund created by the efforts of class

representatives and their counsel.'") (*quoting Boeing Co. v. Van Gemert*, 444 U.S. 472, 480 (1980) (emphasis in original)). "The underlying justification for attorney reimbursement from a common fund, as explained by the Supreme Court in three early cases, is that unless the costs of litigation were spread to the beneficiary of the fund they would be unjustly enriched by the attorney' efforts." *Swedish Hosp.*, 1 F.3d at 1265 (citations omitted).

### B.  Binding Precedent Also Requires the Fund Be Calculated as a Percentage of the Whole "Constructive" Common Fund.

The cases cited by this Court—*Reynolds* and *Sylvester*—are wrong to the extent they take the position that the percentage of the fund calculation for attorneys fees should be based on the amount of the fund, *less* the reversion, rather than the total value of the fund. This directly conflicts with Supreme Court precedent and D.C. Circuit precedent. *See Boeing Co.*, 444 U.S. at 478, 480-81 (1980); *Swedish Hosp.*, 1 F.3d at 1263 (holding that "proper measure of such fees in a common fund case is a percentage of the fund."). The Supreme Court has held that class plaintiffs' "right to share the harvest of the lawsuit upon proof of their identity, *whether or not they exercise it*, is a benefit in the fund created by the efforts of class representatives and their counsel." *Gascho*, 822 F.3d at 27 (emphasis added) (*citing Boeing*, 444 U.S. at 480).

The constructive common-fund doctrine combines all the separately negotiated components of the settlement benefits created for the class, such as fees, other costs of litigation, payments to class representatives and other class members, class administration fees, and the value of injunctive relief if it can be quantified and it directly benefits the class, into a "constructive" common fund. The doctrine is based on the equitable notion that, even in cases where attorneys' fees and class settlements are paid from separate funds, the two amounts are negotiated as a "package deal" such that "[t]he defendant is concerned, first and foremost, with its total liability." *In re Home Depot Inc.*, 931 F.3d 1065, 1080 (11th Cir. 2019).

This case is a "constructive" common fund case because (1) the District is paying over the entire SCM Fund to the Claims Administrator; (2) the District negotiated and funded the components as a "package deal" to resolve "its total liability"; and (3) as the Supreme Court held in *Boeing*, the "present rights" of class members to access the money in the fund through a claims process is a benefit to all class members even if they do not submit claims. *Gascho*, 822 F.3d at 282–283 (*quoting Boeing*, 444 U.S. at 482)*; see also In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, *1, *55–56 (D.D.C. 2001) (using constructive common fund cases, where attorneys' fees are borne by defendants and not plaintiffs, that the attorneys' fees nonetheless are a valuable part of the settlement and thus fairly characterized as part of the common fund; expressly rejecting amount of funds claimed as fund for calculating percentage of the fund fee); *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 364 (D.D.C. 2007) (the settlement has separate funds for class recovery and attorneys' fees, and because the attorneys' fees are borne by defendants and not plaintiffs, they represent a valuable part of the settlement).

Both *Swedish Hospital* and *Gascho* support the constructive common fund concept. *See Swedish Hosp.* at 1265 (viewing fund as a whole for attorneys' fees purposes) (*quoting Boeing*, 444 U.S. at 478); *Gascho*, 822 F.3d at 297 (treating settlement and all amounts paid by the defendant as a constructive common fund). This Court routinely allows constructive common fund in cases like this one. *See supra* pp. 2–3 (listing cases). Given the foregoing, the case does "not present the typical conflict of interest between class counsel and class members that underlies the application of the percentage of recovery method." *See e.g.*, *In re: Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067 at *38.

### C. The Percentage of the Fund Fee Yields a Negative Multiplier to Class Counsel's Lodestar Fees.

One method Courts use to ensure that class counsel's fees are reasonable is a lodestar "cross-check." *Rogers v. Lumina Solar, Inc.*, No. 18-cv-2128 (KBJ), 2020 U.S. Dist. LEXIS 108259, *1, *33–34 (D.D.C 2020). Although this type of cross-check is not required in this Circuit, "district courts are free to employ such a cross-check at their direction to confirm the reasonableness of an award[.]" *Id.*[9]

The District has agreed not to challenge any fee petition for fees in the amount of $1,900,000.00. Settlement Agreement [ECF No. 169-1], ¶ 72. The agreement is based on the District's review of Class Counsel Claiborne's timesheets. This amount represents about 80% of what Class Counsel Claiborne's actual fee would be using Class Counsel Claiborne's standard hourly rate of $997.00 (for year 2023) and estimating 2,300 hours total.[10] *See* Motion for Preliminary Approval [ECF No. 169] and Motion for Attorney's Fees and Costs [ECF No. 171]. Class Counsel William Claiborne alone has billed 2,149 actual hours as of the end of the

---

[9] A reasonable fee is one that is "adequate to attract competent counsel, but that does not produce windfalls to attorneys." *Blum v. Stenson*, 465 U.S. 886, 897, (1984). The Supreme Court has held that there is a strong presumption that the fee yielded by the now-ubiquitous "lodestar" method, which bases fees on the prevailing market rates in the relevant community, is reasonable. *West v. Potter*, 717 F.3d 1030, 1033-1034 (D.C. Cir. 2013).

[10] Under fee-shifting statutes, the attorney is paid the current rate (the year attorney receives the payment) rather than the rate when services were rendered, to compensate a fee applicant for delay in receiving payment for services "rendered long in the past[, which] deprives the eventual recipient of the value of the use of the money in the meantime." *West v. Potter*, 717 F.3d 1030, 1034 (D.C. Cir. 2013).

    Class Counsel William Claiborne has 29 years' experience, first being admitted to the D.C. bar in 1995. Pursuant to the Laffey Matrix as updated by Terris, Pravlik & Millian, his rate should be $1,057.00 in 2024. The rate when Class Counsel filed the Motion for Preliminary Approval [ECF No. 169] and the Motion for Attorney's fees and Costs [ECF No. 169] was $997.

    There are two competing matrices for establishing hourly lodestar rates in the District. The Laffey Matrix as updated by Terris, Pravlik & Millian and the Fitzpatrick Matrix prepared for the U.S. Attorney's Office ("USAO"). This Court tends to apply Laffey Matrix in cases. *See, e.g.*, Order approving Plaintiffs' Consent Motion for an Award of Attorneys' Fees and Expenses for Work in the Second Half of 2021 [ECF No. 667, dated 8/12/22], *DL v. District of Columbia*, 05-cv-1437-RCL, & Exhibit 9 [ECF No. 662-9], Terris, Pravlik & Millian Laffey Matrix.

mediation, and he estimated that he would have to spend an additional 200 to 250 hours papering and administering the settlement for an estimated total of 2,300 hours total. That yields a total lodestar fee of $2,293,100. The fee of $1,900,000 is only 80% of the lodestar fee. Using a lodestar cross-check of the "percentage of the fund" fee against the "lodestar" fee that shows that the "percentage of the fund" fee is about 20% less than Class Counsel's actual fee. Thus, the lodestar cross-check yields a "negative" multiple of about .8.[11] Given the additional hours Class Counsel Claiborne spent negotiating with the District subsequent to the First Fairness Hearing regarding the declaratory relief, attempting to resolve notice issues, preparing this submission, and the increase in class counsel's rate this year, and adding in Mr. Scrofano's time, the negative multiple is closer to .74. Claiborne Declaration on fees and lodestar cross-check.

In a lodestar cross-check calculating the ratio between attorney's fees and benefit to the class must include a method for setting the denominator that considers "all components that the parties found necessary for settlement." *Gascho*, 822 F.3d at 282. Attorney's fees are the numerator, and the denominator is the dollar amount of the total benefit to the class (which includes the "benefit to class members," the attorney's fees and may include costs of administration). The declaratory relief is valued at $5,000—the likely low-end of the market rate for filing a comparable sealing motion in Superior Court—and for the entire class of 1,882 the total value of the declaratory relief comes out to $9,410,000. Including the value of the declaratory relief in the total benefit to the class gives a *negative multiple between .13 and .15*!

---

[11] A negative multiplier describes a calculation using less than an attorney's standard rate to calculate the Lodestar when using the percentage-of-the-fund method. *Hoyte v. Gov. of the D.C.*, 13-569 (CRC) [ECF No. 252], ¶ 33(Court awarded class counsel 45% of the entire value of the settlement even where the terms of the proposed settlement had a cap, a reversion, and a clear sailing agreement, largely because using the lodestar cross-check yield a negative multiplier of .6).

Negative multipliers or even reduced multipliers can confirm that a fee is "reasonable," rebutting any presumption or inference that a fee is collusive or excessive. *See Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 7 (D.D.C. 2008) (fee calculated using lodestar rate which is less than fee awarded using the percentage-of-the-fund method constitutes "further evidence that request for approval of . . . fees is reasonable"); *Gascho*, 822 F.3d at 276 (negative multiple (less than one) indicated a reasonable fee where District Court used the Lodestar method to calculate the fee and a percentage of the fund calculation as a cross-check).

In *Rogers*, that the lodestar cross-check confirmed that the proposed fee award was reasonable and should be approved because "Class Counsel specifically represent that their billable time and expenses exceed the agreed-to fee award," that is, the multiplier was negative. *Rogers v. Lumina Solar, Inc.*, 2020 U.S. Dist. LEXIS 108259, *33–34; *see also Rosado v. Ebay Inc.*, 2016 U.S. Dist. LEXIS 80760, *26 (lodestar cross-check produced a negative multiplier of .54, which strongly suggests the reasonableness of the negotiated fee) (citing cases).

Neither case cited by the Court—*Reynolds* and *Sylvester*—conducted a lodestar cross-check. In *Reynolds*, the suggestions of collusion were so deep it even involved the Judge who enjoined other, more successful class actions and invited the class counsel to submit their timesheets in camera "lest the paucity of the time they had devoted to the case . . . be used as ammunition by objectors." 288 F.3d at 284. The lawyers' efforts between the filing of the complaint and the settlement negotiations were so feeble their representation of the class was inadequate, an independent reason for disapproving the settlement. *Id*. The appellate panel simply did not have enough information to make a ruling on the reasonableness of the fees. *Id.*

Neither counsel nor the Court in *Sylvester* conducted a lodestar cross-check. In *Sylvester*, the Court found that class counsel had not engaged in "sufficient" discovery, thereby failing to

fulfill the first condition for a presumption of fairness. *Sylvester*, 369 F. Supp. 2d at 47. Given

this, the court simply believed that the presumption of unfairness triggered by the clear sailing

agreement and the reversion could never be overcome based on the low reaction rate of the class

members. *Id.* at 46–47. Because the class counsel did not submit a lodestar cross-check, there

was no way for the Court to conduct an independent analysis of the proposed fee to see whether

it was reasonable under Rule 23(h)(1).[12]

     In contrast, in this case, Class Counsel complied with Rule 23(h)(1) by filing a separate

Motion for Fees and Costs [ECF No. 171] laying out the fees requested, time spent, hourly rate,

and the results of the lodestar cross-check. Counsel also posted their analysis online 30 days

before the opt out or objection deadline, and "directed [it] to class members in a reasonable

manner," so the class members could see the motion and consider it before making a decision

whether to opt-out or make an objection. Rule 23(h)(1).

     Class Counsel are not submitting fee requests for any of this administrative work

performed since filing the Motion for Preliminary Approval [ECF No. 169] on August 25, 2023.

So rather than electing the percentage-of-the-fund method to increase their lodestar fee by a

multiple of three or four, Class Counsel use the percentage-of-the-fund method because the law

requires it. *See Swedish Hosp.*, 1 F.3d at 1263. Instead of a bonus, this requires counsel to take a

haircut. Another factor distinguishing the present case from *Reynolds* and *Sylvester* is that

---

[12] *Sylvester* is further distinguishable. The court there stated that absent class members who do
not submit claims in a reversionary fund case "receive nothing in exchange for their claims being
extinguished." *Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34, 51 n. 23. Here, the proposed
settlement, in addition to money damages for claimants, gives *all* class members the benefit of
the extremely valuable declaratory relief. Second, in this Circuit, absent class members who do
not make claims still have an equitable ownership interest in their shares of the fund and they
would be unjustly enriched if the class counsel were not reasonably compensated for creating
their respective shares in the class fund. *Swedish Hosp. Corp.*, 1 F.3d at 1265; *Gascho*, 822 F.3d
at 282-283 (*quoting Boeing*, 444 U.S. at 482).

counsel in those cases had the option of electing the lodestar method to calculate their fees but chose the percentage of funds instead because it yielded such a higher result. Class Counsel did not use lodestar because under *Swedish Hosp.,* the percentage-of-the-fund method is the only option available.

### D.   There is No Rule of Proportionality for § 1983 Cases.

Another point that distinguishes the proposed settlement from the class action settlements in *Reynolds* and *Sylvester* is that there is no rule of proportionality in Section 1983 cases.[13] Congress enacted § 1988 as a fee shifting statute for § 1983 cases specifically because it found that the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process. *Rivera*, 477 U.S. at 586 (Powell, J. concurring). This was because § 1983 civil rights cases typically did not generate a large enough recovery to attract competent counsel on contingency fees. *Id.* at 576.

In *Riverside*, the Supreme Court expressly rejected the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff recovers, because of the vital nature of the private and public interests at stake in civil rights cases and the importance of statutory incentives leading aggrieved parties to bring civil rights actions. *Id.* at 574.[14] "A rule that limits attorney's fees in civil rights cases to a proportion of the

---

[13] The proposed award of attorney's fees does not exceed the plaintiffs' recovery because of the extremely valuable declaratory relief.

[14] Congress has enacted legislation limiting attorney's fees in certain common fund class action cases to the value of claims actually made rather than based on the total value of the fund created for the benefit of the class whether or not all class members make claims, for example, all coupon settlements under CAFRA, and securities class actions. The Private Securities Litigation Reform Act of 1995 explicitly makes this factor a cap for a fee award in actions to which it applies. See 15 U.S.C. §§77z–1(a)(6); 78u–4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"). But Congress has not done so in § 1983/ § 1988 fee shifting cases outside the Prison Litigation Reform Act context which is not applicable here.

damages awarded would seriously undermine Congress' purpose in enacting § 1988." There is no reason this rule should not apply in class actions as well as individual plaintiff cases. In *Gascho*, the Sixth Circuit held that the same policies underlying § 1988 in attracting competent counsel to handle § 1983 cases applied to class action cases based on statutes with fee shifting statutes as Plaintiffs' Constitutional claims do. *Gascho*, 822 F.3d 269, 282–283.

In *Reynolds* the Court suggested that any fee awarded to class counsel on remand should be proportional to the benefits they confer on the class. *Reynolds*, 288 F.3d at 286. Subsequently, in *Pearson v. NBTY, Inc.*, a consumer class actions in which Class Counsel had used a very burdensome claims process to depress claims, the Seventh Circuit established a rule that a district court should compare attorney fees to what is actually recovered by the class and presume that fees that exceed the recovery to the class are unreasonable. 772 F.3d 778, 780-81 (7th Cir. 2014). But, a few years later, the Court, faced with a meritorious petition for fees in an amount that exceeded the class's recovery, held that the presumption was not "irrebuttable," because there is nothing *per se* improper about an attorney's fee that exceeds the plaintiffs' recovery *given* the extensive time and effort that class counsel had devoted to a difficult and novel claim in a class action case against a powerful corporation. *In re Sears, Roebuck & Co. Front-Loading Washer Prod. Liab. Litig.*,867 F.3d 791, 792 (7th Cir. 2017) (presumption established in [general rule] is "not irrebuttable" and where there is a "difficult case" where counsel expended "extensive time and effort" a fee in excess to the benefit to the class may be justified).

Plaintiffs' counsel in *In re Sears* defended the fee in part on "the novelty/complexity of the legal issues involved." *Id.* Writing for the panel, Judge Posner observed that "the more novel and complex a case, the more hours will be billed and the higher the hourly billing rates will be."

*Id*. The court ruled that a reasonable fee would exceed $2.7 million which was three times the recovery for the class. *Id*. at 793.

If the Court sought to use the *In re Sears* test, the settlement here would still be reasonable. This case is an extremely novel and complex § 1983 case that has gone on for nearly 9 years. Plaintiffs, here, litigated motions to dismiss [ECF No. 23, 53], motion for class action treatment [ECF No. 26], Motion to reconsider Order on motion to dismiss [ECF No. 69], cross-motions for summary judgment [ECF No. 121, 134], and a complex motion to compel class members' conviction records [ECF No. 96]. Class Counsel also conducted complex database discovery into several District agency databases and then had experts combine the data to compile class lists and to exclude people disqualified because of criminal history. Thus far, this is the first and still *only* Second Amendment class action in the country to proceed past the motion to dismiss stage (on the theory that arresting people for engaging in the Constitutionally protected conduct of carrying a pistol in public while refusing to issue licenses violates their Second Amendment rights) let alone to settlement.

One of the rationales of the presumption of fairness is that the Court and the parties have an opportunity to understand the issues. A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104; *Randle v. SunTrust Bank, Inc.*, 2024 U.S. Dist. LEXIS 29178, *19 (D.D.C. 2024); *Cf. Freeport Partners, L.L.C. v. Allbritton*, 2006 U.S. Dist. LEXIS 9710, *27 (D.D.C. 2006) (when class action settles well before trial, the court lacks the benefit of an adversarial process to sharpen the issues, and the court must use special care in scrutinizing the fairness,

adequacy, and reasonableness of a proposed settlement). In contrast, the settlements in *Reynolds* and *Sylvester* were not entitled to a "presumption of fairness."

## III.   THE DECLARATORY RELIEF AVAILABLE TO ALL CLASS MEMBERS HAS A VALUE FAR BEYOND THE MONETARY AWARDS SOME CLASS MEMBERS WILL RECEIVE.

The Final Settlement Order will provide both objective value and collateral, subjective value to all class members regardless of whether they submit a claim. Under the terms of the settlement, all class members are entitled to receive an Order from this Court declaring their arrests "null and void" mirrored after the District's criminal record sealing statutes.

As discussed above, another factor dispelling the suggestion of collusion at the expense of absent class members is the declaratory relief. The value of the declaratory relief is quantifiable by reference to the going rate for sealing motions in the Superior Court, and it is valued at $5,000 per class member. Scrofano Decl. ¶ 25. The declaratory relief which is valued at about $5,000 per class member or about $9,410,000 for the entire class.

The declaratory relief provided to these class members is much greater than the value of expungement relief provided to class members in protestor cases, because, in those cases, the premise of the claim is that the class members did not commit any offense, and that the movant was actually innocent of the charged offense. Scrofano Decl., ¶ 19. Conversely, in this case, the premise of most of the class is that class members violated the District's firearms statutes (later found unconstitutional) by carrying a handgun in public without a license because the District would not provide licenses.

The District's "sealing" or "expungement" statutes provide different levels of expungement based on the degree of culpability of the movant. The declaratory relief provides the same level of expungement as the District's "actual innocence" statute, which is only available to arrestees who can prove that they were "actually innocent" of the offense for which

they were arrested. Scrofano Decl., ¶ 22–23. The declaratory relief provided to class members provides the same level of expungement as the "actual innocence" statute. *Id.* at 22.

The relief here is the gold standard of expungement, available only to people who can establish "actual innocence" as a factual matter. Virtually none of the class members can do that because they committed the offense of carrying a pistol without a license or possessing ammunition or a pistol without a registration certificate. Even an acquittal by a jury—as Named Plaintiff Mr. Carl Atkinson obtained, does not establish "actual innocence" as a factual matter under the statute. D.C. Code § 16-802(f) ("An acquittal does not establish a presumption that the movant is innocent or entitled to relief pursuant to this section); *Ruffin v. United States*, 135 A.3d 799 (D.C. 2016) (acquittal does not satisfy the "clear and convincing" standard for motions filed four years or more after offense).

An example where injunctive relief provided real benefit to the class is found in *Littlejohn v. Copland*, 819 Fed. Appx. 491 (9th Cir. 2020). In *Littlejohn*, the Court of Appeals affirmed approval of a consumer class action settlement for injunctive relief where plaintiff alleged that a representation that SweetTARTS candy contained "no artificial flavors" was false and misleading because the candy contained an artificial flavor called "dlmalic" acid. *Id.* at 492. The injunctive relief required the defendant "to remove the phrase 'no artificial flavors' from SweetTARTS packages and to identify dl malic acid as an ingredient." *Id.* The court found the settlement adequate because "modification of SweetTARTS packaging and advertising adequately addresses the very claims raised in Plaintiff's Complaint, providing value to the Class." *Id.* at 493.

Similarly, in *Farrell v. Bank of Am. Corp., N.A.*, the Ninth Circuit found that the equitable relief deserved to be included in the value of the settlement. The Ninth Circuit wrote

that, "[w]hile it can be difficult to value nonmonetary relief, we have no trouble finding that the value here exceeds the $29.1 million assigned to it by the parties because the value of debt relief and defendant's agreement to refrain from assessing the fees challenged in the lawsuit could be quantified by their value to the defendants." 827 Fed. App'x. 628, 631 (9th Cir. 2020).

In contrast, the injunctive relief was found worthless in *Reynolds*. In *Reynolds* the crux of the class claim was H & R Block's non-disclosure of its interest in Beneficial's refund anticipation loans. *Reynolds*, 288 F.3d at 283. However, the injunctive relief did not include a requirement that H & R Block disclose its interest in Beneficial's refund anticipation loans. *Id.*

In this case, the "legal nullity" declaration restoring class members to the legal positions they enjoyed before their arrests "addresses the very claims raised in Plaintiffs' Amended Complaint and provides value to the Class," *Littlejohn*, 819 Fed. App'x. at 493, and so should be included in the value of the settlement. Therefore, the "constructive" fund should include the value of the declaratory relief as part of the value of the common fund for purposes of applying the percentage method of determining fees because (a) directly benefits the class; (b) is quantifiable; and (c) provides more relief to class members than they would get if they filed and prevailed on motions to seal records in Superior Court. *Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1056 (9th Cir. 2019); *Ceccone*, 2016 U.S. Dist. LEXIS 127942, *29; Scrofano Decl., ¶ 25.

The lodestar cross-check Class Counsel performed in the Motion for Preliminary Approval or in the Motion for Attorney's Fees and Costs and above did not include the value of the declaratory relief in valuing the proposed settlement even though the declaratory relief: (a) directly benefits the class; (b) is quantifiable; and (c) provides more relief to class members than they would get if they filed and prevailed on motions to seal records in Superior Court. Class Counsel are not seeking an increase in their fees; they simply ask the Court to include the value

of the declaratory relief in the evaluation of the "fairness" of the proposed settlement and the "reasonableness" of the fee.

Moreover, the collateral relief to class members from the "nullification" declaration— such as restoring their Second Amendment rights for persons convicted of firearms offenses for persons ineligible for registration certificates or CPLs because of firearms offense convictions— is extremely valuable, even though it cannot be quantified.

In sum, the value of the declaratory relief for each class member is $5,000, and $9,410,000 for the class. The total value of the constructive common fund including the total value of the fund allocated for absent class members and the total value of the declaratory relief for all class members, is $14,510,000. Even if the Court valued the SCM Fund at one-half, as the District Court in *Gascho* did, the value of the SCM Fund would still come out to $1,252,095.06. The total value of the constructive common fund would be $3,847,904.94 ($5,100,000 minus $1,252,095.06). Adding in the total value of the declaratory relief would bring the total back up to $13,257,904.90. Either one of these amounts will support a fee of $1,900,000 using the percentage of the fund method.

## IV.   THE LOW REACTION RATE IS NOT UNUSUAL AND COUNSEL IS TAKING STEPS TO INCREASE THE RATE.

The low reaction rate in this case is not due to a sham notice plan or a burdensome claims process. *See* Plaintiffs' Submission on Notice Plan. [ECF No. 178-1]. It is a simple fact that the reaction rate is seldom more than 10% or 20% in § 1983 cases outside of the protestor context. Nevertheless, Counsel are taking steps to increase the reaction rate. [15] After the first mailing

---

[15] Class Counsel still expected the reaction rate to be higher based on the passion gun owners generally feel for their Second Amendment rights, and Class Counsel hoped to increase the reaction rate by enlisting the assistance of PDS and SCTLA, the District of Columbia Superior Court Trial Lawyers Association, which together account for most lawyers who practice criminal

JND, the Claims Administrator, had 713 "undeliverable" notices, that is, notices that the Postal Service could not deliver or forward or provide another address for. Plaintiffs' Submission on Notice [ECF No. 178-1], p. 7. Using the National Change of Address Database and other resources JND found an additional 290 addresses and delivered notice to 265 class members in that group. JND mailed 1,717 reminder notices to potential class members March 18, 2024. Also, as a result of the Social Security number reverse-lookups, JND identified 41 new addresses from the undeliverable population and will mail those individuals the full notice packet today.

The process is working; the total number of claims approved as of the February 8, 2024, report was 147, as of the February 22, 2024, report was 152, and the total number of claims approved as of the March 7, 2024, report was 156.[16] Counsel expects the response rate to continue increasing because the reminder notice with information of the extended deadline has only recently been mailed to the class.

Plaintiffs Submission on Notice [ECF No. 178] in this case demonstrates that the Notice plan is intended to reach as many class members as practicable. The Court already granted the Parties motion to extend the claims period by 90 days, until May 10, 2024. [ECF No. 179]. The Parties will move to extend this deadline by an additional nine months—to February 10, 2025— contingent on the Court approving the proposed settlement. Plaintiffs expect the reaction rate to increase from the current 9% to as high as 15% or 20% if the claims period were left open for an additional nine months. If the proposed settlement is approved and the class period is extended an additional nine months, the Parties will file a motion proposing making an initial distribution

_____

defense in the Superior Court. The reaction rate in *Hoyte* for the "vehicle" class (about 22%) exhausted the class fund so there turned out to be no reversion to the District.

[16] These numbers may include some duplicate claims.

of damages to class members who have submitted claims after administration, and then maintaining a reserve to pay later claims on a rolling basis.

The reaction rate in other § 1983 cases based on unconstitutional statutes Plaintiffs have found, some based on class counsel's personal knowledge, include: *Hoyte v. Gov. of the D.C.*, 13-569 (CRC) (about 22%); *Hardy v. District of Columbia*, 49 F. Supp. 3d 48, 50 (D.D.C. 2016) (14.1%); *Alexander v. Government of the District of Columbia*, 17-1885 (ABJ)(12%). Class Counsel William Claiborne was the class counsel on both *Hoyte* and *Alexander*.

Many Courts and commentators balance the low reaction rates with the societal benefits of class actions which vindicate important Constitutional and societal values even if they do not generate large enough recoveries to pay attorney's fees out of the number of claims made by the class. *See e.g.*, *Riverside*, 477 U.S. 561 at 576 (discussing single plaintiff case); *Gascho*, 822 F.3d at 287, n 6, n.7; *Pete*, 517 F.2d at 1290 (societal factors besides the amount of class recovery such as vindicating important rights must be considered in fixing fees for attorneys in class actions).

The claims process is not burdensome or designed to deter claims because it consists in only what is needed to "winnow out" uninjured class members. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (lack of "winnowing mechanism" to exclude uninjured class members destroys predominance); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2023).[17] To file a claim, a class

---

[17] The amended class definition excludes from the putative class definition: 1) persons who were convicted of a felony before their arrests or prosecutions; 2) persons who were convicted of a domestic violence misdemeanor within the five-year period before their arrests or prosecutions; 3) persons who were subject to a judicial order compelling them to relinquish any firearms in their possession or barring them from possessing any firearms at the time of their arrests or prosecutions; and 4) persons who were convicted of at least one felony or violent misdemeanor

member have to mail in a claim form or submit a claim online using a number provided in the notice or available from the Claims Administrator. The claim form required basic information (name, address, phone number, and email address), that the claimant check boxes indicating subclass membership if applicable and that they have no disqualifying circumstances or convictions. Putative class members *do not* have to obtain and present a copy of their criminal history. After going through these steps, claimants simply to sign a statement on the form asserting "under penalty of perjury" that the information entered was true. *See Gascho*, 822 F.3d at 287 (describing needlessly burdensome claims process where claimant had to present a receipt and a UPC code as proof of purchase of diapers purchased up to eight years before the settlement); *Cf. Pearson v. NBTY, Inc.*, 772 F.3d at 783 (finding that sworn statement would be sufficient documentation, without requiring receipts or other business records likely to have been discarded, which made the claims process bound to discourage filings).

The Third Circuit correctly noted that devaluing the available relief if it goes unclaimed could in many cases unduly penalize class counsel and have the lasting effect of discouraging the filing of class actions in cases where few claims are likely to be made but the deterrent effect of such a suit would be socially desirable. *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 179 (3d Cir. 2013). The latter policy concern reflects one of the purposes of consumer class actions—the need to ensure that mistreatment of consumers will not be insulated because the damage suffered by an individual consumer is too small to justify the expense and time required to challenge the practice—both for the individual harmed and the attorney who represents that consumer. *Gascho*, LLC, 822 F.3d at 284.

---

charge arising out of the arrest. This exclusion does not apply to convictions solely for firearms charges under (i)–(v) above. Order [ECF No. 180].

Newberg on Class Actions also makes the case that awarding Class Counsel a percentage of the entire common fund serves the deterrent rationale of class actions.

> This example demonstrates that limiting counsel to a percentage of the class's actual recovery in a claims-made or reversionary fund situation is likely to disgorge significantly less money overall, providing defendants with what might be characterized as a windfall. All things being equal, it seems more defensible that class attorneys, rather than defendants, receive the excess, as they will likely reinvest it in future class action cases.

5 Newberg on Class Actions § 15:70 (Applying the percentage method—Value of fund—Valuing reversionary and claims-made funds) (5th ed.).

## V.   IT IS IN THE BEST INTEREST OF CLASS MEMBERS FOR THE DISTRIBUTION TO BE PRO RATA WITH A MAXIMUM CAP RATHER THAN A PRO RATA WITH NO MAXIMUM, AND FOR THERE TO BE A REVERSION OF UNCLAIMED FUNDS TO THE DISTRICT OF COLUMBIA.

The proposed settlement, with all its warts, is in the best interests of the class because it offers significant monetary and declaratory relief now. The total value of the constructive common fund including the total value of the fund allocated for absent class members coupled with the total value of the declaratory relief for all class members, is $14,510,000 (SCM Fund of $2,504,190.11 for payment of claims to class members, Settlement Agreement [ECF No. 169-1], ¶ 40(e), and $9,410,000 for the value of the declaratory relief for the class). Caps on individual recoveries, reversions, and "clear sailing agreements" are standard in Section 1983 class action settlements with the District and are the price of settlement. *Supra*. As discussed above, Class Counsel does not believe that continued litigation would significantly improve the terms of the settlement. Even after the costs, delays, and risks of further litigation, class members might wind up with a worse result. Rule 23(e)(2)I.

As Newberg and Conte point out in their discussion of the subfactors of Rule 23(e)(2)(C)(i), even if the class obtains a higher dollar amount after trial, the higher dollar amount may be offset by increased costs and the expense of delay caused by trial and likely

appeals of the certification decision and any verdict. § 13:48. Final approval criteria—Rule 23(e)'s multifactor test (adequacy of relief for the class), 4 Newberg and Conte.

Class Counsel fought for higher caps. Class Counsel would certainly agree if the District agreed to increase the caps or reduce or eliminate the reversion. The amount of the cap is a bargained-for term. The District was simply unwilling to settle without a cap.

Another reason the proposed settlement is in the best interests of the class is that the absent class members who have submitted claims have unanimously "voted" in favor of the proposed settlement including the terms of the settlement and the fee petition without objection, and none opted-out. The D.C. Circuit and Judges in this Court generally consider that the "attitude of the members of the class, as expressed directly or by failure to object, after notice, to the settlement, is a proper consideration for the trial court." *Rogers*, 2020 U.S. Dist. LEXIS 108259 at *28. The lack of timely objections or exclusion requests or opposition to the settlement from class members "unambiguously weighs in favor of approval." *Id. at* *24

The D.C. Circuit has given great weight to the positive response of class members who do not object or opt out and has refused to brush of the significance of their "votes" of support, even though the D.C. Circuit is aware that some other Courts accord less weight to lack of objectors in complex cases.[18] In *Cobell*, the Court denied an argument that the distribution scheme was unfair to some class members because the existence of the opt-out alternative effectively negated any inference that those who remained in the settlement class rather than opting out considered the settlement unfair. *Cobell v. Salazar*, 679 F.3d at 920. The D.C. Circuit refused to disturb the District Court's finding that the "extensive and extraordinary notice"

---

[18] *Cobell v. Salazar*, 679 F.3d 909, 923 (*acknowledging In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) and *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1137 (7th Cir. 1979).

procedures ensured class members who submitted claims "knew about th[e] settlement and understood what they were getting into and approved it." *Id.* The D.C. Circuit in *Swedish Hospital* reasoned that even if no significance could be found in the class members' failure to object to the proposed fee arrangement, that said nothing about the weight that should be given to class members who did respond. *Swedish Hosp.*, 1 F.3d at 1271.

Class Counsel have gone to extraordinary lengths to locate addresses and send notice and the District has assisted by agreeing to extensions to the claims period deadline. The amount of damages, $1,200 for any arrest and prosecution, and an order declaring their arrests a legal nullity, are not so inconsequential as to make submitting a claim form more trouble than its worth. In this case, close to 10% of the class members did respond and none of the class members who submitted claims objected to any term in the settlement and no one opted out. It is unfair to the class members who did submit claims to brush off their claims because other class members did not make claims. *Swedish Hosp.*, 1 F.3d at 1271.

Given that the reaction rate in this type of class is systemically low it makes sense to accord significant weight to the class members who did respond. To date, the only complaint that the class members have voiced to Class Counsel is frustration at the delay.

At the end of the day, this proposed settlement, in Class Counsel's opinion, is "fair, reasonable, and adequate" and the relief for the class is adequate. Rule 23(e). Plaintiffs do not believe that further litigation discounted by risk and delay would materially improve the terms of the settlement.

## VI.    THE AWARDS TO CLASS REPRESENTATIVES ARE REASONABLE.

The $50,000 incentive payments to the Class Representatives are high but fair, given the services provided by the Class Representatives, the public exposure of their arrests on gun

charges each had to endure. The amounts of the proposed incentive payments are within the range awarded by Courts in this District in similar cases. *See, e.g., Kifafi v. Hilton Hotels Ret. Plan*, 999 F. Supp. 2d 88, 105 (D.D.C. 2013) (awarding named plaintiff $50,000 as an incentive award); *Advocate Health Care v. Mylan Labs. Inc. (In re Lorazepam & Clorazepate Antitrust Litig.)*, 2003 U.S. Dist. LEXIS 12344, *34 (D.D.C. 2003) (awarding $20,000 to each plaintiff in an antitrust case); *Cobell v. Jewell*, 802 F.3d 12, 18 (D.C. Cir. 2015) (noting District Court had granted four of the Class Representatives a total of $2.5 million in incentive awards when damages awards to class members were under $3,000); *Wells*, 557 F. Supp. 2d at 9 (awarding $10,000 to each of two class representative).

The amount of $50,000 is commensurate with the most recent recoveries by individuals who have actively brought and advanced claims as individuals for the same or similar injuries in connection with the September 27, 2002 IMF/World Bank mass arrests. In *Barham v. District of Columbia*, 02-2283 (EGH) each of 17 Class Representatives received $50,000 each Document 629-7 (Settlement Agreement). In *Becker v. District of Columbia*, 01-811 (PLF/ JMF) the amounts were the same—$50,000 each. Motion for Final Approval. [ECF No. 649].

This has been lengthy and hard-fought litigation, and the class representatives have engaged in extensive and repeated discovery and have been available and have actively participated in the progress of this lengthy litigation and negotiations. Class Representatives Ms. and Messrs. Maggie Smith, Gerard Cassagnol, Frederick Rouse, and Mr. Delontay Davis have served from the beginning,  and each was deposed. Ms. Kimberly Buffaloe and Mr. Carl Atkinson (both District residents) were added to rebut the District's defense that the class was limited to non-District residents only. They participated in all discovery except depositions. The basis for incentive payments is the services Class Representatives provide to the class, such as

monitoring class counsel, responding to interrogatories and document production requests, being deposed by opposing counsel, keeping informed of the progress of the litigation, and serving as a client for purposes of approving any proposed settlement with the defendant. 5 Newberg on Class Actions § 17:3 (Rationale for incentive awards); *see also Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 8-9 (D.D.C. 2008) ("In deciding whether to grant incentive awards and the amounts of such awards, courts consider factors such as the actions the plaintiff[s] [have] taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff[s] expended in pursuing the litigation.") (internal quotations omitted).

In the absence of such commensurate recovery, there would be a severe disincentive for persons to serve as class representatives, a role which entails the same or greater activity as an individual plaintiff along with the additional fiduciary responsibilities and obligations in service to the class as a whole. Class counsel represents that the class representatives have each served as stalwart advocates on behalf of the class as a whole and have been essential to securing the exceptional results for the benefit of the class overall.

## CONCLUSION

Class Counsel have litigated this case for nine years and agreed to a fair settlement with the District. As explained herein, that settlement meets all the criteria of Rule 23(e) and is otherwise fair, reasonable, adequate, and in the best interest of the Class. Therefore, Plaintiffs ask the Court to approve the settlement without delay.

Respectfully submitted,

/s/ William Claiborne
WILLIAM CLAIBORNE
D.C. Bar # 446579
717 D Street, N.W. Suite # 300

Washington, DC 20004
Phone 202/824-0700
Email claibornelaw@gmail.com

Counsel for Plaintiffs and the Settlement Class


/s/ Joseph Scrofano
Scrofano Law PC
DC Bar No: 994083
600 F Street NW
Suite 300
Washington, DC 20004
Ph: 202-870-0889
jas@scrofanolaw.com

Co-Counsel for Plaintiffs and Settlement Class